*18*

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

APR 0 9 2001

Michael N. Milby
Clerk of Court

| | | |
|---|---|---|
| INTERNATIONAL SHIPBREAKING LIMITED, L.L.C. | § § § § | |
| V. | § § | C.A. NO. B-01-048 (ADMIRALTY) |
| SMITH L.C. & SMITH MARITIME, *In Personam*, and the TUG ELSBETH II, her engines, tackle, and gear, etc., *In Rem* | § § § § | |

## ORIGINAL ANSWER AND COUNTERCLAIM OF SMITH MARITIME WITH DEMAND FOR COUNTER SECURITY

Smith Maritime, for its Original Answer and Counterclaim to the Complaint brought by International Shipbreaking Limited, L.L.C. ("ISL") and for its Demand for Counter Security, respectfully states as follows:

### I.
### FIRST DEFENSE

ISL's Complaint fails to state a cause of action against Smith Maritime upon which relief can be granted.

### II.
### SECOND DEFENSE

Smith Maritime answers the specific allegations in the Complaint as follows:

1.    Smith Maritime is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph I.

2.    Smith Maritime is without knowledge or information sufficient to form a belief as to the truth of allegations in Paragraph II.

3.    Smith Maritime admits that it contracted with ISL for the towage of two "fast frigates" from Pearl Harbor, Hawaii to Brownsville, Texas via the Panama Canal but denies or is

19,645/1PDCP4121.JWR-Original Answer & CC.doc

without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph III.

4.    Smith Maritime denies the allegations in Paragraph IV.

5.    Smith Maritime admits that the Tug ELSBETH II is or was in the navigable waters of the District; that it has conducted business in the District; that, at the time this Answer and Counterclaim was being prepared, Capt. Latham Smith was aboard the Tug ELSBETH II; and that, at the time this Answer and Counterclaim was being prepared, the Tug ELSBETH II was in the navigable waters of the District.  Smith Maritime denies or is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph V.

6.    Smith Maritime denies the allegations in Paragraph VI.

7.    Smith Maritime admits that ISL requested the arrest and *in rem* seizure of the Tug ELSBETH II pursuant to Rule C of the Supplemental Rules for Certain Admiralty and Maritime Claims.

8.    Smith Maritime denies the allegations in Paragraph VIII.

## III.
## THIRD DEFENSE

Defendant further answers that this claim may be subject to dismissal and/or transfer to another forum as being brought contrary to a forum selection clause set forth in the applicable contract(s).

## IV.
## FOURTH DEFENSE

Defendant further answers that this claim may be subject to arbitration under the applicable contract(s) and that Plaintiff's claim may therefore be subject to dismissal and/or stay pending arbitration.

## V.
## FIFTH DEFENSE

For further answer, if any be necessary, Smith Maritime asserts that if any damage occurred to ISL, which is strictly denied, such damage was caused by a party or third parties for whom Smith Maritime is not legally responsible. Smith Maritime further asserts that it is entitled to contribution/indemnity for any damages actually caused by those parties.

## VI.
## SIXTH DEFENSE

For further answer, if any be necessary, Smith Maritime asserts that if any damage occurred to ISL, which is strictly denied, such damage was caused by the contributory negligence of ISL.

## VII.
## SEVENTH DEFENSE

For further answer, if any be necessary, Smith Maritime invokes all of the rights and immunities granted to it under any applicable contract(s) or other applicable law, including, but not limited to, the general maritime law of the United States.

## VIII.
## COUNTERCLAIM AND DEMAND FOR COUNTER SECURITY

Smith Maritime's counterclaim is for breach of contract and for unseaworthiness of the tow. When ISL contracted with Smith Maritime for the towage from Pearl Harbor, Hawaii to Brownsville, Texas, ISL agreed to make a lump sum payment to Smith Maritime for Six Hundred and Forty Eight Thousand Dollars ($648,000.00), payable in six installments. A true and correct copy of the "TOWCON" International Ocean Towage Agreement entered into by ISL and Smith Maritime (the "Contract") is attached hereto as **"Exhibit A"** and incorporated by reference for all purposes. In addition to the lump sum payment installments, ISL agreed to pay other costs reasonably incurred by Smith Maritime during the hire of the Tug ELSBETH II, including

demurrage and equipment costs. Nevertheless, throughout the course of its dealings under the contract, Smith Maritime has been subjected to innumerable delays, excuses, and outright breaches of contractual obligations by ISL.

Smith Maritime also asserts a claim against ISL for unseaworthiness of the tow. Not only did ISL warrant the seaworthiness of the tow in the contract but, as a matter of law, a tow warrants that it is seaworthy and that it is sufficiently staunch to withstand the pressures that ordinarily accompany the intended voyage. *See, e.g.*, King Fisher v. NP Sunbonnet, 724 F.2d 1181 (5th Cir. 1984). In addition to these warranties, the owner of the tow has an affirmative duty to advise the tug of any conditions which may affect the safety of the towing movement. Cargill, Inc. v. C & P Towing Co., Inc., 1991 AMC 101 (E.D. Va. 1990). Given that ISL has brought suit in negligence against Smith Maritime for the loss of the tow, presumably it has undertaken the burdens of ownership of the tow as well. Nevertheless, at no time did ISL advise Smith Maritime of any condition that would affect the safety of the towing movement. When a tow sinks under normal towing conditions with no ascertainable cause, the vessel's sinking is presumed to be a direct result of her unseaworthiness. Consolidated Grain & Barge Co. v. Mareoria Conveyor Corp., 716 F.2d 1077, 1081 (5th Cir. 1983). In this case, the Ex-USS STODDERT took on water inexplicably. Within only a few short hours after a starboard list was noticed, her entire stern was underwater. After cutting her free from the Tug ELSBETH II, the Ex-USS STODDERT took on more water and eventually sank. As a result of the Ex-USS STODDERT's unseaworthiness, Smith Maritime incurred substantial losses, including, but not limited to, one of its tow lines and all of the fuel it had stored on the Ex-USS STODDERT.

As a direct result of the various breaches of the contract by ISL and the unseaworthiness of the Ex-USS STODDERT, Smith Maritime has incurred damages exceeding Three Hundred Thousand Dollars ($300,000.00).

Smith Maritime has given security for ISL's claim against it in the form of a surety bond in the amount of One Million Dollars ($1,000,000.00) filed with this Court. Because Smith Maritime is asserting a counterclaim arising out of the same transaction and occurrence that is the basis of the original action, pursuant to Rule E(7)(a) of the Supplemental Rules for Certain Admiralty and Maritime Claims, Smith Maritime demands that ISL give security in the form of a surety bond in the amount of Four Hundred Thousand Dollars ($400,000.00) for this counterclaim. Pursuant to Rule E(7)(a) of the Supplemental Rules for Certain Admiralty and Maritime Claims, proceedings on the original claim must be stayed until this security is given unless the Court directs otherwise.

WHEREFORE, PREMISES CONSIDERED Smith Maritime prays that ISL's Complaint be dismissed as to it, or in the alternative that upon final hearing hereof, judgment be entered that ISL take nothing by its suit and that Smith Maritime be awarded its costs incurred in its defense. Further, Smith Maritime prays that this Honorable Court adjudge and decree that ISL is liable in all respects for the counterclaim and for the counter security demanded herein, including attorneys' fees, interest, and costs, and for all other and further relief, both in law and in equity, as this Honorable Court may deem just.

Respectfully submitted,

Jeffrey R. Bale
State Bar No. 01629800
S.D. Tex. Adm. I.D. No. #3324
Justin W. R. Renshaw
State Bar No. 24013392
S.D. Tex. Adm. I.D. No. 25865
Niels Esperson Building, 20th Floor
808 Travis Street
Houston, Texas 77002
Telephone:      (713) 225-0905
Facsimile:      (713) 225-2907
*Attorneys in Charge for Claimant/Defendant,*
*Smith Maritime*

OF COUNSEL:

EASTHAM, WATSON, DALE, & FORNEY, L.L.P.

## CERTIFICATE OF SERVICE

I, the undersigned, do hereby certify that I forwarded a true and correct copy of the foregoing to all counsel of record on this the 5th day of April 2001.

**Via CM/RRR #7000 1670 0006 1835 2675**
James H. Hunter, Jr.
Ewing E. Sikes, III
ROYSTON, RAYZOR, VICKERY & WILLIAMS, L.L.P.
P.O. Box 3509
Brownsville, TX  77523-3509

Justin W. R. Renshaw

"TOWCON" INTERNATIONAL OCEAN TOWAGE AGREEMENT (LUMP SUM)                                    PART I

| | |
|---|---|
| 22. Nature of service(s) (Cl. 1) | 25. Contemplated route (Cl. 7) |
| Towage of(2) "fast frigates" 430'x 42'x20' from Pearl Harbor to Brownsville, TX | Great Circle route to Hawaii; return via southerly route for optimization of favorable currents |
| 23. Place of departure (Cl. 1) | 24. Place of destination (Cl. 8) |
| Jacksonville /Pearl Harbor | Brownsville, TX |
| 26. Free time at place of departure (Cl. 2(g)) | 27. Free time at place of destination (Cl. 2(g)) |
| Panama Canal 5 days -return Pearl Harbor 4 days | |
| 28. Notices (Place of departure) (Cl. 7(e)) | 29. Delay payment (Cl. 2(b)) $4,500/day |
| (a) Initial departure period (months) | (a) Port rate $4,500/day 4500 |
| | (b) Sea rate $8,000/day 8000 Sea |
| (b) Final departure notice (days notice/days prior) | 30. Riding crew to be provided by (who state number to be provided) (Cl. 9) N/A |
| (c) Final departure period and notice (days notice/days prior) | |
| (d) Port departure time and date notice (days/hours) | |
| (e) Notices to be given to | 31. Riding crew provided by Tugowner state amount per man per day payable by Hirer (Cl. 9) |
| Mutual convenience | N/A |
| 32. Lump sum towage price (state when state it becomes payable and payable)(Cl. 2) | 33. Payment of lump sum & other amounts (state currency, mode of payment, place of payment and bank account) (Cl. 2) |
| (a) Lump sum towage price $648,000  648,000 | Independent Bankers Bank |
| (b) amount due and payable on signing agreement $ 35,000 | Orlando, FL  ABA#063111596 |
| (c) amount due and payable on (state time) and prior to departure (state place) depart JAX  $50 per Panama- 175000 | Further credit to: Putnam State Bank ABA#063113219 |
| (d) amount due and payable on arrival of tug at (state place) departure Pearl - $200,000 | Final credit to: SMITH MARITIME Acct.#0110726 |
| Panama- $130,000; bal on arrival | |
| 34. Interest rate (%) per annum on late state number of days after any sum (a) due (Cl. 2) | 35. Security (state sum, by whom to be provided and when provided, only to be filed if expressly agreed) (Cl. 5) |
| 36. Current of tug's bunker oil (also state type of bunkers) (Cl. 3(b)) | 37. Cancelling date, if any agreed (Cl. 7(a/c)) |
| #2 gas/oil capped @ $1.19; differential to be paid/credited | 25 Nov. 00 |
| 38. Cancellation fee (Cl. 15) | 39. Number of additional clauses, covering special provisions, if agreed |
| $35,000 | Amend clause 25 to read: "U.S. Maritime Law" & "U.S.District Court State of Florida" |

*It is mutually agreed between the party mentioned in Box 1 (hereinafter called the Tugowner) and the party mentioned in Box 1 (hereinafter called the Hirer) that the Tugowner shall, subject to the terms and conditions of this Agreement which consists of PART I (including additional clauses, if any agreed and stated in Box 39, and PART II, use his best endeavours to perform the towage and/or other services as set out herein. In the event of a conflict of terms and conditions, the provisions of PART I shall prevail over those of PART II to the extent of such conflict but no further.*

| Signature (Tugowner) | Signature (Hirer) |
|---|---|
| | CO CHIEF OPERATING OFFICER SMITH MARITIME INTERNATIONAL |

Printed by The BIMCO Charter Party Editor

**EXHIBIT A**

| 1. Date and place of Agreement | RECOMMENDED<br>INTERNATIONAL OCEAN TOWAGE AGREEMENT (LUMP SUM)<br>CODE NAME: "TOWCON"   PART I |
|---|---|

| 2. Tugowner/place of business<br><br>SMITH MARITIME<br>967 Bulkhead Road<br>Green Cove Springs, FL  32043<br><br>904-284-0503 ph<br>904 284-0508 fax | 3. Hirer/place of business |
|---|---|

| 4. Tow (name and type) | 5. Gross tonnage/displacement tonnage |
|---|---|

| 6. Maximum length/minimum breadth & towing draught (fore and aft) | 7. Flag and place of registry |
|---|---|

| 8. Registered owners | 9. Classification society |
|---|---|

| 10. P. & I. liability insurers | 11. General condition of tow |
|---|---|

| 12. Particulars of cargo and/or ballast and/or other property on board the tow |
|---|

| 13. Tug  (name and type)<br><br>ELSBETH II, 6000HP Ocean Tug | 14. Flag and place of registry<br><br>U.S./ Palatka, FL |
|---|---|

| 15. Gross tonnage<br><br>139 GRT | 16. Classification society<br><br>ABS |
|---|---|

| 17. P. & I. liability insurers<br><br>· Seaport Worldwide Associates (see attached) |
|---|

| 18. Certificated bollard pull (if any)<br><br>72 T | 19. Indicated horse power<br><br>6000 HP |
|---|---|

| 20. Estimated daily average bunker oil consumption in good weather and smooth water<br>3200 gal/day |
|---|
| (a) at full towing power with tow<br>3900 gal/day U.S. |
| (b) at full sea speed without tow<br>2000 gal @ 8kts; 2200 gal @ 9 kts; 2700 gal @ 10 kts |

| 21. Winches and main towing gear<br><br>double drum; 2 wires @ 2 1/4"; 2000' nylon towing spring<br>emergency towlines & chain bridles sufficient for tandem<br>tows; 1800' spare tow wire |
|---|

(continued)

International Salvage Union (ISU)<br>European Tugowners Association (ETA)<br>The Baltic and International Maritime Council (BIMCO)<br><br>Copyright, published by<br>The Baltic and International Maritime Council (BIMCO)

Printed by The BIMCO Charter Party Editor

CUtePDF – www.texiss.com

**PART II**
**"Towcon" International Ocean Towage Agreement (Lump Sum)**

**The Tow**
'The Tow' shall include any vessel, craft or object of whatsoever nature including anything carried thereon as described in PART I to which the Tugowner agrees to render the service(s) as set out in Box 22.

**Price and Conditions of Payment**
(a) The Hirer shall pay the Tugowner the sum set in Box 32 (hereinafter called 'the Lump Sum').

(b) The Lump Sum shall be payable as set out in Boxes 32 and 33.

(c) The Lump Sum and all other sums payable to the Tugowner under this Agreement shall be payable without any discount, deduction, set-off, lien, claim or counter-claim, each instalment of the Lump Sum shall be fully and irrevocably earned at the moment it is due as set out in Box 32, Tug and/or Tow lost or not lost, and all other sums shall be fully and irrevocably earned on a daily basis.

(d) All payments by the Hirer shall be made in the currency and to the bank account specified in Box 33.

(e) In the event that the average price per metric tonne of bunkers actually paid by the Tugowner differs from the amounts specified in Box 38 then the Hirer or the Tugowner, as the case may be, shall pay to the other the difference per metric tonne for every metric tonne consumed during the voyage. The average price specified above shall be the average of the prices per metric tonne actually paid by the Tugowner on the basis of quantities purchased at the last bunkering port prior to the voyage, any bunkering port during the voyage, and the first bunkering port after completion of the voyage. The log book of the Tug shall be prima facie evidence of the quantity of bunkers consumed.

(f) Any Delay Payment due under this Agreement shall be paid to the Tugowner as and when earned on presentation of the invoice.

(g) The Free Time specified in Boxes 26 and 27 shall be allowed for the connecting and disconnecting of the Tow and all other purposes relating thereto. Free Time shall commence when the Tug arrives at the pilot station at the place of departure or the Tug and Tow arrives at the pilot station at the place of destination or anchors or arrives at the usual waiting area off such places. Should the Free Time be exceeded, Delay Payment(s) at the rate specified in Box 29 shall be payable until the Tug and Tow sail from the place of departure or the Tug is free to leave the place of destination.

**3. Additional Charges and Extra Costs**
(a) The Hirer shall appoint his agents at the place of departure and place of destination and ports of call or refuge and shall provide such agents with adequate funds as required.

(b) The Hirer shall bear and pay as and when they fall due:-
   (i) All port expenses, pilotage charges, harbour and canal dues and all other expenses of a similar nature levied upon or payable in respect of both the Tug and the Tow.
   (ii) All taxes, (other than those normally payable by the Tugowner in the country where he has his principal place of business and in the country where the Tug is registered) stamp duties or other levies payable in respect of or in connection with this Agreement or the payments of the Lump Sum or other sums payable under this Agreement or the services to be performed under or in pursuance of this Agreement, any Customs or Excise duties and any costs, dues or expenses payable in respect of any necessary permits or licences.
   (iii) The cost of the services of any assisting tugs when deemed necessary by the Tugmaster or prescribed by Port or other Authorities.
   (iv) All costs and expenses necessary for the preparation of the Tow for towing (including such costs or expenses as those of raising the anchor of the Tow or lending or casting off any moorings of the Tow).
   (v) The cost of insurance of the Tow shall be the sole responsibility of the Hirer to provide.
(c) All taxes, charges, costs, and expenses payable by the Hirer shall be paid by the Hirer direct to those entitled to them. If, however, any such tax, charge, cost or expense is in fact paid by or on behalf of the Tugowner (notwithstanding that the Tugowner shall under no circumstances be under any obligation to make such payments on behalf of the Hirer) the Hirer shall reimburse the Tugowner on the basis of the actual cost to the Tugowner upon presentation of invoice.

**4. War Risk Escalation Clause**
The Lump Sum is based and assessed on all war risk insurance costs applicable to the Tugowner in respect of the contemplated voyage in effect on the date of this Agreement.
In the event of any subsequent increase or decrease in the actual costs due to the Tugowner fulfilling his obligations under this Agreement, the Hirer or the Tugowner, as the case may be, shall reimburse to the other the amount of any increase or decrease in the war risk, confiscation, deprivation or trapping insurance costs.

**5. Interest**
If any amounts due under this Agreement are not paid when due, then interest shall accrue and shall be paid in accordance with the provisions of Box 34, on all such amounts until payment is received by the Tugowner.

**6. Security**
The Hirer undertakes to provide, if required by the Tugowner, security to the satisfaction of the Tugowner in the form and in the sum, at the place and at the time indicated in Box 35 as a guarantee for due performance of this Agreement. Such security shall be returned to the guarantor when the Hirer's financial obligations under this Agreement have been met in full.
(Optional, only applicable if Box 35 filled in).

**7. Place of Departure/Notices**
(a) The Tow shall be tendered to the Tugowner at the place of departure stated in Box 24.

(b) The precise place of departure shall always be safe and accessible for the Tug to enter, to operate in and for the Tug and Tow to leave and shall be a place where such Tug is permitted to commence the towage in accordance with any local or other rules, requirements or regulations and shall always be subject to the approval of the Tugowner which shall not be unreasonably withheld.

(c) (i) The Tow shall be ready to sail from the Place of Departure between the dates indicated in Box 28 (a), hereinafter called the Initial Departure Period.
   (ii) The Hirer shall give the Tugowner such notice as is stipulated in Box 28 in respect of Initial Departure Notice (Box 28 (b)), Final Departure Period Notice (Box 28 (c)) and Final Departure Time and Date Notice (Box 28 (d)).
   (iii) The Tow shall be offered to the Tugowner, duly certificated and otherwise in accordance with the terms and conditions of this Agreement.

(d) If the Hirer fails to comply strictly with the provisions of Cl. 7(c) the date of departure shall be deemed to be either the last day of the Initial Departure Period or the last day of the Final Departure Period, whichever is earlier, and this date shall be binding for all consequences arising in respect of Delay Payments and any other payments due or charges incurred in the performance of this Agreement.

**8. Place of Destination**
(a) The Tow shall be accepted forthwith and taken over by the Hirer or his duly authorised representative at the place of destination stated in Box 25.

(b) The precise place of destination shall always be safe and accessible for the Tug and Tow to enter, to operate in, and for the Tug to leave and shall be a place where such Tug is permitted to redeliver the Tow in accordance with any local or other rules, requirements or regulations and shall always be subject to the approval of the Tugowner, which approval shall not be unreasonably withheld.

**9. Riding Crew**
(a) In the event that the Tugowner provides a Riding Crew for the Tow, such crew and their suitability for the work shall be in the discretion of the Tugowner. All expenses for such personnel shall be for the account of the Tugowner.

(b) In the event that any personnel are placed on board the Tow by the Hirer all expenses for such personnel will be for the account of the Hirer and such personnel shall be at all times under the orders of the Master of the Tug, but shall not be deemed to be the servants or agents of the Tugowner.

(c) The Riding Crew shall be provided at the Hirer's sole expense with sui-

| | |
|---|---|
| 1 | 67 |
| 2 | 68 |
| 3 | 69 |
| 4 | 70 |
| | 71 |
| 5 | 72 |
| 6 | 73 |
| 7 | 74 |
| 8 | 75 |
| 9 | 76 |
| 10 | 77 |
| 11 | 78 |
| 12 | 79 |
| 13 | 80 |
| 14 | 81 |
| 15 | 82 |
| 16 | 83 |
| 17 | 84 |
| 18 | 85 |
| 19 | 86 |
| 20 | 87 |
| 21 | 88 |
| 22 | 89 |
| 23 | 90 |
| 24 | 91 |
| 25 | 92 |
| 26 | 93 |
| 27 | 94 |
| 28 | 95 |
| 29 | 96 |
| 30 | 97 |
| 31 | 98 |
| 32 | 99 |
| 33 | 100 |
| 34 | 101 |
| 35 | 102 |
| 36 | 103 |
| 37 | 104 |
| 38 | 105 |
| 39 | 106 |
| 40 | 107 |
| 41 | 108 |
| 42 | 109 |
| 43 | 110 |
| 44 | 111 |
| 45 | 112 |
| 46 | 113 |
| 47 | 114 |
| 48 | 115 |
| 49 | 116 |
| 50 | 117 |
| 51 | 118 |
| 52 | 119 |
| 53 | 120 |
| 54 | 121 |
| 55 | 122 |
| 56 | 123 |
| 57 | 124 |
| 58 | 125 |
| 59 | 126 |
| 60 | 127 |
| 61 | 128 |
| 62 | 129 |
| 63 | 130 |
| 64 | |
| 65 | |
| 66 | |

This computer generated form is printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the preprinted text of this document, which is not clearly visible, the original BIMCO approved document shall apply. BIMCO assume no responsibility for any loss or damage caused as a result of discrepancies between the original BIMCO document and this document

Case 1:01-cv-00048 Document 18 Filed in TXSD on 04/09/2001 Page 10 of 15

# PART II
## "Towcon" International Ocean Towage Agreement (Lump Sum)

table accomodation, food, fresh water, life saving appliances and all other requirements to comply as necessary with the law and regulations of the law of the Flag of the Tug and/or Tow and of the States through the territorial waters of which the Tug will pass or enter. It is a requirement that members of the Riding Crew provided by the Tugowner shall be able to speak and understand the English language or any other mutual language. 131–136

### 9. Towing Gear and Use of Tow's Gear
(a) The Tugowner agrees to provide free of cost to the Hirer all towing hawsers, bridles and other towing gear normally carried on board the Tug, for the purpose of the towage or other services to be provided under this Agreement. The Tow shall be connected up in a manner within the discretion of the Tugowner.

(b) The Tugowner may make reasonable use at his discretion of the Tow's gear, power, anchors, anchor cables, radio, communication and navigational equipment and all other appurtenances free of cost during and for the purposes of the towage or other services to be provided under this Agreement.

### 11. Permits and Certification
(a) The Hirer shall arrange at his own cost and provide to the Tugowner all necessary licenses, authorisations and permits required by the Tug and Tow to undertake and complete the contractual voyage together with all necessary certification for the Tow to enter or leave all or any ports of call or refuge on the contemplated voyage.

(b) Any loss or expense incurred by the Tugowner by reason of the Hirer's failure to comply with this Clause shall be reimbursed by the Hirer to the Tugowner and during any delay caused thereby the Tugowner shall receive additional compensation from the Hirer at the Tug's Delay Payment rate specified in Box 29.

### 12. Tow-worthiness of the Tow
(a) The Hirer shall exercise due diligence to ensure that the Tow shall, at the commencement of the towage, be in all respects fit to be towed from the place of departure to the place of destination.

(b) The Hirer undertakes that the Tow will be suitably trimmed and prepared and ready to be towed at the time when the Tug arrives at the place of departure and fitted and equipped with such shapes, signals, navigational and other lights of a type required for the towage.

(c) The Hirer shall supply to the Tugowner or the Tugmaster, on the arrival of the Tug at the place of departure an unconditional certificate of towworthiness for the Tow issued by a recognised firm of Marine Surveyors or Survey Organisation, provided always that the Tugowner shall not be under any obligation to perform the towage until in his discretion he is satisfied that the Tow is in all respects trimmed, prepared, fit and ready for towage but the Tugowner shall not unreasonably withhold his approval.

(d) No inspection of the Tow by the Tugowner shall constitute approval of the Tow's condition or be deemed a waiver of the foregoing undertakings given by the Hirer.

### 13. Seaworthiness of the Tug
The Tugowner will exercise due diligence to tender the Tug at the place of departure in a seaworthy condition and in all respects ready to perform the towage, but the Tugowner gives no other warranties, express or implied.

### 14. Substitution of Tugs
The Tugowner shall at all times have the right to substitute any tug or tugs for any other tug or tugs of adequate power (including two or more tugs for one, or one tug for two or more) at any time whether before or after the commencement of the towage or other services and shall be at liberty to employ a tug or tugs belonging to other tugowners for the whole or part of the towage or other service contemplated under this Agreement. Provided however, that the main particulars of the substituted tug or tugs shall be subject to the Hirer's prior approval, but such approval shall not be unreasonably withheld.

### 15. Salvage
(a) Should the Tow break away from the Tug during the course of the towage service, the Tug shall render all reasonable services to re-connect the 137–180

towline and fulfill this Agreement without making any claim for salvage.

(b) If at any time the Tugowner or the Tugmaster considers it necessary or advisable to seek or accept salvage services from any vessel or person on behalf of the Tug or Tow, or both, the Hirer hereby undertakes and warrants that the Tugowner is his duly authorised servant or agent including the Tugmaster have the full actual authority of the Hirer to accept such services on behalf of the Tow on any reasonable terms. 194–200

### 16. Cancellation and Withdrawal
(a) At any time prior to the departure of the Tow from the place of departure the Hirer may cancel this Agreement upon payment of the cancellation fee set out in Box 36. If cancellation takes place whilst the Tug is en route to the place of departure or after the Tug has arrived at or off the place of departure then in addition to the said cancellation fee the Hirer shall pay any additional amounts due under this Agreement.

(b) In the event that the towage operation is terminated after departure from the place of departure, but before the Tow arrives at the place of destination without fault on the part of the Tugowner, his servants or agents, the Tugowner shall be entitled to be paid, and if already paid to retain all sums payable according to Box 32, accrued Delay Payments and any other amounts due under this Agreement. The above amounts are in addition to any damages the Tugowner may be entitled to claim for breach of this Agreement.

(c) The Tugowner may without prejudice to any other remedies he may have to leave the Tow in a place where the Hirer may take repossession of it and be entitled to payment of the Lump Sum less expenses saved by the Tugowner and all other payments due under this Agreement, upon any one or more of the following grounds:

(i) If there is any delay or delays (other than delay caused by the Tug) at the place of departure exceeding in aggregate 21 running days.

(ii) If there is any delay or delays (other than a delay caused by the Tug) at any port or place of call or refuge exceeding in aggregate 21 running days.

(iii) If the security as may be required according to Box 35 is not given within 7 running days of the Tugowner's request to provide security.

(iv) If the Hirer has not accepted the Tow within 7 running days of arrival at the place of destination.

(v) If any amount payable under this Agreement has not been paid within in 7 running days of the date such sums are due.

(d) Before exercising his option of withdrawing from this Agreement as aforesaid, the Tugowner shall if practicable give the Hirer 48 hours notice (Saturdays, Sundays and public Holidays excluded) of his intention so to withdraw.

(e) Should the Tug not be ready to commence the towage at the latest at midnight on the date, if any, indicated in Box 37, the Hirer shall have the option of cancelling this Agreement and shall be entitled to claim damages for detention if due to the wilful default of the Tugowner. Should the Tugowner anticipate that the Tug will not be ready, he shall notify the Hirer thereof by telex, cable or otherwise in writing without delay stating the expected date of the Tug's readiness and ask whether the Hirer will exercise his option to cancel. Such option to cancel must be exercised within 48 hours after the receipt of the Tugowner's notice, otherwise the third day after the date stated in the Tugowner's notice shall be deemed to be the new agreed date to commence the towage in accordance with this Agreement. 201–245

### 17. Necessary Deviation or Slow Steaming
(a) If the Tug during the course of the towage or other service under this Agreement puts into a port or place or seeks shelter or is detained or deviates from the original route as set out in Box 23, or slow steams because either the Tugowner or Tugmaster reasonably consider

(i) that the Tow is not fit to be towed or

(ii) the Tow is incapable of being towed at the original speed contemplated by the Tugowner or

(iii) the towing connection requires rearrangement, or

(iv) repairs or alterations to or additional equipment for the Tow are required to safeguard the venture and enable the Tow to be towed to destination, or

(v) it would not be prudent to do otherwise on account of weather conditions actual or forecast, or

because of any other good and valid reason outside the control of the Tug- 246–260

# PART II
## "Towcon" International Ocean Towage Agreement (Lump Sum)

owner or Tugmaster, or because of any delay caused by or at the request of the Hirer, this Agreement shall remain in full force and effect, and the Tugowner shall be entitled to receive from the Hirer additional compensation at the appropriate Delay Payment rate as set out in Box 29 for all time spent in such port or place and for all time spent by the Tug at sea in excess of the time which would have been spent had such slow steaming or deviation not taken place.

(b) The Tug shall at all times be at liberty to go to the assistance of any vessel in distress for the purpose of saving life or property or to call at any port or place for bunkers, repairs, supplies, or any other necessaries or to tend disabled seamen, but if towing the Tug shall leave the Tow in a safe place and during such period this Agreement shall remain in full force and effect.

(c) The Tug shall have liberty to comply with any orders or directions as to departure, arrival, routes, ports of call, stoppages, destination, delivery, requisition or otherwise howsoever given by the Government of the Nation under whose flag the Tug or Tow sails or any department thereof, or any person acting or purporting to act with the authority for such Government or any department thereof having under the committee or person having under the terms any department thereof by the committee or person having under the terms of the War Risks Insurance on the Tug the right to give such orders or directions and if by reason of and in compliance with any such orders or directions anything is done or is not done the same shall not be deemed a deviation and delivery in accordance with such orders or directions shall be a fulfilment of this Agreement and the Lump Sum and/or all other sums shall be paid to the Tugowner accordingly.

(d) Any deviation howsoever or whatsoever by the Tug or by the Tugowner not expressly permitted by the terms and conditions of this Agreement shall not amount to a repudiation of this Agreement and the Agreement shall remain in full force and effect notwithstanding such deviation.

## 18. Liabilities

1. (a) The Tugowner will indemnify the Hirer in respect of any liability adjudged due or claim reasonably compromised arising out of injury or death occurring during the towage or other service hereunder to any of the following persons:

(i) The Master and members of the crew of the Tug and any other servant or agent of the Tugowner;

(ii) The members of the Riding Crew provided by the Tugowner or any other person whom the Tugowner provides on board the Tow;

(iii) Any other person on board the Tug who is not a servant or agent of the Hirer or otherwise on board on behalf of or at the request of the Hirer.

(b) The Hirer will indemnify the Tugowner in respect of any liability adjudged due or claim reasonably compromised arising from injury or death occurring during the towage or other service hereunder to any of the following persons:

(i) The Master and members of the crew of the Tow and any other servant or agents of the Hirer;

(ii) Any other person on board the Tow for whatever purpose except the members of the Riding Crew or any other persons whom the Tugowner provides on board the Tow pursuant to their obligations under this Agreement.

2. (a) The following shall be for the sole account of the Tugowner without any recourse to the Hirer, his servants, or agents, whether or not the same is due to breach of contract, negligence or any other fault on the part of the Hirer, his servants or agents:

(i) Loss or damage of whatsoever nature, howsoever caused to or sustained by the Tug or any property on board the Tug.

(ii) Loss or damage of whatsoever nature caused to or suffered by third parties or their property by reason of contact with the Tug or obstruction created by the presence of the Tug.

(iii) Loss or damage of whatsoever nature suffered by the Tugowner or by third parties in consequence of the loss or damage referred to in (i) and (ii) above.

(iv) Any liability in respect of wreck removal or in respect of the expense of moving or lighting or buoying the Tug or in respect of preventing or abating pollution originating from the Tug.

The Tugowner will indemnify the Hirer in respect of any liability adjudged due to a third party or any claim by a third party reasonably compromised arising out of any such loss or damage. The Tugowner shall not in any cir-

cumstances be liable for any loss or damage suffered by the Hirer or caused to or sustained by the Tow in consequence of loss or damage howsoever caused to or sustained by the Tug or any property on board the Tug.

(b) The following shall be for the sole account of the Tugowner without any recourse to the Tugowner, his servants or agents, whether or not the same is due to breach of contract, negligence or any fault on the part of the Tugowner, his servants or agents:

(i) Loss or damage of whatsoever nature, howsoever caused to or sustained by the Tow.

(ii) Loss or damage of whatsoever nature caused to or suffered by third parties or their property by reason of contact with the Tow or obstruction created by the presence of the Tow.

(iii) Loss or damage of whatsoever nature suffered by the Hirer or by third parties in consequence of the loss or damage referred to in (i) and (ii) above.

(iv) Any liability in respect of wreck removal or in respect of the expense of moving or lighting or buoying the Tow or in respect of preventing or abating pollution originating from the Tow.

The Hirer will indemnify the Tugowner in respect of any liability adjudged due to a third party or any claim by a third party reasonably compromised arising out of any such loss or damage but the Hirer shall not in any circumstances be liable for any loss or damage suffered by the Tugowner or caused to or sustained by the Tug in consequence of loss or damage, howsoever caused to or sustained by the Tow.

3. Save for the provisions of Clauses 11, 12, 13 and 16 neither the Tug owner nor the Hirer shall be liable to the other party for loss of profit, loss of use, loss of production or any other indirect or consequential damage for any reason whatsoever.

4. Notwithstanding any provisions of this Agreement to the contrary, the Tugowner shall have the benefit of all limitations of, and exemptions from, liability accorded to the Owners or Chartered Owners of Vessels by any applicable statute or rule of law for the time being in force and the same benefits are to apply regardless of the form of signatures given to this Agreement.

## 19. Himalaya Clause

All exceptions, exemptions, defences, immunities, limitations of liability, indemnities, privileges and conditions granted or provided by this Agreement or by any applicable statute rule or regulation for the benefit of the Tugowner or Hirer shall also apply to and be for the benefit of demise charterers, sub-contractors, operators, master, officers and crew of the Tug or Tow and to and be for the benefit of all bodies corporate parent of, subsidiary to, affiliated with or under the same management as either of them, as well as all directors, officers, servants and agents of the same and to and be for the benefit of all parties performing services within the scope of this Agreement for or on behalf of the Tug or Tugowner or Hirer as servants, agents and sub-contractors of such parties. The Tugowner or Hirer shall be deemed to be acting as agent or trustee of and for the benefit of all such persons, entities and vessels set forth above but only for the limited purpose of contracting for the extension of such benefits to such persons, bodies and vessels.

## 20. War and Other Difficulties

(a) If owing to any Hostilities; War or Civil War; Acts of Terrorism; Acts of Public Enemies; Arrest or Restraint of Princes, Rulers or People; Insurrections; Riots or Civil Commotions; Disturbances; Acts of God; Epidemics; Quarantine; Ice; Labour Troubles; Labour Obstructions; Strikes; Lock-outs; Embargoes; Seizure of the Tow under Legal Process or for any other cause outside the control of the Tugowner it would be impossible or unsafe or commercially impracticable for the Tug or Tow or both to leave or attempt to leave the place of departure or any port or place of call or refuge or to reach or enter or attempt to reach or enter the port or place of destination of the Tow and there deliver the Tow and leave again, all of which safely and without unreasonable delay, the Tug may leave the Tow or any part thereof at the place of departure or any other port or place where the Hirer may take repossession and this shall be deemed a due fulfilment by the Tugowner of this Agreement and any outstanding sums and all extra costs of delivery of such place and any storage costs incurred by the Tugowner shall thereupon become due and payable by the Hirer.

(b) If the performance of this Agreement or the voyage to the place of de-

This computer generated form is printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the preprinted text of this document, which is not clearly visible, the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss or damage caused as a result of discrepancies between the original BIMCO document and this document.

## PART II
### "Towcon" International Ocean Towage Agreement (Lump Sum)

pasture would in the ordinary course of events require the Tug and/or Tow to pass through or near to an area where after this Agreement is made there is or there appears to be danger of such area being blocked or passage through being restricted or made hazardous by reason of War, Acts of Terrorism, Trapping of Vessels, Civil War, Acts of Public Enemies, Arrest or Restraint of Princes, Rulers or People, Insurrection, Riots or Civil Commotions or Disturbances or other dangers of a similar nature then: [396-405]

(i) If the Tug has not entered such area en route to the place of departure, or having entered has become trapped therein, the Hirer shall pay a Delay Payment at the rate specified in Box 29 for every day of the resulting delay. Provided that if the delay is for a period of more than 14 days either party hereto shall be entitled to terminate this Agreement by telex, cable or other written notice in which event, save for liabilities already accrued, neither party shall be under any further liability to the other but the Tugowner shall not be bound to repay to the Hirer any payments already made and all amounts due shall remain payable. [406-411]

(ii) If the Tug and Tow whilst en route to the place of destination have not entered such area during the course of the towage or other service the Hirer shall pay Delay Payment at the rate indicated in Box 29 for every day by which the towage is prolonged by reason of waiting for such area to become clear and/or safe and/or by reason of proceeding by a longer route to avoid or pass such area in safety [412-416]

(iii) If the Tug and Tow whilst en route to the place of destination have become trapped in such area during the course of the towage or other service, the Hirer shall pay a Delay Payment at the rate specified in Box 29 for every day of the resulting delay. Provided that if the delay is for a period of more than 14 days either party hereto shall be entitled to terminate this Agreement by telex, cable or other written notice in which event, save for liabilities already accrued, neither party shall be under any further liability to the other but the Tugowner shall not be bound to repay to the Hirer any payment already made and all amounts due shall remain payable. [417-427]

### 21. Lien
Without prejudice to any other rights which he may have, whether in rem or in personam, the Tugowner, by himself or his servants or agents or otherwise shall be entitled to exercise a possessory lien upon the Tow in respect of any sum howsoever or whatsoever due to the Tugowner under this Agreement and shall for the purpose of exercising such possessory lien be entitled to take and/or keep possession of the Tow; provided always that the Hirer shall pay to the Tugowner all reasonable costs and expenses howsoever or whatsoever incurred by or on behalf of the Tugowner in exercising or attempting or preparing to exercise such lien and the Tugowner shall be entitled to receive from the Hirer the Tug's Delay Payment at the rate specified in Box 29 for any reasonable delay to the Tug resulting therefrom. [428-439]

### 22. Warranty of Authority
If at the time of making this Agreement or providing any service under this Agreement other than towing at the request, express or implied, of the Hirer, the Hirer is not the Owner of the Tow referred to in Box 4, the Hirer expressly represents that he is authorised to make and does make this Agreement for and on behalf of the Owner of the said Tow subject to each and all of these conditions and agrees that both the Hirer and the Owner of the Tow are bound jointly and severally by these conditions. [440-447]

### 23. General
(a) If any one or more of the terms, conditions or provisions in this Agreement or any part thereof shall be held to be invalid, void or of no effect for any reason whatsoever, the same shall not affect the validity of the remaining terms, conditions or provisions which shall remain and subsist in full force and effect. [448-452]

(b) For the purpose of this Agreement unless the context otherwise requires the singular shall include the plural and vice versa. [453-454]

(c) Any extension of time granted by the Tug owner to the Hirer or any indulgence shown relating to the time limits set out in this Agreement shall not be a waiver of the Tugowner's right under this Agreement to act upon the Hirer's failure to comply with the time limits. [455-459]

### 24. Time for Suit
[460]

Save for the indemnity provisions under Clause 18 of this Agreement, any claim which may arise out of or in connection with this Agreement or of any towage or other service to be performed hereunder shall be notified by telex, cable or otherwise in writing within 6 months of delivery of the Tow or of the termination of the towage or other service for any reason whatever, and any suit shall be brought within one year of the time when the cause of action first arose. If either of these conditions is not complied with the claim and all rights whatsoever and howsoever shall be absolutely barred and extinguished. [461-469]

_____ U. S. maritime law

### 25. Law and Jurisdiction
This Agreement shall be construed in accordance with and governed by ~~English law~~. Any dispute or difference which may arise out of or in connection with this Agreement or the services to be performed hereunder shall be referred to the ~~High Court of Justice in London.~~ [470-474]

No suit shall be brought in any other state or jurisdiction except that either party shall have the option to bring proceedings in rem to obtain conservative seizure or other similar remedy against any vessel or property owned by the other party in any state or jurisdiction where such vessel or property may be found. [475-479]

Agreement to be governed by Florida law

JS.

This computer generated form is printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document, which is not clearly visible, the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss or damage caused as a result of discrepancies between the original BIMCO document and this document.

(Official Form 1) (9/97)

| FORM B1 | United States Bankruptcy Court | Voluntary Petition |
| --- | --- | --- |
| | Southern District of Texas | |

| Name of Debtor (if individual, enter Last, First, Middle):<br>TREVINO, SARA | Name of Joint Debtor (Spouse) (Last, First, Middle): |
| --- | --- |
| All Other Names used by the Debtor in the last 6 years<br>(include married, maiden, and trade names): | All Other Names used by the Joint Debtor in the last 6 years<br>(include married, maiden, and trade names): |
| Soc. Sec./Tax I.D. No. (if more than one, state all):<br>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 | Soc. Sec./Tax I.D. No. (if more than one, state all): |
| Street Address of Debtor (No. & Street, City, State & Zip Code):<br>112 CLARISSA DR.<br>Brownsville, TX 78521 | Street Address of Joint Debtor (No. & Street, City, State & Zip Code): |
| County of Residence or of the<br>Principal Place of Business:    Cameron | County of Residence or of the<br>Principal Place of Business: |
| Mailing Address of Debtor (if different from street address): | Mailing Address of Joint Debtor (if different from street address): |

24223

LAW OFFICES OF
JOHN VENTURA, P.C.
BROWNSVILLE OPERATING ACCOUNT
62 EAST PRICE ROAD   (956) 546-9398
BROWNSVILLE, TEXAS 78521

FIRST NATIONAL BANK
701 E. LEVEE
BROWNSVILLE, TX 78520

88-2141/1149

4/9/01

**200.00

PAY
TO THE
ORDER OF        U S BANKRUPTCY COURT — — — — — — — — — — — — — — — — — — — — — — DOLLARS

Two Hundred and 00/100************************************************

$

U S BANKRUPTCY COURT

615 LEOPARD STREET
CORPUS CHRISTI, TX  78476

AUTHORIZED SIGNATURE        MP

MEMO    TREVINO SARA

⑈024223⑈ ⑊114921415⑊    ⑈008000⑈300⑈

_Administrative Information (Estimates only)_
- ☐ Debtor estimates that funds will be available for distribution to unsecured creditors.
- ☐ Debtor estimates that, after any exempt property is excluded and administrative expenses paid, there
  will be no funds available for distribution to unsecured creditors.

THIS SPACE IS FOR COURT USE ONLY

4:20 ck

United States District Court
Southern District of Texas
RECEIVED

APR 9 - 2001

Michael N. Milby, Clerk

| Estimated Number of Creditors | 1-15 | 16-49 | 50-99 | 100-199 | 200-999 | 1000-over | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | ■ | ☐ | ☐ | ☐ | ☐ | ☐ | | |

| Estimated Assets | $0 to<br>$50,000 | $50,001 to<br>$100,000 | $100,001 to<br>$500,000 | $500,001 to<br>$1 million | $1,000,001 to<br>$10 million | $10,000,001 to<br>$50 million | $50,000,001 to<br>$100 million | More than<br>$100 million |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | ■ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |

| Estimated Debts | $0 to<br>$50,000 | $50,001 to<br>$100,000 | $100,001 to<br>$500,000 | $500,001 to<br>$1 million | $1,000,001 to<br>$10 million | $10,000,001 to<br>$50 million | $50,000,001 to<br>$100 million | More than<br>$100 million |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | ■ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |

Official Form 1) (9/97)

**FORM B1**

# United States Bankruptcy Court
## Southern District of Texas

**Voluntary Petition**

| Name of Debtor (if individual, enter Last, First, Middle):<br>LANOY, ARTHUR F. | Name of Joint Debtor (Spouse) (Last, First, Middle):<br>LANOY, KATHY L. |
|---|---|
| All Other Names used by the Debtor in the last 6 years<br>(include married, maiden, and trade names): | All Other Names used by the Joint Debtor in the last 6 years<br>(include married, maiden, and trade names): |
| Soc. Sec./Tax I.D. No. (if more than one, state all):<br>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 | Soc. Sec./Tax I.D. No. (if more than one, state all):<br>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 |
| Street Address of Debtor (No. & Street, City, State & Zip Code):<br>655 W. GEM<br>RAYMONDVILLE, TX 78580 | Street Address of Joint Debtor (No. & Street, City, State & Zip Code):<br>655 W. GEM<br>RAYMONDVILLE, TX 78580 |
| County of Residence or of the<br>Principal Place of Business:    WILLACY | County of Residence or of the<br>Principal Place of Business:    WILLACY |
| Mailing Address of Debtor (if different from street address): | Mailing Address of Joint Debtor (if different from street address): |

of Business Debtor



LAW OFFICES OF
JOHN VENTURA, P.C.
BROWNSVILLE OPERATING ACCOUNT
62 EAST PRICE ROAD  (956) 546-9398
BROWNSVILLE, TEXAS 78521

FIRST NATIONAL BANK
701 E. LEVEE
BROWNSVILLE, TX 78520

88-2141/1149

24222

4/9/01

PAY
TO THE
ORDER OF

U S BANKRUPTCY COURT

Two Hundred and 00/100********************************************

$  **200.00

U S BANKRUPTCY COURT

615 LEOPARD STREET
CORPUS CHRISTI, TX 78476

DOLLARS

MEMO        LANOY ARTHUR F.

AUTHORIZED SIGNATURE

⑈024222⑈ ⑊111492141151⑊   ⑈008000130011⑈

**Statistical/Administrative**

☐ Debtor estimates that funds will be available for distribution

☐ Debtor estimates that, after any exempt property is excluded and administrative expenses paid,
will be no funds available for distribution to unsecured creditors.

| Estimated Number of Creditors | 1-15 | 16-49 | 50-99 | 100-199 | 200-999 | 1000-over |
|---|---|---|---|---|---|---|
| | ☐ | ■ | ☐ | ☐ | ☐ | ☐ |

| Estimated Assets | | | | | | |
|---|---|---|---|---|---|---|
| $0 to<br>$50,000 | $50,001 to<br>$100,000 | $100,001 to<br>$500,000 | $500,001 to<br>$1 million | $1,000,001 to<br>$10 million | $10,000,001 to<br>$50 million | $50,000,001 to<br>$100 million | More than<br>$100 million |
| ☐ | ■ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |

| Estimated Debts | | | | | | |
|---|---|---|---|---|---|---|
| $0 to<br>$50,000 | $50,001 to<br>$100,000 | $100,001 to<br>$500,000 | $500,001 to<br>$1 million | $1,000,001 to<br>$10 million | $10,000,001 to<br>$50 million | $50,000,001 to<br>$100 million | More than<br>$100 million |
| ☐ | ☐ | ■ | ☐ | ☐ | ☐ | ☐ | ☐ |

United States District Court
Southern District of Texas
RECEIVED

APR 9 - 2001

Michael N. Milby, Clerk

# United States Bankruptcy Court
## Southern District of Texas

**Voluntary Petition**

Form 1) (9/97)

| | |
|---|---|
| Debtor (if individual, enter Last, First, Middle):<br>ARTHUR F. | Name of Joint Debtor (Spouse) (Last, First, Middle):<br>LANOY, KATHY L. |
| Used by the Debtor in the last 6 years<br>maiden, and trade names): | All Other Names used by the Joint Debtor in the last 6 years<br>(include married, maiden, and trade names): |
| (if more than one, state all): | Soc. Sec./Tax I.D. No. (if more than one, state all):<br>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 |
| No. & Street, City, State & Zip Code):<br>78580 | Street Address of Joint Debtor (No. & Street, City, State & Zip Code):<br>655 W. GEM<br>RAYMONDVILLE, TX 78580 |
| WILLACY | County of Residence or of the<br>Principal Place of Business:   WILLACY |
| ifferent from street address): | Mailing Address of Joint Debtor (if different from street address): |

Debtor

---

## LAW OFFICES OF
## JOHN VENTURA, P.C.
BROWNSVILLE OPERATING ACCOUNT
62 EAST PRICE ROAD  (956) 546-9398
BROWNSVILLE, TEXAS 78521

FIRST NATIONAL BANK
701 E. LEVEE
BROWNSVILLE, TX 78520

88-2141/1149

2422

4/9/01

PAY
TO THE
ORDER OF        U S BANKRUPTCY COURT

Two Hundred and 00/100********************************************************        $  **200.00

U S BANKRUPTCY COURT                                                         DOLLARS

615 LEOPARD STREET
CORPUS CHRISTI, TX  78476

MEMO        LANOY ARTHUR F.                        *John Ventura* (signature)
                                                   AUTHORIZED SIGNATURE                MP

⑈0 24 222⑈ ⑆11149 21415⑆   ⑈008000 1300⑈

---

excluded and administrative expenses p...
...ured creditors.

| | 80-99 | 100-199 | 200-999 | 1000-over |
|---|---|---|---|---|
| | ☐ | ☐ | ☐ | ☐ |

| | $10,000,001 to<br>$50 million | $50,000,001 to<br>$100 million | More than<br>$100 million |
|---|---|---|---|
| | ☐ | ☐ | ☐ |

| | $10,000,001 to<br>$50 million | $50,000,001 to<br>$100 million | More than<br>$100 million |
|---|---|---|---|
| | ☐ | ☐ | ☐ |

United States District Court
Southern District of Texas
RECEIVED

APR 9 - 2001

Michael N. Milby, Clerk