

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

AUG 1 7 2001

Michael N. Milby
Clerk of Court

| | | |
|---|---|---|
| INTERNATIONAL SHIPBREAKING | § | |
| LIMITED, L.L.C. | § | |
| Plaintiff | § | |
| | § | |
| V. | § | C.A. NO. B-01-048 |
| | § | (ADMIRALTY) |
| | § | |
| SMITH L.C. & SMITH MARITIME, | § | |
| *In Personam*, and the TUG ELSBETH II, | § | |
| her engines, tackle, and gear, etc., *In Rem* | § | |
| | § | |
| Defendants. | § | |

## SMITH MARITIME'S AMENDED
## MOTION FOR FINAL SUMMARY JUDGMENT

Smith Maritime, for its Amended Motion for Final Summary Judgment pursuant to Fed. R.

Civ. P. 56 and the Order of the Court dated August 14, 2001, states as follows:[1]

## I.
## INTRODUCTION

A.      **Factual Background**

  **1. International Shipbreaking Limited, L.L.C.'s Contract with the U.S. Navy**

On November 14, 2000 International Shipbreaking Limited, L.L.C. ("ISL") was awarded a

contract to dismantle two decommissioned Navy destroyers, the Ex-USS COCHRANE (the

"COCHRANE") and the Ex-USS STODDERT (the " STODDERT")(collectively the "Destroyers").

A true and correct copy of the Navy's contract with ISL is attached hereto as Exhibit A and

incorporated by reference for all purposes.  The contract was a typical U.S. government services

---

[1] Smith Maritime has added citations to the summary judgment record, where appropriate, and has amended the
affidavits in Exhibits B, C, and D so that the affiant states that the affidavits are made based upon personal knowledge.
Smith Maritime's Motion has *not* been amended to include additional legal or factual arguments.

contract under which ISL was to provide shipbreaking services to the Navy. Exhibit A, Section B-1. The scope of the work to be performed with respect to the destroyers was limited to towing, dismantling, disposal of hazardous materials, sale of scrap material, and partnering. Exhibit A, Section C1-1. In addition to services, ISL was required to procure and maintain insurance on the vessels. Exhibit A, Section H-12.

### 2. ISL's Subcontract with Smith Maritime

ISL sub-contracted with Smith Maritime for the towage of the destroyers from Hawaii to ISL's facility in Brownsville. A true and correct copy of the "Towcon" is attached hereto as Exhibit B and incorporated herein by reference for all purposes. Smith Maritime dispatched the Tug ELSBETH II (the "Tug") to Pearl Harbor/Honolulu, Hawaii from Port Canaveral, Florida on November 25, 2000. *See* Exhibit D, a true and correct copy of the Tug's log, p. 50. The Tug arrived at Honolulu on December 26, 2000 and received preliminary instructions on the parameters of the towing venture. Exhibit D, p. 61. On January 1, 2001, the crew began preparations for towing the designated ships to ISL's facility via the Panama Canal. Exhibit D, p. 62.

### 3. The Tow Voyage

On January 17, 2001 the Tug departed Pearl Harbor with the destroyers in tow. Exhibit D, p. 63. On board the Tug were: Captain Glen Kern; 1st Mate Paul Torres; 2nd Mate Jim Morrison; Engineer Doug Rich; Assistant Engineer Rudolph Parris; and A/B Deckhand Charles Cameron. Id. There was no riding crew on either of the destroyers.

On February 2, 2001 at 0640, after some 16 days at sea, Paul Torres advised Captain Kern that the STODDERT looked heavy with a starboard list. Exhibit D, p. 71. By 0900 approximately 1/3 of the STODDERT's main deck aft was reported to be awash and the bulbous bow was rising out of the water. Id. Around 1000 the tow wire to the STODDERT was cut for safety reasons. Id.

For the next several hours, the Tug circled the STODDERT until the weather cleared enough for a salvage party to board. Exhibit D, p. 71-72. At approximately 1400, Paul Torres and

Jim Morrison volunteered to board the STODDERT to assess the situation and attempt to salvage her. Exhibit D, p. 72.

Soon after boarding the STODDERT it became clear to that salvage was unlikely as the one pump on board was completely inaccessible under the water in one of the aft compartments. *See* Exhibit C, the Affidavit of Latham Smith. Mr. Morrison reported this back to the Tug. Smith Maritime then contacted the United States Coast Guard, the United States Navy, and representatives of ISL. Id. It was then, "after much radio discussion", that Captain Smith, who was in Florida and communicating with the Tug, instructed Captain Kern to order all hatches opened to allow the STODDERT to sink. Id. The decision was made pursuant to instructions from the CEO of ISL, Bob Berry. Id. True and correct phone records from Smith Maritime evidencing some, if not all, of these conversations are attached hereto as Exhibit C (*See also* Exhibit C, the affidavit of Latham Smith).[2]

Mr. Morrison and Mr. Torres proceeded to open the STODDERT's hatches to facilitate the sinking. Exhibit C; Exhibit D, p. 72. Mr. Morrison and Mr. Torres were successful in opening some but not all of the hatches as many were already underwater and inaccessible when they got to them. Exhibit D, p. 72. At 1240 on February 3, 2001 at 07° 56.869' North - 140° 33.095' West, the bow of the STODDERT dropped below the surface of the Pacific Ocean. Id. The Tug proceeded onwards through the Panama Canal with the COCHRANE in tow. Id. Upon arrival in Brownsville, the COCHRANE was delivered to ISL. Exhibit D, p. 95.[3]

## B.     ISL's Claims against Smith Maritime

On March 22, 2001 ISL filed suit against "Smith L.C." and Smith Maritime, *in personam*, and the Tug ELSBETH II, *in rem* for the loss of the STODDERT alleging 1) Negligence and 2)

---

[2] Indicating that numerous long distance calls to Texas and Hawaii were made from Smith Maritime beginning at 1046 Eastern Time which would have been around the time the STODDERT's list was first reported.
[3] As is shown below, however, the facts as relate to the tow voyage and the sinking of the STODDERT are ultimately irrelevant.

Breach of Warranty of Workmanlike Service under the Towcon. *See* ISL's Complaint, Docket Entry No. 1, p. 1. ISL also effected the arrest the Tug under Supplemental Rule C of the Federal Rules of Civil Procedure and demanded security for its claims against the vessel *in rem*. *See* ISL's Motion for Issuance of Warrant of Maritime Arrest and the Court's Order of Arrest, Docket Entry Nos. 2 and 5. Smith Maritime obtained and filed a bond for One Million Dollars ($1,000,000.00) and the Tug was released from arrest. *See* Smith Maritime's Bond, Docket Entry No. 9.

### C.   Smith Maritime's Counterclaim

Smith Maritime filed a Claim of Owner for the Tug and timely filed an Answer to ISL's complaint. *See* Docket Entry Nos. 8 and 18. Smith Maritime also filed a counterclaim against ISL alleging breach of the Towcon because ISL had not paid the final installment due under the agreement. *See* Docket Entry No. 18. Pursuant to Supplemental Rule E(7), Smith Maritime demanded countersecurity from ISL in the amount of Four Hundred Thousand Dollars ($400,000.00) representing amounts outstanding under the contract and accounting for interest and costs. Id. On May 14, 2001, after a hearing on the issue, this Court ordered ISL to post countersecurity in the amount of Three-Hundred Thousand, Five Hundred and Sixty-Six Dollars and Forty-Two Cents ($300,566.42), representing the full amount of Smith Maritime's invoice to ISL for the balance due under the Towcon. *See* Exhibit E, p. 31, l. 4-5 and Docket Entry No. 28. On July 9, 2001 ISL posted a cash bond for the full amount ordered of it and deposited the funds with the registry of the Court. *See* Docket Entry No. 32.

## II.
## ARGUMENT AND AUTHORITIES

### A.   ISL's Negligence and Breach of Warranty Claims

In Admiralty the law is clear that absent physical damage to property in which the claimant has a proprietary interest, there can be no recovery for mere economic losses in cases of unintentional maritime tort. <u>Reserve Mooring, Inc. v. American Commercial Barge Line</u>, 251 F.3d

1069 (5th Cir. 2001); <u>Louisiana v. M/V TESTBANK,</u> 752 F.2d 1019 (5th Cir. 1985).  *See also*

<u>Robins Dry Dock v. Flint</u>, 275 U.S. 303, 48 S.Ct. 134 (1927).  The fact of physical damage in this

case is not in dispute - - the Ex-USS STODDERT is some ten thousand feet below the surface of the

Pacific Ocean.  However, ISL has argued that it had some sort of functional ownership over the

STODDERT that entitles it to bring this lawsuit.  Quite simply ISL never had any kind of ownership

over the STODDERT and it never would have had any even had the STODDERT arrived in

Brownsville as planned.  Because ISL had no proprietary interest in the STODDERT, there is no

genuine issue of material fact on any of its claims and Smith Maritime is entitled to judgment as a

matter of law.

Under cross examination by Smith Maritime's lead counsel, the Co-Chief Operating Officer

of ISL, Mr. Robert L. Berry, testified regarding ISL's proprietary interest in the STODDERT as

follows:

> Q:  Okay.  Well, let's just talk very briefly about this.  Now, first of all, you [referring to ISL] did not own the STODDERT, did you?
>
> A:  We did not own it.
>
> Q:  Didn't have any sort of ownership, or possessory interest in that?
>
> A:  It was in our care and custody and possession.
>
> Q:  But it belonged to the United States Government?
>
> A:  Belonged to the United States government.

Exhibit E, the Transcript of the Hearing May 14, 2001, p. 24, l. 17-24.  The only reason ISL had

custody of the STODDERT was through authority from the destroyer's owner, the U.S. Navy, given

in a *services* contract.  Exhibit A, Section B-1.  ISL clearly had no ownership interest in either the

STODDERT or the COCHRANE.  ISL was, at best, just as Mr. Berry testified, a mere custodian of

U.S. government property.  At no time did ownership of the destroyers vest in ISL.  In fact, ISL

would not have even owned the scrap it was supposed to have made of the STODDERT. *See* Exhibit A, Section C1-5. *See also* Exhibit E, p. 10, l. 23-25. ISL lost nothing but its expectation that it was to receive funds from the Navy to dismantle the STODDDERT. ISL cannot recover for its "damages" because, quite simply, the law does not recognize a cause of action to recover the type of damage claimed by ISL in this case. Because the undisputed evidence is clear that ISL did not sustain physical injury to property it owned, its claim for purely economic damages must be denied and Smith Maritime is entitled to judgment as a matter of law on all of ISL's claims. <u>Reserve Mooring</u>, 251 F.3d at 1072.

Alternatively, the contract governing the relationship between ISL and Smith Maritime provides that incidents such as the sinking of the tow are for the sole account of the Hirer, ISL, without any recourse to Smith Maritime, whether or not caused by breach of contract, negligence or any fault on the part of Smith Maritime. Exhibit B, Part II, Cl. 18(2)(b). Towage is not a bailment and the tug is not an insurer. <u>Stevens v. THE WHITE CITY</u>, 285 U.S. 195, 196, 52 S.Ct. 347, 348 (1932). ISL freely negotiated the terms of the Towcon and agreed to bear the risk of loss during the tow voyage from Hawaii to Brownsville. There is no genuine issue of material fact as to any of ISL's allegations and Smith Maritime is entitled to judgment as a matter of law.

**B.    Smith Maritime's Breach of Contract Claim**

There is nothing especially unusual about contracts for towage and the general rules of contract formation and interpretation apply. *See, e.g.,* <u>Onaway Transportation Co. v. Offshore Tugs, Inc.</u>, 695 F.2d 197 (5th Cir. 1983). ISL agreed to pay Smith Maritime Six Hundred and Forty Eight Thousand Dollars ($648,000.00) for the towage of the two ships "Tow lost or not lost". Exhibit B, Part II, Cl. 2(c). To date, some Three-Hundred Thousand, Five Hundred and Sixty-Six Dollars and Forty-Two Cents ($300,566.42) remain outstanding under the Towcon. Exhibit B, the Affidavit of Latham Smith. With respect to the Towcon at issue in this case, there is absolutely no question that

1) the contract is valid and 2) the amount due was non-negotiable as fixed. Mr. Berry testified that he personally negotiated the Towcon with Smith Maritime on behalf of ISL and that the total amount due under it was $648,000. Exhibit E, p. 11, l. 21-22; p. 12, l. 7-9. He further testified that some of the money due had been paid and, although attempting to avoid the balance, ultimately acknowledged that ISL remained obligated to Smith Maritime for at least some of the balance in excess of $300,000. Exhibit E, p. 24, l. 2-16. The attached affidavit of Latham Smith proves the amounts outstanding under the clear, unambiguous terms of the Towcon. As a result, there is no genuine issue of material fact with respect to Smith Maritime's counterclaim against ISL and Smith Maritime is entitled to judgment as a matter of law on its counterclaim as well.

## III.
## CONCLUSION

ISL has suffered no injury for which the law allows recovery. Smith Maritime, on the other hand, has incurred considerable expenses and remains unpaid for its services to ISL. The facts relevant to the issues before the court are quite simple. First, ISL has no ownership interest in the Ex-USS STODDERT that precludes application of the principle expressed in Robins Dry Dock and its progeny. The unequivocal language of the Navy services contract, ISL's bid, and the testimony of Mr. Robert Berry all show that there are no genuine issues of material fact in this regard and that Smith Maritime is entitled to judgment as a matter of law. Second, ISL contracted to pay Smith Maritime a total of $648,000 for its services, "Tow lost or not lost". Mr. Berry's testimony shows that the contract was negotiated and entered into for the amount stated. Latham Smith has provided the Court his affidavit not only proving up the contract, but also attesting to the amounts still outstanding. There are no genuine issues of material fact that would prevent Smith Maritime's recovery of these amounts and Smith Maritime is entitled to judgment as a matter of law on its counterclaim as well.

WHEREFORE, PREMESES CONSIDERED, Smith Maritime respectfully requests that this Court enter a final judgment that ISL take nothing by its suit and that Smith Maritime be awarded its costs incurred in its defense. Further, Smith Maritime prays that this Honorable Court adjudge and decree that ISL is liable in all respects for the counterclaim herein, including attorneys' fees. interest, and costs, and for all other and further relief, both in law and in equity, as this Honorable Court may deem just.

Respectfully submitted,

Jeffrey R. Dale
State Bar No. 01629800
S.D. Tex. Adm. I.D. No.
Justin W. R. Renshaw
State Bar No. 24013392
S.D. Tex. Adm. I.D. No. 25865
Niels Esperson Building, 20th Floor
808 Travis Street
Houston, Texas 77002
Telephone:     (713) 225-0905
Facsimile:      (713) 225-2907

*Attorneys in Charge for Claimant/Defendant,*
*Smith Maritime*

OF COUNSEL:

EASTHAM, WATSON, DALE, & FORNEY, L.L.P.

## CERTIFICATE OF SERVICE

I, the undersigned, do hereby certify that I forwarded a true and correct copy of the foregoing to all counsel of record on this the 16th day of August 2001.

**VIA CM/RRR #  7000 1670 0006 1835 3665**
**and FACSIMILE:  956/542-4370 [w/o exhibits]**
James H. Hunter, Jr.
Ewing E. Sikes, III
ROYSTON, RAYZOR, VICKERY & WILLIAMS, L.L.P.
P.O. Box 3509
Brownsville, TX  77523-3509

Jeffrey R. Bale



# DEPARTMENT OF THE NAVY
SUPERVISOR OF SHIPBUILDING, CONVERSION AND REPAIR, USN
P.O. BOX 215
PORTSMOUTH, VIRGINIA 23705-0215

5720
Ser 130/045
April 18, 2001

IN REPLY REFER TO

Mr. Justin W. R. Renshaw
Eastham, Watson, Dale & Forney, L.L.P.
20th Floor
Neils Eperson Building
808 Travis
Houston, Texas 7702-5769

Dear Mr. Renshaw:

This responds to your Freedom of Information Act (FOIA) request of April 3 in which you requested copies of the Contract and Task Order under which the Ex-Stoddert was to be scrapped by ISL. Copies of the contract and the Task Order are hereby released to you.

Fee incurred in processing you request total $35.20 (.25 hours search @ $25 per hour, plus 193 pages of reproduction @ $.15 per page). Please remit your check for $31.20, payable to the U. S. Treasury, to this office in accordance with the attached invoice.

Sincerely,

*Stephen P. Anderson*

STEPHEN P. ANDERSON
Counsel
By direction

Enclosures: (1) Contract N00024-99-C-2318
            (2) Task Order A00002

**EXHIBIT**

A

DN

db

# AMENDMENT OF SOLICITATION/MODIFICATION OF CONTRACT

| 1. CONTRACT ID CODE | PAGE OF PAGE |
| --- | --- |
| | 1    3 |

| 2. AMENDMENT/MODIFICATION NO. | 3. EFFECTIVE DATE | 4. REQUISITION/PURCHASE REQ. NO. | 5. PROJECT NO. *(if applicable)* |
| --- | --- | --- | --- |
| A00002 | 11/14/2000 | | |

| 6. ISSUED BY | CODE | N62678 | 7. ADMINISTERED BY *(if other than Item 6.)* | CODE |
| --- | --- | --- | --- | --- |

SUPERVISOR OF SHIPBUILDING,
CONVERSION & REPAIR, USN
P. O. BOX 215
PORTSMOUTH, VA 23705-0215

Purchase Request Date:

| 8. NAME AND ADDRESS OF CONTRACTOR *(No., street, county, State and Zip Code)* | (x) | 9A. AMENDMENT OF SOLICITATION NO. |
| --- | --- | --- |
| INTERNATIONAL SHIPBREAKING LIMITED, LLC<br>18501 R. L. OSTOS ROAD<br>PORT OF BROWNSVILLE<br>BROWNSVILLE, TX 78521 | | |
| | | 9B. DATED *(SEE ITEM 11)* |
| | | 10A. MODIFICATION OF CONTRACT/<br>ORDER NO. |
| | X | N00024-99-C-2318 |
| | | 10B. DATED *(SEE ITEM 13)* |
| CODE     FACILITY CODE | | 99 JAN 28 |

## 11. THIS ITEM ONLY APPLIES TO AMENDMENTS OF SOLICITATIONS

☐ The above numbered solicitation is amended as set forth in Item 14. The hour and date specified for receipt of Offers ☐ is extended ☐ is not extended.

Offers must acknowledge receipt of this amendment prior to the hour and date specified in the solicitation or as amended, by one of the following methods:

(a) By completing Items 8 and 15, and returning (1) copy of the amendment; (b) By acknowledging receipt of this amendment on each copy of the offer submitted; or (c) By seperate letter or telegram which includes a reference to the solicitation and amendment numbers. FAILURE OF YOUR ACKNOWLEDG-MENT TO BE RECEIVED AT THE PLACE DESIGNATED FOR THE RECEIPT OF OFFERS PRIOR TO THE HOUR AND DATE SPECIFIED MAY RESULT IN REJECTION OF YOUR OFFER. If by virtue of this amendment you desire to change an offer already submitted, such changes may be made by telegram or letter, provided each telegram or letter makes reference to the solicitation and this amendment, and is received prior to the opening hour and date specified.

## 12. ACCOUNTING AND APPROPRIATION DATA *(If required)*
SEE PARA. 14.D.

## 13. THIS ITEM APPLIES ONLY TO MODIFICATIONS OF CONTRACTS/ORDERS,
### IT MODIFIES THE CONTRACT/ORDER NO. AS DESCRIBED IN ITEM 14.

| (x) | |
| --- | --- |
| | A. THIS CHANGE ORDER IS ISSUED PURSUANT TO: *(Specify authority)* THE CHANGES SET FORTH IN ITEM 14 ARE MADE IN THE CONTRACT ORDER NO. IN ITEM 10A. |
| | B. THE ABOVE NUMBERED CONTRACT/ORDER IS MODIFIED TO REFLECT THE ADMINISTRATIVE CHANGES *(such as changes in paying office, appropriation date, etc.)* SET FORTH IN ITEM 14, PURSUANT TO THE AUTHORITY OF FAR 43.103(b). |
| X | C. THIS SUPPLEMENTAL AGREEMENT IS ENTERED INTO PURSUANT TO AUTHORITY OF:<br>THE BASIC CONTRACT |
| | D. OTHER *(Specify type of modification and authority)* |

E. IMPORTANT: CONTRACTOR ☐ is not, ☒ is required to sign this document and return 1 copies to the issuing office.

## 14. DESCRIPTION OF AMENDMENT/MODIFICATION *(Organized by UCF section headings, including solicitation/contract subject matter where feasible.)*

(SEE ATTACHED PAGES)

Except as provided herein, all terms and conditions of the document referenced in Item 9A or 9B, as heretofore changed, remains unchanged and in full force and effect.

| 15A. NAME AND TITLE OF SIGNER *(Type or print)* | 16A. NAME AND TITLE OF CONTRACTING OFFICER *(Type or print)* | |
| --- | --- | --- |
| 15B. CONTRACTOR/OFFEROR | 15C. DATE SIGNED | 16B. UNITED STATES OF AMERICA<br>BY | 16C. DATE SIGNED |
| *(Signature of person authorized to sign)* | | *(Signature of Contracting Officer)* | |

PREVIOUS EDITIONS UNUSABLE      30-105-05

STANDARD FORM 30 (REV. 10-83)
Prescribed by GSA
FAR (48 CFR) 53.243

EE 3579

## MODIFICATION CONTINUATION SHEET

MODIFICATION NUMBER - A00002     DATED - 11/14/00

CONTRACT NUMBER     - N00024-99-C-2318;  CLIN 0003A, B & 0010B

NAME OF SHIP     - EX USS COCHRANE (CG-21) & STODDERT (CG-22)

---

14. DESCRIPTION OF MODIFICATION (CONTINUED)

A. Whereas, on 14 November 2000 the contractor was awarded the
follow-on task orders for dismantlement of EX-COCHRANE (CG-21) and
EX-BENJAMIN STODDERT (CG-22) in accordance with the terms and
conditions of the contract and RFQ N622678-00-Q-D007 at a Ceiling
Price of $3,800,196. for the dismantlement plus a Firm Fixed Price
of $1,466,136. for the towing, yielding a total award amount
of $5,266,332.

B. Whereas, the Government desires to take advantage of projected
scrap proceeds incidental to the the dismantlement phase which is
calculated to be a total of $1,046,400., thereby reducing the total
funded amount by $523,200. per ship.

C. As a result of the above, the dollar amounts set forth in
Section "B" of the contract are adjusted subject to the "Limitation
of Cost/Funds" Clauses (52.232-20) and (52.232-22) as follows:

| ITEM 0003A | INCREASE/DECREASE | BALANCE |
|---|---|---|
| Ceiling Price | $1,900,098.00 | $1,900,098.00 |
| Other Est. Cost | ($523,200.00) | ($523,200.00) |
| Sub-CLIN Total | $1,376,898.00 | $1,376,898.00 |

| ITEM 0003B | INCREASE/DECREASE | BALANCE |
|---|---|---|
| Ceiling Price | $1,900,098.00 | $1,900,098.00 |
| Other Est. Cost | ($523,200.00) | ($523,200.00) |
| Sub-CLIN Total | $1,376,898.00 | $1,376,898.00 |

| ITEM 0010B | INCREASE/DECREASE | BALANCE |
|---|---|---|
| Firm Fixed Price | $1,466,136.00 | $1,466,136.00 |

D. Change the accounting and appropriation data as follows:

**CLIN 0003A**
AE1711804.8H2G 000 TZSXW 0 068342 2D 000000 22G100000030  $1,376,898.

**CLIN 0003B**
AE1711804.8H2G 000 TZSXW 0 068342 2D 000000 22G100000030  $1,376,898.

**CLIN 0010B**
AE1711804.8H2G 000 TZSXW 0 068342 2D 000000 22G100000030  $1,466,136.

E. The CONTRACT PRICE is changed by ............... $4,219,932.
to a new CONTRACT TOTAL PRICE of....................$6,731,512.



# MODIFICATION CONTINUATION SHEET

MODIFICATION NUMBER - A00002     DATED - 11/14/00

CONTRACT NUMBER      - N00024-99-C-2318;   CLIN 0003A, B & 0010B

NAME OF SHIP         - EX USS COCHRANE (CG-21) & STODDERT (CG-22)

14. DESCRIPTION OF MODIFICATION (CONTINUED)

F. The performance period for CLINS 0003A and B is as follows:

> 15 Febuary 2001 through 10 December 2001

G. The change in delivery dates, price, or cost and fee described above is considered to be fair and reasonable and has been mutually agreed upon in full and final settlement of all claims arising out of this modification and any other modification or change order indicated above, including all claims for delays and disruption resulting from, caused by, or incident to such modifications or change orders.



*700~ 1*

| SOLICITATION, OFFER, AND AWARD | 1. THIS CONTRACT IS RATED ORD. UNDER DPAS (15 CFR 350) ) | RATING DO-A3 | PAGE OF 1 PAGES 128 |
|---|---|---|---|

| 2. CONTRACT NO. N00024-99-C-2318 | 3. SOLICITATION NO. N00024-98-R-2219 | 4. TYPE OF SOLICITATION [ ] SEALED BID (IFB) [X] NEGOTIATED (RFP) | 5. DATE ISSUED 28 JAN 99 | 6. REQUISITION/PURCHASE NO. N00024-99-NR-91254 |
|---|---|---|---|---|

| ISSUED BY CODE | N00024 | 8. ADDRESS OFFER TO (If other than Item 7) |
|---|---|---|
| NAVAL SEA SYSTEMS COMMAND BUYER/SYMBOL: R. WEST/SEA 02232J 2531 JEFFERSON DAVIS HWY ARLINGTON, VA 22242-5160 | | DEPARTMENT OF THE NAVY NAVAL SEA SYSTEMS COMMAND, SEA 02232 2531 JEFFERSON DAVIS HWY, RM 5S18 ARLINGTON, VA 22242-5160 |

NOTE: In sealed bid solicitations "offer" and "offeror" mean "bid" and "bidder".

## SOLICITATION

9. Sealed offers in original and __three (3)__ copies for furnishing the supplies or services in the Schedule will be received at the place specified in Item 8, or if handcarried, in the depository located in __(see Block 8)__ until __2:00 PM EST__ local time __9 March 1999__
(Hour)  (Date)

CAUTION - LATE Submissions, Modifications, and Withdrawals: See Section L, Provision No. 52.214-7 or 52.215-10. All offers are subject to all terms and conditions contained in this solicitation.

| 10. FOR INFORMATION CALL: | A. NAME R. WEST | B. TELEPHONE NO. (include area code) (NO COLLECT CALLS) (703) 602-7517, ext. 236 |
|---|---|---|

### 11. TABLE OF CONTENTS

| (x) | SEC | DESCRIPTION | PAGE(S) | (x) | SEC | DESCRIPTION | PAGE(S) |
|---|---|---|---|---|---|---|---|
| | | PART I – THE SCHEDULE | | | | PART II – CONTRACT CLAUSES | |
| x | A | SOLICITATION/CONTRACT FORM | 1 | x | I | CONTRACT CLAUSES | 44 |
| x | B | SUPPLIES OR SERVICES AND PRICES/COSTS | 2 | | | PART III – LIST OF DOCUMENTS, EXHIBITS AND OTHER ATTACH | |
| x | C | DESCRIPTION/SPECS./WORK STATEMENT | 11 | x | J | LIST OF ATTACHMENTS | 85 |
| x | D | PACKAGING AND MARKING | 20 | | | PART IV – REPRESENTATIONS AND INSTRUCTIONS | |
| x | E | INSPECTION AND ACCEPTANCE | 21 | x | K | REPRESENTATIONS, CERTIFICATIONS AND OTHER STATEMENTS OF OFFERORS | 86 |
| x | F | DELIVERIES OR PERFORMANCE | 22 | | | | |
| x | G | CONTRACT ADMINISTRATION DATA | 24 | x | L | INSTRS., COND., AND NOTICES TO OFFERORS | 105 |
| x | H | SPECIAL CONTRACT REQUIREMENTS | 25 | x | M | EVALUATION FACTORS FOR AWARD | 126 |

## OFFER (Must be fully completed by offeror)

NOTE: Item 12 does not apply if the solicitation includes the provisions at 52.214-16, Minimum Bid Acceptance Period.

12. In compliance with the above, the undersigned agrees, if this offer is accepted within (See Clause K-15) from the date for receipt of offers specified above, to furnish any or all items upon which prices are offered at the price set opposite each item, delivered at the designated point(s), within the time specified in the schedule.

| 13. DISCOUNT FOR PROMPT PAYMENT (See Section I, Clause No. 52-232-8) | 10 CALENDAR DAYS % | 20 CALENDAR DAYS % | 30 CALENDAR DAYS % | __ CALENDAR DAYS % |
|---|---|---|---|---|

| 14. ACKNOWLEDGMENT OF AMENDMENTS (The offeror acknowledges receipt of amendments to the SOLICITATION for offerors and related documents numbered and dated. | AMENDMENT NO. | DATE | AMENDMENT NO. | DATE |
|---|---|---|---|---|
| | 0001 | 2/18/99 | 0003 | 3/5/99 |
| | 0002 | 2/24/99 | 0004 | 3/15/99 |

| 15A. NAME AND ADDRESS OF OFFEROR | CODE | | FACILITY | 16. NAME AND TITLE OF PERSON AUTHORIZED TO SIGN OFFER (Type or print) |
|---|---|---|---|---|
| International Shipbreaking Limited, L.L.C. 18501 R.L. Ostos Road Port of Brownsville Brownsville, TX 78521 (West Coast) | | | | Kevin J. McCabe Chairman |

| 15B. TELEPHONE NO. (Include area code) (914) 253-4940 or (956) 831-2299 | 15C. CHECK IF REMITTANCE ADDRESS [ ] IS DIFFERENT FROM ABOVE. ENTER SUCH ADDRESS IN SCHEDULE. | 17. SIGNATURE | 18. OFFER DATE March 30, 1999 |
|---|---|---|---|

## AWARD (To be completed by Government)

| 19. ACCEPTED AS TO ITEMS NUMBERED | 20. AMOUNT $2,661,580 | 21. ACCOUNTING AND APPROPRIATION See Attached Financial Accounting Data Sheets |
|---|---|---|

| 22. AUTHORITY FOR USING OTHER THAN FULL AND OPEN COMPETITION [ ] 10 U.S.C. 2304 (c) ( ) [ ] 41 U.S.C. 253 (c) ( ) | 23. SUBMIT INVOICES TO ADDRESS SHOWN IN (4 copies unless otherwise specified) ) | ITEM SECTION B |
|---|---|---|

| 24. ADMINISTERED BY (If other than Item 7) CODE SEE ADDENDUM | 25. PAYMENT WILL BE MADE BY SEE ADDENDUM | CODE |
|---|---|---|

| 26. NAME OF CONTRACTING OFFICER (Type or print) JAMES M. BARNARD | 27. UNITED STATES OF AMERICA | 28. AWARD DATE 29 SEP 1999 |
|---|---|---|

IMPORTANT - Award will be made on this Form, or Standard Form 26, or by other authorized official written notice.

NSN 7540-01-152-8064
PREVIOUS EDITION NOT USABLE

33-132

STANDARD FORM 33 (REV. 4-85)
Prescribed by GSA
FAR (48 CFR) 53.214(c)

**00006**

## ADDENDUM

1. International Shipbreaking Limited, L.L.C. is awarded Contract N00024-99-C-2318 under Solicitation N00024-98-R-2219.

2. Contract Cover Sheet, SF 33, the following information is added:

BLOCK 24:  Contract Administration Office

    Supervisor of Shipbuilding, Conversion & Repair, USN
    SUPSHIP Jacksonville Det. Ingleside
    2384 State Highway 361
    Ingleside, Texas 78362

    Code N68958

BLOCK 25:  Payment Office

    DFAS DAO Cleveland Center
    Code IEB Financial Services 9712 Virginia Avenue
    Norfolk, Virginia 23511-3297

    Code 68732

3. In accordance with Amendment 0001, the following clause is added into Section I-2 of this contract:

**FAR 52.219-23 Notice of Price Evaluation Adjustment for Small Disadvantaged Business Concerns (Oct 1998)**

(a) Definitions. As used in this clause—

"Small disadvantaged business concern" means an offeror that represents, as part of its offer, that it is a small business under the size standard applicable to this acquisition; and either—

(1) It has received certification by the Small Business Administration as a small disadvantaged business concern consistent with 13 CFR part 124, subpart B; and

(i) No material change in disadvantaged ownership and control has occurred since its certification;

(ii) Where the concern is owned by one or more disadvantaged individuals, the net worth of each individual upon whom the certification is based does not exceed $750,000 after taking into account the applicable exclusions set forth at 13 CFR 124.104(c)(2); and

2

(iii) It is listed, on the date of its representation, on the register of small disadvantaged business concerns maintained by the Small Business Administration;

(2) It has submitted a completed application to the Small Business Administration or a Private Certifier to be certified as a small disadvantaged business concern in accordance with 13 CFR part 124, subpart B, and a decision on that application is pending, and that no material change in disadvantaged ownership and control has occurred since its application was submitted. In this case, in order to receive the benefit of a price evaluation adjustment, an offeror must receive certification as a small disadvantaged business concern by the Small Business Administration prior to contract award; or

(3) Is a joint venture as defined in 13 CFR 124.1002(f).

"Historically black college or university" means an institution determined by the Secretary of Education to meet the requirements of 34 CFR 608.2. For the Department of Defense (DoD), the National Aeronautics and Space Administration (NASA), and the Coast Guard, the term also includes any nonprofit research institution that was an integral part of such a college or university before November 14, 1986.

"Minority institution" means an institution of higher education meeting the requirements of Section 1046(3) of the Higher Education Act of 1965 (20 U.S.C. 1135d-5(3)) which, for purposes of this clause, includes a Hispanic-serving institution of higher education as defined in Section 316(b)(1) of the Act (20 U.S.C. 1059c(b)(1)).

"United States" means the United States, its territories and possessions, the Commonwealth of Puerto Rico, the U.S. Trust Territory of the Pacific Islands, and the District of Columbia.

(b) Evaluation adjustment. (1) Offers will be evaluated by adding a factor of 10% percent to the price of all offers, except--

(i) Offers from small disadvantaged business concerns that have not waived the adjustment;

(ii) For DOD, NASA, and Coast Guard acquisitions, otherwise successful offers from historically black colleges or universities or minority institutions;

(iii) Otherwise successful offers of eligible products under the Trade Agreements Act when the dollar threshold for application of the Act is equaled or exceeded (see section 25.402 of the Federal Acquisition Regulation (FAR));

(iv) Otherwise successful offers where application of the factor would be inconsistent with a Memorandum of Understanding or other international agreement with a foreign government; and

CtdPDF - www.fasttio.com

(v) For DOD acquisitions, otherwise successful offers of qualifying country end products (see sections 225.000-70 and 252.225-7001 of the Defense FAR Supplement).

(2) The factor shall be applied on a line item basis or to any group of items on which award may be made. Other evaluation factors described in the solicitation shall be applied before application of the factor. The factor may not be applied if using the adjustment would cause the contract award to be made at a price that exceeds the fair market price by more than the factor in paragraph (b)(1) of this clause.

(c) Waiver of evaluation adjustment. A small disadvantaged business concern may elect to waive the adjustment, in which case the factor will be added to its offer for evaluation purposes. The agreements in paragraph (d) of this clause do not apply to offers that waive the adjustment.

_____ Offeror elects to waive the adjustment.

(d) Agreements. (1) A small disadvantaged business concern, that did not waive the adjustment, agrees that in performance of the contract, in the case of a contract for—

(i) Services, except construction, at least 50 percent of the cost of personnel for contract performance will be spent for employees of the concern;

(ii) Supplies (other than procurement from a nonmanufacturer of such supplies), at least 50 percent of the cost of manufacturing, excluding the cost of materials, will be performed by the concern;

(iii) General construction, at least 15 percent of the cost of the contract, excluding the cost of materials, will be performed by employees of the concern; or

(iv) Construction by special trade contractors, at least 25 percent of the cost of the contract, excluding the cost of materials, will be performed by employees of the concern.

(2) A small disadvantaged business concern submitting an offer in its own name agrees to furnish in performing this contract only end items manufactured or produced by small disadvantaged business concerns in the United States. This paragraph does not apply in connection with construction or service contracts.

4. In accordance with Amendment 0003, the following provision replaces the same titled provision in Section C of this contract:

**C1-5   SALE OF SCRAP MATERIAL.** The Contractor is required to sell the scrap and reusable equipment/material generated as a result of dismantling the ship. The Contractor shall maximize proceeds from the sale of the scrap and reusable equipment/material by conducting informal competitive sales, as required by the Contracting Officer. The Contractor is authorized to credit the amount of the proceeds to the price or cost of the work covered by the contract in accordance with 40 U.S.C. 485(e).

CVAPDF - www.fasoo.com

N00024-99-C-2318

The Contractor shall report the quantity of scrap and reusable equipment recovered for resale in the Cost Data Report (C1-10).

5. The execution of this contract establishes the requirement for CLIN 0001, and satisfies the minimum order requirement of one ship under contract clause H-3 FAR 52.216-19 – ORDER LIMITATIONS (DEVIATION). The following additional information is provided specific to the effort to be performed on CLIN 0001:

SHIP: Ex-BAGLEY (FF1069), located at MARAD Suisun Bay, Benicia, California

* NISMF Bremerton reporting letter ser 062 of 29 Jan 98 was provided to offerors during bidder inspections. Another copy can be requested from PMS 333.
* Upon contract award, contact Mr. Pete Galassi, Director, NISMF Bremerton, tel. 360-476-3510, for arrangements to remove the ship from MARAD Suisun Bay.
* The acoustic silencing propeller hub vortex dissipator, known as the hub device, has not had keypoint demilitarization accomplished on it. The contractor is required to demilitarize this hub device by total destruction as described in paragraph C1.3-3 of the Statement of Work. The hub device is located between the propeller and the propeller fairwater cap.

6. In accordance with Section J – **LIST OF ATTACHMENTS**, of the solicitation the Contractor's Operational Plan, Schedule for CLIN 0001, Environmental Management Plan, Safety and Health Management Plan and Environmental and Safety Information, Instructions, Terms and Conditions are attached to this contract and hereby made subject to the provisions of the "ORDER OF PRECEDENCE" (FAR 52.215-8) clause of this contract.

7. In accordance with Clause H-5, PERFORMANCE INCENTIVE, an award fee pool of $150,000 is established for CLIN 0001.

CMPDF - www.hedoc.com

**00009**                                        N00024-99-C-2318

<u>SCHEDULE</u>

**SECTION B - SUPPLIES OR SERVICES AND PRICES/COSTS**

The Contractor shall furnish the following supplies and services when ordered by the
Contracting Officer in accordance with the terms and conditions set forth in this Contract.
Offerors must fill out target cost, target fee, minimum fee and maximum fee for line item
0001 and a firm fixed price for line item 0014 on the East Coast lot.    For the West Coast
lot, offerors must fill out target cost, target fee, minimum fee and maximum fee for line
item 0001 and firm fixed prices for line items 0010 through 0012.   Pricing of follow-on
task orders will be done by successful offerors when new task orders are solicited.
Estimated costs for CLIN 0001 include the gross cost of performance, excluding scrap
material proceeds and towing costs.  Offerors submitting bids for both coasts must submit
two separate proposals; offerors can not submit one proposal bidding two different lots.

In accordance with clause H-7 "SINGLE OR MULTIPLE AWARDS (OCT 1995), the
Government intends to make multiple awards for the same supplies and services and
compete follow-on task orders between firms who successfully complete the initial award
quantity of one ship.   It is anticipated that up to two IDIQ contracts will be awarded for
each coastal lot dependent on funding availability and industry response. To facilitate
multiple awards, offerors are advised that proposals must be effective for 365 days after
receipt.

| East Coast Lot | | | | |
|---|---|---|---|---|
| **ITEM NO.** | **SUPPLIES/SERVICES** | **UNIT** | | **ESTIMATED COST** |
| 0001 | Dismantle FF 1052 class | 1/EA | Target Cost: | $       N/A |
| | (Approx.  3,250 Tons) | | Target Fee: | $       N/A |
| | | | Minimum Fee: | $       N/A |
| | | | Maximum Fee: | $       N/A |
| **Note:  Share ratio (Government/Contractor) for line item 0001 is 50/50 over and under target cost.** | | | | |
| 0002 | Dismantle CG 16 class | TBD | TBD | **Required at the time** |
| | (Approx.  4,500 Tons) | | | **follow-on task** |
| | (See Notes A & B) | | | **orders are solicited** |
| 0003 | Dismantle CG 26 class | TBD | TBD | **Required at the time** |
| | (Approx.  5,000 Tons) | | | **follow-on task** |
| | (See Notes A & B) | | | **orders are solicited** |

1

CVMPDF - www.fasiio.com

00010

## SCHEDULE

| ITEM NO. | SUPPLIES/SERVICES | UNIT | | ESTIMATED COST |
|---|---|---|---|---|
| 0004 | Dismantle DD 931 class | TBD | TBD | Required at the time |
| | (Approx. 3,000 Tons) | | | follow-on task |
| | (See Notes A & B) | | | orders are solicited |
| 0005 | Dismantle DD 963 class | TBD | TBD | Required at the time |
| | (Approx. 6,000 Tons) | | | follow-on task |
| | (See Notes A & B) | | | orders are solicited |
| 0006 | Dismantle DDG 2 class | TBD | TBD | Required at the time |
| | (Approx. 3,300 Tons) | | | follow-on task |
| | (See Notes A & B) | | | orders are solicited |
| 0007 | Dismantle DDG 37 class | TBD | TBD | Required at the time |
| | (Approx. 5,200 Tons) | | | follow-on task |
| | (See Notes A & B) | | | orders are solicited |
| 0008 | Dismantle FF 1040 class | TBD | TBD | Required at the time |
| | (Approx. 2,600 Tons) | | | follow-on task |
| | (See Notes A & B) | | | orders are solicited |
| 0009 | Dismantle FF 1052 class | TBD | TBD | Required at the time |
| | (Approx. 3,250 Tons) | | | follow-on task |
| | (See Notes A & B) | | | orders are solicited |
| 0010 | Dismantle FFG 7 class | TBD | TBD | Required at the time |
| | (Approx. 2,800 Tons) | | | follow-on task |
| | (See Notes A & B) | | | orders are solicited |
| 0011 | Dismantle MHC 43 | TBD | TBD | Required at the time |
| | (Approx. 700 Tons) | | | follow-on task |
| | (See Notes A & B) | | | orders are solicited |
| 0012 | Dismantle MSO 427 Class | TBD | TBD | Required at the time |
| | (Approx. 700 Tons) | | | follow-on task |
| | (See Notes A & B) | | | orders are solicited |

Case 1:01-cv-00048    Document 43    Filed in TXSD on 08/17/2001    Page 21 of 338

**00011**

## SCHEDULE

| ITEM NO. | SUPPLIES/SERVICES | UNIT | | ESTIMATED COST |
|---|---|---|---|---|
| 0013 | Provide DATA for Items 0001 through 0012 as required by the relevant Contract Data Requirements List (CDRL) DD Form 1423 Exhibits. | 1/LOT | NSP | NSP |
| | | | | (Price for CDRL included in items (0001 through 0012) |
| | | | Firm Fixed Price | |
| 0014 | Towing charge for one FF 1052 class ship from Naval Inactive Ships Maintenance Facility (NISMF) Philadelphia, PA (See Note C) | 1/EA | | $       N/A |

Case 1:01-cv-00048   Document 43   Filed in TXSD on 08/17/2001   Page 22 of 338

00012

## SCHEDULE

| | West Coast Lot | | | |
|---|---|---|---|---|
| **ITEM NO.** | **SUPPLIES/SERVICES** | **UNIT** | | **ESTIMATED COST** |
| 0001 | Dismantle FF 1052 class | 1/EA | Target Cost: | $ 1,577,026.00 |
| | (Approx. 3,250 Tons) | | Target Fee: | $ 236,554.00 |
| | | | Minimum Fee: | $ 157,703.00 |
| | | | Maximum Fee: | $ 473,108.00 |
| **Note:** Share ratio (Government/Contractor) for line item 0001 is 50/50 over and under target cost. | | | | |
| 0002 | Dismantle DD 963 class | TBD | TBD | Required at the time |
| | (Approx. 6,000 Tons) | | | follow-on task |
| | (See Notes A & B) | | | orders are solicited |
| 0003 | Dismantle DDG 2 class | TBD | TBD | Required at the time |
| | (Approx. 3,300 Tons) | | | follow-on task |
| | (See Notes A & B) | | | orders are solicited |
| 0004 | Dismantle FF 1052 class | TBD | TBD | Required at the time |
| | (Approx. 3,250 Tons) | | | follow-on task |
| | (See Notes A & B) | | | orders are solicited |
| 0005 | Dismantle MSO 427 class | TBD | TBD | Required at the time |
| | (Approx. 700 Tons) | | | follow-on task |
| | (See Notes A & B) | | | orders are solicited |
| 0006 | Dismantle SS 572 | TBD | TBD | Required at the time |
| | (Approx. 1,600 Tons) | | | follow-on task |
| | (See Notes A & B) | | | orders are solicited |
| 0007 | Dismantle CG 16 class | TBD | TBD | Required at the time |
| | (Approx. 4,500 Tons) | | | follow-on task |
| | (See Notes A & B) | | | orders are solicited |
| 0008 | Dismantle CG 26 class | TBD | TBD | Required at the time |
| | (Approx. 5,000 Tons) | | | follow-on task |
| | (See Notes A & B) | | | orders are solicited |

**00013**

## SCHEDULE

| ITEM NO. | SUPPLIES/SERVICES | UNIT | PRICE | AMOUNT |
|---|---|---|---|---|
| 0009 | Provide DATA for Items 0001 through 0007 as required by the relevant Contract Data Requirements List (CDRL) DD Form 1423 Exhibits. | 1/LOT | NSP | NSP |
| | | | (Price for CDRL included in items 0001 through 0008) | |
| | | | **Firm Fixed Price** | |
| 0010 | Towing charge for one FF 1052 class ship from Naval Inactive Ships Maintenance Facility (NISMF) Pearl Harbor, HI (See Note C) | 1/EA | | $    894,000.00 |
| 0011 | Towing charge for one FF 1052 class ship from NISMF Bremerton, WA (See Note C) | 1/EA | | $    796,000.00 |
| 0012 | Towing charge for one FF 1052 class ship from MARAD Suisun Bay, CA (See Note C) | 1/EA | | $    698,000.00 |

\***Contract line items within each task order will be given sub-line suffixes to indicate fiscal year.   Sub-line suffixes and corresponding fiscal years are as follows:  AA FY-99, AB FY-00, AC FY-01, AD FY-02, and AE FY-03.

NOTE A:  Task orders for this item will be priced on a Cost Plus Incentive Fee (CPIF), Fixed Price Incentive (Successive Targets) (FPI(S)), or Firm Fixed Price (FFP) basis.  The Government's preference for the first ship of a class is CPIF or FPIS. The decision on contract type, for follow-on task orders, will be determined by the Government based on a risk assessment.  Assessments will be made based on Government/Contractor risk at the time of follow-on task order solicitation.  If a FPIS arrangement is used, there will be a repricing of the task order at the 50% point of completion. The repricing will result in a Fixed Price Incentive (Firm Target) (FPI(F)) or a Firm Fixed Price (FFP) task order.  The ceiling price agreed to under the initial pricing will not be changed in subsequent negotiations of a Fixed Price Incentive (Firm Target) or exceeded under a Firm Fixed Price task order.

Case 1.01-cv-00048   Document 43   Filed in TXSD on 08/17/2001   Page 24 of 338

<u>SCHEDULE</u>

**NOTE B:** If the follow-on task order is priced on a FPIS basis, the profit adjustment formula outlined in SECTION I-2, FAR 52.216-17 INCENTIVE PRICE REVISION -- SUCCESSIVE TARGETS (OCT 1997) applies.

**NOTE C:** This item will be priced on a firm fixed price basis.

**B-1   CONTRACT TYPE SUMMARY FOR PAYMENT OFFICE (COST/FIXED PRICE) (NAVSEA) (FEB 1997)**

This is an indefinite-quantity indefinite-delivery contract for the supplies or services specified, and effective for the period stated, in SECTION F – "DELIVERIES OR PERFORMANCE." Individual task orders shall be placed against the line items above. The task order for CLIN 0001 shall be placed on a cost plus incentive fee basis defined in FAR 16.405-1. Contract type for task orders for East Coast Lot CLINs 0002 – 0012 and West Coast Lot CLINs 0002-0008 will be determined by the Government at the time of task order solicitation. The format for Cost Plus Incentive Fee (CPIF) orders is defined in FAR 16.405-1. Fixed-price incentive (successive targets) (FPIS) orders are defined in FAR 16.403-2 and firm fixed price orders are defined in FAR 16.202-1. Task orders will be issued in accordance with the ordering provisions contained in SECTION- H "Special Contract Requirements." A summary of CLINs by contract type follows:

| East Coast Lot CLINs | Contract Type | West Coast Lot CLINs | Contract Type |
|---|---|---|---|
| 0001 | CPIF | 0001 | CPIF |
| 0002-0012 | TBD | 0002-0008 | TBD |
| 0013 | NSP* | 0009 | NSP* |
| 0014 | FFP | 0010-0012 | FFP |

*Data requirements are not separately priced. Costs will be included within the priced line items.

**B-2   LIMITATION OF COST/LIMITATION OF FUNDS LANGUAGE (MAY 1993) (Applicable to cost type task orders)**

The clause entitled "LIMITATION OF COST" (FAR 52.232-20) or "LIMITATION OF FUNDS" (FAR 52.232-22), as appropriate, shall apply separately and independently to each separately identified estimated cost.

**B-3   COMPENSATION (FI) (NAVSEA) (JAN 1990) (Applicable to fixed price type task orders)**

The total compensation to be paid the Contractor shall be the sum of the total final price(s) established in accordance with the "INCENTIVE PRICE REVISION--FIRM TARGET" (FAR 52.216-16) clause and the amounts payable to or due from the contractor pursuant to the contract provisions identified in paragraph (d)(1) of said clause.

CVAPDF - www.fwww.com

**00015**

## SCHEDULE

**B-4    ITEM(S) - DATA REQUIREMENTS (NAVSEA) (SEP 1992)**

The data to be furnished hereunder shall be prepared in accordance with the Contract Data Requirements List, DD Form 1423, Exhibit A, attached hereto.

**B-5    EXPEDITING CONTRACT CLOSEOUT (NAVSEA) (DEC 1995)**

(a) As part of the negotiated fixed price or total estimated amount of this contract, both the Government and the Contractor have agreed to waive any entitlement that otherwise might accrue to either party in any residual dollar amount of $500 or less at the time of final contract closeout. The term "residual dollar amount" shall include all money that would otherwise be owed to either party at the end of the contract, except that, amounts connected in any way with taxation, allegations of fraud and/or antitrust violations shall be excluded. For purposes of determining residual dollar amounts, offsets of money owed by one party against money that would otherwise be paid by that party may be considered to the extent permitted by law.

(b) This agreement to waive entitlement to residual dollar amounts has been considered by both parties. It is agreed that the administrative costs for either party associated with collecting such small dollar amounts could exceed the amount to be recovered.

**B-6    PAYMENTS OF FEE(S) (COMPLETION) (NAVSEA) (MAY 1993)**
**(Applicable to cost type task orders)**

(a) For purposes of this contract, "fee" means "target fee" in cost-plus-incentive-fee type contracts, "base fee" in cost-plus-award-fee type contracts, "fixed fee" in cost-plus-fixed-fee type contracts for completion and phase type contracts.

(b) The Government shall make payments to the Contractor, subject to and in accordance with the clause in this contract entitled "FIXED FEE" (FAR 52.216-8) or "INCENTIVE FEE", (FAR 52.216-10), as applicable. Such payments shall be equal to fifteen percent (15 %) of the allowable cost of each invoice submitted by and payable to the Contractor pursuant to the clause of this contract entitled "ALLOWABLE COST AND PAYMENT" (FAR 52.216-7), subject to the withholding terms and conditions of the "FIXED FEE" or "INCENTIVE FEE" clause, as applicable (percentage of fee is based on fee dollars divided by estimated cost dollars, including facilities capital cost of money). Total fee(s) paid to the Contractor shall not exceed the fee amount(s) set forth in this contract.

(c) In the event of discontinuance of the work under this contract, or any specified phase of the contract, in accordance with the clause of this contract entitled "LIMITATION OF FUNDS" (FAR 52.232-22) or "LIMITATION OF COST" (FAR 52.232-20), as applicable, the fee shall be equitably adjusted by mutual agreement to reflect the

**00016**

## SCHEDULE

diminution of work. If the adjusted fee is less than the sum of all fee payments made to the Contractor under this contract, the Contractor shall repay the excess amount to the Government. If the adjusted fee exceeds all payments made to the Contractor under this contract, the Contractor shall be paid the additional amount, subject to the availability of funds. In no event shall the Government be required to pay the Contractor any amount in excess of the funds obligated under this contract at the time of the discontinuance of work.

(d) Fee(s) withheld pursuant to the terms and conditions of this contract shall not be paid until the contract has been modified to reduce the fee(s) in accordance with paragraph (c) above, or until the Procuring Contracting Officer has advised the paying office in writing that no fee adjustment is required.

B-7   NAPS 5252.232-9001  SUBMISSION OF INVOICES (COST-REIMBURSEMENT, TIME-AND-MATERIALS, LABOR-HOUR, OR FIXED PRICE INCENTIVE) (JUL 1992)

(a) "Invoice" as used in this clause includes contractor requests for interim payments using public vouchers (SF 1034) but does not include contractor requests for progress payments under fixed price incentive contracts.

(b) The Contractor shall submit invoices and any necessary supporting documentation, in an original and 4 copies, to the contract auditor at the following address:  DCAA, Houston Branch Office, 8876 Gulf Freeway, Suite 500, Houston , Texas 77017-6544, unless delivery orders are applicable, in which case invoices will be segregated by individual order and submitted to the address specified in the order. In addition, an information copy shall be submitted to the Contracting Officer Representative (COR) identified in Section G. Following verification, the contract auditor will forward the invoice to the designated payment office for payment in the amount determined to be owing, in accordance with the applicable payment (and fee) clause(s) of this contract.

(c) Invoices requesting interim payments shall be submitted no more than once every two weeks, unless another time period is specified in the Payments clause of this contract. For indefinite delivery type contracts, interim payment invoices shall be submitted no more than once every two weeks for each delivery order. There shall be a lapse of no more than 60 calendar days between performance and submission of an interim payment invoice.

(d) In addition to the information identified in the Prompt Payment clause herein, each invoice shall contain the following information, as applicable:

    (1) Contract line item number (CLIN)
    (2) Subline item number (SLIN)
    (3) Accounting Classification Reference Number (ACRN)
    (4) Payment terms

CVAPDF - www.fesite.com

**00017**

## SCHEDULE

    (5)  Procuring activity

    (6)  Date supplies provided or services performed

    (7)  Costs incurred and allowable under the contract

    (8)  Vessel (e.g., ship, submarine or other craft) or system which supply/service is provided.

(e)  A DD Form 250, "Material Inspection and Receiving Report",

    [] is required with each invoice submittal.

    [X] is required only with final invoice.

    [] is not required.

(f)  A Certificate of Performance

    [X] shall be provided with each invoice submittal.

    [] is not required.

(g)  The Contractor's final invoice shall be identified as such, and shall list all other invoices (if any) previously tendered under this contract.

(h)  Costs of performance shall be segregated, accumulated and invoiced to the appropriate ACRN categories to the extent possible.  When such segregation of costs by ACRN is not possible for invoices submitted with CLINS/SLINS with more than one ACRN, an allocation ratio shall be established in the same ratio as the obligations cited in the accounting data so that costs are allocated on a proportional basis.

9

Case 1:01-cv-00048   Document 43   Filed in TXSD on 08/17/2001   Page 28 of 338

## SECTION C - DESCRIPTION/SPECIFICATION/WORK STATEMENT

The Contractor shall furnish supplies or services under the items specified in Section B of the Schedule in accordance with this section and requirements set forth in orders issued by the Contracting Officer in accordance with the special contract requirement(s) clause H-4 "ORDERS."

## GENERAL INFORMATION

**C1-1   SCOPE OF WORK.**  The contractor shall provide all personnel, equipment, tools, vehicles, materials, facilities, supervision and any other items and services necessary to dismantle and dispose of the ship in a manner which is safe for workers and the environment, and complies with all applicable Federal, State and local laws.  The scope of work for dismantling and disposal of the ship includes:

- Towing the vessel
- Dismantling of the vessel:
  - Establishing a schedule
  - Utilize Dry-dock, Slip, or Other method
  - Demilitarizing residual military equipment, and property,
  - Stripping of unique Government Property (FFG 7 & DD 963 Classes only)
  - Completely scrapping the hull
- Hazardous material/waste removal and disposal,
- Sale of scrap material
- Partnering

All work performed under this contract shall be in compliance with applicable Federal, State, and Local laws and regulations. The Contractor must have all valid permits and licenses necessary prior to performing the associated scope of work. The Contractor must maintain valid permits and licenses throughout the period of performance of this contract.

**C1-2   TOWING VESSEL.**  The Contractor shall provide harbor clearance, ocean engineering and point-to-point towing services to ensure safe transport of the ship from existing ship locations to their ship dismantling location.

**C1-3   DISMANTLING OF THE VESSEL.**  The Contractor shall dismantle ships identified by task order.  Additionally, the Contractor shall implement an initial Operational Plan described in the Contractor's proposal and incorporated into the contract as attachment J-2.  Updates to the Operational Plan, if required, shall be included with each successive task order.

**C1-3.1 Schedule.**  The Contractor shall develop and implement a schedule for each task order.  The Contractor's schedule for CLIN 0001, described in the Contractor's proposal, is incorporated into the contract as attachment J-3.  Schedules for CLINs other than CLIN 0001 will be proposed by the Contractor when requested by the Contracting Officer for

CUtePDF - www.tuvia.com

**00019**

## SCHEDULE

subsequent task orders. The schedule will address all tasks required for ship dismantling including towing, demilitarization of residual military equipment and property, stripping of Government property as required, identification and safe removal & disposal of hazardous materials/wastes, and ship dismantling. The schedule shall include planned start & completion dates and timeline for each phase of the scrapping process. Identification of work items considered to be on the critical path to completion will also be identified. The schedule shall be used as the baseline schedule in developing the status reports required in C1-9.1.

**C1-3.2 Dry-dock, Slip, or Other method.** The Contractor shall implement plans, as described in the Operational Plan, for using dry-dock, slip or other method for dismantling the underwater hull. The plans shall include methods for ensuring ship stability during the cutting process, final dismantlement of underwater hull, and measures to prevent flooding or sinking. In addition, plans shall include measures to prevent slag or other contaminants from entering the water.

**C1-3.3 Demilitarization of residual equipment and systems.** Keypoint demilitarization was previously completed by the Government so as to preclude restoration or repair of equipment to a usable condition; keypoint demilitarization has not been performed on FFG 7 class and DD 963 class ships. The Contractor shall ensure that all guided missile launching systems, mounts and fire control systems; sonar domes, transducers and associated equipment; torpedo tubes, ASROC launchers, antennas, radar reflective material, wave guides and any other weapon systems are further and totally destroyed by melting, cutting, tearing, scratching, crushing or breaking the item and components. Sale of this equipment for continued use is prohibited. Final dismantlement and mutilation described above, and below in C1-3.5, will constitute demilitarization of the hull and required equipment. Upon completion of each task order, the Contractor shall certify that the hull, and the equipment described herein, have been demilitarized in accordance with the requirements of C1-3.3 and C1-3.5.

**C1-3.4 Stripping of unique Government Property (FFG 7 & DD 963 Classes only).** The Government reserves the right to strip unique Government property, including LM 2500 gas turbine engines and generators, before or during performance.

**C1-3.5 Completely scrap hull.** The Contractor shall completely scrap the hull, including any superstructure. This will include the removal from the ship(s) (without replacement) of all hull, inner bottom, bulkhead, deck and deck house material, as well as all decks, longitudinals, webs, girders and other framing. The term "hull" means the framework of a ship, including the keels, together with all decks, deck houses, tanks, the inside outside plating and bulkhead, but exclusive of masts, yardarm, rigging, machinery, outfitting and equipment. Final dismantlement and mutilation of the hull and superstructure shall be performed in such a manner that no considerable part of the ship is left intact or undisturbed to the extent that it can be reconstructed or readily identified as an existing portion of the original hull or superstructure. Scrapping is defined as reducing the property such that it has no value except for its basic material content.

CMxPDF - www.texia.com

**00020**                                          N00024-99-C-2318

<u>SCHEDULE</u>

**C1-4   HAZARDOUS MATERIAL/WASTE REMOVAL AND DISPOSAL.** The Contractor is responsible for all steps necessary to remove and dispose of all hazardous materials/wastes in compliance with all Federal, State, and local laws and regulations. Additionally, the Contractor is required to implement an effective **Environmental Management Plan (EMP)** described in the Contractor's proposal and incorporated in the contract under attachment J-4. The Contractor shall provide the Government with copies of all hazardous material/waste manifests, within 30 days of receipt of the hazardous waste by an approved disposal site. Upon completion of the task order, the Contractor shall certify, in writing, that the Contractor has accomplished all hazardous material removal and hazardous waste removal and disposal in compliance with all Federal, State, and local laws & regulations.

**C1-5   SALE OF SCRAP MATERIAL.** The Contractor is required to sell the scrap and reusable equipment/material generated as a result of dismantling the ship in accordance with FAR 52.245-2(i) and 52.245-5(i). The Contractor shall report the quantity of scrap and reusable equipment recovered for resale in the Cost Data Report (C1-10).

**C1-6   CONTRACTOR PERSONNEL.**
Contractor personnel shall be sufficient to accomplish the scope of work, including key personnel.

**C1-6.1   Key Personnel** The Contractor shall provide the following key personnel in their management organization: Program Manager and Environmental, Safety & Health Manager.

**C1-6.1.1   Program Manager** The Contractor shall provide a full-time on-site program manager (PM) responsible for the performance of work required under this statement of work. Additionally, the PM is responsible for submitting status reports in accordance with section C1-9.

**C1-6.1.2   Environmental, Safety & Health Manager** The Contractor shall provide an Environmental, Safety & Health (ES&H) manager who will be responsible for all environmental and safety matters pertaining to this contract. The ES&H manager will report directly to the Program Manager.

**C1-6.2   Contractor Employees.** The Contractor shall ensure that employees have current and valid professional certifications before starting work under this contract. Certifications shall be maintained by the Contractor.

**00021**

SCHEDULE

**C1-6.3  Employee Training and Certification**  The Contractor shall provide all necessary classroom and on-the-job training required to prepare and document employees as trained and ready or duty prior to assignment to abatement or dismantling work on the ship.  Training records shall be maintained on site by the Contractor.

**C1-7  ENVIRONMENTAL CONTROLS.**  The Contractor shall operate and maintain its facility in a manner that complies with all Federal, State and Local environmental laws, regulations and instructions. The Contractor shall be responsible for obtaining all necessary licenses and permits, accomplishing all notification and manifesting requirements, complying with any applicable Federal, State and Local laws and regulations, and taking any necessary corrective actions resulting from work performed under this contract. Upon the Government's request, the Contractor will provide copies of licenses and permits to the Government. The Contractor shall use only transporters and treatment, storage, and disposal facilities with valid permits. The Government will not be a co-permittee on any permits obtained by the Contractor.  In the event environmental laws or regulations change during the term of this contract, the Contractor is required to comply as such laws or regulations come into effect.  If there is an increase or decrease in cost as a result of the change, the Contractor shall inform the Administrative Contracting Officer (ACO) pursuant to notice requirements of FAR 52.243-7 Notification of Changes.

The Contractor shall provide the Government with copies of all correspondence with Federal, State, or local regulatory agencies relating to this contract. This shall include but not be limited to: Notification of any regulatory agency inspection conducted, of any Notice of Violations, citations, or cautionary notices received from regulators during the reporting period, relating to the performance of this contract.

**C1-8  SAFETY AND HEALTH PROGRAM.**  All work shall be conducted in a safe manner and shall comply with all requirements specified throughout the contract and applicable Federal, State, and local laws & regulations. The contractor shall furnish all safety equipment in accordance with Federal, State, and local laws and regulations. The Contractor shall implement the **Safety and Health Management Plan**, described in the Contractor's proposal and incorporated into the contract as attachment J-5, in compliance with applicable Federal, State, and local laws and regulations. The plan shall provide for the safe work environment of Contractor Personnel and ensure protection of Government property.  All subcontractors shall comply with the Contractor's Safety and Health Management Plan. In the event of an accident/mishap, the Contractor shall take reasonable and prudent action to establish control of the accident/mishap scene, prevent further damage to persons or property, and preserve evidence until released by the accident/mishap investigative authority.

The Contractor shall provide the Government with copies of all correspondence with Federal, State, or local regulatory agencies relating to this contract. This shall include but not be limited to: Notification of any regulatory agency inspection conducted, of any Notice of Violations, citations, or cautionary notices received from regulators during the reporting period, relating to the performance of this contract.

4

## SCHEDULE

**C1-8.1 Safety Administration.** Prior to commencing work, the Contractor shall meet in conference with the contracting officer's representative (COR) to discuss and develop an understanding of the administration of their Safety and Health Management Plan.

**C1-8.2 Safety Inspections.** The Contractor's workspace may be inspected periodically for regulatory compliance. Correction of violations will be the responsibility of the contractor. The Contractor will provide assistance to Federal and State regulatory inspectors.

**C1-8.3 Accident and Injury Reporting.** The Contractor shall record and immediately report to the ACO, all available facts relating to injury to either Contractor or Government personnel or each instance of damage to Government property. The Contractor shall provide the Government with a copy of any report to a regulatory agency of accidents or incidents that occur during the performance of this contract.

**C1-9 Status Reports.** The Contractor shall prepare status reports. The reports will be due for all active contract task orders on the 15th calendar day of each month for the previous month's performance, or as agreed to with the ACO. All task order status reports shall be delivered under one transmittal letter. The purpose of these reports will be to apprise the Navy of the status of the individual projects and the overall program and to call attention to any departures from the applicable management and work plans.

**C1-9.1 Summary Status Report.** The Contractor shall prepare a summary status report that shall consist of the pertinent technical and financial information for the reporting period. Its focus shall be the Contractor's overall effort on all task orders, highlighting key activities and any deviations from planned schedules and budgets.

**C1-9.1.1 Technical.** This section shall consist of a concise, executive level summary of all technical activities performed under the contract during the reporting period. The summary shall highlight activities of the program and progress achieved under each project. Specific areas of interest shall include difficulties encountered during the reporting period and corrective actions taken, and a schedule showing accomplishments versus planned activities. The report shall include any changes of key personnel concerned with the project. The report shall also address the following:

1. Progress achieved since the previous progress report including status of hazardous material removal and disposal, approximate tonnage of scrap metals and equipment removed and shipped, and identification of the deck to which the ship has been dismantled. Also, identify the approximate percentage of completion of removal and dismantling work on each ship.
2. Quantity and type of hazardous waste shipped for disposal during the reporting period.
3. Progress in correcting any deficiencies identified by Navy or regulatory agency inspections.

CVAPDF - www.fastio.com



## SCHEDULE

4. Notification of any regulatory agency inspection conducted, of any Notice of Violations, citations, or cautionary notices received from regulators during the reporting period, relating to the performance of this contract. Also, notification of any other documentation relating to Federal, state, or local administrative or legal actions arising under or relating to the contract.

5. Progress expected to be achieved over the next month.

6. Identification of problems relating to timely completion of this contract.

7. Status of outstanding permits/licenses required for performance of this contract, and status of any existing permits/licenses due to expire within 90 days of the Progress Report.

8. Advance notice of commencement of project activities that will require notification to any regulatory agency by the Contractor or any of its subcontractors.

The first summary status report shall be submitted to the Government within 30 calendar days after start of the task order. The Contractor will include in the monthly progress report the Contractor's plan to respond to any discrepancies noted or questions asked in writing by the Government.

**C1-9.1.2 Financial.** This section shall provide the following information:

- Cumulative invoiced amounts
- Estimated costs to complete
- Estimated budget variances and a plan for corrective actions, if applicable
- Cost savings initiative implemented during the reporting period

**C1-9.2 Final Project Report.** Upon completion of each ship, the Contractor shall provide a final report to include the requirements listed above.

## C1-10 COST DATA REPORTS.

The Contractor shall provide monthly and final cost data reports. A separate report shall be generated for each task order. Variations from the format specified in the CDRL can be proposed within 30 days after award. The Government reserves the right to reject the proposed cost reporting format if it does not provide equivalent information.

The Contractor agrees to maintain all books, records detailing contract expenses and revenue, and other documents used to perform the contract and make such documents available to the Government for review and audit purposes. The Contractor must further maintain such records for a period of two years after contract completion or for such a time as the Contractor, for its own purposes, retains such books, records, and other documents, whichever is longer.

CSIsPDF - www.fenix.com

<u>SCHEDULE</u>

## C1-11 NOTIFICATION OF ITEMS FOUND ONBOARD

During dismantling of the vessels, in the event that the Contractor discovers items such as photographs, documents, drawings or other information onboard the vessel, the Contractor will immediately notify the COR of the items found and their location on the ship. These items will be safe guarded and turned over to the COR.

## C1-12 INSPECTION FACILITIES

The Contractor shall provide office facilities and services for use by the Government contract administration and oversight organization. The facilities and services shall be equal to those provided by the Contractor for his use for generally similar purposes. The Contractor shall also provide a minimum of two desks and two chairs. The Contractor shall provide two parking spaces at the Contractor's facility for use by the Government. The contractor shall provide and maintain a telephone and direct line with local and long distance capability; telephones for this type of service shall be provided with a dial lock or equivalent. The Contractor shall include in the contract price the full cost of providing all telephone service except for long distance calls. Long distance calls shall be billed to the Government on the basis of actual cost.

## C1-13 PARTNERING

The Government intends to encourage the foundation of a cohesive partnership with the Contractor and its subcontractors. This partnership will be structured to draw on the strengths of each organization to identify and achieve reciprocal goals. The objectives are effective and efficient contract performance, intended to achieve completion within budget, on schedule, and in accordance with the statement of work.

This partnership will be bilateral in makeup, and participation will be totally voluntary. Any cost associated with effectuating this partnership will be agreed to by both parties and will be shared equally with no change in contract price. To implement this partnership initiative, it is anticipated that within 60 days of notice of award the Contractor's Program Manager and the Government Program Office will attend a partnership development seminar followed by a team-building workshop to be attended by the Contractor's key personnel and Government personnel. Follow-up workshops will be held periodically throughout the duration of the contract as agreed to by the Contractor and Government.

## PART 2 - GENERAL REQUIREMENTS

## C2-1 TARGET PRICE NOTIFICATION REQUIREMENT (NAVSEA) (SEP 1995) (Applicable to both cost and fixed price incentive task orders)

(a) The Contractor shall notify the Contracting Officer, in writing, whenever it has reason to believe that--

Case 1:01-cv-00048   Document 43   Filed in TXSD on 08/17/2001   Page 35 of 338

SCHEDULE

(1)  the costs the Contractor expects to incur within the next 60 days (including amounts payable to subcontractors), when added to all costs previously incurred, will exceed 75 percent of the target cost specified in the Schedule, or

(2)  the projected cost for the performance of this contract, exclusive of target profit, will be greater than the target cost specified in Section B of the contract.

(b)  As part of the notification the Contractor shall provide the Contracting Officer the date when it is estimated that costs incurred will equal or exceed target cost and a revised estimate of the total cost of performing the contract.  In the event that the revised estimated cost plus any adjustment for profit or loss exceeds the ceiling price specified in the Schedule, the Government's liability is limited to the ceiling price specified in the Schedule.

(c)  This notification requirement shall apply to each separately identified target price specified in Section B of the contract.

C2-2 ACCESS TO THE VESSEL(S) (AT) (NAVSEA) (JAN 1983)

Officers, employees and associates of other prime Contractors with the Government and their subcontractors, shall, as authorized by the Supervisor, have, at all reasonable times, admission to the plant, access to the vessel(s) where and as required, and be permitted, within the plant and on the vessel(s) required to perform and fulfill their respective obligations to the Government.  The Contractor shall make reasonable arrangements with the Government or Contractors of the Government, as shall have been identified and authorized by the Supervisor to be given admission to the plant and access to the vessel(s) for office space, work areas, storage or shop areas, or other facilities and services, necessary for the performance of the respective responsibilities involved, and reasonable to their performance.

C2-3  DEPARTMENT OF LABOR SAFETY AND HEALTH STANDARDS FOR SHIPBUILDING (AT) (NAVSEA) (JAN 1990)

Attention of the Contractor is directed to Public Law 91-596, approved December 29, 1970 (84 Stat. 1590, 29 USC 655) known as the "OCCUPATIONAL SAFETY AND HEALTH ACT OF 1970" and to the "OCCUPATIONAL SAFETY AND HEALTH STANDARDS FOR SHIPYARD EMPLOYMENT" promulgated thereunder by the Secretary of Labor (29 CFR. 1910 and 1915).  These regulations apply to all shipbuilding and related work, as defined in the regulations.  Nothing contained in this contract shall be construed as relieving the Contractor from any obligations which it may have for compliance with the aforesaid regulations.

8

CVAPDF - www.fevie.com

00026-



N00024-99-C-2318

## SCHEDULE

### C2-4  PERMITS AND RESPONSIBILITIES (NAVSEA) (SEP 1990)

The Contractor shall, without additional expense to the Government, be responsible for obtaining any necessary licenses and permits, and for complying with any applicable Federal, State, and Municipal laws, codes, and regulations, in connection with any movement over the public highways of overweight/overdimensional materials.

Case 1:01-cv-00048    Document 43    Filed in TXSD on 08/17/2001    Page 37 of 338

00027

## SCHEDULE

## SECTION D – PACKAGING AND MARKING

All data shall be prepared for shipment in accordance with best commercial practice.

### D-1 MARKING OF REPORTS (NAVSEA) (SEP 1990)

All reports delivered by the Contractor to the Government under this contract shall prominently show on the cover of the report:

    (1)  name and business address of the Contractor
    (2)  contract/task order number
    (3)  sponsor: _____
                (Name of COR)

               _____
               (Name of Requiring Activity)

               _____
               (City and State)

1

CVAPDF - www.fastio.com

00028                                           N00024-99-C-2318

## SECTION E – INSPECTION AND ACCEPTANCE

### E-1 GENERAL

Inspection and acceptance of all data shall be as specified on the attached Contract Data Requirements List(s), DD Form 1423. Following clause incorporated by reference.

| FAR SOURCE | TITLE AND DATE |
|---|---|
| FAR 52.246-13 | INSPECTION – DISMANTLING, DEMOLITION OR REMOVAL OF IMPROVEMENTS (AUG 1996) |

### E-2 CLAUSES INCORPORATED BY REFERENCE (COST-TYPE ORDERS)
(Applicable to all cost type task orders)

| FAR SOURCE | TITLE AND DATE |
|---|---|
| 52.246-3 | INSPECTION OF SUPPLIES--COST-REIMBURSEMENT (APR 1984) |
| 52.246-5 | INSPECTION OF SERVICES--COST-REIMBURSEMENT (APR 1984) |

### E-3 CLAUSES INCORPORATED BY REFERENCE (FIXED-PRICE ORDERS)
(Applicable to fixed price type task orders)

| FAR SOURCE | TITLE AND DATE |
|---|---|
| 52.246-2 | INSPECTION OF SUPPLIES--FIXED PRICE (AUG 1996) |
| 52.246-4 | INSPECTION OF SERVICES--FIXED PRICE (AUG 1996) |
| 52.246-16 | RESPONSIBILITY FOR SUPPLIES (APR 1984) |

00029

N00024-99-C-2318

## SCHEDULE

## SECTION F - DELIVERIES OR PERFORMANCE

Orders under this contract (East Coast Lot CLINs 0001–0015 and West Coast Lot CLINs 0001–0010) shall be issued during the period commencing with the effective date of any resultant contract through sixty (60) months.

The Contractor shall furnish supplies or services for CLIN 0001 in accordance with the schedule proposed by the contractor and incorporated into the contract. Schedules for each successive task order shall be proposed by the Contractor and incorporated in each order in accordance with the special contract requirement(s) of this contract entitled "ORDERS".

Unless otherwise specified in any order, the supplies to be furnished by the Contractor shall be delivered f.o.b. carrier's equipment, wharf, or freight station, at the Government's option, at or near the Contractor's plant or at the plants of subcontractors as authorized by the Contracting Officer. The method of shipment will be specified by the cognizant contract administration office when the supplies are ready for shipment.

## F-1 CLAUSES INCORPORATED BY REFERENCE (COST-TYPE ORDERS)
(Applicable to all cost type task orders)

| FAR SOURCE | TITLE AND DATE |
|---|---|
| 52.242-15 and Alt I | STOP-WORK ORDER (AUG 1989) AND ALTERNATE I (APR 1984) |
| 52.247-65 | F.O.B. ORIGIN, PREPAID FREIGHT--SMALL PACKAGE SHIPMENTS (JAN 1991) |

## F-2 CLAUSES INCORPORATED BY REFERENCE (FIXED-PRICE ORDERS)
(Applicable to all fixed price type task orders)

| FAR SOURCE | TITLE AND DATE |
|---|---|
| 52.242-15 | STOP-WORK ORDER (AUG 1989) |
| 52.242-17 | GOVERNMENT DELAY OF WORK (APR 1984) |
| 52.247-34 | F.O.B. DESTINATION (NOV 1991) |
| 52.247-29 | F.O.B. ORIGIN (JUN 1988) |

1

Case 1:01-cv-00048   Document 43   Filed in TXSD on 08/17/2001   Page 40 of 338

## SCHEDULE

| | |
|---|---|
| 52.247-48 | F.O.B. DESTINATION--EVIDENCE OF SHIPMENT (JUL 1995) (DEVIATION - JUL 1997) |
| 52.247-52 | CLEARANCE AND DOCUMENTATION REQUIREMENTS-- SHIPMENTS TO DOD AIR OR WATER TERMINAL TRANSSHIPMENT POINTS (APR 1984) |
| 52.247-55 | F.O.B. POINT FOR DELIVERY OF GOVERNMENT- FURNISHED PROPERTY (APR 1984) |
| 52.247-58 | LOADING, BLOCKING AND BRACING OF FREIGHT CAR SHIPMENTS (APR 1984) |

**F-3 CLAUSES INCORPORATED BY REFERENCE**

FAR
SOURCE        TITLE AND DATE

| | |
|---|---|
| 52.247-61 | F.O.B. ORIGIN--MINIMUM SIZE OF SHIPMENTS (APR 1984) |
| 52.247-65 | F.O.B. ORIGIN, PREPAID FREIGHT--SMALL PACKAGE SHIPMENTS (JAN 1991) |

CVisPDF - www.fasoa.com

Case 1:01-cv-00048    Document 43    Filed in TXSD on 08/17/2001    Page 41 of 338

N00024-99-C-2318

## SCHEDULE

## SECTION G - CONTRACT ADMINISTRATION DATA

Contract administration shall be as set forth below and in orders issued by the Contracting Officer in accordance with the special contract requirement(s) of this contract entitled "ORDERS".

### G-1 ELECTRONIC FUNDS TRANSFER (EFT) PAYMENT REQUIREMENTS

DFARS 252.232-7009, PAYMENT BY ELECTRONIC FUNDS TRANSFER (CCR), is included in this solicitation/contract. All Contractor payments will be made by EFT unless excepted or otherwise determined by the paying office designated in the contract.

The Contractor <u>must</u> initiate enrollment in EFT by contacting the paying office designated in the contract and requesting form SF 3881, Automated Clearing House (ACH) Vendor/Miscellaneous Payment Enrollment Plan. This form must be completed by the Contractor and their financial institution and returned to the paying office. The paying office will complete the process and notify the Contractor that EFT enrollment is complete. All payments under this contract will be held until the Contractor provides the required EFT enrollment information.

### G-2 POINTS OF CONTACT

Enter below the address (street and number, city, county, state and zip code) of the Contractor's facility which will administer the contract if such address is different from the address shown on the SF 26 or SF 33, as applicable.

PURCHASING OFFICE REPRESENTATIVE:     COMMANDER
                                      ATTN: RAY WEST/SEA 02232J
                                      NAVAL SEA SYSTEMS
                                      COMMAND
                                      2531 JEFFERSON DAVIS HWY
                                      ARLINGTON VA 22242-5160
                                      Telephone No. 703/602-7517 X236

CONTRACTING OFFICER'S
REPRESENTATIVE:                       COMMANDER
                                      ATTN: GLEN CLARK/PMS 333
                                      NAVAL SEA SYSTEMS
                                      COMMAND
                                      2531 JEFFERSON DAVIS HWY
                                      ARLINGTON VA 22242-5160
                                      Telephone No. 703/602-5670 X242

The Contractor shall forward a copy of all invoices to the Contracting Officer's Representative.

00032

## SCHEDULE

## SECTION H - SPECIAL CONTRACT REQUIREMENTS

| NR | TITLE | PAGE |
|------|-------|------|
| H-1 | NAVSEA 5252.202-9101 ADDITIONAL DEFINITIONS (MAY 1993) | 26 |
| H-2 | FAR 52.216-22 -- INDEFINITE QUANTITY (OCT 1995) | 26 |
| H-3 | FAR 52.216-19 -- ORDER LIMITATIONS (DEVIATION) | 27 |
| H-4 | NAVSEA 5252.216-9110 ORDERS (NOV 1996) | 27 |
| H-5 | PERFORMANCE INCENTIVE | 32 |
| H-6 | NAVSEA 5252.227-9113 GOVERNMENT-INDUSTRY DATA EXCHANGE PROGRAM (AUG 1997) | 37 |
| H-7 | SINGLE OR MULTIPLE AWARDS (OCT 1995) | 37 |
| H-8 | NAVSEA 5252.237-9106 SUBSTITUTION OF PERSONNEL (SEP 1990) | 38 |
| H-9 | NAVSEA 5252.217-9121 INDEMNIFICATION FOR ACCESS TO VESSEL (MAY 1989) | 38 |
| H-10 | MANAGEMENT AND DISPOSAL OF HAZARDOUS WASTE | 38 |
| H-11 | MINIMUM INSURANCE REQUIREMENTS (NAVSEA) (SEP 1990) | 39 |
| H-12 | NAVSEA 5252.228-9105 INSURANCE-PROPERTY LOSS OR DAMAGE-LIABILITY TO THIRD PERSONS (DEVIATION) | 39 |
| H-13 | PROCEDURES/CRITERIA FOR FOLLOW-ON TASK ORDERS | 40 |
| H-14 | NAVSEA 5252.233-9103 DOCUMENTATION OF REQUESTS FOR EQUITABLE ADJUSTMENT (AT) - ALTERNATE I (MAY 1998) | 40 |
| H-15 | FAR 52.214-16 MINIMUM BID ACCEPTANCE PERIOD (APR 1984) | 42 |

1

**00033**

<u>SCHEDULE</u>

**H-1    NAVSEA 5252.202-9101 ADDITIONAL DEFINITIONS (MAY 1993)**

As used throughout this contract, the following terms shall have the meanings set forth below:

(a) DEPARTMENT - means the Department of the Navy.

(b) REFERENCES TO THE FEDERAL ACQUISITION REGULATION (FAR) - All references to the FAR in this contract shall be deemed to also reference the appropriate sections of the Defense FAR Supplement (DFARS), unless clearly indicated otherwise.

(c) REFERENCES TO ARMED SERVICES PROCUREMENT REGULATION OR DEFENSE ACQUISITION REGULATION - All references in this document to either the Armed Services Procurement Regulation (ASPR) or the Defense Acquisition Regulation (DAR) shall be deemed to be references to the appropriate sections of the FAR/DFARS.

(d) NATIONAL STOCK NUMBERS - Whenever the term Federal Item Identification Number and its acronym FIIN or the term Federal Stock Number and its acronym FSN appear in the contract, order or their cited specifications and standards, the terms and acronyms shall be interpreted as National Item Identification Number (NIIN) and National Stock Number (NSN) respectively which shall be defined as follows:

(1) <u>National Item Identification Number (NIIN)</u>. The number assigned to each approved Item Identification under the Federal Cataloging Program. It consists of nine numeric characters, the first two of which are the National Codification Bureau (NCB) Code. The remaining positions consist of a seven digit non-significant number.

(2) <u>National Stock Number (NSN)</u>. The National Stock Number (NSN) for an item of supply consists of the applicable four position Federal Supply Class (FSC) plus the applicable nine position NIIN assigned to the item of supply.

**H-2    FAR 52.216-22 -- INDEFINITE QUANTITY (OCT 1995)**

(a) This is an indefinite-quantity indefinite-delivery contract for the supplies or services specified, and effective for the period stated, in SECTION F – "DELIVERIES OR PERFORMANCE." The quantities of supplies and services specified in the Schedule are estimates only and are not purchased by this contract.

(b) Delivery or performance shall be made only as authorized by orders issued in accordance with the Ordering clause. The Contractor shall furnish to the Government, when and if ordered, the supplies or services specified in the Schedule up to and including the quantity designated in the Schedule as the "maximum." The Government

**00033**                           <u>SCHEDULE</u>

**H-1     NAVSEA 5252.202-9101 ADDITIONAL DEFINITIONS (MAY 1993)**

As used throughout this contract, the following terms shall have the meanings set forth below:

(a) DEPARTMENT - means the Department of the Navy.

(b) REFERENCES TO THE FEDERAL ACQUISITION REGULATION (FAR) - All references to the FAR in this contract shall be deemed to also reference the appropriate sections of the Defense FAR Supplement (DFARS), unless clearly indicated otherwise.

(c) REFERENCES TO ARMED SERVICES PROCUREMENT REGULATION OR DEFENSE ACQUISITION REGULATION - All references in this document to either the Armed Services Procurement Regulation (ASPR) or the Defense Acquisition Regulation (DAR) shall be deemed to be references to the appropriate sections of the FAR/DFARS.

(d) NATIONAL STOCK NUMBERS - Whenever the term Federal Item Identification Number and its acronym FIIN or the term Federal Stock Number and its acronym FSN appear in the contract, order or their cited specifications and standards, the terms and acronyms shall be interpreted as National Item Identification Number (NIIN) and National Stock Number (NSN) respectively which shall be defined as follows:

    (1) <u>National Item Identification Number (NIIN)</u>. The number assigned to each approved Item Identification under the Federal Cataloging Program. It consists of nine numeric characters, the first two of which are the National Codification Bureau (NCB) Code. The remaining positions consist of a seven digit non-significant number.

    (2) <u>National Stock Number (NSN)</u>. The National Stock Number (NSN) for an item of supply consists of the applicable four position Federal Supply Class (FSC) plus the applicable nine position NIIN assigned to the item of supply.

**H-2     FAR 52.216-22 -- INDEFINITE QUANTITY (OCT 1995)**

(a) This is an indefinite-quantity indefinite-delivery contract for the supplies or services specified, and effective for the period stated, in SECTION F – "DELIVERIES OR PERFORMANCE." The quantities of supplies and services specified in the Schedule are estimates only and are not purchased by this contract.

(b) Delivery or performance shall be made only as authorized by orders issued in accordance with the Ordering clause. The Contractor shall furnish to the Government, when and if ordered, the supplies or services specified in the Schedule up to and including the quantity designated in the Schedule as the "maximum." The Government

CMIPDF - www.fasisc.com

**00034**

### SCHEDULE

shall order at least the quantity of supplies or services designated in the Schedule as the "minimum."

(c) Except for any limitations on quantities in the Order Limitations clause or in the Schedule, there is no limit on the number of orders that may be issued. The Government may issue orders requiring delivery to multiple destinations or performance at multiple locations.

(d) Any order issued during the effective period of this contract and not completed within that period shall be completed by the Contractor within the time specified in the order. The contract shall govern the Contractor's and Government's rights and obligations with respect to that order to the same extent as if the order were completed during the contract's effective period; provided, that the Contractor shall not be required to make any deliveries under this contract after 30 SEP 2005.

### H-3   FAR 52.216-19 -- ORDER LIMITATIONS (DEVIATION)

(a) Minimum order. The Government is required to order at least the minimum quantity.

    (1) the minimum quantity covered by this contract is one (1) ship

(b) Maximum order. The Contractor is not obligated to honor --

    (1) Any single order that exceeds seven (7) ships.

    (2) A series or combination of orders from any ordering office within any 365-day period that together call for quantities exceeding the seven (7) ship limitation in subparagraph (1), above.

(c) Notwithstanding paragraph (b) of this section, the Contractor shall honor any order exceeding the maximum order limitations in paragraph (b), unless that order (or orders) is returned to the ordering office within 10 days after issuance with written notice stating the Contractor's intent not comply and the reasons.

### H-4   NAVSEA 5252.216-9110 ORDERS (NOV 1996)

(a) General. Orders for supplies or services specified in Section B of the Schedule may be issued by the Contracting Officer at any time during the effective period of this contract. Except as otherwise provided in paragraph (e) below, the Contractor agrees to accept and perform orders issued by the Contracting Officer within the scope of this contract. It is understood and agreed that the Government has no obligation under the terms of this contract to issue any orders. Except as otherwise provided in any order, the Contractor shall furnish all materials and services necessary to accomplish the work specified in each order issued hereunder; provided, however, that this contract shall not be used for the furnishing of supplies or services which are covered by any "guaranty" or

**00035**

N00024-99-C-2318

<u>SCHEDULE</u>

"warranty" clause(s) of the contract(s) under which the supplies were manufactured. In the event of any inconsistency between any order and this contract, this contract shall control. All requirements of this contract shall be applicable to all orders issued hereunder. Each order shall be considered a separate binding contract as of its effective date. The Contractor shall segregate the costs incurred in the performance of any order issued hereunder from the costs of all other orders issued under this contract.

(b) <u>Ordering</u>. Orders and revisions thereto shall be made in writing and be signed by any authorized Contracting Officer cited in paragraph (i). Each order shall:

    (1) set forth detailed specifications or requirements for the supplies or services being ordered, (or reference applicable specifications or requirements in Section C of this contract), and, shall refer to the appropriate item under Section B of this contract;

    (2) set forth quantities being ordered;

    (3) set forth preservation, packaging and packing instructions, if any;

    (4) set forth the contractor's proposed completion schedule;

    (5) designate the place(s) where inspection and acceptance will be made by the Government;

    (6) set forth either the firm contract price or, in the case of an undefinitized order, the definitization schedule and both the monetary limitation on Government liability for the undefinitized order and the maximum ceiling amount at which the order may be definitized;

    (7) set forth appropriation and accounting data for the work being ordered;

    (8) set forth any discount offered for prompt payment;

    (9) be dated;

    (10) be identified by number in accordance with DFARS 204.7004;

    (11) set forth the property, if any, to be furnished by the Government and the date(s) such property is to be delivered to the Contractor;

    (12) set forth the disbursing office where payment is to be made and other applicable contract administration data;

Case 1:01-cv-00048   Document 43   Filed in TXSD on 08/17/2001   Page 47 of 338

N00024-99-C-2318

## SCHEDULE

Contractor shall submit a cost proposal with sufficient data to support the accuracy and derivation of its price; and, when required by FAR or the Contracting Officer, cost or pricing data, including SF 1411. If additional cost information is available prior to the conclusion of negotiations, the Contractor shall provide that information to the Contracting Officer. The price agreed upon shall be set forth in a bilateral modification to the order. In no event shall the price exceed the maximum ceiling amount specified in the undefinitized order.

(2) Each undefinitized order shall contain a schedule for definitization which shall include a target date for definitization and dates for submission of a qualifying proposal, beginning of negotiations and, if appropriate, submission of make-or-buy and subcontracting plans and cost or pricing data. Submission of a qualifying proposal in accordance with the definitization schedule is a material element of the order. The schedule shall provide for definitization of the order by the earlier of:

(i) specified target date which is not more than 180 days after the issuance of the undefinitized order. However, that target date may be extended by the Contracting Officer for up to 180 days after the Contractor submits a qualifying proposal as defined in DFARS 217.7401; or

(ii) the date on which the amount of funds obligated by the Government under the undefinitized order exceeds fifty percent (50%) of the order's maximum ceiling amount, except as provided in subparagraph (f)(3) below.

(3) If agreement on a definitive order is not reached within the time provided pursuant to subparagraph (f)(2) above, the Contracting Officer may, with the approval of the Head of the Contracting Activity, determine a reasonable price in accordance with Subpart 15.8 and Part 31 of the FAR, and issue a unilateral order subject to Contractor appeal as provided in the "DISPUTES" clause (FAR 52.233-1). In any event, the Contractor shall proceed with completion of the order, subject to the "LIMITATION OF GOVERNMENT LIABILITY" clause (FAR 52.216-24).

(g) Limitation of Government Liability. (1) Each undefinitized order shall set forth the limitation of Government liability, which shall be the maximum amount that the Government will be obligated to pay the Contractor for performance of the order until the order is definitized. The Contractor is not authorized to make expenditures or incur obligations exceeding the limitation of Government liability set forth in the order. If such expenditures are made, or if such obligations are incurred, those expenditures and obligations will be at the Contractor's sole risk and expense. Further, the limitation of liability shall be the maximum Government liability if the order is terminated. The clause at FAR 52.216-24 shall be included in any undefinitized order.

6

N00024-99-C-2318

## SCHEDULE

(13) cite the applicable circumstance or exception and the justification control number. Orders for items not identified in the class justification, or an individual justification, and the contract are unauthorized;

(14) be issued on an SF 26 or a DD Form 1155; and

(15) set forth any other pertinent information.

(c) Firm Priced Orders. Except as otherwise provided in paragraph (d) below, the Contractor shall not begin any work on an order until a firm priced order is issued by the Contracting Officer. Upon receipt of a proposed order, the Contractor shall promptly submit to the Contracting Officer a price proposal for the work specified in the order. The Contractor agrees that it will submit a signed SF 1411 (Contract Pricing Proposal) or such other cost or pricing data as the Contracting Officer may require. Promptly after receipt of the Contractor's proposal and supporting cost or pricing data, the Contractor and the Contracting Officer shall negotiate and agree upon a price and delivery schedule for the work being ordered. The price and delivery schedule, as agreed upon, shall be set forth in the priced order and the order shall be signed by both the Contracting Officer and the Contractor. Upon receipt of the priced order, the Contractor shall promptly commence work and shall diligently complete it.

(d) Undefinitized Orders. Whenever the Contracting Officer determines that urgent demands or requirements prevent the issuance of a firm priced order, the Contracting Officer may issue an unpriced order. Such order may be unilateral or bilateral and shall establish a limitation on Government liability, a maximum ceiling amount and a schedule for definitization, as described in subparagraph (f)(2) below. Upon request, the Contractor shall submit a maximum ceiling amount proposal before the undefinitized order is issued. The maximum ceiling amount is the maximum price at which the order may be definitized. Except as provided in paragraph (e) below, the Contractor shall commence performance of the order upon receipt. The clause entitled "CONTRACT DEFINITIZATION" (DFARS 252.217-7027) shall be included in any undefinitized order.

(e) Rejection of Unilateral Orders. The Contractor may reject any unilateral order if the Contractor determines it cannot feasibly perform the order, or if it does not concur with the maximum ceiling amount. However, each unilateral order shall be deemed to have been accepted by the Contractor unless within fifteen (15) days of issuance of the order the Contractor notifies the Contracting Officer in writing of its rejection of the order.

(f) Definitization of Undefinitized Orders. (1) The Contractor agrees that following the issuance of an undefinitized order, it will promptly begin negotiating with the Contracting Officer the price and terms of a definitive order that will include: (A) all clauses required by regulation on the date of the order; (B) all clauses required by law on the date of execution of the definitive order; and, (C) other mutually agreeable clauses, terms and/or conditions. No later than sixty (60) days after the undefinitized order is issued, the

5

**00038**

## SCHEDULE

(2) Except for undefinitized orders for Foreign Military Sales; purchases of less than $25,000; special access programs; and Congressionally-mandated long lead procurements; and except as otherwise provided in subparagraph (g)(3) below, the limitation of Government liability shall not exceed fifty percent (50%) of the maximum ceiling amount of an undefinitized order. In the case of orders within these excepted categories, however, the procedures set forth herein shall be followed to the maximum extent practical.

(3) If the Contractor submits a qualifying proposal, as defined in DFARS 217.7401, to definitize an order before the Government obligated fifty percent (50%) of the maximum ceiling amount, the Contracting Officer may increase the limitation of Government liability up to no more than seventy-five percent (75%) of the maximum ceiling amount or up to seventy-five percent (75%) of the price proposed by the Contractor, whichever is less.

(4) If at any time the Contractor believes that its expenditures under an order will exceed the limitation of Government liability, the Contractor shall so notify the Contracting Officer, in writing, and propose an appropriate increase in the limitation of Government liability of such order. Within thirty (30) days of such notice, the Contracting Officer will either (i) notify the Contractor in writing of such appropriate increase, or (ii) instruct the Contractor how and to what extent the work shall be continued; provided, however, that in no event shall the Contractor be obligated to proceed with work on an undefinitized order beyond the point where its costs incurred plus a reasonable profit exceed the limitation of Government liability, and provided also that in no event shall the Government be obligated to pay the Contractor any amount in excess of the limitation of Government liability specified in any such order prior to definitization.

(h) <u>Initial Spares</u>. The limitations set forth in paragraph (d) and subparagraphs (f)(2), (g)(2) and (g)(3), do not apply to undefinitized orders for the purchase of initial spares.

(i) <u>Ordering Activities</u>. The following activities are authorized to issue orders hereunder:

The Contracting Officer of the Ordering Activity shall forward a copy of each executed order marked "DD-350", to the Commander, Naval Sea Systems Command, ATTN: SEA 0293.

The Contracting Officer of the Ordering Activity shall forward a copy of each executed order marked "DD-350", to the Commander, Naval Sea Systems Command, ATTN: SEA 0294.

(j) Funds in the following amounts are committed under this Contract for use by the Ordering Activity in obligating funds to pay for orders placed hereunder:

CVAPDF - www.fenito.com

Case 1:01-cv-00048   Document 43   Filed in TXSD on 08/17/2001   Page 50 of 338

**00039**

## SCHEDULE

| Item | Funds |
|------|-------|
| CLIN 0001 | $1,963,580.00 |
| CLIN 0012 | $ 698,000.00 |

## H-5    PERFORMANCE INCENTIVE

In addition to the fee specified in SECTION B – "SUPPLIES OR SERVICES AND PRICES/COSTS," the Contractor may earn an incentive fee as determined by the Fee Determining Official (FDO). The Government's purpose in granting an incentive fee is to encourage and reward superior Contracting effort directed toward performance of this contract. The specifics for evaluation are set forth in paragraphs that follow.

(a)  Incentive Fee Board

The Contractor's performance evaluation for each period will be conducted by an Incentive Fee Board (IFB) consisting of not more than six members consisting of:

(1)  The Chairperson (PMS 333 or designated  representative)

(2)  Administrative Contracting Officer (SUPSHIP code 400  or designated representative)

(3)  NAVSEA Representative (To be determined)

(4)  COR

(5) PCO or designated representative

(6) RECORDER (SUPSHIP Representative or designated representative, Non-voting)

(b)  Fee Determining Official

The FDO, the Chairperson, shall make determinations of the incentive fee due to the Contractor based upon the performance evaluation conducted by the Incentive Fee Board established pursuant to paragraph (a) above.

(c)  Incentive Fee Determination and Reclama Procedures

(1)  Within fifteen (15) working days after the end of each evaluation period under the contract, the Contractor shall furnish to the IFB such information as may be reasonably required, including a statement of cost incurred, to assist the IFB in evaluating the Contractor's performance during that evaluation period.

8

Case 1.01-cv-00048    Document 43    Filed in TXSD on 06/17/2001    Page 51 of 338

<div align="center">SCHEDULE</div>

(2)  Within three (3) working days after the Incentive Fee Board meeting, the IFB shall prepare the performance evaluation letter and present it to the Fee Determining Official.  A copy will be provided to the Contractor upon transmittal to the FDO.

(3)  Within six (6) working days from receipt of the copy of the performance evaluation, the Contractor may submit to the FDO any comments with respect thereto.  In support of his comments, the Contractor may furnish a written description of his performance during the period under consideration.  This description shall clearly identify specific evaluation categories, factors and elements, and the Contractor's own rating thereof.

(4)  Within six (6) working days from the receipt of the Contractor evaluation comments, the FDO shall provide the Contracting Officer a final performance evaluation and determination of the incentive fee.

(5)  Within five (5) working days from receipt of the final determination, the Contracting Officer shall issue a unilateral modification to the contract to provide for the incentive fee.

(d)  <u>Finality of Fee Determination Official's Determination</u>

Determinations of the Fee Determining Official with respect to the amount of the incentive fee to be paid to the Contractor are unilateral decisions of the FDO and shall not be subject to the clause of this contract entitled "DISPUTES" (FAR 52.233-1).

(e)  <u>Evaluation Categories</u>

The Contractor's performance during each evaluation period will be judged in the categories of environmental and safety compliance with equal importance given to each.  Within each category the contractor's processes, execution of those process and results will be evaluated based on the criteria outlined below.

(1)  <u>Environmental compliance 50%</u>:

1.1 <u>Processes</u>

1.1.1 Adequacy and maintenance of written procedures for identification, testing, removal, treatment, storage, transportation and disposal of all potentially regulated materials (including but not limited to):
- PCBs
- Asbestos
- Fuel oil, hydraulic oil, lubricants/greases/sludges, bilge water, and sump oil

CVAPDF - www.tasisa.com

**00041**

## SCHEDULE

- Lead, Barium, Cadmium (paint, ballast)
- Chromium (felt gaskets, sodium chromate fresh water, zinc chromate paint coatings)
- Mercury (switches, gauges and indicators)
- Waste water (contaminated during scrapping)
- Degreasing agents
- Paints to include enamels, polyurethanes, and water based latex paints.
- Any caustics used for boilers and cleaning agents
- Freon and ozone depleting substances

1.1.2 Application and receipt of all EPA identification numbers and all permits, licenses (federal, state and local)

1.1.3 Completeness and viability of hazardous material spill response plan

1.2 Execution

1.2.1 Weekly self-inspections with written documentation and hazard correction tracking

1.2.2 Periodic independent assessments of environmental compliance

1.2.3 Ongoing manager, supervisor and employee training on hazardous material handling, stowage and shipment procedures

1.2.4 Ability to carry-out actual and simulated hazardous material spill response scenarios

1.3 Results

1.3.1 Number and severity of environmental violations

(2) Safety compliance 50%:

2.1 Processes

2.1.1 Quality of written safety rules and practices that are understood and followed by all employees.

2.1.2 Written rules for use and maintenance of personal protective equipment

2.1.3 Written plans to cover emergency situations

2.1.4 Hazard correction tracking procedures

2.1.5 Managerial commitment to worker safety and health protection

2.1.6 Top management's personal involvement

10

00042

## SCHEDULE

2.1.7 Clearly assigned safety and health responsibilities with documentation of accountability from top management to line supervisors

2.1.8 Quality protection for all subcontract employees equal to that provided for your own employees

2.1.9 Annual safety and health program evaluations with written narrative reports, recommendations for program changes, action plans, and verification procedures

2.1.10 Pre-use analysis procedures for new processes, materials, or equipment to determine potential hazards

2.1.11 Consistent disciplinary system applied to all employees (including supervisors and managers) who disregard the rules

2.1.12 Access to certified safety and health professionals

2.2 Execution

2.2.1 Weekly self-inspections with written documentation and hazard correction tracking

2.2.2 Periodic safety and industrial hygiene self-assessment surveys to identify existing or potential hazards in the work place

2.2.3 Routine industrial hygiene monitoring of toxic substances and noise

2.2.4 Accident investigations with written documentation

2.2.5 Manager, supervisor and employee training with emphasis on safety and health responsibilities

2.2.6 Training in the use and maintenance of personal protective equipment

2.2.7 Emergency preparedness drills, including annual evacuation drills

2.2.8 Documentation of all training received, including assessment procedures

2.2.9 First aid and CPR-trained personnel available onsite during all shifts

2.2.10 Documented ongoing monitoring and maintenance of workplace equipment

2.2.11 Periodic independent assessments of safety compliance

2.3 Results

2.3.1 Annual calendar year injury and lost workday case records and employment statistics compared with the BLS national average injury incidence and lost workday case rates for regular worksite employees and for contractors' employees who work 500 or more hours at your worksite in any one quarter

2.3.2 Number and severity of safety violations received compared to national averages for similar industries

CISPDF - www.fasiso.com

**00043**

<u>SCHEDULE</u>

(f) <u>Evaluation Periods/Incentive Fee Pool</u>

(1) <u>Evaluation Periods</u>.   The IFB will evaluate the Contractor's performance on completion of each individual task order. An interim incentive fee board will be held at the approximate mid-point of performance to give the contractor an indication of how their performance is perceived. No fee will be awarded in connection with the interim incentive fee board. Dates for the interim and final incentive fee board will be contained in each individual task order.

The Government reserves the right to adjust the above evaluation periods by unilateral contract modification.

(2) <u>Incentive Fee Pool</u>. Specific incentive fee pool values will be specified in each task order issued under this contract.  There will be no rollover of fee permitted between task orders.

(g) <u>Evaluation Procedures</u>

The contractor's performance in the evaluation categories in paragraph (e) will be  assigned a numeric score by the Incentive Fee Board that corresponds to the adjective ratings in the chart shown on the following page.  Based on the numeric score a performance rating will be generated for each category.  This performance rating multiplied by the weight assigned to the category evaluated will be applied to the incentive fee pool to derive an incentive fee for each category.

| Numerical Rating | Criteria |
|---|---|
| 66-100 | The Contractor's performance exceeds the requirements by a substantial margin. There may be a few areas for improvement, but all are minor. |
| 34-65 | The Contractor's performance exceeds the requirements in most areas. There may be several areas for improvement, but these areas are offset by better performance in other areas. |
| 0-33 | The Contractor's performance meets and, in some cases, exceeds the requirements.  Areas for improvement are approximately offset by better performance in other areas |

The relationship of the percent of incentive fee pool to be paid for each task order evaluated (subject to the determination of the Fee Determining Official) to the performance rating will be as follows:

<u>Performance Rating</u>          <u>Percent of Incentive Fee Pool</u>
0-100                                 (Rating)

12

Case 1:01-cv-00048   Document 43   Filed in TXSD on 08/17/2001   Page 55 of 338

(h) <u>Payment of Incentive Fee</u>

The Contractor shall be paid incentive fee, if any, upon submittal of a proper invoice or voucher to the cognizant Payment Office, together with a copy of the unilateral modification to the contract authorizing payment of incentive fee for the applicable Evaluation Period. The Contractor's invoice shall show the amount of incentive fee payable to each sub-line item, which shall be directly proportionate to the amount or allowable Estimated Cost (exclusive of base fee and FCOM) incurred by the Contractor during the Evaluation Period. The Contractor's invoice must cite the appropriate accounting.

**H-6    NAVSEA 5252.227-9113 GOVERNMENT-INDUSTRY DATA EXCHANGE PROGRAM (AUG 1997)**

(a) The Contractor shall participate in the appropriate interchange of the Government-Industry Data Exchange Program (GIDEP) in accordance with NAVSEA S0300-BU-GYD-010 dated November 1994. Data entered is retained by the program and provided to qualified participants. Compliance with this requirement shall not relieve the Contractor from complying with any other requirement of the contract.

(b) The Contractor agrees to insert paragraph (a) of this requirement in any subcontract hereunder exceeding $500,000.00. When so inserted, the word "Contractor" shall be changed to "Subcontractor".

(c) GIDEP materials, software and information are available without charge from:

> GIDEP Operations Center
> P.O. Box 8000
> Corona, CA 91718-8000
>
> Phone:       (909) 273-4677 or DSN 933-4677
> FAX:         (909) 273-5200
> Internet:    http://www.gidep.corona.navy.mil

**H-7    FAR 52.216-27 SINGLE OR MULTIPLE AWARDS**

The Government may elect to award a single delivery order contract or task order contract or to award multiple delivery order contracts or task order contracts for the same or similar supplies or services to two or more sources under this solicitation.

**H-8    NAVSEA 5252.237-9106  SUBSTITUTION OF PERSONNEL (SEP 1990)**

(a) The Contractor agrees that a partial basis for award of this contract is the list of key personnel proposed. Accordingly, the Contractor agrees to assign to this contract those key

CVAPDF - www.fwsis.com

persons whose resumes were submitted with the proposal necessary to fulfill the requirements of the contract. No substitution shall be made without prior notification to and concurrence of the Contracting Officer in accordance with this requirement.

(b)    All proposed substitutes shall have qualifications equal to or higher than the qualifications of the person to be replaced. The Contracting Officer shall be notified in writing of any proposed substitution at least forty-five (45) days, or ninety (90) days if a security clearance is to be obtained, in advance of the proposed substitution. Such notification shall include:   (1) an explanation of the circumstances necessitating the substitution; (2) a complete resume of the proposed substitute; and (3) any other information requested by the Contracting Officer to enable him/her to judge whether or not the Contractor is maintaining the same high quality of personnel that provided the partial basis for award.

H-9    NAVSEA 5252.217-9121 INDEMNIFICATION FOR ACCESS TO VESSEL (MAY 1989)

Notwithstanding any provision in the "ACCESS TO VESSEL" clause (DFARS 252.217-7011), or any other clause of the contract, the Contractor agrees to allow officers, employees, and associates of the Government, or other prime contractors with the Government and their subcontractors, and officers, employees, and associates of offerors on other contemplated work, admission to the Contractor's facilities and access to the vessel without any further request for indemnification from any party, which has not been previously included in the contract price.

H-10   MANAGEMENT AND DISPOSAL OF HAZARDOUS WASTE

(a) General

(1)The Contractor shall comply with the Resource Conservation and Recovery Act (RCRA), the Comprehensive Response, Compensation, and Liability Act of 1980 (CERCLA) and all other applicable Federal, State and local laws, codes, ordinances and regulations for the management and disposal of hazardous waste. This includes, but is not limited to, obtaining licenses and permits, giving notices and submitting reports in connection with hazardous waste management and disposal in the performance of this contract.

(b) Generator Identification Number

(1) The Contractor shall complete hazardous waste documentation required by RCRA using an Environmental Protection Agency (EPA) or delegated state environmental agency generator identification number issued to the Contractor pursuant to applicable law.

CHMPDF - www.fesno.com

Case 1:01-cv-00048   Document 43   Filed in TXSD on 08/17/2001   Page 57 of 338

## SCHEDULE

### H-11  MINIMUM INSURANCE REQUIREMENTS (NAVSEA) (SEP 1990)

In accordance with the clause of this contract entitled "INSURANCE--WORK ON A GOVERNMENT INSTALLATION" (FAR 52.228-5), the Contractor shall procure and maintain insurance, of at least the kinds and minimum amounts set forth below:

(a)  Workers' Compensation and Employer's Liability coverage shall be at least $100,000, except as provided in FAR 28.307(a).

(b)  Bodily injury liability insurance coverage shall be written on the comprehensive form of policy of at least $500,000 per occurrence.

(c)  Automobile Liability policies covering automobiles operated in the United States shall provide coverage of at least $200,000 per person and $500,000 per occurrence for bodily injury and $20,000 per occurrence for property damage.  The amount of liability coverage on other policies shall be commensurate with any legal requirements of the locality and sufficient to meet normal and customary claims.

### H-12  NAVSEA 5252.228-9105 INSURANCE-PROPERTY LOSS OR DAMAGE-LIABILITY TO THIRD PERSONS (DEVIATION)

(a)  Unless otherwise directed by the Department, the Contractor shall procure, and maintain for the period of ship towing ,with respect to each of the vessels Collision Liability and Protection and Indemnity Liabilities Insurance, if available, as set forth in the pamphlet entitled "Standard Forms of Marine Builders Risk (Navy Form Syndicate) and War Damage Insurance Policies, referred to in Vessel Contracts of the Bureau of Ships", dated 23 November 1942, in an amount equal to Two Million Dollars ($2,000,000). The Government will indemnify the Contractor against liabilities (including expenses incidental thereto) to third persons which, but for the limitation on amount specified in this paragraph, would have been covered by such Collision Liability and Protection and Indemnity Liabilities Insurance, and which are not compensated for by insurance or otherwise, provided such liabilities are represented by final judgments or by settlements approved in writing by the Department.  The Contractor shall not, however, be so indemnified against liabilities with respect to which the Contractor has failed to procure or maintain insurance, if available, as required or approved by the Department.  The Contractor shall promptly notify the Department of each suit or action filed and each claim made against which the Contractor may be entitled to indemnification under this paragraph.  The Contractor shall furnish the Department with copies of all papers received with respect to each suit, action or claim and, if requested by the Department, shall authorize representatives of the Government to settle, or direct or take charge of the defense of, such suit, action or claim.  In the absence of such request, the Contractor shall diligently proceed with such defense.  The Government's liability under this paragraph (a) and the Collision Liability and Protection and Indemnity Liabilities Insurance forms set forth in the pamphlet entitled "Standard Forms of Marine Builders Risk (Navy Form Syndicate) and War Damage Insurance Policies, referred to in

**00047**                          SCHEDULE                    N00024-99-C-2318

Vessel Contracts of the Bureau of Ships, dated 23 November 1942, is subject to the
availability of appropriated funds at the time a contingency occurs. Nothing in this
contract shall be construed as implying that the Congress will, at a later date, appropriate
funds sufficient to meet deficiencies.

(b) The cost of the insurance required by paragraph (d) of this requirement is included in
the estimated cost and the cost of all other insurance which may be required or approved
pursuant to this requirement will reimbursed to the Contractor. If the Department should
require or approve the cancellation of any insurance or any insurance is otherwise
cancelled, the Contractor will promptly pay to the Government the amount of all
unearned premiums refunded to the Contractor, but only to the extent that such premiums
shall have been reimbursed to the Contractor by the Government.

(c) All insurance which is or may be required or approved pursuant to this requirement
shall be in such form, in such amounts, for such periods of time, and with such insurers as
the Department may from time to time require or approve, provided the Contractor and
the Government shall be named as insureds. The policies or certificates of insurance
shall be deposited with the Assistant Secretary of the Navy (R,D&A), Insurance Office,
or as the Department may otherwise direct.

(d) The indemnification afforded by the Government to the Contractor for the purposes of
this requirement is without regard and as an exception to the clause of this contract
entitled "LIMITATION OF COST" (FAR 52.232-20).

**H-13   PROCEDURES/CRITERIA FOR FOLLOW-ON TASK ORDERS**

Follow-on orders placed under this contract will be made in accordance with the guidance
in FAR 16.505(b). The criteria in order of importance for follow-on awards are
cost/price, past performance on earlier task orders and schedule. In addition, the
Contracting Officer may consider other factors that are relevant to the award of a follow-
on task order. For each new order, offerors will provide a schedule and cost proposal.

**H-14   NAVSEA 5252.233-9103 DOCUMENTATION OF REQUESTS FOR
         EQUITABLE ADJUSTMENT (AT) - ALTERNATE I (MAY 1998)**

(a) For the purposes of this requirement, the term "change" includes not only a change made
pursuant to a written order designated as a "change order" but also (i) an engineering change
proposed by the Government or the Contractor pursuant to the "Other Change Proposals" or
other requirements of this contract and (ii) any act or omission to act on the part of the
Government in respect of which a request is made for equitable adjustment under the
"CHANGES" clause or any other article or requirement of this contract.

(b) Whenever the Contractor requests or proposes an equitable adjustment of $100,000 or
more per vessel in respect of a change made pursuant to a written order designated as a
"change order" or in respect of a proposed engineering change and whenever the Contractor

16

00049

## SCHEDULE

requests an equitable adjustment in any amount in respect of any other act or omission to act on the part of the Government, the proposal supporting such request shall include the following information for each individual item or element of the request:

(1)  A description (i) of the work required by the contract before the change, which has been deleted by the change, and (ii) of the work deleted by the change which already has been completed.  The description is to include a list of identifiable components, equipment, and other identifiable property involved.  Also, the status of manufacture, procurement, or installation of such property is to be indicated.  Separate description is to be furnished for design and production work.  Items of identifiable raw material, purchased parts, components and other identifiable hardware, which are made excess by the change and which are not to be retained by the Contractor, are to be listed for later disposition;

(2)  Description of work necessary to undo work already completed which has been deleted by the change;

(3)  Description of work which is substituted or added by the change.  A list of identifiable components and equipment (not bulk materials or items) involved, should be included.  Separate descriptions are to be furnished for design work and production work;

(4)  Description of interference and inefficiencies in performing the change;

(5)  Description of disruption attributable solely to the change; which description shall include the following information:

(i)  Description of each identifiable element of disruption and how work has been, or may be, disrupted;

(ii)  The calendar period of time during which disruption occurred, or may occur;

(iii)  Area(s) of the Contractor's operations where disruption occurred, or may occur;

(iv)  Trade(s) or functions disrupted, with a breakdown of manhours and material for each trade or function;

(v)  Scheduling of trades before, during, and after the period of disruption insofar as such scheduling may relate to or be affected by the estimated disruption;

(vi)  Description of any measures taken to lessen the disruptive effect of the change.

(6)  Delay in delivery attributable solely to the change;

17

**00049**

N00024-99-C-2318

## SCHEDULE

(7) Other work or increased costs attributable to the change;

(8) Supplementing the foregoing, a narrative statement of the nature of the alleged Government act or omission, when the alleged Government act or omission occurred, and the "causal" relationship between the alleged Government act or omission and the claimed consequences therefor, cross-referenced to the detailed information provided as required above.

(c) Each proposal submitted in accordance with this requirement shall include a copy of the Contractor's ship's labor budget at the cost class level in effect as of the date the event began, the cost incurred at the cost level as of the same date, and the proposed effect of the change at the cost class level.

(d) It is recognized that an individual request for equitable adjustment may not include all of the factors listed in subparagraphs (b)(1) through (b)(8) above, or that the Contractor may not reasonably be able to furnish complete information on all of the factors listed in subparagraphs (b)(1) through (b)(8) above. Accordingly, the Contractor is only required to set forth in its request for equitable adjustment information with respect to those factors which are relevant to the individual request for equitable adjustment, or in the level of detail which is reasonably available to the Contractor.

(e) In addition to any information required under paragraph (b) above, each proposal submitted in support of a claim for equitable adjustment, under any requirement of this contract, in an amount which requires certified cost or pricing data, if requested by the Contracting Officer, shall contain a duly executed Standard Form (SF) 1411 with respect to each individual claim item. The information furnished shall be in sufficient detail to permit the Contracting Officer to cross-reference the claimed increased costs, or delay in delivery, or both, as appropriate, as set forth in the SF 1411, with the information submitted pursuant to subparagraphs (b)(1) through (b)(8) hereof.

## H-14 FAR 52.214-16 MINIMUM BID ACCEPTANCE PERIOD (APR 1984)

(a) "Acceptance period," as used in this provision, means the number of calendar days available to the Government for awarding a contract from the date specified in this solicitation for receipt of bids. ——————

(b) This provision supersedes any language pertaining to the acceptance period that may appear elsewhere in this solicitation.

(c) The Government requires a minimum acceptance period of 365 calendar days.

(d) In the space provided immediately below, bidders may specify a longer acceptance period than the Government's minimum requirement.

The bidder allows the following acceptance period: _____ calendar days.

18

CSMPDF - www.fenrir.com

Case 1:01-cv-00048   Document 43   Filed in TXSD on 08/17/2001   Page 61 of 338

## SCHEDULE

(e) A bid allowing less than the Government's minimum acceptance period will be rejected.

(f) The bidder agrees to execute all that it has undertaken to do, in compliance with its bid, if that bid is accepted in writing within--

      (1) The acceptance period stated in paragraph (c) of this clause; or

      (2) Any longer acceptance period stated in paragraph (d) of this clause.

Case 1:01-cv-00048   Document 43   Filed in TXSD on 08/17/2001   Page 62 of 338

SECTION I - CONTRACT CLAUSES

SECTION I-1 - CLAUSES INCORPORATED BY REFERENCE

I. FEDERAL ACQUISITION REGULATION (48 CFR CHAPTER 1) CLAUSES:

| FAR SOURCE | TITLE AND DATE |
|---|---|
| 52.202-1 | DEFINITIONS (OCT 1995) |
| 52.203-3 | GRATUITIES (APR 1984) |
| 52.203-5 | COVENANT AGAINST CONTINGENT FEES (APR 1984) |
| 52.203-6 | RESTRICTIONS ON SUBCONTRACTOR SALES TO THE GOVERNMENT (JUL 1995) |
| 52.203-7 | ANTI-KICKBACK PROCEDURES (JUL 1995) |
| 52.203-8 | CANCELLATION, RESCISSION, AND RECOVERY OF FUNDS FOR ILLEGAL OR IMPROPER ACTIVITY (JAN 1997) |
| 52.203-10 | PRICE OR FEE ADJUSTMENT FOR ILLEGAL OR IMPROPER ACTIVITY (JAN 1997) |
| 52.203-12 | LIMITATION ON PAYMENTS TO INFLUENCE CERTAIN FEDERAL TRANSACTIONS (JUN 1997) |
| 52.204-2 | SECURITY REQUIREMENTS (AUG 1996) |
| 52.204-4 | PRINTING/COPYING DOUBLE-SIDED ON RECYCLED PAPER (JUN 1996) |
| 52.209-6 | PROTECTING THE GOVERNMENT'S INTEREST WHEN SUBCONTRACTING WITH CONTRACTORS DEBARRED, SUSPENDED, OR PROPOSED FOR DEBARMENT (JUL 1995) |
| 52.211-5 | MATERIAL REQUIREMENTS (OCT 1997) |

1

Case 1:01-cv-00048   Document 43   Filed in TXSD on 08/17/2001   Page 63 of 338

| FAR SOURCE | TITLE AND DATE |
|---|---|
| 52.211-15 | DEFENSE PRIORITY AND ALLOCATION REQUIREMENT (SEP 1990) |
| 52.215-2 | AUDIT AND RECORDS--NEGOTIATION (AUG 1996) |
| 52.215-8 | ORDER OF PRECEDENCE--UNIFORM CONTRACT FORMAT (OCT 1997) |
| 52.215-10 | PRICE REDUCTION FOR DEFECTIVE COST OR PRICING DATA (OCT 1997) |
| 52.215-11 | PRICE REDUCTION FOR DEFECTIVE COST OR PRICING DATA--MODIFICATIONS (OCT 1997) |
| 52.215-12 | SUBCONTRACTOR COST OR PRICING DATA (OCT 1997) |
| 52.215-13 | SUBCONTRACTOR COST OR PRICING DATA--MODIFICATIONS (OCT 1997) |
| 52.215-14 | INTEGRITY OF UNIT PRICES (OCT 1997) (Applies if contract award was based on full and open competition.) |
| 52.215-14 and Alt I | INTEGRITY OF UNIT PRICES (OCT 1997) AND ALTERNATE I (OCT 1997) (Applies if contract award was not based on full and open competition.) |
| 52.215-15 | TERMINATION OF DEFINED BENEFIT PENSION PLANS (OCT 1997) |
| 52.215-18 | REVERSION OR ADJUSTMENT OF PLANS FOR POST-RETIREMENT BENEFITS OTHER THAN PENSIONS (PRB) (OCT 1997) |
| 52.216-7 | ALLOWABLE COST AND PAYMENT (APR 1998) |

00053

N00024-99-C-2318

TITLE AND DATE

INCENTIVE FEE (MAR 1997) (APPLICABLE TO COST TYPE
TASK ORDERS)

UTILIZATION OF SMALL, SMALL DISADVANTAGED AND
WOMEN-OWNED BUSINESS CONCERNS (JUN 1997)

SMALL, SMALL DISADVANTAGED AND WOMEN-OWNED
SMALL BUSINESS SUBCONTRACTING PLAN (AUG 1998)

SMALL, SMALL DISADVANTAGED AND WOMEN-OWNED
SMALL BUSINESS SUBCONTRACTING PLAN (AUG 1998)
AND ALTERNATE II (MAR 1996)



LIQUIDATED DAMAGES--SUBCONTRACTING PLAN (AUG
1998)

NOTICE TO THE GOVERNMENT OF LABOR DISPUTES
(FEB 1997)

CONVICT LABOR (AUG 1996)

CONTRACT WORK HOURS AND SAFETY STANDARDS
ACT--OVERTIME COMPENSATION (JUL 1995)

WALSH-HEALEY PUBLIC CONTRACTS ACT (DEC 1996)

EQUAL OPPORTUNITY (APR 1984)

3

Case 1:01-cv-00048  Document 43  Filed in TXSD on 08/17/2001  Page 65 of 338

N00024-99-C-2318

| FAR SOURCE | TITLE AND DATE |
|---|---|
| 52.222-28 | EQUAL OPPORTUNITY PREAWARD CLEARANCE OF SUBCONTRACTS (APR 1984) (Applies if this contract is $1,000,000 or more.) (As used in the foregoing clause, the term "Contracting Officer" shall be deemed to mean the "Administrative Contracting Officer (ACO)".) |
| 52.222-35 | AFFIRMATIVE ACTION FOR DISABLED VETERANS AND VETERANS OF THE VIETNAM ERA (APR 1998) |
| 52.222-36 | AFFIRMATIVE ACTION FOR WORKERS WITH DISABILITIES (JUN 1998) |
| 52.222-37 | EMPLOYMENT REPORTS ON DISABLED VETERANS AND VETERANS OF THE VIETNAM ERA (APR 1998) |
| 52.223-2 | CLEAN AIR AND WATER (APR 1984) |
| 52.223-3 | HAZARDOUS MATERIAL IDENTIFCATION AND MATERIAL SAFETY DATA (JAN 1997) |
| 52.223-6 | DRUG-FREE WORKPLACE (JAN 1997) |
| 52.223-11 | OZONE-DEPLETING SUBSTANCES (JUN 1996) |
| 52.223-12 | REFRIGERATION EQUIPMENT AND AIR CONDITIONERS (MAY 1995) |
| 52.223-13 | CERTIFICATION OF TOXIC CHEMICAL RELEASE REPORTING (OCT 1996) |
| 52.223-14 | TOXIC CHEMICAL RELEASE REPORTING (OCT 1996) |
| 52.225-10 | DUTY-FREE ENTRY (APR 1984) (Applies if this contract exceeds $100,000.) |

00055

| FAR SOURCE | TITLE AND DATE |
|---|---|
| 52.225-11 | RESTRICTIONS ON CERTAIN FOREIGN PURCHASES (AUG 1998) |
| 52.225-14 | INCONSISTENCY BETWEEN ENGLISH VERSION AND TRANSLATION OF CONTRACT (AUG 1989) |
| 52.226-1 | UTILIZATION OF INDIAN ORGANIZATIONS AND INDIAN-OWNED ECONOMIC ENTERPRISES (SEP 1996) |
| 52.227-1 | AUTHORIZATION AND CONSENT (JUL 1995) |
| 52.227-2 | NOTICE AND ASSISTANCE REGARDING PATENT AND COPYRIGHT INFRINGEMENT (AUG 1996) |
| 52.227-10 | FILING OF PATENT APPLICATIONS—CLASSIFIED SUBJECT MATTER (APR 1984) |
| 52.227-14 and ALT I | RIGHTS IN DATA (JUN 1987) (ALTERNATE II) |
| 52.228-7 | INSURANCE—LIABILITY TO THIRD PERSONS (MAR 1996) |
| 52.229-3 | FEDERAL, STATE, AND LOCAL TAXES (JAN 1991) (APPLICABLE TO FIXED PRICE TYPE TASK ORDERS) |
| 52.229-4 | FEDERAL, STATE, AND LOCAL TAXES (NON-COMPETITIVE CONTRACTS) (APPLICABLE TO FIXED PRICE TYPE TASK ORDERS) |

CSrPDF - www.csr.com

Case 1:01-cv-00048   Document 43   Filed in TXSD on 08/17/2001   Page 67 of 338

00056

| FAR SOURCE | TITLE AND DATE |
|---|---|
| 52.229-5 | TAXES--CONTRACTS PERFORMED IN U.S. POSSESSIONS OR PUERTO RICO (APR 1984) (APPLICABLE TO FIXED PRICE TYPE TASK ORDERS) |
| 52.230-2 | COST ACCOUNTING STANDARDS (APR 1998) |
| 52.230-3 | DISCLOSURE AND CONSISTENCY OF COST ACCOUNTING PRACTICES (APR 1998) |
| 52.230-6 | ADMINISTRATION OF COST ACCOUNTING STANDARDS (APR 1996) |
| 52.232-1 | PAYMENTS (APR 1984) (APPLICABLE TO FIXED PRICE TYPE TASK ORDERS) |
| 52.232-8 | DISCOUNTS FOR PROMPT PAYMENT (MAY 1997) (APPLICABLE TO FIXED PRICE TYPE TASK ORDERS) |
| 52.232-9 | LIMITATION ON WITHHOLDING OF PAYMENTS (APR 1984) |
| 52.232-11 | EXTRAS (APR 1984) (APPLICABLE TO FIXED PRICE TYPE TASK ORDERS) |
| 52.232-16 | **PROGRESS PAYMENTS (JUL 1991) (APPLIES IF THE CONTRACTOR IS OTHER THAN A SMALL BUSINESS CONCERN.) (APPLICABLE TO FIXED PRICE TYPE TASK ORDERS)** |

Case 1:01-cv-00048  Document 43  Filed in TXSD on 08/17/2001  Page 68 of 338

00057

| FAR SOURCE | TITLE AND DATE |
|---|---|
| 52.232-16 and Alt I | PROGRESS PAYMENTS (JUL 1991) AND ALTERNATE I (AUG 1987) (APPLIES IF THE CONTRACTOR IS A SMALL BUSINESS CONCERN.) (APPLICABLE TO FIXED PRICE TYPE TASK ORDERS) |
| 52.232-17 | INTEREST (JUN 1996) |
| 52.232.19 | AVAILABILITY OF FUNDS FOR THE NEXT FISCAL YEAR (APR 1984) |
| 52.232-20 | LIMITATION OF COST (APR 1984) (APPLIES IF THIS CONTRACT CONTAINS FULLY FUNDED LINE ITEMS.)(APPLICABLE TO COST TYPE TASK ORDERS) |
| 52.232-22 | LIMITATION OF FUNDS (APR 1984) (APPLIES IF THIS CONTRACT CONTAINS INCREMENTALLY FUNDED LINE ITEMS.) |
| 52.232-23 and Alt I | ASSIGNMENT OF CLAIMS (JAN 1986) AND ALTERNATE I (APR 1984) |
| 52.232-25 | PROMPT PAYMENT (JUN 1997) |
| 52.232-33 | MANDATORY INFORMATION FOR ELECTRONIC FUNDS TRANSFER PAYMENT (AUG 1996) |
| 52.233-2 | SERVICE OF PROTESTS (AUG 1996) |
| 52.233-1 and Alt I | DISPUTES (OCT 1995) AND ALTERNATE I (DEC 1991) |
| 52.233-3 | PROTEST AFTER AWARD (AUG 1996) |

7

00058                                                          N00024-99-C-2318

| FAR SOURCE | TITLE AND DATE |
|---|---|
| 52.234-1 | INDUSTRIAL RESOURCES DEVELOPED UNDER DEFENSE PRODUCTION ACT TITLE III (DEC 1994) |
| 52.237-8 | RESTRICTION ON SEVERANCE PAYMENTS TO FOREIGN NATIONALS (OCT 1995) |
| 52.242-1 | NOTICE OF INTENT TO DISALLOW COSTS (APR 1984) |
| 52.242-2 | PRODUCTION PROGRESS REPORTS (APR 1991) |
| 52.242-3 | PENALTIES FOR UNALLOWABLE COSTS (OCT 1995) (Applies if this contract exceeds $500,000.) |
| 52.242-10 | F.O.B. ORIGIN--GOVERNMENT BILLS OF LADING OR PREPAID POSTAGE (APR 1984) |
| 52.242-11 | F.O.B. ORIGIN--GOVERNMENT BILLS OF LADING OR INDICIA MAIL (FEB 1993) |
| 52.242-12 | REPORT OF SHIPMENT (REPSHIP) (JUL 1995) |
| 52.242-13 | BANKRUPTCY (JUL 1995) |
| 52.242-15 | STOP-WORK ORDER (AUG 1989) |
| 52.242-15 and Alt I | STOP-WORK ORDER (AUG 1989) AND ALTERNATE 1 (APR 1984) |
| 52.243-1 and Alt I | CHANGES--FIXED-PRICE (AUG 1987) AND ALTERNATE I (APR 1984) (APPLICABLE TO FIXED PRICE TYPE TASK ORDERS) |
| 52.243-2 and Alt I | CHANGES--COST-REIMBURSEMENT (AUG 1987) AND ALTERNATE I (APR 1984) |

8

Case 1:01-cv-00048   Document 43   Filed in TXSD on 08/17/2001   Page 70 of 338

**00059**

| FAR SOURCE | TITLE AND DATE |
|---|---|
| 52.243-6 | CHANGE ORDER ACCOUNTING (APR 1984) |
| 52.244-2 | SUBCONTRACTS (AUG 1998) |
| 52.244-5 | COMPETITION IN SUBCONTRACTING (DEC 1996) |
| 52.245-2 | GOVERNMENT PROPERTY (FIXED-PRICE CONTRACTS) (DEC 1989) (DEVIATION) (OCT 1997) (The language "special tooling accountable to the contract is subject to the provisions of the special tooling clause and not the provisions of the Government Property (Fixed-Price Contracts) clause" in paragraph 52.245-2(c) is waived for a period of one year, ending 16 October 1998, or until the FAR is changed, whichever occurs first.) (This clause applies if contract award was based on full and open competition.) |
| 52.245-5 | GOVERNMENT PROPERTY (COST-REIMBURSEMENT, TIME-AND-MATERIAL, OR LABOR-HOUR CONTRACTS) (JAN 1986) |
| 52.246-23 | LIMITATION OF LIABILITY (FEB 1997) |
| 52.246-24 | LIMITATION OF LIABILITY--HIGH VALUE ITEMS (FEB 1997) |
| 52.246-25 | LIMITATION OF LIABILITY--SERVICES (FEB 1997) |
| 52.247-1 | COMMERCIAL BILL OF LADING NOTATIONS (APR 1984) |
| 52.248-1 | VALUE ENGINEERING (MAR 1989) (Applies if this contract equals or exceeds $100,000.) |

C0060

| FAR SOURCE | TITLE AND DATE |
|------------|----------------|
| 52.249-2 | TERMINATION FOR CONVENIENCE OF THE GOVERNMENT (FIXED PRICE) (SEP 1996) (Applies if this contract exceeds $100,000.) (APPLICABLE TO FIXED PRICE TYPE TASK ORDERS) |
| 52.249-6 | TERMINATION (COST-REIMBURSEMENT) (SEP 1996) (APPLICABLE TO COST TYPE TASK ORDERS) |
| 52.249-8 | DEFAULT (FIXED-PRICE SUPPLY AND SERVICE) (APR 1984) (APPLICABLE TO FIXED PRICE TYPE TASK ORDERS) |
| 52.249-14 | EXCUSABLE DELAYS (APR 1984) (APPLICABLE TO COST TYPE TASK ORDERS) |
| 52.251-1 | **GOVERNMENT SUPPLY SOURCES (APR 1984) (APPLICABLE TO COST TYPE TASK ORDERS)** |
| 52.253-1 | **COMPUTER GENERATED FORMS (JAN 1991)** |

10

CVisPDF - www.fscino.com

Case 1:01-cv-00048   Document 43   Filed in TXSD on 08/17/2001   Page 72 of 338

## II. DEFENSE FAR SUPPLEMENT (48 CFR CHAPTER 2) CLAUSES:

| DFARS SOURCE | TITLE AND DATE |
|---|---|
| 252.201-7000 | CONTRACTING OFFICER'S REPRESENTATIVE (DEC 1991) |
| 252.203-7001 | SPECIAL PROHIBITION ON EMPLOYMENT (JUN 1997) |
| 252.203-7002 | DISPLAY OF DOD HOTLINE POSTER (DEC 1991) (Applies if this contract exceeds $5,000,000.) |
| 252.204-7000 | DISCLOSURE OF INFORMATION (DEC 1991) |
| 252.204-7003 | CONTROL OF GOVERNMENT PERSONNEL WORK PRODUCT (APR 1992) |
| 252.205-7000 | PROVISION OF INFORMATION TO COOPERATIVE AGREEMENT HOLDERS (DEC 1991) (Applies if this contract exceeds $500,000.) |
| 252.211-7000 | ACQUISITION STREAMLINING (DEC 1991) |
| 252.215-7000 | PRICING ADJUSTMENTS (DEC 1991) |
| 252.215-7002 | COST ESTIMATING SYSTEM REQUIREMENTS (JUL 1997) |
| 252.219-7003 | SMALL, SMALL DISADVANTAGED AND WOMEN-OWNED SMALL BUSINESS SUBCONTRACTING PLAN (DOD CONTRACTS) (APR 1996) |
| 252.222-7001 | RIGHT OF FIRST REFUSAL OF EMPLOYMENT--CLOSURE OF MILITARY INSTALLATIONS (APR 1993) |
| 252.223-7004 | DRUG-FREE WORK FORCE (SEP 1988) |
| 252.223-7006 | PROHIBITION ON STORAGE AND DISPOSAL OF TOXIC AND HAZARTDOUS MATERIALS (APR 1993) |

11

CAMPDF - www.fasoo.com

G0062                                          N00024-99-C-2318

| DFARS SOURCE | TITLE AND DATE |
|---|---|
| 252.225-7001 | BUY AMERICAN ACT AND BALANCE OF PAYMENTS PROGRAM (MAR 1998) |
| 252.225-7002 | QUALIFYING COUNTRY SOURCES AS SUBCONTRACTORS (DEC 1991) |
| 252.225-7009 | DUTY-FREE ENTRY-QUALIFYING COUNTRY END PRODUCTS AND SUPPLIES (MAR 1998) |
| 252.225-7010 | DUTY-FREE ENTRY-ADDITIONAL PROVISIONS (MAR 1998) |
| 252.225-7012 | PREFERENCE FOR CERTAIN DOMESTIC COMMODITIES (SEP 1997) |
| 252.225-7014 and ALT I | PREFERENCE FOR DOMESTIC SPECIALTY METALS (MAR 1998) AND ALTERNATE I (MAR 1998) |
| 252.225-7015 | PREFERENCE FOR DOMESTIC HAND OR MEASURING TOOLS (DEC 1991) |
| 252.225-7016 | RESTRICTION ON ACQUISITION OF BALL OR ROLLER BEARINGS (AUG 1998) |
| 252.225-7025 | RESTRICTION ON ACQUISITION OF FORGINGS (JUN 1997) |
| 252.225-7026 | REPORTING OF CONTRACT PERFORMANCE OUTSIDE THE UNITED STATES (MAR 1998) (Applies if this contract exceeds $500,000 or is modified to exceed $500,000.) |
| 252.225-7028 | EXCLUSIONARY POLICIES AND PRACTICES OF FOREIGN GOVERNMENTS (DEC 1991) |
| 252.225-7031 | SECONDARY ARAB BOYCOTT OF ISRAEL (JUN 1992) |
| 252.225-7041 | CORRESPONDENCE IN ENGLISH (JUN 1997) |
| 252.225-7042 | AUTHORIZATION TO PERFORM (JUN 1997) |

12

Case 1:01-cv-00048   Document 43   Filed in TXSD on 08/17/2001   Page 74 of 338

| DFARS SOURCE | TITLE AND DATE |
|---|---|
| 252.225-7043 | ANTITERRORISM/FORCE PROTECTION POLICY FOR CONTRACTORS OUTSIDE THE UNITED STATES (JUN 1998) |
| 252.227-7013 | RIGHTS IN TECHNICAL DATA--NONCOMMERCIAL ITEMS (NOV 1995) |
| 252.227-7014 | RIGHTS IN NONCOMMERCIAL COMPUTER SOFTWARE AND NONCOMMERCIAL COMPUTER SOFTWARE DOCUMENTATION (JUN 1995) |
| 252.227-7016 | RIGHTS IN BID OR PROPOSAL INFORMATION (JUN 1995) |
| 252.227-7019 | VALIDATION OF ASSERTED RESTRICTIONS--COMPUTER SOFTWARE (JUN 1995) |
| 252.227-7025 | LIMITATIONS ON THE USE OR DISCLOSURE OF GOVERNMENT FURNISHED INFORMATION MARKED WITH RESTRICTIVE LEGENDS (JUN 1995) |
| 252.227-7027 | DEFERRED ORDERING OF TECHNICAL DATA AND COMPUTER SOFTWARE (APR 1988) |
| 252.227-7030 | TECHNICAL DATA--WITHHOLDING OF PAYMENT (OCT 1988) |
| 252.227-7036 | CERTIFICATION OF TECHNICAL DATA CONFORMITY (JAN 1997) |
| 252.227-7037 | VALIDATION OF RESTRICTIVE MARKINGS ON TECHNICAL DATA (NOV 1995) |
| 252.231-7000 | SUPPLEMENTAL COST PRINCIPLES (DEC 1991) |
| 252.232-7004 | DOD PROGRESS PAYMENT RATES (FEB 1996) |
| 252.242-7000 | POST AWARD CONFERENCE (DEC 1991) |

13

CVAPDF - www.fastio.com

Case 1:01-cv-00048    Document 43    Filed in TXSD on 08/17/2001    Page 75 of 338

00064

| DFARS SOURCE | TITLE AND DATE |
|---|---|
| 252.242-7003 | APPLICATION FOR U.S. GOVERNMENT SHIPPING DOCUMENTATION/INSTRUCTIONS (DEC 1991) |
| 252.242-7004 | MATERIAL MANAGEMENT AND ACCOUNTING SYSTEM (SEP 1996) (Applies if this contract provides progress payments, unless it is set aside exclusively for a small, small disadvantaged, or woman-owned small business concern.) |
| 252.243-7001 | PRICING OF CONTRACT MODIFICATIONS (DEC 1991) (APPLICABLE TO FIXED PRICE TYPE TASK ORDERS) |
| 252.243-7002 | REQUESTS FOR EQUITABLE ADJUSTMENTS (MAR 1998) (Applies if this contract exceeds $100,000.) |
| 252.244-7000 | SUBCONTRACTS FOR COMMERCIAL ITEMS AND COMMERCIAL COMPONENTS (DOD CONTRACTS) (FEB 1997) |
| 252.245-7001 | REPORTS OF GOVERNMENT PROPERTY (MAY 1994) |
| 252.246-7000 | MATERIAL INSPECTION AND RECEIVING REPORT (DEC 1991) |
| 252.246-7001 | WARRANTY OF DATA (DEC 1991) |
| 252.249-7002 | NOTIFICATION OF PROPOSED PROGRAM TERMINATION OR REDUCTION (DEC 1996) |

14

Case 1:01-cv-00048   Document 43   Filed in TXSD on 08/17/2001   Page 76 of 338

**00065**

TION I-2 - CLAUSES INCORPORATED IN FULL TEXT

**52.215-19  NOTIFICATION OF OWNERSHIP CHANGES (OCT 1997)**

he Contractor shall make the following notification in writing:

(1)  When the Contractor becomes aware that a change in its ownership has occurred, or tain to occur, that could result in changes in the valuation of its capitalized assets in the unting records, the Contractor shall notify the Administrative Contracting Officer (ACO) n 30 days.

(2)  The Contractor shall also notify the ACO within 30 days whenever changes to asset tions or any other cost changes have occurred or are certain to occur as a result of a change nership.



he Contractor shall--

(1)  Maintain current, accurate, and complete inventory records of assets and their costs;

(2)  Provide the ACO or designated representative ready access to the records upon
st;

(3)  Ensure that all individual and grouped assets, their capitalized values, accumulated ciation or amortization, and remaining useful lives are identified accurately before and after of the Contractor's ownership changes; and

(4)  Retain and continue to maintain depreciation and amortization schedules based on the records maintained before each Contractor ownership change.

he Contractor shall include the substance of this clause in all subcontracts under this ict that meet the applicability requirement of FAR 15.408(k).

**52.215-21  REQUIREMENTS FOR COST OR PRICING DATA OR 'RMATION OTHER THAN COST OR PRICING DATA--MODIFICATIONS (OCT AND ALTERNATE II (OCT 1997)**

cceptions from cost or pricing data.

CNJPDF - www.fasiio.com

Case 1:01-cv-00048   Document 43   Filed in TXSD on 08/17/2001   Page 77 of 338

(1) In lieu of submitting cost or pricing data for modifications under this contract, for price adjustments expected to exceed the threshold set forth in FAR 15.403-4 on the date of the agreement on price or the date of the award, whichever is later, the Contractor may submit a written request for exception by submitting the information described in the following subparagraphs. The Contracting Officer may require additional supporting information, but only to the extent necessary to determine whether an exception should be granted, and whether the price is fair and reasonable--

(i) Identification of the law or regulation establishing the price offered. If the price is controlled under law by periodic rulings, reviews, or similar actions of a governmental body, attach a copy of the controlling document unless it was previously submitted to the contracting office.

(ii) Information on modifications of contracts or subcontracts for commercial items.

(A) If--

(1) The original contract or subcontract was granted an exception from cost or pricing data requirements because the price agreed upon was based on adequate price competition, or prices set by law or regulation, or was a contract or subcontract for the acquisition of a commercial item, and

(2) The modification (to the contract or subcontract) is not exempted based on one of these exceptions, then the Contractor may provide information to establish that the modification would not change the contract or subcontract from a contract or subcontract for the acquisition of a commercial item to a contract or subcontract for the acquisition of an item other than a commercial item.

(B) For a commercial item exception, the Contractor may provide, at a minimum, information on prices at which the same item or similar items have been sold that is adequate for evaluating the reasonableness of the price of the modification. Such information may include--

(1) For catalog items, a copy of or identification of the catalog and its date, or the appropriate pages for the offered items, or a statement that the catalog is on file in the buying office to which the proposal is being submitted. Provide a copy or describe current discount policies and price lists (published or unpublished), e.g., wholesale, original equipment manufacturer, or reseller. Also explain the basis of each offered price and its relationship to the

16

established catalog price, including how the proposed price relates to the price of recent sales in quantities similar to the proposed quantities.

(2)  For market-priced items, the source and date or period of the market quotation or other basis for market price, the base amount, and applicable discounts.  In addition, describe the nature of the market.

(3)  For items included on an active Federal Supply Service Multiple Award Schedule contract, proof than an exception has been granted for the schedule item.

(2) The Contractor grants the Contracting Officer or an authorized representative the right to examine, at any time before award, books, records, documents, or other directly pertinent records to verify any request for an exception under this clause, and the reasonableness of price.  For items priced using catalog or market prices, or law or regulation, access does not extend to cost or profit information or other data relevant solely to the Contractor's determination of the prices to be offered in the catalog or marketplace.

(b)  Requirements for cost or pricing data.  If the Contractor is not granted an exception from the requirement to submit cost or pricing data, the following applies:

(1) The Contractor shall submit cost or pricing data and supporting attachments in accordance with Table 15-2 of FAR 15.408.

(2) As soon as practicable after agreement on price, but before contract award (except for unpriced actions), the Contractor shall submit a Certificate of Current Cost or Pricing Data, as prescribed by FAR 15.406-2.

(c)  When the proposal is submitted, also submit one copy each to:  (1) the Administrative Contracting Officer, and (2) the Contract Auditor.

## FAR 52.216-17 INCENTIVE PRICE REVISION -- SUCCESSIVE TARGETS (OCT 1997)

(a)  .  General.  The supplies or services identified in the Schedule as East Coast Lot CLINS 0002 through 0011 and West Coast Lot CLINS 0002 through 0005 are subject to price revision in accordance with this clause; provided, that in no event shall the total final price of these items exceed the ceiling price of _____ dollars ($ _____).  The prices of these items shown in the Schedule are the initial target prices, which include an initial target profit of 30 (thirty) percent of the initial target cost.  Any supplies or services that are to be --

(1)      Ordered separately under, or otherwise added to, this contract; and

17

00069

Subject to price revision in accordance with this clause shall be identified as such
on to this contract.

on.   "Costs," as used in this clause, means allowable costs in accordance with Part
al Acquisition Regulation (FAR) in effect on the date of this contract.

ing data for establishing the firm fixed price or a final profit adjustment formula.

Within 15 (fifteen) days after the end of the month in which the Contractor has
 of a task order, the Contractor shall submit the following data:
i)     A proposed firm fixed price or total firm target price for supplies delivered
red and services performed and to be performed.
ii)     A detailed statement of all costs incurred in the performance of this
 the end of the month specified above, in the format of Table 15-2, FAR 15.408
 form on which the parties may agree), with sufficient supporting data to disclose
ost trends for --

    (A)     Supplies delivered and services performed; and
    (B)     Inventories of work in process and undelivered contract supplies
ted to the extent necessary).
   )     An estimate of costs of all supplies delivered and to be delivered and all
red and to be performed under this contract, using the statement of costs incurred
 of costs to complete performance, in the format of Table 15-2, FAR 15.408 (or
n on which the parties may agree), together with --
    (A)     Sufficient data to support the accuracy and reliability of the

    (B)     An explanation of the differences between this estimate and the
: used to establish the initial target prices.
he Contractor shall also submit, to the extent that it becomes available before
blishing the total firm price are concluded --
   )     Supplemental statements of costs incurred after the end of the month
aragraph (1) of this section for --
    (A)     Supplies delivered and services performed; and
    (B)     Inventories of work in process and undelivered contract supplies
ed to the extent necessary); and
  )     Any other relevant data that the Contracting Officer may reasonably

the Contractor fails to submit the data required by subparagraphs (c)(1) and (2)
thin the time specified and it is later determined that the Government has
tractor, the Contractor shall repay the excess to the Government immediately.

CAMPDF - www.testo.com

Case 1:01-cv-00048   Document 43   Filed in TXSD on 08/17/2001   Page 80 of 338

Unless repaid within 30 days after the end of the data submittal period, the amount of the excess shall bear interest, computed from the date the data were due to the date of repayment, at the rate established in accordance with the Interest clause.

(d)    Establishing firm fixed price or final profit adjustment formula.  Upon the Contracting Officer's receipt of the data required by paragraph (c) of this section, the Contracting Officer and the Contractor shall promptly establish either a firm fixed price or a profit adjustment formula for determining final profit, as follows:

(1)    The parties shall negotiate a total firm target cost, based upon the data submitted under paragraph (c) of this section.

(2)    If the total firm target cost is more than the total initial target cost, the total initial target profit shall be decreased.  If the total firm target cost is less than the total initial target cost, the total initial target profit shall be increased.  The initial target profit shall be increased or decreased by 50 (fifty) percent of the difference between the total initial target cost and the total firm target cost.  The resulting amount shall be the total firm target profit; provided, that in no event shall the total firm target profit be less than 5 (five) percent or more than 15 (fifteen) percent of the total initial cost.

(3)    If the total firm target cost plus the total firm target profit represent a reasonable price for performing that part of the contract subject to price revision under this clause, the parties may agree on a firm fixed price, which shall be evidenced by a contract modification signed by the Contractor and the Contracting Officer.

(4)    Failure of the parties to agree to a firm fixed price shall not constitute a dispute under the Disputes clause.  If agreement is not reached, or if establishment of a firm fixed price is inappropriate, the Contractor and the Contracting Officer shall establish a profit adjustment formula under which the total final price shall be established by applying to the total final negotiated cost an adjustment for profit or loss, determined as follows:

(i)    If the total final negotiated cost is equal to the total firm target cost, the adjustment is the total firm target profit.

(ii)    If the total final negotiated cost is greater than the total firm target cost, the adjustment is the total firm target profit, less fifty (50) percent of the amount by which the total final negotiated cost exceeds the total firm target cost.

(iii)    If the total final negotiated cost is less than the total firm target cost, the adjustment is the total firm target profit, plus (50) percent of the amount by which the total final negotiated cost is less than the total firm target cost.

(iv)    The total firm target cost, total firm target profit, and the profit adjustment formula for determining final profit shall be evidenced by a modification to this contract signed by the Contractor and the Contracting Officer.

CIMPDF - www.finebio.com

**00070**                                              N00024-99-C-2318

(e)    Submitting data for final price revision.  Unless a firm fixed price has been established in accordance with paragraph (d) of this section within 15 (fifteen) days after the end of the month in which the Contractor has delivered the last unit of supplies and completed the services specified by item number in paragraph (a) of this section, the Contractor shall submit in the format of Table 15-2, FAR 15.408 (or in any other form on which the parties agree) --

(1)    A detailed statement of all costs incurred up to the end of that month in performing all work under the items;

(2)    An estimate of costs of further performance, if any, that may be necessary to complete performance of all work under the items;

(3)    A list of all residual inventory and an estimate of its value; and

(4)    Any other relevant data that the Contracting Officer may reasonably require.

(f)    Final price revision.  Unless a firm fixed price has been agreed to in accordance with paragraph (d) of this section, the Contractor and the Contracting Officer shall, promptly after submission of the data required by paragraph (e) of this section, establish the total final price, as follows:

(1)    On the basis of the information required by paragraph (e) of this section, together with any other pertinent information, the parties shall negotiate the total final cost incurred or to be incurred for the supplies delivered (or services performed) and accepted by the Government and which are subject to price revision under this clause.

(2)    The total final price shall be established by applying to the total final negotiated cost an adjustment for final profit or loss determined as agreed upon under subparagraph (d)(4) of this section.

(g)    Contract modification.  The total final price of the items specified in paragraph (a) of this section shall be evidenced by a modification to this contract, signed by the Contractor and the Contracting Officer.  This price shall not be subject to revision, notwithstanding any changes in the cost of performing the contract, except to the extent that --

(1)    The parties may agree in writing, before the determination of total final price, to exclude specific elements of cost from this price and to a procedure for subsequent disposition of these elements; and

(2)    Adjustments or credits are explicitly permitted or required by this or any other clause in this contract.

(h)    Adjustment of billing prices.

(1)    Pending execution of the contract modification (see paragraph (e) of this section), the Contractor shall submit invoices or vouchers in accordance with billing prices as provided in this paragraph.  The billing prices shall be the initial target prices shown in this contract until

20

**00071**

firm target prices are established under paragraph (d) of this section. When established, the firm target prices shall be used as the billing prices.

(2)     If at any time it appears from information provided by the contractor under subparagraph (i)(1) of this section that the then-current billing prices will be substantially greater than the estimated final prices, the parties shall negotiate a reduction in the billing prices. Similarly, the parties may negotiate an increase in billing prices by any or all of the difference between the target prices and the ceiling price, upon the Contractor's submission of factual data showing that the final cost under this contract will be substantially greater than the target cost.

(3)     Any adjustment of billing prices shall be reflected in a contract modification and shall not affect the determination of any price under paragraph (d) or (f) of this section. After the contract modification establishing the total final price is executed, the total amount paid or to be paid on all invoices or vouchers shall be adjusted to reflect the total final price, and any resulting additional payments, refunds, or credits shall be made promptly.

(i)     Quarterly limitation on payments statement. This paragraph (i) shall apply until a firm fixed price or a total final price is established under subparagraph (d)(3)or (f)(2).

(1)     Within 45 days after the end of each quarter of the Contractor's fiscal year in which a delivery is first made (or services are first performed) and accepted by the Government under this contract, and for each quarter thereafter, the Contractor shall submit to the contract administration office (with a copy to the contracting office and the cognizant contract auditor) a statement, cumulative from the beginning of the contract, showing --

(i)     The total contract price of all supplies delivered (or services performed) and accepted by the Government and for which final prices have been established;

(ii)     The total cost (estimated to the extent necessary) reasonably incurred for, and properly allocable solely to, the supplies delivered (or services performed) and accepted by the Government and for which final prices have not been established;

(iii)     The portion of the total interim profit (used in establishing the initial contract price or agreed to for the purpose of this paragraph (i)) that is in direct proportion to the supplies delivered (or services performed) and accepted by the Government and for which final prices have not been established -- increased or decreased in accordance with subparagraph (d)(4) of this section when the amount stated under subdivision (ii) of this section, differs from the aggregate firm target costs of the supplies or services; and

(iv)     The total amount of all invoices or vouchers for supplies delivered (or services performed) and accepted by the Government (including amounts applied or to be applied to liquidate progress payments).

(2)     Notwithstanding any provision of this contract authorizing greater payments, if on any quarterly statement the amount under subdivision (i)(1)(iv) of this section exceeds the sum due the Contractor, as computed in accordance with subdivisions (i)(1)(i), (ii), and (iii) of this section, the Contractor shall immediately refund or credit to the Government the amount of this

21

CSWPDF - www.fenito.com

00072

N00024-99-C-2318

excess. The Contractor may, when appropriate, reduce this refund or credit by the amount of any applicable tax credits due the Contractor under 26 U.S.C.1481 and by the amount of previous refunds or credits effected under this clause. If any portion of the excess has been applied to the liquidation of progress payments, then that portion may, instead of being refunded, be added to the unliquidated progress payment account consistent with the Progress Payments clause. The Contractor shall provide complete details to support any claimed reductions in refunds.

       (3)    If the Contractor fails to submit the quarterly statement within 45 days after the end of each quarter and it is later determined that the Government has overpaid the Contractor, the Contractor shall repay the excess to the Government immediately. Unless repaid within 30 days after the end of the statement submittal period, the amount of the excess shall bear interest, computed from the date the quarterly statement was due to the date of repayment, at the rate established in accordance with the Interest clause.

(j)    Subcontracts. No subcontract placed under this contract may provide for payment on a cost-plus-a-percentage-of-cost basis.

(k)    Disagreements. If the Contractor and the Contracting Officer fail to agree upon
       (1) a total firm target cost and a final profit adjustment formula or
       (2) a total final price, within 60 days (or within such other period as the Contracting Officer may specify) after the date on which the data required in paragraphs (c) and (e) of this section are to be submitted, the Contracting Officer shall promptly issue a decision in accordance with the Disputes clause.

(l)    Termination. If this contract is terminated before the total final price is established, prices of supplies or services subject to price revision shall be established in accordance with this clause for
       (1)    completed supplies and services accepted by the Government and
       (2)    those supplies or services not terminated under a partial termination.
All other elements of the termination shall be resolved in accordance with other applicable clauses of this contract.

(m)    Equitable adjustments under other clauses. If an equitable adjustment in the contract price is made under any other clause of this contract before the total final price is established, the adjustment shall be made in the total target cost and may be made in the maximum dollar limit on the total final price, the total target profit, or both. If the adjustment is made after the total final price is established, only the total final price shall be adjusted.

22

**00073**

(n)   Exclusion from target price and total final price.  If any clause of this contract provides that the contract price does not or will not include an amount for a specific purpose, then neither any target price nor the total final price includes or will include any amount for that purpose.

(o)   Separate reimbursement.  If any clause of this contract expressly provides that the cost of performance of an obligation shall be at Government expense, that expense shall not be included in any target price or in the total final price, but shall be reimbursed separately.

(p)   Taxes.  As used in the Federal, State, and Local Taxes clause or in any other clause that provides for certain taxes or duties to be included in, or excluded from, the contract price, the term "contract price" includes the total target price or, if it has been established, the total final price.  When any of these clauses requires that the contract price be increased or decreased as a result of changes in the obligation of the Contractor to pay or bear the burden of certain taxes or duties, the increase or decrease shall be made in the total target price or, if it has been established, in the total final price, so that it will not affect the Contractor's profit or loss on this contract.

## FAR 52.222-2  PAYMENT FOR OVERTIME PREMIUMS (JUL 1990) (APPLICABLE TO COST TYPE TASK ORDERS)

(a) The use of overtime is authorized under this contract if the overtime premium cost does not exceed zero dollars or the overtime premium is paid for work--

   (1) Necessary to cope with emergencies such as those resulting from accidents, natural disasters, breakdowns of production equipment, or occasional production bottlenecks of a sporadic nature;

   (2) By indirect-labor employees such as those performing duties in connection with administration, protection, transportation, maintenance, standby plant protection, operation of utilities, or accounting;

   (3) To perform tests, industrial processes, laboratory procedures, loading or unloading of transportation conveyances, and operations in flight or afloat that are continuous in nature and cannot reasonably be interrupted or completed otherwise; or

   (4) That will result in lower overall costs to the Government.

00074                                          N00024-99-C-2318

(b) Any request for estimated overtime premiums that exceeds the amount specified above shall include all estimated overtime for contract completion and shall--

(1) Identify the work unit; e.g., department or section in which the requested overtime will be used, together with present workload, staffing, and other data of the affected unit sufficient to permit the Contracting Officer to evaluate the necessity for the overtime;

(2) Demonstrate the effect that denial of the request will have on the contract delivery or performance schedule;

(3) Identify the extent to which approval of overtime would affect the performance or payments in connection with other Government contracts, together with identification of each affected contract; and

(4) Provide reasons why the required work cannot be performed by using multishift operations or by employing additional personnel.

**FAR 52.223-9  CERTIFICATION AND ESTIMATE OF PERCENTAGE OF RECOVERED MATERIAL CONTENT FOR EPA DESIGNATED ITEMS (OCT 1997)**

(a) As required by the Resource Conservation and Recovery Act of 1976 (42 U.S.C. 6962(j)(2)(C)), the Contractor shall execute the following certification:

CERTIFICATION

I, _____ (name of certifier), am an officer or employee responsible for the performance of this contract and hereby certify that the percentage of recovered material content for EPA Designated Items was at least the amount required by the applicable contract specifications.

_____
(Signature of the Officer or Employee)

_____
(Typed Name of the Officer or Employee)

_____
(Title)

24

00075                                              N00024-99-C-2318

_____

(Name of Company, Firm, or Organization)


_____

(Date)

(End of certification)

(b)  The Contractor shall also estimate the percentage of recovered materials actually used in the performance of this contract.  The estimate is in addition to the certification in paragraph (a) of this clause.

<p style="text-align:center">ESTIMATE</p>

| EPA DESIGNATED ITEM | TOTAL DOLLAR VALUE OF EPA DESIGNATED ITEM | PERCENTAGE OF RECOVERED MATERIAL CONTENT |
|---|---|---|
| ____ _____ | _____ | |
| ____ _____ | _____ | |
| ____ _____ | _____ | |
| ____ _____ | _____ | |

*Where applicable, also include the percentage of postconsumer material content.

In addition, for paper products, include the percentage of postconsumer material content utilized.

(c)  The Contractor shall submit this certification and estimate upon completion of the contract to Commanding Officer, Naval Facilities Engineering Service Center, Code 424 CA, 1100 23rd Avenue, Port Hueneme, CA 93043-4370.

**FAR 52.223-11 OZONE-DEPLETING SUBSTANCES (JUN 1996)**

(a) Definition. "Ozone-depleting substance", as used in this clause, means any substance

<p style="text-align:center">25</p>

00076

designated as Class I by the Environmental Protection Agency (EPA) (40 CFR Part 82), including but not limited to chlorofluorocarbons, halons, carbon tetrachloride, and methyl chloroform; or any substance designated as Class II by EPA (40 CFR Part 82), including but not limited to hydrochlorofluorocarbons.

(b) The Contractor shall label products which contain or are manufactured with ozone-depleting substances in the manner and to the extent required by 42 U.S.C. 7671j (b), (c), and (d) and 40 CFR Part 82, Subpart E, as follows:

Warning

Contains (or manufactured with, if applicable) *_____, a substance(s) which harm(s) public health and environment by destroying ozone in the upper atmosphere.

* The Contractor shall insert the name of the substance(s).

## FAR 52.242-4 CERTIFICATION OF FINAL INDIRECT COSTS (JAN 1997)

(a) The Contractor shall--

    (1) Certify any proposal to establish or modify final indirect cost rates;

    (2) Use the format in paragraph (c) of this clause to certify; and

    (3) Have the certificate signed by an individual of the Contractor's organization at a level no lower than a vice president or chief financial officer of the business segment of the Contractor that submits the proposal.

(b) Failure by the Contractor to submit a signed certificate, as described in this clause, may result in final indirect costs at rates unilaterally established by the Contracting Officer.

(c) The certificate of final indirect costs shall read as follows:

CERTIFICATE OF FINAL INDIRECT COSTS

This is to certify that I have reviewed this proposal to establish final indirect cost rates and to the best of my knowledge and belief:

26

Case 1:01-cv-00048   Document 43   Filed in TXSD on 08/17/2001   Page 88 of 338

**00077**

1. All costs included in this proposal (identify proposal and date) to establish final indirect cost rates for (identify period covered by rate) are allowable in accordance with the cost principles of the Federal Acquisition Regulation (FAR) and its supplements applicable to the contracts to which the final indirect cost rates will apply; and

2. This proposal does not include any costs which are expressly unallowable under applicable cost principles of the FAR or its supplements.

Firm:
Signature:                          _____
Name of Certifying Official:        _____
Title:                              _____
Date of Execution:                  _____

## FAR 52.243-7 NOTIFICATION OF CHANGES (APR 1984)

(a) Definitions. "Contracting Officer", as used in this clause, does not include any representative of the Contracting Officer. "Specifically authorized representative (SAR)" as used in this clause, means any person the Contracting Officer has so designated by written notice (a copy of which shall be provided to the Contractor) which shall refer to this subparagraph and shall be issued to the designated representative before the SAR exercises such authority.

(b) Notice. The primary purpose of this clause is to obtain prompt reporting of Government conduct that the Contractor considers to constitute a change to this contract. Except for changes identified as such in writing and signed by the Contracting Officer, the Contractor shall notify the Administrative Contracting Officer in writing promptly, within 60 calendar days from the date that the Contractor identifies any Government conduct (including actions, inactions, and written or oral communications) that the Contractor regards as a change to the contract terms and conditions. On the basis of the most accurate information available to the Contractor, the notice shall state—

(1) The date, nature, and circumstances of the conduct regarded as a change;

(2) The name, function, and activity of each Government individual and Contractor official or employee involved in or knowledgeable about such conduct;

(3) The identification of any documents and the substance of any oral communication involved in such conduct;

27

Case 1:01-cv-00048   Document 43   Filed in TXSD on 08/17/2001   Page 89 of 338

(4)  In the instance of alleged acceleration of scheduled performance or delivery, the basis upon which it arose;

(5)  The particular elements of contract performance for which the Contractor may seek an equitable adjustment under this clause, including--

(i)  What contract line items have been or may be affected by the alleged change;

(ii)  What labor or materials or both have been or may be added, deleted, or wasted by the alleged change;

(iii)  To the extent practicable, what delay and disruption in the manner and sequence of performance and effect on continued performance have been or may be caused by the alleged change;

(iv)  What adjustments to contract price, delivery schedule, and other provisions affected by the alleged change are estimated; and

(6)  The Contractor's estimate of the time by which the Government must respond to the Contractor's notice to minimize cost, delay or disruption of performance.

(c)  Continued performance.  Following submission of the notice required by (b) above, the Contractor shall diligently continue performance of this contract to the maximum extent possible in accordance with its terms and conditions as construed by the Contractor, unless the notice reports a direction of the Contracting Officer or a communication from a SAR of the Contracting Officer, in either of which events the Contractor shall continue performance; provided, however, that if the Contractor regards the direction or communication as a change as described in (b) above, notice shall be given in the manner provided.  All directions, communications, interpretations, orders and similar actions of the SAR shall be reduced to writing promptly and copies furnished to the Contractor and to the Contracting Officer.  The Contracting Officer shall promptly countermand any action which exceeds the authority of the SAR.

(d)  Government response.  The Contracting Officer shall promptly, within 30 calendar days after receipt of notice, respond to the notice in writing.  In responding, the Contracting Officer shall either--

(1)  Confirm that the conduct of which the Contractor gave notice constitutes a change and when necessary direct the mode of further performance;

CVAPDF - www.fasiso.com

00073                                              N00024-99-C-2318

(2)  Countermand any communication regarded as a change;

(3)  Deny that the conduct of which the Contractor gave notice constitutes a change and when necessary direct the mode of further performance; or

(4)  In the event the Contractor's notice information is inadequate to make a decision under (1), (2) or (3) above, advise the Contractor that additional information is required, and establish the date by which it should be furnished and the date thereafter by which the Government will respond.

(e)  Equitable adjustments.  (1)  If the Contracting Officer confirms that Government conduct effected a change as alleged by the Contractor, and the conduct causes an increase or decrease in the Contractor's cost of, or the time required for, performance of any part of the work under this contract, whether changed or not changed by such conduct, an equitable adjustment shall be made--

(i)  In the contract price or delivery schedule or both; and

(ii)  In such other provisions of the contract as may be affected.

(2)  The contract shall be modified in writing accordingly.  In the case of drawings, designs or specifications which are defective and for which the Government is responsible, the equitable adjustment shall include the cost and time extension for delay reasonably incurred by the Contractor in attempting to comply with the defective drawings, designs or specifications before the Contractor identified, or reasonably should have identified, such defect.  When the cost of property made obsolete or excess as a result of a change confirmed by the Contracting Officer under this clause is included in the equitable adjustment, the Contracting Officer shall have the right to prescribe the manner of disposition of the property.  The equitable adjustment shall not include increased costs or time extensions for delay resulting from the Contractor's failure to provide notice or to continue performance as provided, respectively, in (b) and (c) above.

**FAR 52.244-2 SUBCONTRACTS (COST-REIMBURSEMENT AND LETTER CONTRACTS) (AUG 1998) AND ALTERNATE I (AUG 1996) (APPLICABLE TO COST TYPE TASK ORDERS)**

(a)       Definitions.  As used in this clause --

29

**00080**                                                    N00024-99-C-2318

Approved purchasing system means a Contractor's purchasing system that has been reviewed and approved in accordance with Part 44 of the Federal Acquisition Regulation (FAR).
Consent to subcontract means the Contracting Officer's written consent for the Contractor to enter into a particular subcontract.
Subcontract means any contract, as defined in FAR Subpart 2.1, entered into by a subcontractor to furnish supplies or services for performance of the prime contract or a subcontract.  It includes, but is not limited to, purchase orders, and changes and modifications to purchase orders.

(b)     This clause does not apply to subcontracts for special test equipment when the contract contains the clause at FAR 52.245-18, Special Test Equipment.

(c)     When this clause is included in a fixed-price type contract, consent to subcontract is required only on unpriced contract actions (including unpriced modifications or unpriced delivery orders), and only if required in accordance with paragraph (d) or (e) of this clause.

(d)     If the Contractor does not have an approved purchasing system, consent to subcontract is required for any subcontract that --

    (1)     Is of the cost-reimbursement, time-and-materials, or labor-hour type; or
    (2)     Is fixed-price and exceeds --
        (i) For a contract awarded by the Department of Defense, the Coast Guard, or the National Aeronautics and Space Administration, the greater of the simplified acquisition threshold or 5 percent of the total estimated cost of the contract; or
        (ii) For a contract awarded by a civilian agency other than the Coast Guard and the National Aeronautics and Space Administration, either the simplified acquisition threshold or 5 percent of the total estimated cost of the contract.

(e)     If the Contractor has an approved purchasing system, the Contractor nevertheless shall obtain the Contracting Officer's written consent before placing the following subcontracts:

_____
_____
_____

(f)(1)  The Contractor shall notify the Contracting Officer reasonably in advance of placing any subcontract or modification thereof for which consent is required under paragraph (c), (d), or (e) of this clause, including the following information:

(i)     A description of the supplies or services to be subcontracted.

30

**00081**

(ii)     Identification of the type of subcontract to be used.

(iii)    Identification of the proposed subcontractor.

(iv)    The proposed subcontract price.

(v)     The subcontractor's current, complete, and accurate cost or pricing data and Certificate of Current Cost or Pricing Data, if required by other contract provisions.

(vi)    The subcontractor's Disclosure Statement or Certificate relating to Cost Accounting Standards when such data are required by other provisions of this contract.

(vii)   A negotiation memorandum reflecting --

(A)    The principal elements of the subcontract price negotiations;

(B)    The most significant considerations controlling establishment of initial or revised prices;

(C)    The reason cost or pricing data were or were not required;

(D)    The extent, if any, to which the Contractor did not rely on the subcontractor's cost or pricing data in determining the price objective and in negotiating the final price;

(E)    The extent to which it was recognized in the negotiation that the subcontractor's cost or pricing data were not accurate, complete, or current; the action taken by the Contractor and the subcontractor; and the effect of any such defective data on the total price negotiated;

(F)    The reasons for any significant difference between the Contractor's price objective and the price negotiated; and

(G)    A complete explanation of the incentive fee or profit plan when incentives are used. The explanation shall identify each critical performance element, management decisions used to quantify each incentive element, reasons for the incentives, and a summary of all trade-off possibilities considered.

(2)    If the Contractor has an approved purchasing system and consent is not required under paragraph (c), (d), or (e) of this clause, the Contractor nevertheless shall notify the Contracting Officer reasonably in advance of entering into any

(i)    cost-plus-fixed-fee subcontract, or

(ii)   fixed-price subcontract that exceeds the greater of the simplified acquisition threshold or 5 percent of the total estimated cost of this contract.

The notification shall include the information required by paragraphs (f)(1)(i) through (f)(1)(iv) of this clause.

(g)    Unless the consent or approval specifically provides otherwise, neither consent by the Contracting Officer to any subcontract nor approval of the Contractor's purchasing system shall constitute a determination --

(1)    Of the acceptability of any subcontract terms or conditions;

(2)    Of the allowability of any cost under this contract; or

(3)    To relieve the Contractor of any responsibility for performing this contract.

31

**00082**

(h)     No subcontract or modification thereof placed under this contract shall provide for payment on a cost-plus-a-percentage-of-cost basis, and any fee payable under cost-reimbursement type subcontracts shall not exceed the fee limitations in FAR 15.404-4(c)(4)(i).

(i)      The Contractor shall give the Contracting Officer immediate written notice of any action or suit filed and prompt notice of any claim made against the Contractor by any subcontractor or vendor that, in the opinion of the Contractor, may result in litigation related in any way to this contract, with respect to which the Contractor may be entitled to reimbursement from the Government.

(j)      The Government reserves the right to review the Contractor's purchasing system as set forth in FAR Subpart 44.3.

(k)     Paragraphs (d) and (f) of this clause do not apply to the following subcontracts, which were evaluated during negotiations:

_____

_____

_____

### FAR 52.244-6 SUBCONTRACTS FOR COMMERCIAL ITEMS AND COMMERCIAL COMPONENTS (APR 1998)

(a) Definitions.  "Commercial item," as used in this clause, has the meaning contained in the clause at 52.202-1, Definitions.  "Subcontract," as used in this clause, includes a transfer of commercial items between divisions, subsidiaries, or affiliates of the Contractor or subcontractor at any tier.

(b) To the maximum extend practicable, the Contractor shall incorporate, and require its subcontractors at all tiers to incorporate, commercial items or nondevelopmental items as components of items to be supplied under this contract.

(c) Notwithstanding any other clause of this contract, the Contractor is required to include any FAR provision or clause, other than those listed below to the extent they are applicable and as may be required to establish the reasonableness of prices under Part 15, in a subcontract at any tier for commercial items or commercial components:

32

00098

## SHIP DISPOSAL PROJECT (SDP)
## CONTRACT/PR NUMBER N00024-99-C-2318

Code            Definition

** The "X" is assigned a value indicating the number of days, e.g., 30DAC.

**"BLOCK 13"** - **DATE OF SUBSEQUENT SUBMISSION (DATE OF SUBS SUBM)** - The due date(s) for subsequent data submission(s), if data is to be submitted more than once. If submittal is constrained by a specific event or milestone, the constraint may be given using a code from above.

**"BLOCK 14"** - **DISTRIBUTION AND ADDRESSEES (DISTRIBUTION)** - The addressees and the number of draft copies and final copies (regular and reproducible) to be provided to each. DoD component designator and office symbols/codes may be used; however, an explanation of these will be provided in the Addressee Listing. The first addressee will be the acceptance activity for the data if acceptance by DD 250 is to be accomplished at the destination (see Block 7). When reproducible copies are required (e.g, diskette, or negatives, etc.), an explanation will be provided. Please note that the Contractor may provide the data to be submitted via diskette using Microsoft Office 4.0, 4.2, 4.3 Product format, unless otherwise indicated. When submittals are submitted via diskette only one diskette per addressee is required.

**"BLOCK 15"** - **TOTAL** - The total number of copies (regular/reproducible) required by Block 14. Summation of the quantity of regular/reproducible copies listed in Block 14. Number of regular copies required are indicated to the left of the slash mark and number of reproducibles to the right.

**"BLOCK 16"** - **REMARKS** - Contains all pertinent information not specified elsewhere on the DD Form 1423 and may contain amplification of any other blocks on this form (e.g., DID tailoring, use of contractor format, approval criteria and authority, inspection and acceptance clarification, distribution statements, specific submission instructions, explanation of reproducible copy and delivery requirements, desired medium for the delivery of the data item, etc.).

N00024-96-C-2002/HMR

# ADDRESSEE LISTING

**DD FORM 1423 (CDRL)**
**BLOCK 14 ENTRY**                       COMPLETE ADDRESS

SUPSHIP                TO BE DETERMINED; ADDRESS WILL BE PROVIDED AFTER
                       CONTRACT AWARD


PMS333                 PROGRAM EXECUITVE OFFICER, EXPEDITIONARY WARFARE
PROJECT MANAGER        PMS333
                       2531 JEFFERSON DAVIS HIGHWAY
                       ARLINGTON, VA  22242-5171


SEA 02232              COMMANDER, NAVAL SEA SYSTEMS COMMAND
CONTRACTS              SEA 02232
                       2531 JEFFERSON DAVIS HIGHWAY
                       ARLINGTON, VA  22242-5160

00100

# CONTRACT DATA REQUIREMENTS LIST
## (DD FORM 1423 ADP MECHANIZED EQUIVALENT)
### CLIN: 0013 (East); 0009 (West)   EXHIBIT: A   CATEGORY: TDP   SYSTEM/ITEM: SDP
### CONTRACT/PR NO.: N00024-99-R-2318   CONTRACTOR: INTERNATIONAL SHIPBREAKING LIMITED, L.L.C.

**BLK01-DATA ITEM NO.:**         A001

**BLK02-TITLE OF DATA ITEM:**    Integrated Master Schedule

**BLK03-SUBTITLE:**              Schedules

**BLK04-AUTHORITY:**             DI-MISC-81183A - See BLK16

**BLK05-CONTRACT REF:**          Contract Section C1-3.1

**BLK06-REQUIRING OFFICE:**      SUPSHIP

**BLK07-DD 250 REQ:**            LT

**BLK08-APP CODE:**

**BLK09-DIST STATEMENT REQD:**

**BLK10-FREQUENCY:**             As required by the Contracting Officer

**BLK11-AS OF DATE:**

**BLK12-DATE OF 1ST SUBM:**      As required by the Contracting Officer

**BLK13-DATE OF SUBS SUBM:**     R/ASR

**BLK14-DISTRIBUTION:**

| Addressee | Reg/Repro |
|-----------|-----------|
| SUPSHIP   | 1/0       |
| PMS333    | 1/0       |

**BLK15-TOTAL:**                 2/0

**BLK16-REMARKS:**               BLK04: Tailored to allow contractor format. Only format and content described in 10.1, 10.2, and 10.2.6 apply. Substitute references to "Work Breakdown Structure" with "Contractor's work systems".

PREPARED AND
APPROVED BY:

DATE: 10 NOV 98
PAGE 1

00101

<div align="center">

CONTRACT DATA REQUIREMENTS LIST
(DD FORM 1423 ADP MECHANIZED EQUIVALENT)
CLIN: 0013 (East); 0009 (West)   EXHIBIT: A   CATEGORY: TDP   SYSTEM/ITEM: SDP
CONTRACT/PR NO.: N00024-99-R-2318   CONTRACTOR: INTERNATIONAL
SHIPBREAKING LIMITED, L.L.C.

</div>

BLK01-DATA ITEM NO.:          A002

BLK02-TITLE OF DATA ITEM:     Certification/Data Report

BLK03-SUBTITLE:              Certification of Demilitarization and Dismantlement

BLK04-AUTHORITY:             DI-MISC-80678 - See BLK16

BLK05-CONTRACT REF:          Contract Section C1-3.3

BLK06-REQUIRING OFFICE:      SUPSHIP

BLK07-DD 250 REQ:            LT

BLK08-APP CODE:

BLK09-DIST STATEMENT REQD:

BLK10-FREQUENCY:             OTIME – See BLK 16

BLK11-AS OF DATE:

BLK12-DATE OF 1ST SUBM:      NLT 15 days after completion of task order

BLK13-DATE OF SUBS SUBM:

BLK14-DISTRIBUTION:

| Addressee | Reg/Repro |
|-----------|-----------|
| SUPSHIP   | 1/0       |
| PMS333    | 1/0       |

BLK15-TOTAL:                 2/0

BLK16-REMARKS:               BLK04: Tailored to allow contractor format. Only format and content
                             described in 10.1, 10.2, 10.2.1, 10.2.4, and 10.5 apply

                             BLK 10: A certification will be prepared and signed for each ship.

PREPARED AND
APPROVED BY:                                          DATE: 10 NOV 98
                                                     PAGE 2

00102

# CONTRACT DATA REQUIREMENTS LIST
## (DD FORM 1423 ADP MECHANIZED EQUIVALENT)
### CLIN: 0013 (East); 0007 (West)   EXHIBIT: A   CATEGORY: TDP   SYSTEM/ITEM: SDP
### CONTRACT/PR NO.: N00024-98-R-2219   CONTRACTOR:

BLK01-DATA ITEM NO.:          A003

BLK02-TITLE OF DATA ITEM:     Certification/Data Report

BLK03-SUBTITLE:               Certification of Proper Disposal of Hazardous Material & Waste

BLK04-AUTHORITY:              DI-MISC-80678 - See BLK16

BLK05-CONTRACT REF:           Contract Section C1-4

BLK06-REQUIRING OFFICE:       SUPSHIP

BLK07-DD 250 REQ:             LT

BLK08-APP CODE:

BLK09-DIST STATEMENT REQD:

BLK10-FREQUENCY:              OTIME  - See BLK 16

BLK11-AS OF DATE:

BLK12-DATE OF 1ST SUBM:       NLT 15 days after completion of task order

BLK13-DATE OF SUBS SUBM:

BLK14-DISTRIBUTION:

| Addressee | Reg/Repro |
|-----------|-----------|
| SUPSHIP   | 1/0       |
| PMS333    | 1/0       |

BLK15-TOTAL:                  2/0

BLK16-REMARKS:                BLK 04: Tailored to allow contractor format. Only format and content
                              described in 10.1, 10.2, 10.2.4, and 10.5 apply.

                              BLK 10: A certification will be prepared and signed for each ship.

PREPARED AND
APPROVED BY:                                                DATE: 10 NOV 98

00103

## CONTRACT DATA REQUIREMENT LIST
### (DD FORM 1423 ADP MECHANIZED EQUIVALENT)
**CLIN: 0013 (East); 0007 (West)  EXHIBIT: A  CATEGORY: TDP  SYSTEM/ITEM: SDP**
**CONTRACT/PR NO.: N00024-98-R-2219  CONTRACTOR:**

| | |
|---|---|
| **BLK01-DATA ITEM NO.:** | A004 |
| **BLK02-TITLE OF DATA ITEM:** | Accident/Incident Report |
| **BLK03-SUBTITLE:** | Accident and Injury Report |
| **BLK04-AUTHORITY:** | DI-SAFT-81563 - See BLK16 |
| **BLK05-CONTRACT REF:** | Contract Section C1-8.3 |
| **BLK06-REQUIRING OFFICE:** | SUPSHIP |
| **BLK07-DD 250 REQ:** | LT |
| **BLK08-APP CODE:** | |
| **BLK09-DIST STATEMENT REQD:** | |
| **BLK10-FREQUENCY:** | ASREQ |
| **BLK11-AS OF DATE:** | |
| **BLK12-DATE OF 1ST SUBM:** | within 1 day of a condition triggering this report |
| **BLK13-DATE OF SUBS SUBM:** | R/ASR |

**BLK14-DISTRIBUTION:**

| Addressee | Reg/Repro |
|---|---|
| SUPSHIP | 1/0 |
| PMS333 | 1/0 |

| | |
|---|---|
| **BLK15-TOTAL:** | 2/0 |
| **BLK16-REMARKS:** | BLK04: In addition to the conditions triggering this report, this report will be generated in the event of one or more disabling injuries. |

**PREPARED AND
APPROVED BY:**

**DATE: 10 NOV 98**

**PAGE 4**

00104

# CONTRACT DATA REQUIREMENTS LIST
## (DD FORM 1423 ADP MECHANIZED EQUIVALENT)
### CLIN: 0013 (East); 0007 (West)   EXHIBIT: A   CATEGORY: TDP   SYSTEM/ITEM: SDP
### CONTRACT/PR NO.: N00024-98-R-2219   CONTRACTOR:

| | |
|---|---|
| BLK01-DATA ITEM NO.: | A005 |
| BLK02-TITLE OF DATA ITEM: | Status Report |
| BLK03-SUBTITLE: | Summary Status Report |
| BLK04-AUTHORITY: | DI-MGMT-80368 - See BLK16 |
| BLK05-CONTRACT REF: | Contract Section C1-9.1 |
| BLK06-REQUIRING OFFICE: | SUPSHIP |
| BLK07-DD 250 REQ: | LT |
| BLK08-APP CODE: | |
| BLK09-DIST STATEMENT REQD: | |
| BLK10-FREQUENCY: | MTHLY |
| BLK11-AS OF DATE: | |
| BLK12-DATE OF 1ST SUBM: | NLT 30 days after start of the task order |
| BLK13-DATE OF SUBS SUBM: | Monthly thereafter until completion of the task order |

BLK14-DISTRIBUTION:

| Addressee | Reg/Repro |
|---|---|
| SUPSHIP | 1/0 |
| PMS333 | 1/0 |

| | |
|---|---|
| BLK15-TOTAL: | 2/0 |
| BLK16-REMARKS: | BLK04: Tailored to allow contractor format. |

PREPARED AND
APPROVED BY:

DATE: 10 NOV 98
PAGE 5

00105

# CONTRACT DATA REQUIREMENTS LIST
## (DD FORM 1423 ADP MECHANIZED EQUIVALENT)
### CLIN: 0013 (East); 0007 (West)  EXHIBIT: A  CATEGORY: TDP  SYSTEM/ITEM: SDP
### CONTRACT/PR NO.: N00024-98-R-2219  CONTRACTOR:

| | |
|---|---|
| **BLK01-DATA ITEM NO.:** | A006 |
| **BLK02-TITLE OF DATA ITEM:** | Status Report |
| **BLK03-SUBTITLE:** | Final Project Report |
| **BLK04-AUTHORITY:** | DI-MGMT-80368 - See BLK16 |
| **BLK05-CONTRACT REF:** | Contract Section C1-9.2 |
| **BLK06-REQUIRING OFFICE:** | SUPSHIP |
| **BLK07-DD 250 REQ:** | LT |
| **BLK08-APP CODE:** | |
| **BLK09-DIST STATEMENT REQD:** | |
| **BLK10-FREQUENCY:** | OTIME |
| **BLK11-AS OF DATE:** | |
| **BLK12-DATE OF 1ST SUBM:** | NLT 30 days after completion of task order |
| **BLK13-DATE OF SUBS SUBM:** | |

**BLK14-DISTRIBUTION:**

| Addressee | Reg/Repro |
|---|---|
| SUPSHIP | 1/0 |
| PMS333 | 1/0 |

**BLK15-TOTAL:**  2/0

**BLK16-REMARKS:**  BLK04: Tailored to allow contractor format.

BLK 10: A report will be prepared for each ship.

PREPARED AND
APPROVED BY:

DATE: 10 NOV 98

PAGE 6

00106

# CONTRACT DATA REQUIREMENTS LIST
## (DD FORM 1423 ADP MECHANIZED EQUIVALENT)
**CLIN: 0013 (East); 0007 (West)   EXHIBIT: A   CATEGORY: TDP   SYSTEM/ITEM: SDP**
**CONTRACT/PR NO.: N00024-98-R-2219   CONTRACTOR:**

| | |
|---|---|
| BLK01-DATA ITEM NO.: | A007 |
| BLK02-TITLE OF DATA ITEM: | Cost Data Summary Report |
| BLK03-SUBTITLE: | Cost Data Report |
| BLK04-AUTHORITY: | DI-F-6006 - See BLK16 |
| BLK05-CONTRACT REF: | Contract Section C1-10 |
| BLK06-REQUIRING OFFICE: | SUPSHIP |
| BLK07-DD 250 REQ: | LT |
| BLK08-APP CODE: | A – Approval for format only |
| BLK09-DIST STATEMENT REQD: | |
| BLK10-FREQUENCY: | MTHLY |
| BLK11-AS OF DATE: | |
| BLK12-DATE OF 1ST SUBM: | NLT 30 days after start of the task order |
| BLK13-DATE OF SUBS SUBM: | Monthly thereafter until completion of the task order |

BLK14-DISTRIBUTION:

| Addressee | Reg/Repro |
|---|---|
| SUPSHIP | 1/0 |
| PMS333 | 1/0 |

| | |
|---|---|
| BLK15-TOTAL: | 2/0 |
| BLK16-REMARKS: | BLK04: Use format in spreadsheet "costrep1.xls". |

PREPARED AND
APPROVED BY:

DATE: 10 NOV 98
PAGE 7

0010?

International Shipbreaking Limited, L.L.C.

TABLE OF CONTENTS

Page

TITLE PAGE                                          (i)

TABLE OF CONTENTS                                   (ii)

INDEX OF FIGURES AND TABLES                         (v)

GLOSSARY                                            (vi)


SECTION 1

1.0 PROGRAM AND ENGINEERING MANAGEMENT              1
      1.0a       Introduction                       1
      1.0b       Management & Experience Factors     1

1.1 OPERATIONAL PLAN                                4
      1.1a       Towing Operations and Plans         4
      1.1b       Step by Step Procedures When Performing Ship Dismantling   5
      1.1c       Monitoring Subcontractors           13
      1.1d       Workforce                           14
      1.1e       Securing Ships During Severe Weather   17
      1.1f       Removing Bilge and Sump Water       18
      1.1g       Removing Fuel and Hydraulic Oil Residue   19

1.2 SHIP DISMANTLING CAPABILITY AND APPROACH        21
      1.2a       Management and Organization         21
      1.2b       Risk Factors                        23
      1.2c       Key Personnel                       29
      1.2.1      Teaming And Subcontractor Relations   40
      1.2.2      Facilities                          42

1.3 APPROACH TO COST CONTROL                        47
      1.3.1      Approach To Maximizing Scrap Sale Proceeds   50
      1.3.2      Cost Collection Methodology         52

1.4 SCHEDULE                                        55

00108                                    International Shipbreaking Limited, L.L.C.

## 1.1   OPERATIONAL PLAN

### 1.1a.   Towing Operations and Plans

During the past four years, we have successfully towed a total of ten (10) obsolete Government vessels (and one commercial vessel) from Philadelphia, PA, Norfolk, VA, Beaumont, TX and Suisun Bay, CA to ISL's Brownsville, TX facility. These vessels are listed in Table1.1a. Our Program Manager, Robert Berry, will oversee this operation and the tow to our facility in Brownsville, Texas. Captain Berry has over 20 years experience moving salvage and scrap vessels, and has been a licensed Ocean Tug Master. He will interface with the chartered tug operator; provide instruction, answer questions and monitor performance. Neither he nor any of ISL's employees will accompany the tow or the tug. The employees of the charter tug operator will perform all sea-based aspects of the tow. A third party marine surveyor will certify for our benefit and that of our insurance carrier that all tow preparation and towing procedures are done in a safe and appropriate manner.

ISL, assisted by experienced subcontractors, will prepare each ship for tow. We will retain the services of a certified Marine Surveyor and an experienced team of riggers (e.g. W.R. Tye and Associates). We will follow the engineering and naval architecture recommendations of the Surveyor in preparing the vessel for a safe "dead-ship" tow. The preparation of the vessel will include securing all overboard valves, securing all doors and openings, tying down any loose equipment, securing rudder and shafts and installing towing bridles, emergency tow lines and running lights. Fuel/ballast will be distributed according to U.S. Coast Guard regulations, as detailed by the Surveyor, so that the vessel will be correctly trimmed. The vessel will be rigged to be able to drop anchor in an emergency. The chartered tug operator will be selected to meet the requirements of the Surveyor, will be certified to operate in U.S. waters by the USCG and will meet all insurance requirements (e.g. Smith Maritime, Moran Towing, Crowley, Foss Inc., Sause Bros.).

## Table 1.1a

| International Shipbreaking Limited, L.L.C. | |
|---|---|
| Ex-Yukon | Ex-General Simon B. Buckner |
| Ex-Marias | Ex-General Maurice Rose |
| Ex-Iwo Jima | Ex-Champion |
| Ex-Ajax | Ex-MormacGlen |
| Ex-Josephus Daniels | Ex-Northwind |
| DB31-Ex-Atlas | |

Our specific approach to towing the first vessel is as follows:
- Identify vessel to be towed and the port of departure;
- Negotiate tow contract with one or more tug operators for best value;
- Solicit from NAVSEA technical concerns related to the tow;
- Establish tow schedule and departure date;
- Arrange for preparation of vessel according to Section 1.1a (pg 4);

CRIMPDF - www.texto.com

00109

- Arrange for final marine survey of prepared vessel and tug;
- Bind tow insurance;
- Coordinate hook-up of tug to vessel, including assist tugs;
- Monitor progress of tow;
- Arrange assist tugs for arrival in Brownsville;
- Receive vessel into ISL's West Slip.

## 1.1b.   Step by Step Procedures When Performing Ship Dismantling

### 1.  *Plans for using dismantling slip*

ISL currently has two dismantling slips ("East Slip" and "West Slip") which we operate side by side in the Port of Brownsville, Texas.  Figure 1.1b and the accompanying photographs show the layout of our facility.  The East Slip is 900 feet in length and 150 feet wide and has drafts of 28 feet at its mouth gradually sloping up to 12 feet at the forward end of the ramp.  The West Slip is 700 feet in length and 120 feet wide and has drafts of 24 feet at the mouth declining to 18 feet near the ramp.  These slips have been used to dismantle all the ships listed in Table 1.1a.

5

00110

International Shipbreaking Limited, L.L.C.

Figure 1.1b
Facility Layout

00111

International Shipbreaking Limited, L.L.C.

CitePDF - www.fastio.com

00112

International Shipbreaking Limited, L.L.C.

CVisPDF - www.fesiso.com

# 00113

It is our intention to utilize the West Slip for CLIN 0001 of the SDP contract. We can currently berth and work on up to six ships simultaneously. We are also negotiating for options on land directly east of, and contiguous to, our facility that will allow us to expand the operation by digging up to three additional dismantling slips. These slips and the corresponding berthing areas on our waterfront in the Ship Channel will allow for an additional six ship capacity resulting in up to 12 ships being worked on at any one time. It is important to note that ISL has a maintenance dredging permit on both existing slips and that the entrance depth is not limited by concrete sills as are other slips in the Port of Brownsville.

We do not believe our current backlog will affect or impact in any way the SDP work. Generally speaking, the backlog benefits NAVSEA since it keeps us active in our only line of business -ship dismantling. The backlog allows us to remain active if there are delays in the timing of awards that will serve NAVSEA better than an SDP participant with no other ship dismantling contracts.

As our Technical Plan indicates, ISL has two (2) dismantling slips, the East Slip and the West Slip. If ISL is successful in being awarded a task order under the SDP, we intend to dedicate our West Slip to production under the SDP. All MARAD and DRMS work will continue to be performed in our East Slip. ·Just as we expect NAVSEA to become an important client of ISL, both MARAD and DRMS are important clients now.

Specifically, ISL has all the necessary equipment and infrastructure in place to competently and effectively complete any task order under the SDP, irrespective of the other ·contracts awarded to the Company. We believe we have the facility, manpower and resources necessary to perform under our existing contracts and submitted bids. ·If ISL is fortunate enough to be awarded contracts for both an East Coast Lot *and* a West Coast Lot, we will be able to quickly dig a third slip on our property to handle all of our backlog.

## 2.  *Measures to ensure stability during hull dismantling*

Once the Vessel has been positioned in the West dismantling slip, it is secured to the eastern side of the slip with lines secured to several dead-men buried along the bank and to the 500 ton land winch located at the head of the slip. A safety inspection is then performed to ensure that there was no damage to the vessel while in tow. At this point in time, the vessel is safely afloat and all lines are secured. Gangway access to the vessel is then secured. Generally speaking, the super-structure is first removed from the vessel. Once the super-structure is removed, the vessel is cut in a stair step method from the bow back to the engineering spaces and from the stern forward to the engineering spaces. The stair step cutting procedure, shown in Figure 1.1 b 2, allows for the forefoot of the vessel to be placed on the cutting ramp and to be pulled shoreward. Port and starboard hull and transverse bulkhead cuts are performed with consideration of freeboard and restriction of progressive flooding.

The removal of the vessel's structure, from above the waterline in a stair-step manner, reduces the ground reaction weight, enabling the hull to be pulled shoreward while maintaining stability and trim. Following each shoreward pull, the portion of the hull that rests on land above the high tide line is dismantled. Portions of the topside continue to be removed in a stair-step manner, again reducing ground reaction and allowing another shoreward pull. This process

CISPDF - www.fevisa.com

continues until the vessel is completely dismantled.

Both the Project Manager and Environmental and Safety Manager have significant hands-on experience with these dismantling procedures and have utilized this and similar methodologies without incident. Also, it is noted that this approach has been used by various dismantling companies in Brownsville for over fifty years, with hundreds of ships having been dismantled without a documented or anecdotal problem relating to the loss of structural integrity resulting in flooding or sinking. ISL may, from time to time, retain the services of a qualified naval architect, such as PCCI Inc., to assess and monitor residual strength and stability of the vessel during cutting with concerns toward vessel floodable length, residual strength, or trim and stability.

End of Section

CVAPDF - www.favisa.com

00115

International Shipbreaking Limited, L.L.C.

## Figure 1.1 b 2
## Photo of Stair-Step Cutting Process

00116

3.  *Final dismantlement of underwater hull*

Based upon the use and configuration of our dismantling slip, the final dismantlement of the underwater hull always occurs on land.  Once a sufficient amount of the weight on the vessel has been lifted off, the vessel is attached at the bow to a land winch located at the head of the slip.  Using the winch, the vessel is pulled up the ramp.  Cuts are then made to the portion of the hull resting on dry land and lifted off.  Once the pieces of hull resting on land are removed, the winch is re-attached to the hull and the vessel is pulled again, moving more of the underwater hull to dry land.  This process is repeated until the stern of the ship is pulled onto the ramp, cut and removed.  Figure 1.1 b 2 shows this cutting process.  This method has been used for the dismantlement of all the hulls listed in Table 1.1a.

4.    *Measures to prevent flooding/sinking of the ship*

While the vessel is in our custody, daily inspections of the vessel take place to check for hull stability and the occurrence of additional water in the holds.  Our managers have extensive experience with ships, marine salvage and damage control.  To the extent an inspection uncovers the ship taking on water, excessive trim, list, hog, or sag conditions, ISL has electric and gas powered pumps which will be utilized to stabilize the vessel until the condition can be remedied, or until the vessel can be pulled further up the ramp placing the hull more firmly on ground.  Additionally outer bulkheads and transverse bulkheads are cut to provide additional freeboard should the vessel flood while coming up the ramp.

5.    *Measures to prevent slag or other contaminants from entering the water*

Most of the cutting slag will be retained in the hull during the dismantling process.  ISL has designed a set of floating slag catchers (we call "FSC's").  Each unit will have general dimensions of 30' by 8'and is employed next to the vessel.  Depending on the area of the vessel to be cut, two or three FSCs will be used by positioning the FSC alongside the area of the hull being cut.  The FSC will be secured to the vessel via lines and will catch any slag that results from cuts to the outside of the hull.  The FSCs are mobile and can be positioned along any portion of the hull that is floating.

The use of FSCs prevents slag from falling into the water as a result of cuts to the outside of the hull.  In addition, our cutting procedure within the vessel maintains a thirty-six inch (36") high exterior shell plating above the lowest cut deck throughout the vessel while any portion of the vessel's hull remains in the slip.  The purpose of this exterior shell is to maintain and control debris, paint chips and liquids within the hull as well as provide a safety barrier for the workers.  Therefore, slag, debris, paint chips and liquids remain within the vessel until removed in a controlled manner.  We also take care to eliminate debris and paint chips from leaving the vessel by collecting debris and paint chips on the vessel and placing them in containers for disposal.  Historically, paint chips have not been a problem.  In addition, all liquids remain on board until a controlled pumping is executed.  We have never had any reportable spills.  As the vessel is pulled up the slip onto dry land, the final cuts are made to the hull on land.

CUsPDF - www.tesoa.com

00117

1.1 c.  **Monitoring Subcontractors**

Certified employees of ISL will accomplish the vast majority of all labor necessary for hazardous material removal and shipbreaking operations.  Subcontractors will be used for certain specialized tasks such as rigging and towing, transporting and disposal of regulated hazardous waste, marine surveying, naval architecture and marine chemistry.  All hazardous waste disposal companies used by ISL will come from the DRMS qualified TSDF list.  If they are not on the DRMS list, we will request specific authorization.  We will supply all State, Federal ID numbers and applicable permits for evaluation.  Finally, we will monitor the cost performance and the competitive pricing of subcontractors by utilizing the systems and methodologies described in Section 1.3.2, Cost Collection Methodology.

CVnPDF - www.tevisu.com

# 00118

## 1.1 d.   Workforce

ISL is currently the largest employer of ship cutting labor in the United States.   We currently employ 101 people.   The workforce is broken down into the following specialized categories:

Table 1.1d

| Summary of Work Force | | | |
|---|---|---|---|
| Key Personnel | 2 | Equipment Operators | 7 |
| Ship Cutters | 16 | Mechanics | 10 |
| Yard Cutters | 18 | Non-Ferrous Workers | 7 |
| Asbestos Workers | 21 | Laborers | 10 |
| Sampling Technicians | 1 | Office Staff | 3 |
| Oil/Tank Technicians | 2 | Security | 4 |

Brownsville has a long history of maintaining a skilled ship cutting labor force.   Our employees enjoy a pay and benefits package that includes workmen's compensation insurance, vacation, and a bonus program.   ISL has a waiting list of qualified employees awaiting a job opening.   We anticipate hiring approximately 15 employees upon the successful award of a position in the Ship Disposal Program.   Newly hired employees will be assigned proportionally into experienced work crews throughout the yard so that the NAVSEA contract will be assured that the majority of labor assigned will be among our most experienced. We do not plan to staff this important program with apprentices who need to learn on the job.   ISL's philosophy of employing appropriately only skilled personnel will result in lower overall costs to the Government and safer operations.

It is important to note that our experienced ship dismantling employees are now in place, working solely on vessel dismantling, and have been doing so for many years.   We believe that these skilled workers offer a benchmark for U.S. vessel dismantling and are enthusiastic about demonstrating their skills and competing with ship building and ship repair yards,

It has been and will continue to be the normal and customary practice of the Company to pay approximately eight hours of overtime per week for the skilled labor it employs.   The weekly schedule for crewmembers is typically four days of working ten hours each, followed by a fifth day working eight hours.   The staff has come to accept this schedule and the resulting eight hours of overtime as an employment benefit.   It allows the Company to retain workers who are not only skilled in their particular function, but are also well trained in all aspects of worker safety and environmentally sound practices.

ISL measures workload requirements by drawing upon the experience of its management team to assess short term and longer-term events that may impact the safety and efficiency of the facility.   These factors include:

- **Weather**.   Management will adjust the workload depending upon weather factors that affect our operation in Brownsville such as rain, heat and wind.   We will also adjust the workday depending upon the season and the amount of daylight hours available to

# 00119

work safely.

- *Throughput*: The specialized work crews we have developed are staffed depending upon the amount of throughput have experienced in the past. Generally speaking, ship cutters are capable of cutting and lifting up to 15 tons per man per day off a vessel. Yard cutters, on the other hand, can produce up to 10 tons per day of shear scrap, up to 5 tons of finished scrap and up to 3 tons of finished steel plate. The Program Manager adjusts the cutting work force weekly depending upon what type of scrap material we have available at the time.

- *Safety*: Our experience in this industry has led us to believe that certain crew sizes work safely and efficiently. Ship cutting crews are safest when they do not exceed eight cutters on a ship. Asbestos crews are most efficient when they have nine workers and one foreman.

- *Cost*: The Program Manager reviews time sheets and the payroll weekly to assess the overall efficiency of the workforce so that hours and functions may be adjusted for the coming week. We also review supplies and material utilized in order to maintain our budget integrity.

- *Class of Ship*: Each class of vessel has particular issues which impact workload, such as amounts of regulated and hazardous material, the use of decking material such as concrete, the design of the vessel (compact compartments vs. open holds) and the ferrous and non-ferrous content of the material. These factors need to be assessed after the vessel arrives and the material is tested.

Ends of Section

00120

International Shipbreaking Limited, L.L.C.

Figure1.1d

CVisPDF - www.fasino.com

00121

## 1.1 e.  Securing Ships During Severe Weather

Occasionally in South Texas, we are put on alert for a hurricane or other severe weather watches or warnings.  When this occurs, all employees at the facility join in efforts to prepare for the severe weather.  Listed below are general procedures we follow:

### (i)      Hurricanes
- All portable buildings are anchored to the ground;
- Any other structures, such as box vans, will be either anchored or moved to a safer area;
- Any light scrap piled in the yard will need heavy pieces of iron laid on top of it, in order to weigh it down unless we have time to ship it out prior to the storm hitting;
- Any objects that appear to be capable of becoming airborne will be secured;
- Cranes will be boomed down and secured;
- All hoses and tools will be picked up and secured;
- Vessels in our slip will be re-inspected and secured with extra line using other pieces of equipment as extra anchors.  Any empty ballast tanks will be filled with sea water as required;
- Oxygen and gas is turned off at main connection;
- Once all is secured the facility will be evacuated;
- Hazardous materials and petroleum storage areas will be secured by closing all valves, capping lines, securing doors and checking the integrity of drum lids.

### (ii)     Lightning
- Workers on the vessel and in the yard stop work and stand by under cover;
- All power to vessels is shut off;
- Cranes are boomed down;
- All personnel are to seek shelter.

### (iii)    Securing the Ship
We have installed a series of dead-men along each of the banks along the slips.  Each vessel within a slip is secured to a series of these dead-men and the lines are inspected regularly and tightened in anticipation of severe weather.  The vessel positioned at the head of the slip is also secured to the land winch.  Where appropriate, when we have multiple vessels in a slip, they are secured to one another for extra stability.  In addition, empty ballast tanks on board the vessel will be pumped full with seawater to provide additional weight and stability.  Finally, extra lines can be attached to the vessel and connected to land based heavy equipment, such as bulldozers and heavy lift cranes to provide additional anchorage on an as needed basis.

CMXPDF - www.texisi.com

00122

### 1.1 f.   Removing Bilge and Sump Water

#### *(i)  Waste Water*

Wastewater generated during scrapping will be contained within the vessel.  The vessel is positioned in our slip to have the bow inclined at a 1.5 to 3 degree slope, thus causing all water used on board during scrapping to collect at transverse bulkheads.   During and prior to completion of scrapping, the water that has accumulated will be collected and transported to our on-site oil/water separator for discharge into the Port of Brownsville sewage treatment plant for further treatment and ultimate discharge under the Port discharge permit.  Sampling for metals, oil and grease and PCBs occur according to our agreement with the treatment facility.  Figure 1.2 b shows the oil/water separator.

# 00123

### 1.1 g   Removing Fuel And Hydraulic Oil Residue

At ISL, fuel oils are recovered as virgin oil with the exception of tank bottom residues that are handled as used oil or solidified and disposed of as oily debris/residue in a TNRCC approved landfill disignated for that material.  Virgin oils are consolidated in an on-board tank, depending on quantity, then transferred to a tank placed on-board by crane.  This tank is filled, removed by crane and moved to the diked oil storage area where it is consolidated with other oils from the vessel.  Hydraulic oil is handled as used oil and is segregated from virgin fuel oil and from other used oils.  Hydraulic oil, depending on quantity is drummed on board and/or pumped to a tank placed on-board.  In either case, the containerized hydraulic oil is removed by crane and moved to the diked storage area.  Tank bottom, hydraulic system and bilge sludge are solidified, placed in a watertight covered roll-off to await final disposal.  ISL has a waste stream in-place for this material at the BFI Landfill in Sinton, Texas (TNRCC approved).

### 1.   Petroleum Products

At ISL, all petroleum products are placed into three broad categories: virgin products, used oils and oil/water mixtures.  Virgin oils will be handled as such.  Used oil storage handling and management will comply with the applicable TNRCC requirements found in 30 TAC Section 335.1, 30 TAC 24 Section 324 (relating to used oil) and 40 CFR Part 279 (relating to standards for used oil).  The Company is not a marketer of used oil, nor will we utilize used oil as an on-site fuel.  All used oil will be collected from on-site sources, prior to dismantling and therefore does not co-mingle with virgin oil.  The on-site separator is not utilized for used oil.  Oil/water mixtures will be processed through our on-site oil/water separator with water discharged to the Port's permitted treatment system.  All oils that are extracted by the separator are treated as used oil.

### (i)   Marine Chemist Certification

All hot work shall be performed in accordance with CFR 29 1915 Subpart B – Confined and Enclosed Spaces and other Dangerous Atmospheres in Shipyard Employment.  We will provide a trained competent person and a certified marine chemist (Mr. Eric Moore Certificate # 626) as the regulation requires.

### (ii) Spill Prevention

The wet slips are continuously boomed as a preventive oil spill containment measure (except during vessel insertion).  Absorbent boom and pads are also kept on-site.  The facility has a SPCC plan and an emergency response plan.  Our Oil Spill Response Organization ("OSRO") is Code 3 Corp., located in Harlingen, Texas.  Their listed response time is 45 minutes.  An ISL response group, directed by Mr. Chambers, will provide first response utilizing the ISL small boat, additional boom, absorbent boom, absorbent pads, pumps and the on-site vacuum truck for initial containment and mitigation.  Additionally, ISL is a member of the Brownsville Navigation District mutual assistance group and may call upon other Port of Brownsville resources for first response.

00124

### (iii) Notification

The National Response Center, Port Isabel Coast Guard, Texas General Land Office and the TNRCC will be contacted in the event of a regulated discharge. The TDH is notified in the case of an asbestos release. The spill plan and notification list is kept in the security building. Mr. Barry Chambers is the responsible person.

### (iv) Removal Operations of Petroleum Products

During petroleum product removals, only appropriate pumps will be used during transfers on the vessel. All hoses will be wired and taped with an absorbent pad under all connections. Fuel oils will be consolidated into a tank onboard the vessel. A shore side crane will remove the tank. This process has been reviewed and monitored by the USCG. After removal of petroleum products, the tanks will be cleaned and removed for disposal in accordance with 29 CFR 1915 hot work requirements.

### End of Section

# 00125

## 1.4   SCHEDULE

**Timeline Description Of The Dismantling Process**

S              Contract Award Date

S+10          Towing of the Ship

Please refer back to Section 1.1a of this proposal where the towing process is reviewed. We believe that 16 days from departure of the tow to arrival is achievable, dependingDepending on the availability of the tugboat, we believe that the following tow schedules are achievable.

- Bremerton WA to Brownsville TX: approximately 50 days (S+60 arrival) from tow hook on assuming a distance of 5,500 miles, 6.5 knot average speed and 14 days to transit the canal.
- Suisun Bay CA to Brownsville TX: approximately 45 days (S+55 arrival) from tow hook on assuming a distance of 4,750 miles, 6.5 knot average speed and 14 days to transit the canal.
- Pearl Harbor HA to Brownsville TX: approximately 62 days (S+72 arrival) from tow hook on assuming a distance of 7,350 miles, 6.5 knot average speed and 14 days to transit the canal.

The tow preparation time for each port is assumed to be approximately 10 days from the award of the contract. However, this time frame will be dependent upon the access into the port, the availability of lifting cranes at the port to assist in bridle, emergency tow line, anchor and chain placement, the availability of tenders, possible need for pumping to achieve requisite trim and the general condition of the vessels. We have not inspected vessels in these ports; accordingly, our estimate is dependent on the accuracy of these assumptions. The availability of an appropriate tug is dependent upon many factors such as: when is the contract awarded; weather at the time of the award; the location of the tug at the time of the award and the necessary travel time to arrive at the relative port; the offered price of the tug and; the appropriate preparation of the vessel. We have not estimated any of these factors. Our schedule only assumes 10 days to prepare the vessel for tow and the tugboat.number of days mentioned above for tow time. Assuming the tugboat is available at the time of award, we would commence preparation of the vessel (S to S + 10 days). The tug would attach on S+10 and commence the tow. The distance between Philadelphia and Brownsville is 1,980 nautical miles. Tugboats, which are capable of making the voyage, have at least a 3,000 horsepower rating and generally maintain speeds of approximately 6.5 knots per hour.

**S+60   Vessel Arrival in Brownsville, TX (for schedule purposes, we are using Bremerton WA as the departure port).**

**S+61 to 64   Obtain Marine Chemist Certificate**

A Competent Person is to accompany marine chemist and yard foreman onboard vessel to begin opening all the hatches leading to tanks. The tanks will be checked for contents and levels. Readings for combustible gases, oxygen and hydrogen sulfide will also be checked and logged. The marine chemist will also issue directives on safe areas for hot work within the vessel.

CWPDF - www.testv.com

00126

International Shipbreaking Limited, L.L.C.

Recommendations on protective equipment are also issued.

After inspection is complete, the marine chemist will issue his recommendations on the certificate. This certificate will be posted on the gangway leading to the vessel at all times.

### S+65 to 70   Demilitarization of residual military equipment

Upon arrival, equipment which have been identified by contract or other means which will require special handling and/or complete destruction instead of resale will be identified and handled appropriately in accordance with DRMS/NAVY requirements.

### S+61 to 80   Environmental Evaluation and Sampling

Upon arrival, the Environmental Manager and the Safety Coordinator will inspect the ship for all apparent environmental and safety hazards. They will be accompanied by the air-monitoring technician who will check LEL, oxygen and hydrogen sulfide levels.

Shortly thereafter, the Asbestos Qualified person/supervisor and the Asbestos Inspector will inspect the ship per NESHAP notification requirements. The Company's policy is that all TSI other than obvious fiberglass and rubber shall be presumed as asbestos. The Company believes that this approach enhances worker safety, reduces regulatory liability and simplifies the inspection process. Concurrently, the Environmental Manager will lay out the procedures for following the EPA/PCB Guidelines for Sampling Ships for Scrapping. We have attached as an exhibit to this Technical Proposal the Company's Sampling Protocol (Exhibit 5). Again, this approach enhances worker safety, reduces regulatory liability and simplifies the handling process. Therefore, Stratum III items are sampled, tested and handled accordingly.

Segregated Ballast Tanks are located, tested for Chrome inhibitors and handled accordingly. Mercury, Cadmium and Barium potential sources are investigated and handled accordingly. Used Oil sources are investigated and plans made for segregated removal. The Company has a hazard assessment program in place, which places certain job classifications in a lead program that includes air monitoring for lead and cadmium, blood lead testing and engineering controls.

### S+61 to 180   Regulated Material

All regulated materials are handled in accordance with the regulations noted above. Asbestos removal is handled in four broad phases. Phase one encompasses everything above the main deck, Phase two encompasses the bow to the forward bulkhead of engineering spaces to the double bottoms, Phase three encompasses everything from the stern to the after bulkhead of the engineering spaces to the double bottoms, Phase four encompasses the engineering spaces from the main deck to the double bottoms. This process allows us to use several asbestos removal crews operating in multiple negative air enclosures and to separate torch activity from the proximity of the asbestos enclosure, thus keeping torch fumes out of the asbestos work areas. All asbestos is stored in leak-proof bags that are stored in covered roll-offs until transported to a Texas/EPA permitted disposal cell. Records are maintained that show the weight and cubic yards/feet of all presumed asbestos shipped for disposal from a particular vessel on a monthly basis. All areas are given final/dismantling clearance to commence asbestos removal by a joint

CAMPDF - www.fenira.com

# 00127

inspection from our asbestos inspector and qualified person. All dismantling personnel are trained to immediately stop work and notify the supervisor if "any type" of suspect material is found in the course of work. The inspector and qualified individual determine the appropriate action and bring back the asbestos work crews and then re-inspect prior to restarting dismantling work.

Used oil sources are determined during the initial inspection and segregated collection occurs as access is made available. The used oil is stored, transported and recycled according to the applicable TNRCC requirements found in 30 TAC Section 335.1, 30 TAC 24 Section 324 (relating to used oil) and 40 CFR part 279 (relating to standards for used oil). It is noted that "steam propelled vessels" from inactive fleet storage do not contain large quantities of used oil. Records are maintained to show total gallons provided to a marketer on a monthly basis per vessel.

PCBs are handled via the EPA PCB Guidance document, the initial inspection and regular re-assessment. Storage and Disposal are handled according to 40 CFR, part 761. Sources of Mercury are investigated during the initial inspection and regular re-inspection. Waste Mercury is handled as a RCRA hazardous waste stored and disposed of accordingly. Workers are trained to stop work and notify a supervisor if a potential Mercury source is found. In the event of a small quantity spill, certain ISL personnel have the necessary 40 hour OSHA training and specific training in using on-site Mercury spill remediation kits. A large spill would require calling Code 3, the pre-determined hazmat subcontractor. Cadmium, Chromium, Beryllium, Zinc and Barium sources are investigated during the initial inspection and regular re-inspection and evaluated according to OSHA and RCRA regulations. Workers are trained to notify the supervisor and stop work if a potential source of RCRA solids is found.

Bilge water is periodically collected and transported to an 8500 gallon storage tank. ISL has three such tanks within the cement block and concrete diked facility storage and separator area. These bilge waters are often contaminated with virgin fuel from leaking fuel lines leading to the ship boilers. The water is periodically processed through a separator to the BND treatment plant where it is further treated and discharged via the BND discharge permit. Sampling is performed semiannually per agreement with the BND engineer.

### S+60 to 180    Fuel Removal - Trash Removal

ISL is registered with the TNRCC as a non-industrial facility for the purposes of non-hazardous waste disposal and disposes of such solid waste at TNRCC permitted landfills. ISL maintains records of all solid waste removed from specific vessels and logs weights, cubic yards and landfill for each load. Monthly, we show the total tonnage and cubic yards of non-hazardous waste for each vessel.

Virgin fuels are segregated in the diked storage area and sold as virgin fuel to a marketer. The fuel is transported via DOT standards on a Bill of Lading. ISL maintains records of all virgin fuel sold and shows total gallons sold as the dismantling progresses on a monthly basis.

00128

International Shipbreaking Limited, L.L.C.

### S+75 to 180    Cutting the Vessel

Marine Chemist Certificates have been obtained, Environmental Evaluation and Sampling for removal, storage, transportation and disposal are complete. Under our dismantling plan, the vessel is now safe for hot work. Floating slag pans will be secured along both sides of the vessel in order to prevent slag or other contaminants from entering the water. A competent person now checks the oxygen levels, and lower explosion levels and posts a fire watch prior to any cutting. Once these steps are taken, precutting may begin on the areas to be removed first. After the precut has been completed, a crane is connected to a specific section prior to the final cut. The final cut is then performed, releasing the section from the vessel. These sections may vary in weight from five tons to 25 tons. The section is then lowered to the ground, where yard cutters begin to cut the section into smaller pieces. The ship cutting process advances following the completion of each phase of asbestos abatement and clearance, always keeping in mind the stability of the vessel's hull during dismantling. Based on the angle and contour of the bottom of the slip, the vessel will be sitting on the bottom from mid-ship to the bow and tied on both sides to the slip.

Once the vessel is in position, a land winch will be attached to the stem at the water-line and the vessel is pulled until ground reaction stops the pull or until the hauling blocks are two-blocked. As sections of the vessel bow are removed, the hauling system is reattached. As sections are removed and the vessel is lightened, the winch will advance the vessel onto the pulling ramp with the least effort necessary, always maintaining a 1.5 to 3 degree trim to the stern. Upon the stern reaching the ramp, operations will stop. The stern will be inspected for levels of contaminated water and oil. Prior to any movement of the stern, all liquids will be removed. Once the stern is emptied and safe for hot-work, cutting may begin until the stern is on land and completely dismantled.

End of Section

00129

## SECTION 2

2.0 ENVIRONMENTAL AND HAZARDOUS WASTE AND
WORKER SAFETY MANAGEMENT AND CAPABILITY  1

2.1 ENVIRONMENTAL MANAGEMENT PLAN  1
     A 1  Polychlorinated Biphenyls  1
     A 2  Asbestos Program  4
     A 3  Removing Fuel and Hydraulic Oil Residue  8
     A 4  Lead, Barium, Chrome, Beryllium, Cadmium & Chromium  9
     A 4a  Sodium Chromate  9
     A 5  Mercury  10
     A 6  Ozone Depleting Substances – Freon & Halon  10
     A 7  Waste Water  10
     A 8  Degreasing Agents  11
     A 9  Organic & Inorganic Paint  11
     A 10  Caustics  11

2.1 B  Permits  10
2.1 C  Transporter/Storage/Disposal Facilities  10
2.1 D  Hazardous Materials, Spill Prevention, Emergency Response
     Planning  17
2.1 E  Regulatory Agency Citations and Violation  23
2.1 F  Regulatory Agency Jurisdictions  24

2.2 SAFETY AND HEALTH MANAGEMENT PLAN  24
2.2 A  Diving operations  28
2.2 B  Confined & Enclosed Spaces  28
2.2 C  Welding, Cutting and Heating  29
2.2 D  Fire Prevention/Protection  31
2.2 E  Compressed Gas Cylinders  31
2.2 F  Fall Protection  31
2.2 G  Housekeeping and Temporary Lighting  35
2.2 H  Health and Sanitation  35
2.2 I  Hazard Communication (Chemical)  35
2.2 J  Asbestos  36
2.2 K  Gear and Equipment for Rigging and Material Handling  40
2.2 L  Personal Protective Equipment  41
2.2 M  Personnel Evacuation, Spill Containment & Emergency
     Response  41
2.2 N  Lead Program  42
2.2 O  Respiratory Protection Program  45
2.2 P  Hearing Conservation Program  51

CSMPDF - www.fesmo.com

# 00142

Safewater Technologies, Inc.
10890 Bekay St., Suite 600
Dallas, TX 75238
(214) 341-0628

Note:  This method is more cost effective than transport and disposal solely because of the potential quantities of water and the distances to permitted disposal facilities.

## A5    Mercury

The project manager and the ES&H manager will inspect the vessel upon arrival for all gauges, indicators, or instruments containing mercury.  All Mercury that can be recycled will be handled as such.  All other Mercury will be stored as a hazardous material in accordance with RCRA/TNRCC requirements.  Transportation and disposal will be handled as per 2.1C

## A6    Ozone Depleting Substances-Freon & Halon

The Project Manager and the ES & H Manager will inspect the vessel upon arrival for Ozone Depleting Substances.  A State licensed Company listed in 2.1C will remove, transport and dispose of the material.

## A9    Inorganic & Organic Paint

The project manager and the ES&H manager will inspect the vessel upon arrival for the identification of hazards from inorganic and organic paint.  All dried paint coatings will remain on the metal for recycling.   All paint in containers found on the vessel will be removed, stored in accordance with RCRA/TNRCC requirements and transported and disposed of per 2.1C

## A 7    Waste Water

Wastewater generated during scrapping will be contained within the vessel.  The vessel is positioned in our slip to have the bow inclined at a 1.5 to 3 degree slope, thus causing all water used on board during scrapping to collect in the bottom of the vessel or along transverse bulkheads.  Before completion of scrapping; the water that has accumulated will be collected and transported to the Company's oil/water separator on site for treatment and testing prior to discharging to the BND treatment facility for discharge under the BND permit.  Semiannual tests performed on the waste-water will be for total metals, PCBs and total petroleum hydrocarbons, according to an agreement with the BND engineer.  It is noted that there are no State sampling requirements for the ISL discharge, it is the responsibility of the treatment facility, BND, to assure the quality of their discharge following their treatment.  Residual oils and sludge are handled as noted above.  Engineering controls and preventive measures as described above for Storm Water Control are directly related to minimizing wastewater and the contamination of wastewater.

ISL does not discharge to the waters of the state, therefore, does not require an NPDES discharge permit.  Mr. Chambers consulted with the TNRCC, Region 15, Harlingen, TX. Water

00143

Section Manager, Mr. Hipolito Cabrera with regard to any requirement for a state or federal permit to allow for ISL to discharge to a permitted facility. He advised that ISL did not need a permit under that circumstance. However, ISL would need approval from the sewage treatment plant operator, in this case the BND, and that they determine the acceptance criteria. This is a standard protocol nationally with the exception of some areas that have fully adopted the EPA pre-treatment regulations.

The oil-water separator is not in operation due to a mechanical problem that can be corrected. However, ISL has responded to the BND letter of April 13, 1999 (attached) and sampled the effluent in accordance with the letter and found it, in our opinion, to be acceptable. We will provide the test results to the BND and call for a visit by the wastewater treatment operator shortly. Currently, ISL is transporting its bilge waters to the Ballast Pit until we correct the mechanical problem with the separator.

A copy of the recent initial separator effluent sampling and the BND Turning Basin sewage treatment plant and Ballast Pit State Permits, Project correspondence and a BND oily waste manifest of the Ballast Pit are provided as Exhibit 7.

## A 8   Degreasing Agents

During the initial inspection and during the disntantling process, particular attention is paid to the presence of any degreasing agents. If found, they are containerized, sampled, stored and disposed of per the analytical results. ISL utilizes DEXSIL detection kits for field-testing oils that may be suspect for chlorinated solvents. Particular attention is paid to on-board waste oil tanks.

## A10   Caustics & Acids

The Project Manager and the ES&H Manager will inspect the vessel upon arrival for the identification of suspect caustic material. All suspect caustic material will undergo a field test for pH.PH, and if required, a test method 9040 to determine if it has a pH less than or equal to two or greater than or equal to 12.5. This test will determine if the material is a RCRA corrosive D002. If the material is identified as hazardous, it will be stored in accordance with RCRA/TNRCC requirements and transported and disposed of per 2.1C.

## 2.1 B   PERMITS

The Company has the following permit numbers. Copies of the permits are found in Exhibit 4. The dates the permits were issued are listed on the permit or the accompanying correspondence.

- EPA # TXR000013961
- State Solid Waste Registration # 84238
- Baseline Industrial Storm Water Permit # TXR00H883
- Oil Spill Prevention & Response Certificate (SPRCC) # 30033
- DOT, USCG, Financial Responsibility # 777108-01
- SPCC Plan On site

C0144

International Shipbreaking Limited, L.L.C.

2.1C   Transportation & Disposal of Inorganic & Organic Paint

Laidlaw Environmental Services
500 Battleground Road
La Porte, Texas 77571
Chad Germann
(800) 446-5777
EPA#TXD982290140

Transportation & Disposal of Caustics & Acids (corrosives)

Laidlaw Environmental Services
500 Battleground Road
La Porte, Texas 77571
Chad Germann
(800) 446-5777
EPA#TXD982290140

Transportation & Disposal of Mercury

Laidlaw Environmental Services
500 Battleground Road
La Porte, Texas 77571
Chad Germann
(800) 446-5777
EPA#TXD982290140

Transportation & Disposal of Lead, Barium, Chrome, Beryllium, Cadmium, Chrome

Laidlaw Environmental Services
500 Battleground Road
La Porte, Texas 77571
Chad Germann

12

00145

International Shipbreaking Limited, L.L.C.

(800) 446-5777
EPA#TXD982200140

Transportation & Disposal of PCB & Chrome contaminated felt gaskets

H.E.L.P.E.R.
P.O. Box 509
1606 North East 3rd Street
Madison, SD 57042
Mike Yokum
EPA#SDD980634646

13

00146

| | Identify | Remove | Recycle | Treat | Store | Transport | Dispose |
|---|---|---|---|---|---|---|---|
| Lead | A4 | A4 | Yes | No | A4 | 2.1C | 2.1C |
| Barium | A4 | A4 | Yes | No | A4 | 2.1C | 2.1C |
| Chrome | A4 | A4 | Yes | No | A4 | 2.1C | 2.1C |
| Beryllium | A4 | A4 | Yes | No | A4 | 2.1C | 2.1C |
| Cadmium | A4 | A4 | Yes | No | A4 | 2.1C | 2.1C |
| Chrome Contaminated Gaskets | A4 | A4 | No | No | A4 | 2.1C | 2.1C |
| Sodium Chromate | A4a | A4a | No | A4a | A4a | 2.1C | 2.1C |
| Mercury | A5 | A5 | Yes | No | A5 | 2.1C | 2.1C |
| Ozone Depleting Substances | A6 | A6 | No | No | A6 | 2.1C | 2.1C |
| Inorganic Paint | A9 | A9 | No | No | A9 | 2.1C | 2.1C |
| Organic Paint | A9 | A9 | No | No | A9 | 2.1C | 2.1C |
| Caustics & Acids | A10 | A10 | No | No | A10 | 2.1C | 2.1C |

14

00147

## Transportation and Disposal of Asbestos

Asbestos material in containment is bagged in six mil asbestos labeled bags and tape sealed. Before the bags leave the containment they are bagged again bagged in a second six mil asbestos labeled bag as the bag passes through the decon air lock. The bags are then stored in a covered roll-off container pending transport and disposal at an EPA/TNRCC asbestos landfill cell.

| Transportation: | Disposal: |
|---|---|
| Browning Ferris Industries | Browning Ferris Industries |
| 9402 W. Expressway 83 | Rio Grande Valley Regional Disposal |
| Harlingen, Texas 78552 | Facility |
| Phone (210) 423-7316 | FM 493 and mile 12 Road |
| EPA #: TXD10707910 | Donna, Texas 7857 |
| State ID #: 40-0050 | Permit # 1948 |

## Transportation and Disposal of Fuel Oil (Virgin Oil) and Used Oils

A DOT carrier with a standard Bill of Lading will perform transportation for sale of virgin fuel oils. Transportation for the recycling of used oils will also be performed by a DOT carrier, who has additionally complied with TNRCC Used Oil Recycling rules Chapter 324 and 40 CFR part 279, Standards for the Management of Used Oil. Used oil will only go to an approved marketer under the previously mentioned regulations. A PCB and total Halogen analytical test will precede all used oil disposals. (Note: ISL uses DEXSIL field testing for PCB and Halogens on suspect material prior to mixing in the on-site bulk storage tank.)

| B.F.I. - Transportation | Resource Recycling Services |
|---|---|
| 9402 W. Expressway 83 | Bishop Road, North Bank Terminal |
| Harlingen, Texas | Ingleside, TX 78362 |
| Russell Ide | Rick Lowrence |
| (956) 423-7316 | (888) 814-5033 |
| EPA # TXD107079105 | EPA # TXR 000006205 |
| State # 40413 | TNRCC # 853257 & A853257 |

Quest Oil, Ltd.
Marine Operation
300 Wilson Plaza, East
Corpus Christi, Texas 78476
Ross Hughes
(800) 618-9837
EPA # TXR000019273
RRC # 000085014C

# 00148

International Shipbreaking Limited, L.L.C.

## Transportation & Disposal – Non Hazardous Oil Contaminated Solids

B.F.I. Sinton Landfill
Sinton, TX

## Transportation & Disposal of Ozone Depleting Substances

Hess Air, Inc.
P.O. Box 910
Alamo, TX 78516
Carlos Aguirre
(956) 787-0964
License # A002144C

## Transportation & Disposal of Hazardous Paints

Laidlaw Environmental Services
500 Battleground Road
La Porte, Texas 77571
Chad Germann
(800) 446-5777
EPA # TXD982290140

## Transportation & Disposal of Caustics

Laidlaw Environmental Services
500 Battleground Road
La Porte, Texas 77571
Chad Germann
(800) 446-5777
EPA # TXD982290140

00149

### 2.1 D    HAZARDOUS MATERIALS, SPILL PREVENTION, EMERGENCY RESPONSE PLANNING

**1.    Planned Response Actions - Emergency Checklist:**

The Company will initiate and complete the Emergency Action Checklist form on the following page.  The utilization of this form will assist in ensuring that appropriate regulatory agencies have been contacted and given the correct information regarding any spilled hazardous material, including oil spills.

The following issues however, will be considered during the discovery of an incident, according to the National Contingency Plan, Section 300.300, Section D, Prudent Responsible Party Immediate Activities.

*Safety:*
Evaluate the safety of the general public, responders and industrial and civic neighbors. ISL's Environmental and Safety director will coordinate these activities with Code 3, Inc.'s Emergency Strike Team.

*Source:*
Evaluate the source of the spill (instantaneous release, constant release).  Determine the product classification (viscosity, volatility, toxicity).  Conduct sampling to verify spilled material characteristics for preparation of disposal or recycling of material.

*Treatment:*
Evaluate potential for chemical or other additives to assist in mitigating the total impact (Subchapter J of NCP).

*Contain:*
Determine containment priorities.  Where can we contain effectively?  What can we protect effectively?  What types and quantities of boom are available?  What is the method and timeliness of deployment?

*Recover:*
What type of mechanical recovery equipment is available?  How will recovered product be stored and transported?  Don't allow this portion to slow down recovery operations.

*Disposal:*
Evaluate disposal methods and include regulatory personnel in the decision process.

00150

## Figure 2.1 D.1

### EMERGENCY ACTION CHECKLIST

INCIDENT DATE_____     INCIDENT TIME_____
REPORTED BY_____     PHONE # _____

COMPANY_____     POSITION_____
ADDRESS AND DIRECTION TO INCIDENT LOCATION_____
_____
_____

SUBSTANCE SPILLED_____     QUANTITY SPILLED_____
SOURCE SECURED (____YES) (____NO)
FLOW RATE_____     POTENTIAL_____

SIZE OF IMPACTED AREA_____WATERBODY_____

NEAREST CITY_____     LAT._____LONG._____
WEATHER CONDITIONS: WIND DIRECTION_____ WIND SPEED_____
SKY_____     SEAS_____

CLEAN UP INITIATED (____YES) (____NO)  DCO CALLED (____YES) (____NO)

NRC # _____     GLO SPILL #_____

### INTERNAL NOTIFICATION
**Person in charge will immediately notify:**

B. Chambers, Environmental Director          (956) 831-2299
Robert Berry, Co-COO                         (956) 831-2299
                                             (956) 986-5307 (pager)
24 Hour Emergency                            (956) 831-2299

### REGULATORY NOTIFICATIONS
1. National Response Center          (800) 424-8802
2. U.S. Coast Guard MSO Corpus Christi  (512) 888-3162
3. U.S. Fish and Game Department     (512) 994-9005
4. Texas General Land Office (Austin)  (800) 832-8224
5. Texas General Land Office (Brownsville)  (956) 504-1417
6. Texas Parks and Wildlife Department  (512) 389-4800
7. TNRCC                             (800) 463-6788

18

**00151**

**Ten Action Steps to be taken by Person in Charge**

1. Shut down the operation in progress following pre-established procedures to prevent further damage.
2. Obtain positive product identification and evaluate situation for personnel safety hazards.
3. Contact facility person in charge.
4. Activate facility response plan.
5. Conduct investigation to determine the source utilizing appropriate safety measures.
6. Secure the source or minimize the potential discharge by transferring or isolating product.
7. Conduct containment activities, as appropriate, to minimize the spread of spilled product.
8. Simultaneously with other activities, contact emergency response officials (State, Federal and Local).
9. Contact previously identified entities that could be impacted by the spill.
10. Begin preparation for response and recovery.

## 2.    Chain of Command

The Contractor will utilize the Incident Command System ("ICS"), implementing the five basic functions of this structure and those elements deemed necessary to accomplish the response.

| | |
|---|---|
| COMMAND: | ISL and Code 3, Inc. |
| OPERATIONS: | Code 3, Inc. |
| PLANNING: | Code 3, Inc. |
| LOGISTICS: | Code 3, Inc. |
| FINANCE: | ISL |

International Shipbreaking has pre-designated the following persons to ensure a functional ICS:

| | |
|---|---|
| COMMAND: | Robert Berry, Barry Chambers and/or |
| | Code 3, Inc.: Steve Alvarado, Lee Thompson, Clay Reid |
| OPERATIONS: | Code 3, Inc.: Clay Reid, Lee Abridge, Joe Garcia |
| PLANNING: | Code 3, Inc.: Steve Alvarado, Lee Thompson |
| LOGISTICS: | Code 3, Inc.: Joe Garcia, David Hanawa |
| FINANCE: | Kevin McCabe, Mike Donovan, Rick Makoujy |

## 3.    Communications

Code 3, Inc. will provide the necessary communication equipment necessary to ensure that response activities are implemented and that field communications with command post and/or center is adequate. Code 3, Inc. is capable of providing a Mobile Command Response Center equipped with 800 MHz radios, VHF/UHF, cellular telephones, FAR capabilities, computerized plume and trajectory capabilities. Code 3, Inc. would issue frequencies and

00152

International Shipbreaking Limited, L.L.C.

communication hardware that will enable Command Staff to communicate with Field Operations and Logistics Section Chiefs.

### 4.   Federal, State, and Local Government Notification Procedures

ISL will utilize the Notification Checklist in APPENDIX 1 to ensure that those regulatory agencies that require notification are notified within the required time frame.

### 5.   Sampling

ISL handles a variety of petroleum products ranging from oil, diesel, jet fuel and some lube oils.  MSDS are available.  Should there be a need for sampling, Code 3, Inc. has the capability of conducting an on site Hazardous Categorization Field Test.  This would be performed upon the request of regulatory agencies.

### 6.   Measurement

ISL initially has no way of knowing the volume of any of these materials, since these materials come along with the ships provided under contract with the U.S. Government.  Once the ships are in our slip, these materials are measured for volume as they are removed or in preparation for removal.

### 7.   Spill Prevention

ISL will consult the DCO, Code 3, Inc., for recommendations on methodology for product recovery.  A hard boom is positioned at the mouth of our dismantling slip, which is on the Brownsville Ship Channel.  Absorbent boom is also placed between the stern of the ship, and the hard boom in order to absorb any sheen or product that could possibly be in the water. This boom will also help minimize the amount of material that would have to be recovered if it ever got to the hard boom.  With booms in place, the spilled material could be recovered using skimmers and vacuum trucks.

### 8.   Non-Mechanical Options

Non-Mechanical options such as on-site burning or dispersant use is a methodology that is not viable because of surrounding facilities.

### 9.   Recovered Material

Recovered material will be stored in tanks on site.

00153

### 10.    Strategies/Methods for Oil/Water/Debris Separation

Liquids recovered will be temporarily stored in the vacuum systems being utilized and tanks.    Approval for decanting would be requested from the FOSC/SOSC.    This would minimize the amount of liquid waste being generated.    If decanting is not permitted by FOSC/SOSC, separation would be accomplished by transporting recovered liquids to a recycling company for recovery of product and subsequent disposal of recovered and contaminated liquid waste.

### 11.    Strategies/Methods for Transportation

Code 3, Inc.'s Waste Disposal Division will address coordination and transportation of all generated and recovered material.

### 12.    Strategies/Methods for Waste Minimization and Disposal

The Code 3, Inc. Waste Disposal Manager will develop and recommend methodology for addressing waste minimization and disposal of generated waste.    Additionally, the utilization of the ICS will allow the Company to address the best strategies and methods feasible in minimizing waste generation.

### 13.    Strategies/Methods for Wildlife Protection and Rehabilitation

The Company is located in an area in which wildlife is minimal, however, measures will be taken to ensure that Code 3, Inc. is able to deploy scare cannons and hazing should it be necessary to protect wildlife that may be present in the immediate vicinity of the spill area. The Company would also consult with TPWD and/or USFW for assistance in monitoring possible impact to endangered marine life in the immediate impacted area.

### 14.    Trajectory Information

The Contractor will consult Code 3, Inc. for assistance in developing plume and trajectory models.  This would be accomplished through either calculation utilizing on scene weather conditions and/or available computerized software.  Additionally, NOAA has designed several modeling computer programs that are available as public domain assets.  However, due to the location of our facility, 14 miles from open water, it is strongly believed that spilled material would be confined to the immediate area of our slip.

### 15.    Protection Plans for Environmental Sensitive Areas

The Contractor is located in the Port of Brownsville on the south side of the ship channel. We are the first slip on the south side entering the port and the last slip on the south when exiting the port, approximately ten miles from the mouth of the Ship Channel. There are no identified "Sensitive Areas" identified in the inner Port of Brownsville.  All "Sensitive Areas" lay to the East of the Port farther down the ship channel.

00154

16.    Protection Plans for Other "Sensitive" Areas

Deflection booming would be deployed in the ship channel to divert spilled material into strategic collection areas, if the material was to get out of our slip.   This deflection booming would ensure protection of those existing sensitive areas farther down the channel. The slips where ISL is located feed directly into the Brownsville Ship Channel, therefore it would be essential that a deflection boom and/or a containment boom be deployed to contain any free floating product from migrating into any sensitive areas.

17.    Plans for Providing Medical Services / Treatment

Code 3, Inc. is staffed with Professional EMTs and Paramedics that are able to render medical assistance immediately on location.  Area medical facilities would be utilized should there be a need for medical treatment and/or services.

18.    Safety / Health / Security (Site Safety Plan)

Please refer to Exhibit 5, which defines Site Safety Plan utilized by Code 3, Inc.

19.    Firefighting / Fire Prevention / Fire Protection

ISL would make notifications to the Port Fire Station for assistance.   Additionally, Code 3, Inc. has professional firefighters that would assist in fire suppression.  Four fire mains are also located on our site, along with hoses.  ISL maintains charged 1½" fire lines with portable extinguishers on all dismantling operations. A fire watch is maintained and there is a trained first response team for handling minor incidents.  Additionally, Mr. Barry Chambers is a trained and experienced marine firefighter.

20.    Discharge Cleanup Organization ("DCO") Sub Contractor Information

ISL has entered into an emergency response agreement with Code 3, Inc. Emergency Strike Team in Harlingen, Texas.   Code 3, Inc. is approximately 45 minutes from the dismantling facility and is the only certified TGLO DCO that can provide a total emergency response service.   At different times throughout the year, Code 3, Inc. personnel visit our facility and are familiar with the types of materials stored on site.

21.    Measures Taken To Ensure That Storm Water Drainage Is Not Contaminated With Hazardous Materials

All materials suspected to be containing hazardous constituents or petroleum are removed from their original location and secured prior to leaving the vessel and contacting our ground facility.

**00155**                                                                International Shipbreaking Limited, L.L.C.

All materials are contained, removed, and stored prior to profiling for disposal. Therefore, all regulated material is packaged, asbestos is bagged in containment, oil is pumped into a dual containment tank prior to leaving the vessel where more appropriate storage is located. PCB items are removed and stored in watertight boxes prior to being transported to the PCB permanent storage building. By properly managing these materials, we eliminate any cross contamination that would be generated from storm water coming in contact with a regulated waste. ISL has submitted a Storm Water Pollution Prevention Plan and has been issued NPDES Permit # TXR00H883.

## 2.1 E          REGULATORY AGENCY CITATIONS AND VIOLATIONS

Please refer to Exhibit 2 where we have disclosed the regulatory citations we have received. ISL has taken several actions to ensure environmental compliance. First, we have reviewed the violations listed in Exhibit 2 and found that they were not related to any improper handling, storage, transportation or disposal of regulated material. In these areas ISL has not received a citation, violation or complaint from any regulatory agency. This is an important distinction. The violations were centered on administrative procedures and a necessity for ISL to clearly understand the regulations. We hired an individual who has been a government regulator for TSCA/Asbestos/PCB, RCRA, U.S. Coast Guard oil/marine pollution, lead and who has the skills and experience necessary to assure OSHA compliance in the workplace. He also has the skills and experience necessary for fire protection and prevention.

With respect to the TSCA violation: ISL utilized HELPER of South Dakota to transport and dispose of PCB wire. HELPER was brought to ISL's attention by the U.S Government as the only TSCA permitted/approved wire recycling company in the country. We understood that the U.S. Naval Shipyard in Bremerton, WA utilized the services of HELPER and they were approved by DRMS. HELPER provided the manifest in accordance with their TSDF and transportation requirements and ISL accepted their expertise, considering their references and client list. Unfortunately, HELPER had omitted the TSCA requirement to provide the out-of-service date in the additional information block on the manifest. EPA Region 6 issued an NOV to both HELPER and ISL. ISL elected to settle, while noting that we were a victim of HELPER's error. ISL clearly understands that the responsibility for the manifest always reverts to the generator. ISL did maintain out-of-service dates on all containers and does continue to do so and the ES&H Manager ensures that the information is correctly applied to the manifest.

With respect to asbestos violations: Under NESHAP, a notification is required for all demolition projects. ISL had been submitting individual notifications for each vessel. The NESHAP requires a ten-day notification, continuous work, specific numbers of workers and workdays and prompt notification of completion. The TDH inspected the facility on December 30, 1998 and ISL was notified 163 days later that it had not promptly notified for completion of a specific vessel. Mr. Chambers reviewed the process and concluded that under the existing notification process, ISL would always be at risk for some element of the notification. He was aware of another notification process available which more accurately reflected the facility's process. He contacted and visited the TDH in Austin, TX and convinced the TDH that the alternative notification process should apply to ISL. As a result, ISL is now operating under the

**00156**

alternative notification process that results in a significantly reduced risk of notification non-compliance.

Finally, we also intend to utilize the services of a third party consulting firm such as PCCI, Inc. to provide us with periodic independent assessments of environmental compliance and worker safety compliance procedures.   Their recommendations will be shared with NAVSEA.

## 2.1 F        REGULATORY AGENCY JURISDICTIONS

1.      U.S. Environmental Protection Agency ("EPA")
2.      U.S. Coast Guard ("USCG")
3.      Occupational Safety & Health Administration ("OSHA")
4.      Texas Department of Health ("TDH")
5.      Texas Natural Resources Conservation Commission ("TNRCC")
6.      Texas General Land Office ("TGLO")
7.      U.S. Department of Transportation ("DOT")
8.      U.S. Army Corps of Engineers

## 2.2        SAFETY & HEALTH MANAGEMENT PLAN

The Environmental and Safety Department consists of several individuals who are categorized in three different areas on the organization chart.   Mr. Barry Chambers is the ES&H Manager, responsible for all ES&H functions.   Mr. Oscar Villareal, is our Safety Program Administrator and his position is located in the Environmental & Safety Department which is mis-labeled on the Organizational Chart as "Sampling Technicians" should read ES&H Department.   Within the E&S Department resides Mr. Villareal and Mr. Mendoza, our sampling technician.   Mr. Villareal, who is bi-lingual, is responsible for the daily monitoring of all safety programs, including OSHA required training for new and existing employees.   Mr. Villareal also manages the lead program to assure timely air and blood monitoring.   He also checks the vessels routinely for fall hazards and install safety lines on leading edges as necessary.   Mr. Villareal is also the trained asbestos inspector who in concert with the NESHAP qualified person , initially inspects the vessels for the NESHAP notification data. Mr. Mendoza, who is also bi-lingual, is the trained asbestos sampling technician, asbestos worker and a competent person for checking enclosed and confined spaces as safe for workers. Mr. Pancho Cazares and Mr. Sergio  Cazares are both bi-lingual asbestos trained supervisors/qualified persons responsible for all aspects of the NESHAP demolition with regard to asbestos according to 1915.1001. Mr. Prudencio Reyna is the oil/tank technician who manages the movement of waters and oil aboard the vessels.   These individuals report directly to Mr. Chambers who in turn reports directly to the Project Manager, Mr. Robert Berry.

ISL has purchased numerous training "programs" that are overseen by the ES&H Manager and conducted as required in English and Spanish by the bi-lingual Safety Program Administrator.   Examples of such programs are Hazard Communications, PPE, Hazard Assessment,  Fork-lift  Training,  Fire  Prevention/Protection  training,  Confined  Space,

## 00157

Respiratory Protection etc.  An accredited third party training firm performs other training such as asbestos worker, supervisor and inspector training.

Additionally, ISL conducts a monthly one-day program designed to capture new employees and/or update all employees.  We are currently inputting data into a third party purchased computer program to assist in keeping track of anniversary dates for training updates.

### Hazardous Communication

ISL provides hazardous communication training during the first 15 days of employment and whenever a chemical is introduced to a work area.  The program consists of how to read and interpret information on labels and material safety data sheets ("MSDS") and how workers can obtain and use the available hazard information, including the hazardous chemicals present in the workplace.  The check-off form for initial hazard communication is shown in Figure 2.2 1.

Workers can take measures to protect themselves from the hazards by wearing the proper protective clothing.  Specific methods to observe hazards such as visual appearance and smell will be offered to assist workers to detect the presence of a hazardous chemical.  Labels and other forms of warning will be utilized such as pictures and symbols which will convey the hazards of a chemical in the workplace.  The environmental and safety department will maintain a master file for the entire job site and serve as a resource for the MSDS program.

The Safety Department assesses the hazards that workers may be subject to on a yearly basis.  All workers are placed in job classifications and their PPE equipment is determined for the specific type of work they perform.  A copy of the ISL form utilized for this purpose is shown as Figure 2.2 2.

### End of Page

25

00158

**Figure 2.2 1**
**PPE Hazard Assessment**

The job title indicated has been assessed according to the following:

**29 CFR 1915 Subpart I App A - Non-Mandatory Guidelines for Hazard Assessment, Personal Protective Equipment (PPE) Selection, and PPE Training Program**

Job Title: _____     Location: _____

Hazard assessment performed by: _____

_Signature_

Date: _____

This job title has potential hazard(s) in the following categories:

| | | |
|---|---|---|
| _____ Impact | _____ Penetration | _____ Compression (roll over) |
| _____ Chemical | _____ Heat | _____ Harmful dust |
| _____ Light (optical) radiation | _____ Falling | _____ Drowning |

| Hazard Type | Hazard Source | PPE |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

I certify that the above is an accurate assessment of the job title specified and that it complies with the appropriate OSHA and ISL regulations.

_____          _____
Oscar Villarreal                                        Date
Safety Officer

26

**00159**

**Figure 2.2 2**

## New Employee Orientation Checklist

I.  Initial each item following training.

    1.    Employee provided a copy of the Facility Safety Plan.       \_\_\_\_\_

    2.    Facility Safety Plan explained to the employee.       \_\_\_\_\_

    3.    Employee understands injury-reporting procedures.       \_\_\_\_\_

    4.    Employee understands role of safety committee.       \_\_\_\_\_

    5.    Employee understands safe lifting procedures.       \_\_\_\_\_

    6.    Employee understands Facility Emergency Plan.       \_\_\_\_\_

    7.    Employee understands lockout/tag-out procedures.       \_\_\_\_\_

    8.    If required, forklift training provided.       \_\_\_\_\_

    9.    Employee understands hazard communication program & availability
and location of Right-to-Know information/MSDS.       \_\_\_\_\_

    10.    Employee understands locations of first aid kits and how to receive
medical assistance.       \_\_\_\_\_

    11.    Employee understands facility housekeeping procedures       \_\_\_\_\_

    12.    Employee has completed a pre-employment physical and is medically
fit to wear a respirator, if required.       \_\_\_\_\_

    13.    If required, employee has completed respiratory protection training
and a fit test.       \_\_\_\_\_

    14.    Employee has been provided PPE and hazard assessment training
for:  head protection, hand protection, foot protection, eye protection,
hearing protection, and fall protection and issued required equipment.       \_\_\_\_\_

    15.    Employee has been blood lead tested and trained in industrial adult
lead poisoning prevention.  Also, the employee understands the purpose
and handling of uniforms and proper decon/personal hygiene with respect
to lead poisoning.       \_\_\_\_\_

II.  I acknowledge and understand all of the above and have been issued Personal
Protective Equipment (PPE), as required.

Employee signature: _____ SSN: _____ Date: _____

Employee name (print): _____ Date of hire: _____

Competent person signature and date: _____

CSXPDF - www.fesite.com

International Shipbreaking Limited, L.L.C.

### 2.2 A   Diving Operations

Diving operations, when necessary, are conducted by a subcontractor, Oceaneering International, Inc. of Corpus Christi, Texas, who follow the OSHA requirements set forth is 29 CFR 1910 subpart T.

### 2.2 B   Confined and Enclosed Spaces

The purpose of this plan is to establish a program and procedure for the safe entry into confined spaces at the Company. This program follows the guidance and regulations as found in 29 CFR 1915 Subpart B - Confined and Enclosed Spaces and Other Dangerous Atmospheres in Shipyard Employment. This plan applies to all company-leased employees and subcontractors.

#### Definitions:

"The term *confined space* means a compartment of a small size and limited access such as a double bottom tank, cofferdam, or other space which by the small size and confined nature can readily create or aggravate a hazardous exposure" (1915.4(p)). "The term *enclosed space* means any space, other than a confined space, which is enclosed by bulkheads and overhead. It includes cargo holds, tanks, quarters, and machinery and boiler spaces" (1915.4(q)).

#### Training:

The Contractor shall ensure that each employee that enters a confined space or enclosed space and other areas with dangerous atmospheres is trained to perform all required duties per OSHA 29CFR 1915.12 (d) (Training of Employees Entering Confined and Enclosed Spaces or Other Dangerous Atmospheres).

#### Testing:

The Contractor shall ensure that spaces or adjacent spaces that contain or have contained liquids, gases or solids that are toxic corrosive or irritant are tested by a competent person to determine the air concentration of toxins corrosives or irritants within the space. If testing shows an air concentration in excess of 29 CFR 1915 Subpart Z permissible exposure limit ("PEL") or ("IDLH") the space shall be labeled "NOT SAFE FOR WORKERS".

#### Personal Protective Equipment ("PPE"):

Appropriate PPE shall be provided in accordance with 40 CFR 1915 Subpart J. If respiratory protection is required, all personnel will be trained and fitted in accordance with ISL's Respiratory Protection Program.

#### Rescue Procedures:

Non-entry rescue involves the use of harnesses, mechanical retrieval devices and other appropriate systems to allow rescue without entry. Entry rescue procedures will be handled by outside emergency services, such as the Port of Brownsville Fire and Rescue Department with

CMXPDF - www.fenix.com

**00161**

attendant paramedics. Shipboard supervisors and facility management will provide assistance as necessary and inform the team of any hazards.

## 2.2 C   Welding, Cutting and Heating

All welding, cutting and heating is performed in accordance with 29 CFR 1915 Subpart D. ISL utilizes a dismantling procedure that allows for ventilation of smoke/fumes from the cutting operation. In the event that smoke/fume/heat buildup is not properly ventilating, portable ventilators will be used to allow clear air to enter the work area.

All ISL personnel are instructed that oxygen is not to be used for any purpose, except cutting. ISL cutters are instructed to not enter confined spaces without the management of the Environmental and Safety Department. Nor should the cutters burn on such spaces without clearance from the Marine Chemist/Competent Person. The Marine Chemist/Competent Person shall determine if a space is Safe for Hot Work/Safe for Workers by testing for Oxygen to assure that levels do not exceed 22% or are not less than 19.5%. The Lower Explosive Limit (LEL) shall be less than 10% and the Hydrogen Sulfide level shall be less than 10%. No atmospheric toxins or residues to produce vapors shall be present. Adjacent spaces shall have been cleaned/inert and tested. An ISL form is used for this purpose (Figure 2.2 C).

ISL cutters are instructed not to burn on metals of toxic significance such as lead, zinc, cadmium, chrome and beryllium. If such material is discovered, the cutters are trained to cease cutting and notify their supervisor who will call the safety and environmental department to handle as appropriate.

All ISL burners will wear the appropriate PPE as prescribed by the Safety Coordinator and be medically evaluated and fit tested to wear a respirator. A respirator will be worn while cutting.

**End of Page**

29

00162

International Shipbreaking Limited, L.L.C.

Figure 2.2 C

CitiPDF - www.fastio.com

00163

## 2.2 D   Fire Prevention/Protection

ISL follows the requirements per OSHA 29CFR 1915.52 (Fire Prevention) and trains the burners to remove combustible materials, take care with hot slag and torch flame impingement into adjacent compartments. A trained fire watch is maintained with immediate access to a 1½" charged fire line with an all-purpose nozzle and portable extinguishers. The facility does not maintain a full fire brigade because the Port has a fire station nearby. However, a team of selected individuals is trained to quickly respond to excessive smoke and utilize additional fire lines and extinguishers as necessary. Mr. Barry Chambers is an experienced and trained marine firefighter who will lead the in-house responders and will assist the Port of Brownsville personnel, as required.

## 2.2 E   Compressed Gas Cylinders

ISL uses compressed gas cylinders consisting of oxygen and acetylene for use in its non-ferrous processing area and its mechanics area. ISL locates and secures these cylinders in accordance with 29 CFR 1910.253 (b) (4) (iii). Cylinders are stored in a well-protected, well-ventilated dry location at least 20 feet from highly combustible material and other cylinders. They are assigned to areas away from elevators, stairs or gangways. Assigned storage spaces have chains that secure the cylinders to a wall so that they cannot be knocked over. In addition, we follow 29 CFR 1910. 253 (b) (1) (ii) outlining that the cylinders shall be legibly marked for the purpose of identifying the gas content.

## 2.2 F   Fall Protection Program

The purpose of this program is to establish procedures for using fall protection at the Company's facility. This program supports compliance with Occupational Safety and Health Administration ("OSHA") Fall Protection as found in 29 CFR 1915.

. 1915. All ship cutters are required to use a body harness and lanyard while performing duties on any vessel in our facility. When on board the vessel, the ship cutter is required to wear his equipment. When the ship cutter is near a potential fall hazard of five feet or over, he would the engage the harness as described in the fall protection program.. All harnesses must be in good working condition and are checked daily. Any damaged lanyards or harnesses shall be discard and replaced.

. All ship cutters undergo a comprehensive training program for fall protection in compliance with OSHA 29 CFR 1915.159. This program includes, but is not limited to, the application limits of equipment, techniques to hook up properly and techniques in anchoring and tie-offs. Discussion of key elements such as anchorage, body harness, connectors, controlled access zone, deceleration distance, freefall, lanyard, leading edge, Personal Fall Arrest System Self Retracting Lifeline, unprotected sides etc. are included. ISL provides a full body harness and lanyard for those personnel at risk. Annual refresher courses are also conducted. Fall protection is also covered during the weekly safety meetings as appropriate.

31

CIMPDF - www.fwisv.com

International Shipbreaking Limited, L.L.C.

Bulkhead cut lines are placed at 36" above the deck for outer bulkheads and any inner bulkheads where a potential hazard may present itself upon removal of any cut piece from the vessel. Leading edges are assessed as pieces are removed from the vessel. A yellow rope stretched across the edge cordons off any leading edge. The yellow rope also has caution tape hanging from it to enhance its visibility.

Please note that CFR 29 1915.77 – Working Surfaces – appears to exempt shipbreakers from many requirements, including the use of harnesses. However, ISL is training employees to recognize risks and take precautions where appropriate.

a. **Definitions**

**Anchorage**

A secure point where lifelines, lanyards or deceleration devices are attached.

**Body Harness**

Straps around the employee that distribute the forces from stopping the fall over at least the thighs, pelvis, waist, chest and shoulders, along with a means for attaching the harness to other components of the personal fall arrest system.

**Connector**

A device used to connect parts of the personal fall arrest system and positioning device systems; which may be an independent component of the system (such as a carabiner) or an integral component of the system (such as a buckle or D-ring sewn into a body belt or body harness or a snap hook spliced or sewn to a lanyard or self retracting lanyard).

**Controlled Access Zone ("CAZ")**

An area in which certain work (for example, bricklaying) may take place without the use of guardrail systems, personal fall arrest systems or safety net systems; access to the zone is controlled.

**Deceleration Distance**

The additional vertical distance an employee falling travels from the point at which the deceleration device begins to operate and the point at which the employee stops; measured as the distance between the location of the employee's body belt or body harness attachment point at the moment the deceleration device is activated and the location of that attachment point after the employee comes to a full stop.

**Free Fall**

The act of falling before a personal fall arrest system begins to apply force to stop the fall.

**Free Fall Distance**

The distance between the location of the fall arrest attachment point on the employee's body belt or body harness before the fall and its location just before the system begins to apply force to arrest the fall; does not include deceleration distance and life-line/lanyard elongation.

**UU165**

## Lanyard

A flexible line of rope or strap that generally has a connector at each end for connecting the body belt or body harness to a deceleration device, lifeline or anchorage.

## Leading Edge

The edge of a floor, roof or form work for a floor or other walking/working surface (such as the deck) that changes location as additional floor, roof, decking or form work sections are placed, formed or constructed; considered to be an unprotected side and edge during periods when it is not actively and continuously under construction.

## Lifeline

A component consisting of a flexible line that connects to an anchorage at one end to hang vertically (vertical lifeline) or connects to anchorage at both ends to stretch horizontally (horizontal lifeline); a means for connecting other components of a personal fall arrest system to the anchorage.

## Personal Fall Arrest System

A system worn by an employee to stop a fall before he or she reaches a lower level; consists of an anchorage, connectors, a body belt or body harness and perhaps a lanyard, deceleration device, lifeline or suitable combination of these. As of January 1, 1998, the use of body belts for fall arrest was prohibited.

## Self Retracting Lifeline/Lanyard

A deceleration device containing drum-wound line that can be slowly extracted from or retracted onto the drum under slight tension during normal employee movement and that, after onset of a fall, automatically locks the drum and stops the fall.

### b. Responsibilities

The Program Administrator is the person responsible for:
- Issuing and administering this program and making sure that it satisfies the requirements of all applicable Federal, State and Local fall protection requirements;
- Providing initial and periodic training to employees on fall protection;
- Maintaining the training records of all employees included in training sessions;
- Assuring that a fall protection assessment is completed for each job in which fall hazards may be present.

Supervisors whose employees may be exposed to fall hazards are responsible for:
- Knowing the hazards in their areas that require fall protection;
- Assuring that fall protection is utilized on all jobs where fall hazards exist;
- Enforcing the use of fall protection in the areas in which it is required;

33

CBMPDF - www.texiu.com

**00166**

- Completing a fall protection assessment for each job in which fall hazards may be present.

**Employees who are required to use fall protection are responsible for:**

- Using fall protection according to the training and manufacturers' instructions provided;
- Properly maintaining their personal fall protection systems.

c. **General**

Fall hazards will be assessed on each job site and appropriate fall protection will be provided for all affected employees who have potential fall hazards of 6 feet or greater.

d. **Personal Fall Arrest Systems**

- Employees are required to use personal fall arrest systems in all situations in which fall hazards exist on the job site and guardrails or other forms of permanent fall protection are not available;
- All personal fall protection equipment must meet ANSI standard Z359.1-1992L and applicable OSHA Standards including 1915 Subpart M-Fall Protection;
- All lanyards must be equipped with double-locking snaphooks;
- A personal fall arrest system must consist of a full-body harness, a shock-absorbing lanyard and an anchorage point rated for 5,000 pounds per person;
- Body belts can be used only for positioning and only in situations in which free falls of 6 feet or less exist, and employees can immediately recover after falling;
- Personal fall protection equipment must be replaced when damaged;
- Personal fall protection equipment will be available from the Safety Office.

e. **Training**

- Training will be provided for all employees who may be exposed to fall hazards as part of their jobs;
- The training will enable each employee to recognize fall hazards and teach the procedures to be followed to minimize those hazards;
- The training will also cover the nature of fall hazards in the work area;
- The training will also cover the proper procedures for using, operating, erecting, maintaining, disassembling and inspecting the fall protection systems to be used;
- Employees will be trained in the use of safety monitoring systems;
- The limitations of mechanical equipment will be highlighted during the performance of roofing work on low-sloped roofs;
- Employees will be briefed on the proper procedures for handling and storing equipment and materials and erecting overhead protection;

34

CMPDF - www.fenha.com

- Employees will be briefed on their roles in fall protection plans;
- Employees will be briefed on the content of the OSHA Fall Protection requirements.

## 2.2 G  Housekeeping and Temporary Lighting

ISL performs work according to General Working Conditions in 29 CFR 1915 Subpart F. ISL will maintain all aisles, walkways, stairways, staging platforms, gangways and the work areas clear of items that will inhibit free movement. Particular attention will be paid to access and egress pathways. All temporary power lines and hoses shall be elevated or covered with boards so as not to create a tripping hazard. Free access shall be provided for all fire fighting equipment. All employees that work within the interior of the ship shall be provided portable lighting. All temporary lighting will be installed/checked by the ISL electrician who will assure that the cables are in good condition, splices correctly made and insulated and that the breaker box and cables are adequately sized for the current load. All portable lines into the asbestos enclosures shall be GFI protected. Any other power application that requires GFI protection will be provided.

## 2.2 H  Health and Sanitation

All ISL employees are hazard assessed, provided with and trained in the appropriate PPE for their type of work. ISL provides sanitation facilities for washing hands, face and taking showers. ISL has a lead program for certain employees and they are provided appropriate clothing, sanitation facilities, physicals and routine blood lead testing as well as specific training in the methods to reduce lead blood levels.

All ISL employees are instructed in the various hazards that they be exposed to such as asbestos and lead and the proper PPE and decontamination procedures. Additionally, all employees are advised of the necessity for proper decontamination at the end of the workday to eliminate the potential hazard of carrying contaminants home where they may effect their spouses or their children.

All garbage is properly containerized and isolated from the work areas. ISL does not employ minors under the age of eighteen in shipbreaking-related employment.

## 2.2 I  Hazard Communication (Chemicals)

The ISL hazard communication program is provided during the first two weeks of employment. ISL maintains a Right-to-Know MSDS file book that is available to all employees with explanation from the Bilingual Safety Coordinator. A new employee check-off sheet containing the various elements of Hazard Communication for shipbreaking is show as section 2.2 I figure 1. As part of Hazard Communication, ISL performs an annual hazard assessment of classes of workers. The new employee is provided with and trained in the particular PPE which he/she has been issued for their class of work. If a new chemical

35

00168

International Shipbreaking Limited, L.L.C.

substance is introduced to the workplace, the MSDS is discussed during routine safety meetings

## 2.2 J   Asbestos

### 1.   Employee Training

The Contractor employs three asbestos abatement crews staffed with an Inspector, Supervisors and workers. All crewmembers are certified and trained by the National Abatement Technology Training Center, ("NATEC"). NATEC is licensed by the TDH and has TDH permit # 00-0003.

Any worker who will be in an asbestos abatement work area is trained on how to adequately protect him or herself from exposure during the course of the abatement. They are also trained in the correct job procedures for each of their job positions. All asbestos workers, inspectors and supervisors will attend an EPA, OSHA and state approved training course and pass an exam. Each worker will also receive a pre-placement medical examination, and receive a respirator fit test prior to starting an asbestos project. It is Company policy that asbestos workers aboard vessels wear a PAPR.

CutePDF - www.tesino.com

**00169**

### Asbestos Training Schedule

| | |
|---|---|
| Asbestos Abatement Worker | 4 days (32 hrs.) |
| Yearly Refresher | 1 day (8 hrs.) |
| Asbestos Abatement Supervisor | 5 days (40 hrs.) |
| Yearly Refresher | 1 day (8 hrs.) |
| Asbestos Air Monitoring Technician | 3 days (24 hrs.) |
| Yearly Refresher | 1 day (8 hrs.) |
| Asbestos Inspector | 3 days (24 hrs.) |
| Yearly Refresher | 1 day (8 hrs.) |

All workers completing their training will be issued an accreditation certificate by the state registered training facility.

### 2.    Respiratory Protection Program

A clear and concise policy regarding the use of respirators by our workers when performing asbestos abatement activities has been prepared in accordance with OSHA 29 CFR 1915 Subpart I. This policy serves as the guiding principal for the preparation, implementation and enforcement of an active respiratory protection program.

### 3.    Qualitative Fit Test

- Each employee is required to select a respirator that fits him or her best from various sizes supplied by the Company. The respirators chosen are 3M: large, medium, and small. After selection has been made, the employee is instructed on the different parts of the respirator and how to maintain it.
- Employees are instructed on how to perform a negative and positive pressure test in order to ensure that the respirator has a proper seal.
- A sensitivity test using sodium saccharin will be applied under the 3M hood. This is done in order to see if the taste can be detected. Once the employee indicates that they can taste it, they are instructed to wait 15 minutes in order for their taste buds to return to normal before proceeding.

- The employee is now ready to be fit tested for the respirator they have chosen. The procedures are as follows:

  1. Employee dons respirator;
  2. Employee positions themselves under the 3M hood;
  3. A nebulizer is used to distribute the testing agent, 10 sprays are introduced;
  4. Normal breathing for 1 minute;
  5. Deep breathing for 1 minute;
  6. Turning head from side to side 1 minute;
  7. Nodding head from front to back 1 minute;
  8. Normal talking for 1 minute.

00170

- The test will be determined unsuccessful if at any time the employee detects the sweet taste of the testing agent.

1. When the test is completed without the employee detecting the taste of the testing agent, then and only then will the fit test be deemed successful.
2. Each employee will be re-tested every six months or when conditions indicate any interference with the respirator not fitting properly.

### 4.   Program Administrator

The Safety Coordinator is responsible for implementation of, and adherence to, the provisions of the Respiratory Protection Program.

### 5.   Competent Persons of Enforcement

The Asbestos Supervisor and qualified person are responsible for enforcement of the procedures within the containment areas.

### 6.   Respiratory Selection

Asbestos workers are provided a selection of respirators selected from those approved by the National Institute for Occupational Safety and Health ("NIOSH") for use in atmospheres containing asbestos fibers. Based on the hazards the worker is exposed to in an asbestos environment, the typhoon powered air purifying respirator ("PAPR"), approval # TC-21c- 492, supplied with a high efficiency particulate air filter ("HEPA") or the Racal power flow PAPR, approval # TC-21c-353, will be used because of its tight fit, full face coverage and higher safety margins for the worker.

### 7.   Medical Examinations

Medical tests, which are conducted by an outside physician, will include pulmonary function, chest x-ray, physical exam and a medical history questionnaire conducted yearly.

### 8.   Protective Clothing

Protective clothing for asbestos abatement workers consists of disposable Tyvex full body suits with booties and hoods. Underneath the body suit a pair of disposable polyester boxer shorts are used. Other items used are hard hat, steel toe rubber boots, cotton gloves, and a full face piece respirator described above.

International Shipbreaking Limited, L.L.C.

9.    Entering and Exiting the Asbestos Containment Area

*Entering the clean room:*

a.  Enter clean room;
b.  Remove clothing and place in personal locker;
c.  Put on boxer shorts;
d.  Put on full body Tyvex suit;
e.  Inspect respirator and check fit;
f.  Put hood over respirator straps;
g.  Put personal air monitor on (when requested);
h.  Proceed through shower room;
i.  Enter equipment room.

*In equipment room:*

a.  Put on hard hat, boots, etc;
b.  Collect necessary tools;
c.  Proceed to work area.

*Exiting equipment room:*

a.  Remove all clothing except respirator;
b.  Place disposable clothing in a bag;
c.  Proceed to shower area.

*Entering shower area:*

a.  Wash respirator, soak filter and put filter in bag;
b.  Thoroughly wash body.

*Re-entering clean room:*

a.  Dry off, dress in street clothes;
b.  Dry respirator, replace filter, and place in storage.

10.    Asbestos Engineering Controls and Work Practices

Each potential asbestos containment area will receive an initial exposure assessment. The Competent Person will conduct the assessment. The purpose of the assessment is to predict whether exposure levels during the planned asbestos abatement can be expected to exceed the permissible exposure limits ("PELS") and thus whether additional monitoring or other precautions are required. These exposure assessments are conducted with Gilian BDX II Abatement Air Samplers that have been calibrated with a Gilian Gilibrator-2 Calibration System to ensure accuracy of the pumps. Asbestos Containing Material will be removed or encapsulated within a regulated area, by certified licensed workers only.

Warning / danger signs in accordance with 29 CFR 1915.141(d)(3) will be displayed, in both English and Spanish languages, at all entrances to the regulated areas, and on the outside of the critical barriers.

Critical barriers will be established for regulated areas within which asbestos abatement will be conducted in order to separate them from adjacent areas by impermeable barriers such as securely attached plastic sheeting.

All openings between containment areas and adjacent areas, including but not limited to, windows, doorways, corridor entrances, ventilation openings, drains, ducts, grates,

International Shipbreaking Limited, L.L.C.

skylights, will be sealed with six mil. plastic. All penetrations that could permit air filtration or air leaks through the barrier will be sealed, with the exception of the makeup air provisions and the means of entry and exit.

Floor sheeting will completely cover all floor surfaces and consist of a minimum of two layers of plastic sheeting of 6 mil. thickness. Floor sheeting will extend up sidewalls at least 12 inches and be sized to minimize seams. No seams will be located at wall to floor joints.

Sealing of all floor penetrations against water leakage is mandatory. Wall sheeting will cover completely all wall surfaces and consist of a minimum of one layer of 4 mil. plastic. It will be installed so as to minimize joints and will extend beyond wall and floor joints at least 12 inches.

A worker decontamination ("decon") enclosure system in the regulated area will consist of a clean room, shower room with outlet water filtration system, and equipment room, each separated from the other and from the containment area by airlocks accessible through doorways. Except for the doorways and the makeup air provisions for the enclosure, the worker decontamination system will be sealed against leakage of air. All workers must exit the contamination area through the shower before entering the clean room. No asbestos contaminated individuals or items will enter the clean room.

Negative air units with HEPA filtration and in sufficient number to provide a negative pressure of at least 0.02 inches of water column differential between the containment and outside and a minimum of 4 containment air changes per hour, will be operated continuously for the duration of the abatement project. The duration of the asbestos abatement will be considered from the time a regulated area is established through the time final (and acceptable) air monitoring results are obtained.

Asbestos removal will be done under full containment using the following equipment and methods:

a.  Negative air pressure;
b.  "Airless" spraying water with wetting agent;
c.  Glove bagging;
d.  HEPA vacuum cleaner with filter system;

## 2.2 K   Gear and Equipment for Rigging and Material Handling

### a.      Vessel Hose Rigging

ISL shall inspect and employ rigging gear in accordance with 29 CFR 1915 Subpart G. Prior to each shift, ISL shall inspect all rigging and material handling equipment. All defective gear shall be removed and repaired or replaced before further use. All ropes, chains and slings shall not be used in excess of their safe working load. Protruding ends of strands in splices shall be covered/blunted. Knots will not be used to secure wire rope. Chains shall be inspected for inter-link wear and stretch and chains shall not be shortened by bolting, wiring or knotting. Shackles and hooks shall be inspected at the beginning of each shift to assure that they are properly sized for the task and that they have not been bent or sprung. If so, they will

CSWPDF - www.fxsite.com

**00173**

be replaced. Accredited persons shall test all cranes in accordance with the standards of 29 CFR 1919. When slings are utilized, the slings shall be so arranged, using spreaders if necessary, that the pull is within 20 degrees of the axis of the bolt. Slings will be padded over sharp edges. Loose legs shall be hung by the hook. Loads shall not be suspended over the heads of employees. Ground personnel shall ensure the safe placement of loads and keep non-essential personnel clear of the lift area. Employees shall not ride the hook or a load. A signalman who is competent in the signal code shall direct the crane operator when he cannot see the load.

A competent person shall make all determinations with regard to hoisting and rigging and determination of safe working loads for specific gear. No employee known to have defective uncorrected eyesight or hearing or to be suffering from heart disease, epilepsy, or similar ailments that may suddenly incapacitate him, shall be permitted to operate a crane, winch or other power operated hoisting equipment.

## 2.2 L   Personal Protective Equipment

ISL trains and equips all personnel with PPE in accordance with 29 CFR 1915 Subpart I. ISL performs a hazard assessment of each class of worker annually or as the job may change. Accordingly, the workers are provided with and trained in the required PPE such as, fall protection gear, head protection, eye protection, foot protection, hand and body protection, respiratory protection, welding and cutting protection, heat stress and lifesaving equipment. The equipment is provided and the ISL competent person/safety coordinator gives the training during the first two weeks of employment.

## 2.2 M   Personnel Evacuation, Spill Containment and Emergency Response

ISL has prepared standard operating procedures for emergency preparedness and evacuation plans for ship fires or explosions. The plan is posted in the guard shack and is discussed as a component of routine safety meetings. Major disasters must be anticipated and procedures must be developed and mastered if the well-being of our personnel is to be protected. One's conduct and actions during the first few minutes of any emergency may not only save one's life, but the lives of fellow workers and other members of the community as well.

An Emergency Preparedness and Evacuation Plan has been developed for ISL's facility and is described in Section 2.1 D above. The plan is initiated in the event of a fire, explosion, hazardous material release, injury or other event that presents an imminent hazard to the personnel of the facility or the environment. The action to be taken if one of these events occur, for a ship fire or explosion, is described below. A specific emergency notification list is developed and provided for each of the project personnel. The plan describes fire control equipment required at the facility in the event of a fire and the procedures to follow should a fire occur, or release occur.

00174

**Agencies to be notified:**

> Brownsville Fire Department: 911
> Port of Brownsville: (956) 831-4592
> Emergency Medical Service ("EMS"): 911
> Code 3, Inc.: (956) 421-4911 Emergency Strike Team

**Information to agencies:**

> Company Name: International Shipbreaking Limited, L.L.C.
> Address: 18501 R. L. Ostos Road, Port Of Brownsville
> Location of fire: e.g. on board vessel and/or location in yard
> Type of Fire: (Oil, Chemical, Electrical)

**Procedures to Follow:**

- Keep calm. Report to supervisor and or main office;
- Personnel have been assigned to sound <u>fire alarm</u> (one short blast followed by one long blast, repeated 3 times);
- Upon sounding of fire alarm, all personnel shall evacuate the ship and cutting yards;
- Proceed to assigned evacuation area: west of office. Management will have personnel roster and proceed with verification of all employees present;
- As evacuation is in process, electrical, oxygen, and gas will be shut off at the main values.
- The following personnel make up the fire team.
  - Mr. Jose Martinez - Electrical power;
  - Mr. Robert Serna - check water supply and pressure and shut off oxygen and gas;
  - Messrs. Oscar Villarreal, Trinidad Vidal and Fernando Rodriguez, along with the men listed above, will man fire hoses.

## 2.2 N  <u>Lead Program</u>

Any worker who will be in the cutting yards or on board the vessel cutting metal that contains lead, metallic lead, all inorganic lead compounds and/or organic lead soaps, will be trained on how to adequately use personal protective equipment and air horn ventilators to protect themselves from exposure of fumes and smoke containing lead. The training will be repeated annually and the worker will be informed of the following:

- The content of Standard 29 CFR 1910.1025 and its appendices;
- The specific nature of the operations which could result in exposure to lead above the action limit;
- The purpose, proper selection, fit test, use, and limitations of respirators;
- The purpose and a description of the medical surveillance program and the medical removal protection program including information concerning the adverse effects associated with excessive exposure to lead;
- The engineering controls and work practices associated with the worker's job assignment.

**00175**

### a.    Program Administrator

The Program Administrator is responsible for implementation of, and adherence to, the provisions of the lead program.

### b.    Competent Person of Enforcement

The Competent Person is responsible for enforcement of the procedures on site: east, west cutting yards and aboard all vessels.

### c.    Compliance Program

Exposure monitoring is required in this Program for workers involved in specific tasks that may result in exposures in excess of the action level of 30 micrograms per cubic meter of air (averaged over an 8-hour day).

These assessments are to determine the exposure that occurs if the worker was not using respiratory protection. This initial determination is to be based on personnel exposure monitoring. Subsequent monitoring is based on results of the determinations or whenever there is a change of tasks that may result in additional exposure above the permissible exposure limit ("PEL") (50 micrograms per cubic meter of air averaged over an 8 hour day). ISL performs a yearly risk assessment of lead for many different classes of workers. Those workers determined at risk are air monitored and if the air monitoring exceeds the action level of 30 ug/cubic meter, the entire class of worker is placed in the lead program which includes blood lead monitoring and quarterly air monitoring.

### d.    Respiratory Program

A clear, concise policy regarding the use of respirators by our workers when exposures to lead exceed the PEL has been prepared. This policy serves as the auditing principle for the preparation, implementation, and enforcement of an effective respiratory program.

### e.    Respirator Selection

Workers will be provided a selection of respirators selected from those approved by the Mine Safety and Health Administration ("MSHA") and the National Institute for Occupational Safety and Health ("NIOSH"). The respirators selected will be on the basis of their assigned protection factors relative to the airborne concentration of lead.

Supplied are 3M respirators of different sizes, with dual cartridges and model # 7286 cartridge retainer rings. 3M model # 7251 organic vapor cartridges (approval # TC-23c-435), along with 3M model # 7255 HEPA cartridge filters (approval # TC-21c-265) are provided. Prior to qualitative fit testing, workers will be required to remove any hair growth that would come between the skin and the face-piece-sealing surface. The limitations of these respirators are that they are not for use in atmospheres containing less than 19.5% oxygen nor are they for use in atmospheres immediately dangerous to life and health.

### f.    Medical Surveillance Program

All workers in the lead program will be provided with initial medical surveillance prior to performing any work. The initial medical examination will be performed by a licensed

43

International Shipbreaking Limited, L.L.C.

physician and will include the biological monitoring in the form of blood sampling and analysis for lead and zinc. An OSHA approved laboratory will analyze biological samples, and the results communicated in writing to the affected worker within five days after receipt of the results. In addition, a pulmonary function test will be performed to determine whether or not the worker may be assigned an activity where a negative pressure respirator is used. Only workers who are medically capable to wear respiratory protection equipment will be issued them. Finally, a chest x-ray and a general physical and medical questionnaire will also be required.

### g.    Blood Lead Levels

This protocol shall apply to all employees exposed above the 30 ug/m3 action level for more than 30 days per year. As part of the lead Standard, the employer is required to notify in writing each employee whose blood lead level exceeds 40ug/100g. Under the Standards' ultimate worker removal criteria, a worker is to be removed from any work having an eight hour total weighted average exposure to lead of 30ug/m3 or more whenever the following circumstance applies: a blood lead level of 60ug/100g or greater is obtained and confirmed by a second follow-up blood lead level performed within two weeks after the employer receives the results of the first blood sampling test. Medical removal is to continue until two consecutive blood lead levels are 40ug/100g or less. It is ISL policy to place a worker in a low risk job class if his blood lead levels exceed 40ug/100g. He will remain in the low-risk class until his level drops below 30ug/100g.

### h.    Protective Work Clothing

The Company supplies workers with protective clothing and equipment. They are as follows: full body coveralls (one set per man per day), hard hat, ear plugs, safety glasses, face shield, vented goggles, gloves, and steel toe safety boots with a full steel shank. The Company has contracted with a uniform rental company to supply its workers with uniforms. Each man is fitted with 11 sets of coveralls. Dirty uniforms are picked up weekly and exchanged with clean ones. The uniform company has been given a copy of this standard as per 29 CFR 1915.1025, informing them of the potential harmful effects of exposure to lead.

### i.    Decontamination Facilities

Workers are not allowed to leave the workplace wearing protective clothing or equipment. At the end of each workday, all workers monitored by the lead program will proceed to the decontamination facilities.

Workers enter an area that contains lockers, with each worker getting his or her own locker. They leave their respirator, hard hat, ear plugs, safety glasses, face shield, vented goggles, gloves, and safety boots in the locker. They then put on a pair of rubber slippers and proceed to the area where they will remove their full body coveralls and place them in a container, then proceed into the shower area. In the shower area, there is an area for drying with disposable towels. After drying, they enter the area that contains lockers with their street clothes.

CBMPDF - www.fineide.com

**00177**

Routine safety meetings address the dangers of lead poisoning and the impact of lead on both adults and particularly children. Workers are advised that the most common avenue for lead to enter the body system is through ingestion. Personal hygiene is emphasized, along with not eating or smoking on the job and always washing hands prior to eating, smoking or touching the face. Decontamination is emphasized so that the worker understands the risks to his children from carrying home lead debris. They are also advised of the dangers of lead in the home, particularly from paint, pottery painted toys or eating utensils.

## 2.2 O  Respiratory Protection Program

### 1. Introduction:

This respirator program has been established to ensure that employees and subcontractors under ISL supervision are provided with proper respiratory protection at all ISL facilities and job sites. This program shall be administered by the Safety Director and describes the practices whereby personnel will be provided with and will be required to wear respirators. The Safety Director in conjunction with the Safety Coordinator shall be authorized to review respiratory protection policy questions, to initiate policy changes, and to clarify areas of concern. If the policy does not cover a specific situation or environment, the Safety Director is the person who shall be authorized to designate operating procedures. In order to provide an effective program, standard operating procedures have been established and are described below.

In many cases, the respiratory protection equipment selection process will have been already performed for specific operations that regularly take place at ISL facilities. However, proper respiratory protection equipment must be determined in situations where the environmental variables and site conditions have not been evaluated. In such a case, a qualified person will evaluate conditions that determine respirator selection.

### 2. Qualified Person:

A qualified person is an individual designated by the Safety Director as capable of recognizing and evaluating employee exposure to respiratory hazards. A qualified person shall demonstrate competence in specifying respiratory protection and supervising its use and maintenance.

### 3. Respirator Selection:

It is imperative that the level of respiratory protection be selected on the basis of the hazards to which the workers will be exposed. The following steps will be followed when selecting appropriate respiratory protection.

a. The qualified person will identify the contaminant and will consult the appropriate OSHA Permissible Exposure Limit (PEL) and the Threshold Limit Value (TLV). If these values differ, the lower (i.e. more protective) value will be used to determine the maximum average concentration to which an employee may be exposed during an eight-hour shift. The

45

CVAPDF - www.tavisa.com

**00178**

qualified person will also determine if there are Ceiling Limits or Short Term Exposure Limits (STEL) for the contaminant. The concentration that is Immediately Dangerous to Life or Health (IDLH) will also be determined.

    **b.** The concentration of the contaminant will be determined by ISL and/or customer personnel using calibrated direct reading instruments. Only persons familiar with the limitations and operating characteristics of the instruments should use these. Possible interference from other air contaminants must be evaluated when using detector tubes. Manufacturer's literature accompanying the detector tubes provides information on interference. If neither of these methods is possible, a worst-case situation will be assumed. Any error in respirator selection shall be in favor of providing the better worker safety.

    **c.** If the odor threshold or irritation threshold of a substance is more than three times greater than the PEL or TLV, the substance should be considered to have poor warning properties. Air purifying respirators shall not be used if the material is found to have poor warning properties. If the odor or irritation threshold is somewhat above the PEL, but not in excess of three times the limit, air purifying respirators will not be allowed if the undetected exposure at this level could cause serious or irreversible health effects.

    **d.** The qualified person shall select a type of respirator having an adequate protection factor (PF). The protection factor is defined as the ratio of the ambient air contamination concentration to the concentration inside of the respirator face piece. The maximum protection factor for various types of respirators is listed below. These are for lead only, others are found in 29 CFR 1910.

| | |
|---|---|
| Half-mask, air purifying | 10 |
| Full face-piece, air-purifying with HEPA filter | 50 |
| Air powered with HEPA filter | 1,000 |
| Supplied-air with full-face-piece | 2,000 |
| SCBA positive pressure | >10,000 |

    The qualified person can evaluate the effectiveness of the various types of respirators as follows:

- The estimated air concentration is divided by the PF. If the quotient is less than the PEL or TLV, then the respirator can be expected to provide adequate respiratory protection when it is used in conjunction with an effective respiratory protection program. If the quotient is greater than the reference value, select a more protective type of respirator.

    **e.** Evaluate other factors (Qualified Person):
- Physical properties of the contaminant (dust, fume, mist, gas/vapor).
- Skin absorption and irritation.

**00179**

- Eye irritation. Only full-face-piece respirators are permitted in atmospheres which produce eye irritation.
- Chemical properties of the contaminant (i.e. reactivity with other chemicals, hazardous decomposition products).
- The length of time that the respirator is to be worn. ***Very important when a worker enters IDLH atmospheres using an SCBA which has a limited air supply to know the length of time to be worn.
- Employee health. Respirators increase physical stress, especially on the heart and lungs. No individual shall be allowed to wear a respirator unless a physician has determined that the individual is cleared for respirator use.
- Entry into and escape from unknown concentration requires a positive pressure SCBA or positive (SAR) pressure supplied-air respirator with escape provisions.
- Only supplied air respirators or SCBAs may be used for emergency rescue operations.
- All confined space entry work requires the posting of a standby person hole watch, whose sole duty is to observe and evaluate the work area and involved workers.
- Communications, in the form of visual, audio, or tactile, must be maintained with workers using respiratory protection equipment in confined spaces at all times. It is the standby person watch's responsibility to ensure that these communications are clearly maintained.

f. The qualified person should check the NIOSH approval label. A respirator's approval is invalidated when components are interchanged between different types or makes of respirators, non-approved components are used, or if an approved respirator is used in atmospheric conditions for which it has not been approved. Only NIOSH approved respiratory protection equipment will be used.

g. The Safety Director will be responsible for specifications and selection of all respiratory protection equipment to be purchased and utilized.

### 5. Instruction and Training:

All persons who are expected to wear or to supervise the wearing of respiratory protection will receive training prior to the actual use or supervision of use of the respiratory protective equipment. Such training shall be provided at least annually, covering the following topics:

- Why respiratory protection is required;
- PELs, TLVs;
- Toxicity, acute and chronic;
- Potential for exposure during certain specific activities such as confined space entry and emergency situations;
- Respirator selection;
- Identification of hazards;
  - Types of contaminants
  - Oxygen deficiency

00180

- Evaluation of hazards;
  - Instrumentation
  - Warning properties
  - Skin absorption and irritation
  - Chemical properties of contaminants
  - Unknown atmospheres
  - Protection factors
  - NIOSH approval
- Use and fitting of respirators;
  - The importance of proper fit
  - Fit test procedures
    - Quantitative
    - Qualitative
    - Rational for fit testing
    - Checking the seal
    - Conditions that break the seal
    - Inspection, donning, and doffing procedures
- Respirator limitations;
  - Fit
  - Protection actors of various types of respirators
  - Types of filters and absorbents
  - Recognition of break-through
- Respirator maintenance;
  - Cleaning and sanitizing procedures
  - Respirator/cartridge/accessory storage
  - Respirator inspection
  - Grade D breathing air
- Hands on training provides the employee an opportunity to;
  - Inspect, don, and doff all available respirators
  - Check the face-to-face-piece seal
  - Clean and sanitize the respirators
  - Wear the respirator for extended periods to become familiar with them.

## 6  Qualitative Fit Testing:

Qualitative fit testing shall be conducted prior to assigning an employee to a task requiring the wearing of respiratory protection. The fit test will be repeated on an annual basis thereafter. The qualified person will utilize the irritant fume protocol as described in 29 CFR 1910.1001 (g) (4).

## 7  Storage:

The purpose of good respirator storage is to ensure that the respirator will function properly when used. Each respirator will be stored in its own sealed container to protect it

CSNPDF - www.fesis.com

# 00181

from dust, chemicals, sunlight, moisture, and extreme temperatures. The containers will be kept in a convenient, clean, dry, sanitary location. Respirators are not to be hung from their straps as this can distort the face-piece. Every respirator is to be stored properly whenever it is not being worn. This applies when an employee goes to lunch, takes a break, or leaves the work area for any reason.

## 8    Cleaning and Disinfecting:

Respirators assigned for the exclusive use of one worker should be cleaned at least daily.  Cleaning consists of removing exhalation valve covers, valves, and straps and hand washing the face piece and valves in warm, soapy water. The parts are rinsed and then air dried in a clean space provided for this purpose.

Respirators that are used by more than one worker should be cleaned and disinfected after each use. Respirators can be disinfected by immersing the respirator body for two minutes in a 50-ppm household bleach solution (approximately 2-ml of bleach/liter of water). This is followed by a thorough rinsing in clean water and air-drying.

Respirators should not be immersed in the bleach solution for longer than two minutes in order to minimize damage. Caution must be taken to thoroughly rinse respirators after cleaning and disinfecting to prevent dermatitis.

## 9    Field Inspection:

Respirators shall be inspected each time they are used. The specific items to be inspected depend upon the type of respirator being inspected.  If equipment is found to be defective, repair the unit with approved parts. If parts are not available, remove the unit from service.  Where applicable, the following items will be checked:

- All rubber for dirt, pliability, deterioration, cracks, tears.
- Straps and headgear suspensions for breaks, tears, elasticity, and attachment snaps.
- Valves for holes, distortion, dirt.
- Cartridges for dents, corrosion, and expiration date.
- Face shields for cracks, abrasions, or distortions that interfere with vision.
- Air supply system for air quality, breaks, or kinks in supply hoses, coupling attachments, tightness of connectors, proper setting of regulators and valves.
- Cylinder pressure.
- Regulator and low air pressure alarm.

## 10  Maintenance:

All maintenance shall be thoroughly inspected monthly and after each use.  A qualified person at each facility or job site will be responsible for inspecting respirators and maintaining inspection records.

International Shipbreaking Limited, L.L.C.

### 11  Breathing Air:

Breathing air shall meet the requirements of the Compressed Gas Association specifications for grade D breathing air.  If the customer is providing the air source (compressors, plant air), a certificate which certifies that the air source is at least grade D breathing air shall be obtained and kept on file.

### 12  Work Area Surveillance:

The qualified person is responsible for periodically monitoring work area conditions. Monitoring frequency depends upon the nature of the work. Persons responsible for observing work area conditions must be especially sensitive to changing conditions that may place workers at increased risk to illness or injury.  Any air monitoring devices must be positioned so as to measure the air concentrations at the location of the workers. If there is any question as to the location of the monitoring devices, the position that measures the worst-case concentration should be selected.

Conditions to be observed include:
- Identification of air contaminants.
- generation of new hazard during the work process with attention to:
    1. Flammable vapors.
    2. Oxygen deficiency.
    3. Increase in contaminant concentrations with respect to respirator protection factors.
    4. Heat stress.
- Symptoms of worker illness include:
    1. Dizziness.
    2. Nausea.
    3. Weakness.
    4. Breathing difficulties.
    5. Coughing, sneezing, vomiting.
    6. Fever or chills.
    7. Eye or skin irritation.

Chemical cartridges will be replaced as soon as break-through is noticed.  Likewise, filters will be replaced when an increase in breathing resistance becomes apparent.

Respirator wearers shall be permitted to leave a hazardous area for any respirator-related reason.  Some of the reasons that may cause a worker to leave the area include:

- Inadequate protection factor.
- Detection of leakage/break-through of contaminant into respirator.
- Increased breathing resistance.
- Discomfort.

**00183**

### 13 Medical Examinations:

Each worker will receive a physical to determine if he/she is physically capable of wearing a respirator. The examination will determine if an individual experiences breathing difficulties, claustrophobia or anxiety while wearing respiratory protection. The examination should include:

- Health history with attention to:
  1. Lung related disorders.
  2. Epilepsy.
  3. Heart-related conditions.
  4. Diabetes.
  5. Pulmonary function test.

### 14 Evaluation of Respiratory Program Effectiveness:

Periodic evaluation of this respiratory protection program is essential to ensure that adequate respiratory protection is utilized whenever needed to prevent worker illness or injury. The Safety Director shall be responsible for conducting periodic evaluations of the program. Each employee has a responsibility to notify the Safety Director or the qualified person if a deficiency in the program is believed to exist. Management encourages workers to provide feedback on the effectiveness of the program so that worker health and safety can be ensured.

### 2.2 P   Hearing Conservation Program

#### 1. Introduction:

The objective of the International Shipbreaking Hearing Conservation Program (HCP) is to prevent permanent noise-induced hearing loss resulting from on the job noise exposure. The OSHA regulations require employers to provide employees with proper protection against the effects of noise exposure when sound levels exceed an 8-hour time weighted average ("TWA") of 90 dBA. The protective measures may be provided either through engineering or administrative controls. If these control measures fail to reduce the noise within the acceptable limits, personal protective equipment shall be provided and used. Additionally, whenever employee noise exposures equal or exceed an 8-hour (TWA) sound level of 85 dBA, referred to as the action level, the employer shall develop and administer a Hearing Conservation Program. Requirements outlined in the HCP are mandatory by regulation where the word "shall" is used and are advisory in nature where the word "should" is used. Our HCP includes:

- Noise surveys.
- Audiometric Testing.
- Hearing protection.
- Employee education and training.
- Record keeping.

CVAPDF - www.texla.com

00184

2. **Responsibilities:**

   a.    **Supervisor:**
- Notifying the Safety Coordinator of noise complaints or potential noise hazards.
- Ensuring that employees are provided with hearing protectors when required.
- Ensuring that employees properly use and care for hearing protectors.
- Ensuring that noise-hazardous equipment/areas are properly labeled or posted (greater than or equal to 85 dBA operating noise level).
- Notifying the Safety Coordinator of process, materials or equipment changes that may alter noise exposures.
- Ensuring that potentially overexposed employees are provided with a baseline audiometric hearing test prior to the initial work assignment and then annually thereafter.
- Ensuring new employee orientation/training and annual refresher training of employees are provided to all potentially overexposed personnel.

   b.    **Safety Coordinator**

- Administering the Hearing Conservation Program.
- Workplace and employee noise evaluation noise assessment to determine if administrative and engineering controls are needed, and how they will be implemented.
- Identification of areas or processes that require noise abatement and/or posting.
- Evaluation and periodic re-evaluation of employees' exposure, by job classification, to determine which job titles need to be included in the Hearing Conservation Program.
- Maintain records of employee exposure measurements.

   c.    **Employees**

- Wearing hearing protection devices as required.
- Attending required training sessions on noise hazards.

   d.    **Contracted Audiologist/Physician**
- Providing audiometric testing.
- Providing a comprehensive training program on an annual basis.
- Performing audiogram evaluations.
- Maintaining audiometric test records.
- Recommending appropriate hearing protectors as needed.

International Shipbreaking Limited, L.L.C.

3. **Program Components:**

a. **Noise Surveys**
   - Representative noise monitoring with a designed sampling strategy will be performed by the Safety Coordinator to allow the identification of employees for inclusion in the Hearing Conservation Program and to enable the proper selection of hearing protection.
   - All continuous, intermittent and impulsive sound levels from 80 to 130 dBA shall be integrated into the computation.
   - Monitoring shall be repeated when any changes occur in production, process, equipment or controls, which might render the hearing protectors inadequate or require additional employees to be included in the program.
   - Employees exposed at or above the action level shall be notified of the results of the monitoring.
   - Employees' noise exposure will be reassessed periodically as needed (i.e. following changes in processes, job responsibilities or equipment).

b. **Audiometric Testing**
   - Audiometric testing program will be managed by a contracted audiologist.
   - Performing audiometric database analysis (ADBA) procedures, as defined in ANSI Standard S12.13-1991, to assess the effectiveness of hearing conservation efforts (i.e., is hearing loss being prevented).
   - Baseline audiograms shall be preceded by at least 14 hours without exposure to workplace noise. This requirement may be met by wearing hearing protectors that will reduce the employee's exposure to a sound level of 80 dBA or below.
   - Baseline audiograms shall be provided for the employees whose job classification are included in the Hearing Conservation Program upon employment, and annually thereafter.
   - Employees shall be informed in writing within 21 days when an audiogram indicates a standard threshold shift which is determined to be work-related.

c. **Hearing Protection**
   - Employees exposed to noise levels at or above an 8-hour TWA of 90 dBA shall wear hearing protectors. Employees exposed to noise levels at or above the action level of an eight-hour TWA of 85 dBA shall wear hearing protectors if they have experienced a documented standard threshold shift or have not obtained a baseline audiogram.
   - Hearing protectors shall be available to all employees exposed to noise levels at or above the action level of 85 dBA, 8-hr TWA, at no cost to the employees.
   - Employees shall be given the opportunity to select their hearing protectors from a variety of suitable types.
   - Proper initial fitting and supervision of the correct use of hearing protectors shall be provided.

00186

- Hearing protector attenuation shall be evaluated for the specific noise environments in which the protector will be used.
- Hearing protectors must attenuate the noise level to an 8-hour TWA of 90 dBA or less.
- For employees who have experienced a standard threshold shift, the attenuation must reduce the sound level to an 8-hour TWA of 85 dBA or less.
- Re-evaluation of hearing protectors shall be done whenever a workplace noise level increase renders the hearing protector's attenuation inadequate.
- Workplaces in which the noise level exceeds 85 dBA shall have signs posted. Signs shall read " Hearing Protectors Required ".

d.    **Employee Education and Training**
- Annual training is required for all employees exposed to noise at or above an 8-hour TWA of 85 dBA.
- The training shall cover the following information:
    1. the effects of noise on hearing.
    2. the purpose, advantages, disadvantages, and attenuation of various types of hearing protectors.
    3. instruction of proper fitting and care of protectors.
    4. the purpose and procedures of audiometric testing.
    5. Copies of the occupational noise regulation shall be available to affected employees and their representatives. A copy of the regulation shall also be posted in the workplace.
    6. Any informational materials pertaining to this standard that are supplied by OSHA shall be available to the affected employees.

e.    **Record Keeping**
- The Safety Coordinator shall retain noise exposure measurement records for 2 years.
- Audiometric test records provided by the contracted audiologist will be maintained by departments with employees enrolled in the Hearing Conservation Program and shall include:
    1. The name and job classification of the employee.
    2. The date of the audiogram.
    3. The examiner's name.
    4. The employee's most recent noise exposure assessment.
    5. The date of the last acoustic or exhaustive calibration of the audiometer and the measurement of the background sound pressure levels in the audiometric test rooms.
    6. Records of audiometric test results shall be retained for the duration of the affected employee's employment.

End of Section

CHMPDF - www.fenbo.com

00187

## ATTACHMENT J-6

A. ENVIRONMENTAL AND SAFETY INFORMATION INSTRUCTIONS AND TERMS AND CONDITIONS:

The Contractor is advised that he, not the Government, is responsible for obtaining all hazardous property information regarding the location, quantity, and content of any other hazardous property present on the ship(s). It is the contractor's responsibility to ensure that Federal, state, or local laws or regulations pertaining to these ship(s), are complied with.

FUEL OIL RESIDUALS: The Contractor is cautioned that fuel oil residuals that are present on these ship(s) may be a RCRA regulated waste. Pre-disposal documentation includes liquid load documentation which provides tank soundings and the volume of fuel oil remaining after stripping to low suction.

SODIUM Chromate: All tanks containing water which was added prior to 1990 for stability purposes while the ship was active or undergoing inactivation have been tested for sodium chromate concentrations. The pre-disposal documentation included these results and identified any water tanks that remain on board with regulated concentrations of chromate.

COATINGS: Ships may contain paint coatings that are lead or zinc oxide or chromate based. Due to the age of the ships, all coating must be assumed to be lead and/or zinc chromate based. The contractor must implement controls required by OSHA and other regulations concerning worker safety and environmental compliance.

ASBESTOS:

(A) Ships of this type contain asbestos in the following applications:

> bulkhead and pipe insulation
> bulkhead fire shield
> uptake space insulation
> exhaust duct insulation
> some electrical cable materials
> brake linings
> floor tiles and deck underlay
> steam, water and vent flange gaskets
> flexitalic gaskets
> garlock seals
> shaft packing
> valve packing
> pipe hanger inserts
> weld shop protectors and burn covers
> any other type of thermal insulating material

(B) The access door(s) to compartments containing asbestos insulation have been labeled to indicate that asbestos is present and whether the asbestos insulation is in a friable or non-friable condition. The pre-disposal documentation includes an Asbestos Survey Report which is a compartment listing. The compartment listing does not represent or characterize the total quantity of asbestos containing materials (ACM) throughout the ship. Offerors are cautioned that ACM may also be located underneath non-asbestos containing material. The compartment listing provides notification that ACM is present and whether it is in a friable or non-friable condition. Asbestos is a major health hazard as it enters the air as fibers or dust through operations such as ripout and removal. Compliance with OSHA (29 CFR, Part 1910), EPA (40 CFR, Part 61.02) and other agencies' regulations is required to ensure worker safety and proper disposal of asbestos containing materials. Access to the area shall be restricted to persons whose work requires their

CutePDF - www.fasiio.com

00199

presence. Posted asbestos warning signs are not intended to substitute for asbestos danger signs required during asbestos remediation work. THE GOVERNMENT EXPRESSLY DOES NOT WARRANT OR REPRESENT THAT COMPARTMENTS NOT POSTED WITH ASBESTOS WARNING LABELS DO NOT CONTAIN ASBESTOS.

(C) The Contractor shall be responsible for removing and disposing of all Asbestos in accordance with applicable Federal, State, and local laws and regulations. Further, each offeror shall rely on his own inspection in determining the method and extent of asbestos removal required under applicable laws and regulations. THE GOVERNMENT EXPLICITLY DOES NOT WARRANT THAT THE ITEMS IDENTIFIED IN THE ASBESTOS SURVEY REPORT ARE THE ONLY ITEMS WHICH CONTAIN ASBESTOS IN REGULATED QUANTITIES.

PCB ITEMS:

(A) A polychlorinated biphenyl (PCB) inventory of all electrical and electronic equipment that contain or are suspected to contain PCB transformers and large capacitors has been accomplished and is provided with the predisposal documentation. PCB labels are attached to the equipment for easy identification and each equipment is assigned a serialized number on the inventory for tracking purposes. This inventory represents the Navy's knowledge of the quantity of PCB transformers and large capacitors on board. THE GOVERNMENT EXPLICITLY DOES NOT WARRANT THAT THE ITEMS IDENTIFIED IN THE PCB INVENTORY OR ITEMS POSTED ARE THE ONLY ITEMS WHICH CONTAIN PCBs IN REGULATED QUANTITIES.

(B) A PCB sampling and laboratory analysis survey has been accomplished of potentially PCB solid materials on the ship and is provided with the predisposal documentation. PCBs in concentrations regulated by Federal, State, and local laws and regulations exist on board the ship. The following applications may be found to contain regulated concentrations of solid PCBs:
    Ventilation duct flange gaskets, felt and rubber;
    Electrical cable insulation and other non-metallic components of cable;
    Fluorescent light ballast starters and potting;
    Bulkhead and pipe insulation;
    Foam rubber/plastic anti-sweat insulation used on hull surfaces
    and cold water piping;
    Cork hull anti-sweat insulation;
    Other rubber items such as pipe hanger rubber blocks, snubbers, bumpers, shock and vibration
    mounts, pads, Spools, hatch gaskets, 0-rings, packing and grommets, etc.;
    Adhesive tapes and double-backed adhesive tapes;
    Aluminized paints;
    Any gloss oil-based paints; any oils and greases.

All regulated PCB items must be removed and disposed of in accordance with applicable Federal, State, and local regulations. THE GOVERNMENT EXPLICITLY DOES NOT WARRANT THAT THE PCB ITEMS IDENTIFIED IN THE SURVEY REPORT ARE THE ONLY REGULATED PCB ITEMS ON BOARD, NOR THAT THE SURVEY REPORT IS REPRESENTATIVE OF THE QUANTITY OF PCB CONCENTRATIONS IN ALL LOCATIONS OR MATERIALS ON BOARD.

(C) The Contractor shall be responsible for identifying, handling, and disposing of all items containing PCB contamination in quantities regulated under applicable Federal, State, and local laws and regulations in accordance with applicable Federal, State, and local laws and regulations.

OCCUPATIONAL SAFETY AND Health ADMINISTRATION (OSHA) REGULATIONS:
At a minimum, dismantling and scrapping must be in accordance with OSHA regulations at 29 CFR Parts 1910 and 1915, Shipbreaking.

FINANCIAL ACCOUNTING DATA SHEET - NAVY

| 1. CONTRACT NUMBER (CRITICAL) | 2. SPIIN (CRITICAL) | 3. MOD (CRITICAL) | 4. PR NUMBER |
|---|---|---|---|
| N0002499C2318 | | Basic | N0002499NP91254 |

PAGE _ OF _

6 LINE OF ACCOUNTING

| CLIN/SLIN | A. ACRN (CRITICAL) | B. APPROPRIATION (CRITICAL) | C. SUBHEAD (CRITICAL) | D. OBJ CLA | E. PARM | F. RFM | G. SA | H. AAA (CRITICAL) | I. TT | J. PAA | K. PROJ UNIT | MCC | PDLI & SUF | 7. AMOUNT (CRITICAL) | NAVY INTERNAL USE ONLY REF DOC/ACRN |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0001 | AA | 1791804 | 8H2G | 252 | SA | SXW | O | 068342 | 2D | 000000 | 22G10 | 000 | 0000 | $1,813,580.00 | N0002499RA08H2G |
| 0012 | AA | 1791804 | 8H2G | 252 | SA | SXW | O | 068342 | 2D | 000000 | 22G10 | 000 | 0000 | $698,000.00 | N0002499RA08H2 |

CONSISTENT WITH THE GUIDANCE IN THE DOD FY99 APPROPRIATIONS ACT (P.L. 105-262), SECTION 8116(a), FUNDS PROVIDED ON THIS DOCUMENT MAY NOT BE USED FOR ANY INFORMATION TECHNOLOGY OR NATIONAL SECURITY SYSTEM, SYSTEM NOT MEETING THE YEAR 2000 (Y2K) COMPLIANCE STANDARDS IDENTIFIED WITHIN THE ACT EXCEPT FOR EFFORTS RELATING TO Y2K COMPLIANCE.

THIS DOCUMENT CONVEYS AUTHORITY TO OBLIGATE +0- WITHIN THE FY99 CAAS FUNDING LIMITATION

PAGE TOTAL $2,511,580.00
GRAND TOTAL $2,511,580.00

PREPARED/AUTHORIZED BY:
R. BOYD   PMS3773D
DATE: 20 Sep 99

COMPTROLLER APPROVAL:
P.M. Fox
BY DIRECTION OF
CAPT H. ACKLEY
DEPUTY COMMANDER/COMPTROLLER
DATE: SEP 29 1999

00189

**ENVIRONMENTAL PROTECTION:** All bidders are advised that they must comply with all applicable Federal, State, and local laws, ordinances, regulations, etc., with respect to human safety and the environment during the processing, use or disposal of material purchased from the Department of Defense under this contract.

**REGULATED SUBSTANCES:** PCB, asbestos, or other hazardous or toxic items or components not identified herein may remain on the ship(s). Strict adherence to Federal environmental statutes, U.S. Environmental Protection Agency (EPA) regulations, State and local environmental laws and regulations are required for this item. The contractor is cautioned that it is solely responsible to ascertain the extent to which Federal environmental laws and other State and local statutes and regulations may affect it and comply therewith.

**RESOURCE CONSERVATION AND RECOVERY ACT NOTICE:** EPA Hazardous Waste Regulations, 40 CFR Part 260 et seq., published at 45 Federal Register 33063-33285, May 19, 1980, became effective on November 19, 1980. These cradle-to-grave regulations detail the responsibilities of generators, transporters, treaters, storers, and disposers of hazardous waste. Civil and criminal penalties are available for noncompliance. While the subject material is not subject to these regulations in its present form, subsequent actions taken with regard to the material may cause a hazardous waste to come into existence. The Contractor is cautioned that he is solely responsible to ascertain the extent to which these regulations affect it and comply therewith.

00130

## GLOSSARY

### A

| | |
|---|---|
| ANSI | American National Safety Institute |
| ACM | Asbestos Containing Material |

### B

| | |
|---|---|
| BFI | Browning Ferris Industries |
| BND | Brownsville Navigation District |
| BRG | Brownsville & Rio Grande Railroad |

### C

| | |
|---|---|
| CAZ | Controlled Access Zone |
| CERCLA | Comprehensive Environmental Resource Conservation Liability Act |
| CFR | Code of Federal Regulations |
| CLIN | Contract Line Item Number |

### D

| | |
|---|---|
| DCO | Discharge Cleanup Organization |
| Decon | Decontamination |
| DOT | Department of Transportation |
| DRMD | Defense Reutilization & Marketing Service |

### E

| | |
|---|---|
| EMT | Emergency Medical Technician |
| EPA | Environmental Protection Agency |

### F

| | |
|---|---|
| FAR | Federal Acquisition Regulations |
| FSC | Floating Slag Catcher |

### H

| | |
|---|---|
| Hazmat | Hazardous Material |
| Hazwoper | 40 Hour Hazardous Material Training Person |
| HEPA | High Efficiency Particulate Air filter |

### I

| | |
|---|---|
| IDLH | Immediately Dangerous to Life & Health |
| ISL | International Shipbreaking Limited, L.L.C. |
| ISRI | Institute of Scrap Recycling Industries |

### L

| | |
|---|---|
| LWD | Light Weight Displacement |

### M

| | |
|---|---|
| MARAD | Maritime Administration |

00131

MSHA        Mine Safety and Health Administration
MSDS        Material Safety Data Sheets

## N

NATEC       National Abatement Technology Training Center
ND          Non-Detect
NESHAP      National Emission Standards for Hazardous Air Pollutants
NIOSH       National Institute for Occupational Safety and Health

## O

OSHA        Occupational Safety and Health Administration
OSPRC       Oil Spill Prevention & Response Certificate
OSRO        Oil Spill Response Organization

## P

PAPR        Powered Air Purifying Respirator
PELS        Permissible Exposure Levels
PCB         Polychlorinated Biphenyls
PF          Protection Factor
PLM         Polarized Light Microscopy
PPE         Personal Protective Equipment
PPM         Parts Per Million

## R

RCRA        Resource Conservation and Recovery Act
RESI        Reservoirs Environmental Services, Inc.

## S

SDP         Ship Disposal Program
SPCC        Spill Prevention Containment & Countermeasures
STEL        Short Term Exposure Limits

## T

TCLP        Toxicity Characteristics Leaching Procedure
TCP         Technical Compliance Plan
TDH         Texas Department of Health
TLV         Threshold Limit Value
TGLO        Texas General Land Office
TNRCC       Texas Natural Resources Conservation Commission
TPH         Total Petroleum Hydrocarbons
TPWD        Texas Parks & Wildlife Department
TSCA        Toxic Substances Control Act
TSDF        Treatment, Storage and Disposal Facilities
TSI         Thermal System Insulation

CMiPDF - www.fesite.com

00132

## U

| | |
|---|---|
| USCG | United States Coast Guard |
| USFW | United States Fish & Wildlife Department |

CutePDF - www.texio.com

00133

## 2.1    ENVIRONMENTAL MANAGEMENT PLAN

### A 1    Polychlorinated Biphenyls ("PCB") Program

#### a.    Notification

When the Company is awarded a vessel under this Program, there will be a need to notify the Environmental Protection Agency ("EPA"). The first notification will occur shortly after the award is granted. At that time the Company will notify the EPA Regional PCB Coordinator for Region 6, Ms. Lou Roberts, of the following information:

1.  Date the vessel will be moved from berth to our facility;
2.  The location of our facility;
3.  The date of arrival at our facility;
4.  The proposed time period for storage, PCB removal and scrap metal recovery;
5.  An address and phone number of a responsible person from the seller's office, that can provide information on the status of the sale and progress under the contract;
6.  An address and phone number of a responsible person from the Company's office that can provide information on the status of the PCB removal;
7.  That ISL will be utilizing the EPA Guidance Document for Ship Scrapping;
8.  That ISL will be guided by 40 CFR part 761 as amended by FR Vol. 63 Num. 124 dated 6/29/98.

#### b.    Sampling for PCBs

ISL will perform and comply with the "Sampling Ships for PCBs Regulated for Disposal (Interim Final Policy)" dated November 30, 1995 issued by the EPA. We have attached such regulations as Exhibit 3 to this bid package. In all instances, the Company will conform to all procedures from 40 Code of Federal Regulations ("CFR") part 761 as amended by FR Vol. 63 Num. 124 dated 6/29/98. ISL will sample and test for PCBs in accordance with approved EPA testing method 3550/8082. Our Sampling Protocol is attached as Exhibit 5.

#### c.    Personnel Protective Equipment Worn during PCB Sampling & Removal

During sampling and removal of materials, liquids or solids, which may be contaminated with PCBs, personnel protective equipment ("PPE") will be provided.

#### d.    Records of Sampling and Analysis Results

Sampling and Analysis results for all PCB samples taken, which verify that PCBs have been detected to be greater than or equal to 50-ppm, and regulated PER 40 CFR 761, will be maintained and available for EPA inspection. The information required for each individual sample by the Company is as follows: a chain of custody with a unique sample identification number, the kind of material or item sampled, the location where the sample was collected (frame/deck), the date the sample was collected, the analytical procedure used, the sample collector, the PCB concentration in the sample, and the limit of quantification for the chemical analysis.

Case 1:01-cv-00048   Document 43   Filed in TXSD on 08/17/2001   Page 179 of 338

00134

e.     **Sampling Plan for Non-Liquids per EPA Guidance Document**

The EPA sampling plan is a variation of a stratified random sample. In this kind of sampling, the entire population of non-liquid PCBs is divided into mutually exclusive sub-populations called substratum and stratum. Substratum are sampled independently and represented independently as a known source of PCBs. Stratums are sampled according to a random sampling procedure. A set of blueprints is required for each vessel. Sample locations are selected employing floor (deck) plans; each space or compartment, including hallways and stairwells on each deck are assigned sequential numbers. Specific rooms, spaces or compartments are selected using a random number generator. After all rooms, spaces or compartments are assigned a sequential number, the total amount for each level is entered into the random number generator as the number of possible outcomes. Then the random number generator selects a random result number. The result number chosen represents the space, room, or compartment that is to be sampled. Then, one of the six surfaces in the space is randomly selected. All suspect sub-stratums are provided a sequential number and specific sample determined via the random number generator.

The population of all known sources of non-liquid PCBs will fall into one of three sub-populations referred to as:

- Substratum & Stratum 1 - Electrical Cable;

- Substratum & Stratum 2 - Air Handling Gaskets;

- Substratum & Stratum 3 - other than known sources of 1 & 2 which are comprised of nine different groups listed in the definition of Stratum 3 on page 13 of Exhibit 3 attached.

The total number of samples to be taken from a specific vessel is determined by taking the square root, rounded off to the nearest whole number, of the total gross weight of a vessel. The number representing the square root is the total number of samples to be taken for the entire vessel. The total number of levels is then divided into the square root, to determine the total number of samples to be taken from each level of the vessel. The total numbers of samples per level are then directed first to the selected known sources of PCBs and the remaining samples are directed by random selection.

In the event a representative sample from any level on the vessel of the three Substrata or Strata are detected through analytical method 3550/8082 to be equal to or greater than 50 ppm PCBs, the entire Stratum for that level will be determined as regulated material under 40 CFR 761-Subpart D. In the event that all representative samples taken in accordance with this program indicate that the items sampled are less than 50 ppm PCBs, and therefore non-regulated, the material will be disposed of as a non-hazardous waste, or in the case of Stratum 1 - Electrical Cable, will be stored on site to be processed. Pursuant to Section 6(e) of TSCA, and federal regulations promulgated under 40 CFR 761.60(e), when the PCB process program is in operation, the Company may choose not to sample Substratum or Stratum 1 - Electrical Cable, but instead remove it from the vessel and place it in our one year storage building for processing. All waste generated from this process will be tested and disposed. The processing program shall comply with all applicable monitoring and record keeping requirements as specified in 40 CFR 761.

**00135**                                        International Shipbreaking Limited, L.L.C.

The 1995 Guidance was originally conceived as a risk management tool that provided a best available practice for removing PCBs from a vessel targeted for export. The ISL ES&H Manager, Mr. Barry Chambers, developed and presented a very similar plan to the EPA, as a private environmental consultant to the Coral Sea dismantlement project, prior to the issuance of the EPA guidance document. The EPA (TSCA) agreed that it was impossible to achieve 100% removal of PCB containing materials from a vessel and that it was unreasonable to require an individual/company to so state. Consequently, the concept of a statistically valid random approach to PCB removal was considered and accepted. Dr. Smith (EPA headquarters, TSCA) promulgated the Guidance as it now exists and it has been used in ship dismantling for PCB identification by ISL for both DRMS and MARAD since 1996.

The Guidance separates suspect PCB non-metallic solids into three stratums. The first two stratums are wire and gaskets. Mr. Chambers has, for at least three years, advocated that vessel dismantlers should assume that cable and gaskets as PCB and forego the sampling and any attempt to separate PCB and non-PCB cable and gaskets. The third stratum is separated into various non-metallic sub-stratums and it is this stratum alone to which ISL applies the 1995 Guidance.

The PCB Mega rule has been under development by the EPA for approximately ten years and has codified most of the issues and questions that have caused concern to the agency for over fifteen years. While the rule favorably impacts the ship dismantling industry, because of the new PCB Bulk product rules, it is separate and apart from the 1995 Guidance. The 1995 Guidance randomly identifies PCBs that are then handled in accordance with 40 CFR part 761 as amended by the Mega rules.

### f.   Sampling for PCB liquids

All suspect oils are field-tested utilizing the "Dexsil" CLOR-N-OIL 50 field test kit. All oils from bearings or any type of lubrication system are treated as used oils and are tested prior to bulking and shipping as "used oil". All oil filled transformers, capacitors, circuit breakers, reclosers, etc. are considered as suspect for PCBs and field tested accordingly.

### g.   Storage of PCB Items for Disposal: 40 CFR 761.65

Any PCB article or PCB container stored for disposal will be removed from service and disposed of as required within one year (40 CFR 761.65(a)) from the date when it was first removed from service. Note: The TNRCC has not listed PCB as RCRA regulated, therefore the 90 day RCRA storage limitation does not apply.

The permanent storage facility, which has been placed in service at our facility, is inspected monthly and meets all of the requirements of 40 CFR 761.65(b) including:

- Adequate roof and walls to prevent rain water from reaching the stored PCBs and PCB items;
- No drain valves, floor drains, expansion joints, sewer lines, or other openings that would permit liquids to flow from the curbed area;
- Floor and curbing constructed of continuous smooth and impervious materials such as Portland cement, concrete or steel, to prevent or minimize penetration of PCBs;

00136

- Not located at a site that is below the 100-year flood plain elevation (Note: an on-site flood plain datum has been determined).

The following PCB items may be stored temporarily in an area that does not comply with the four requirements listed above for a period of up to 30 days from the date of their removal from service provided that a notation is attached to the PCB item, or a PCB container indicating the date the item was removed from service:

- Non-leaking PCB articles and PCB equipment;
- Leaking PCB articles and PCB equipment if the PCB item is placed in a non-leaking PCB container that contains sufficient absorbing materials to absorb any liquid PCBs remaining in the PCB item;
- PCB containers containing non-liquid PCBs such as contaminated soil, rags, or debris;
- Non-leaking and structurally undamaged PCB large high voltage capacitors and PCB contaminated electrical equipment that have not been drained of free flowing dielectric fluid may be stored on pallets next to a storage facility that meets the above requirements;
- The capacitors and equipment temporarily stored outside the facility will be checked for leaks weekly;
- All PCB articles and PCB containers in temporary storage will be checked for leaks at least once every week. Any leaking PCB articles and PCB containers and their contents will be transferred immediately to properly marked non-leaking containers. Any spilled or leaked materials will be immediately cleaned up, using absorbents or other adequate means, and the PCB contaminated materials and residues will be disposed of properly. Any container used for storage of liquid PCBs will comply with the shipping container specifications of the Department of Transportation ("DOT") 49 CFR 178.80 (specification 5 container without removable head), 178.82 (specification 5b container without removable head), 178.35 (specification 2s or 2sl), 178.35 (polyethylene containers) or 178.116 (specification 17e container). Any container used for the storage of non-liquid PCBs will comply with the specifications of 49 CFR 178.80 (specifications 5 container), 178.82 (specification SB container), or 178.115 (specification 17C container).

PCB articles and PCB containers will be dated on the article or container when they are placed in storage. The storage will be managed so that the PCB articles and PCB containers can be located by the date that they entered storage.

## A 2   Asbestos Program

The Company presently employs an Asbestos Management Program that fully complies with State and Federal regulations which include:

- National Emission Standards for Hazardous Air Pollutants ("NESHAP");
- Occupational Safety and Health Administration ("OSHA") Shipyard Employment Industry Standard (29 CFR 1915.1001);
- EPA Worker Protection Rule (40 CFR 763.121).

- DOT regulations governing the transport and disposal of asbestos containing material (49 CFR Parts 171 and 172);
- Texas Department of Health ("TDH") 10-day notification prior to starting work.

a.    **Asbestos Sampling Plan**

Sampling and analysis results for all asbestos samples taken, which verify that asbestos equal to or greater than 1% and regulated under 49 CFR parts 171 and 172 will be maintained for inspection by any State or Federal regulatory agency.   The information required for each individual sample taken by the Company is described below.

The Company uses the services of Reservoirs Environmental Services, Inc. ("RESI"), to analyze bulk samples by Polarized Light Microscopy ("PLM") for asbestos content.  PLM is used to analyze bulk samples in compliance with guidelines established by the EPA (EPA/600/R-93/116).  Sample information is put on a RESI chain of custody as follows:

- A unique sample identification number that represents each level of the vessel, in front of this number is the location on the vessel the sample was taken from bow, mid-ship, stern, engine rooms are referred to as forward and aft;
- The kind of material sampled;
- Analytical method to be used;
- Sample collector;
- Date sampled.

ISL also supplies a sampling form, as shown in Figure 2.1.A.2, which shows all pertinent information with regard to the individual sample.  All asbestos abatement on the vessel is done in phases on different areas of the vessel.  This is done to make possible a cutting strategy that will ensure the stability and integrity of the vessel while it is being dismantled in conjunction with the abatement.

It is ISL's policy to treat all TSI that is not obviously fiberglass or rubber as either friable or non-friable asbestos.  All cable is handled as ACM and the cable stripping operation is performed with negative air and engineering controls by trained asbestos workers.

The asbestos inspector and the qualified individual/asbestos supervisor will make all determinations jointly.  ISL believes that this is the most prudent approach to ensure worker safety and reduce regulatory risk.  If there are materials that present a question, such as certain types of wallboard, the inspector is to take a bulk sample and confirm the presence or absence of asbestos.  All dismantling workers are trained to stop work and notify a supervisor, who will in turn call the asbestos inspector/qualified person to evaluate the situation and take appropriate action.

**Asbestos Bulk Sample Analysis Company**

| | |
|---|---|
| TDH # 30-0015 - Bulk | TDH # 700449 - Air |
| Reservoirs Environmental Services, Inc. | South Texas Tech, Inc |
| 1147 Brittmore Road | 1535 W. Contour |
| Suite 112 | Suite 24 |
| Houston, TX 77043 | San Antonio, TX 78212 |

00138

**International Shipbreaking Limited, L.L.C.**

(713) 932-0015
Tiffany Tilyka
Terry Brindley
TDH #: 30-0015

(210) 822-3652
Benito Cortina

CMPDF - www.fastio.com

00139

**Figure 2.1 A.2**
**International Shipbreaking Limited, L.L.C.**
**Sampling Form**

00140                                                        International Shipbreaking Limited, L.L.C.

## A 3    Removing Fuel And Hydraulic Oil Residue

Petroleum products are placed into three broad categories: virgin products, used oils and oil/water mixtures. Virgin oils will be handled as such. Used oils will undergo hazard analysis and comply with pertinent EPA and TNRCC requirements. Oil/water mixtures will be processed through the Company's on-site oil/water separator with water discharged to the Port's permitted discharge system. All fuel, separator, hydraulic and oil contaminated bilge sludge are solidified, placed in a covered watertight container for disposal through an ISL existing waste stream at the BFI TNRCC approved landfill in Sinton, Texas. ISL has a crew specifically assigned to oil and sludge removal.

All spilled/leaked hydraulic and fuel oils are cleaned up as quickly as possible in order to prevent contamination of storm and fire fighting waters. Engineering controls, such as not cutting exterior bulkheads flush with the decks to permit storm-water containment within the vessel and maintaining the integrity of transverse bulkheads to prevent longitudinal storm-water progression are effective methods for the prevention of contaminated storm water drainage.

### a. Marine Chemist Certification

All hot work shall be performed in accordance with CFR 29 1915 Subpart B - Confined and Enclosed Spaces and other Dangerous Atmospheres in Shipyard Employment. The Company will provide a trained competent person and a certified marine chemist (Mr. Eric Moore - Certificate # 626), as the regulation requires.

### b. Spill Prevention

Tank management and storm-water management controls as described above are used as a preventive approach to minimizing the potential for a spill. Oil containment booms are placed at the mouth of our slip prior to any work onboard the vessel in preparation for dismantling until the vessel has been completely dismantled. Absorbent boom and pads are available if needed. All equipment used to transfer any petroleum will be Coast Guard approved. Our emergency response subcontractor is Code 3, Inc., located in Harlingen, Texas. Their listed response time is 45 minutes.

### c. Notification

The U.S. Coast Guard will be notified of any marine transfer activities and the U.S. Coast Guard, the Texas General Land Office, the Brownsville Navigation District and the Texas Natural Resources Conservation Commission will be notified of any waterborne oil spillage.

### d. Removal Operations of Petroleum Products

During petroleum product removals, only appropriate pumps will be used during transfers on the vessel. All hoses will be wired and taped with an absorbent pad under all connections. Fuel oils will be pumped into a segregated mobile tank onboard the vessel. A crane on shore will lift the mobile tank from the vessel and place it on shore, where a transfer will take place

00141

from it to our land based holding tanks. This process will eliminate the possibility of a hose rupturing and causing a spill from being strung from the vessel to shore. This process has been discussed and concurred with by the U.S. Coast Guard. After removal of petroleum products, the ship's oil tanks will be washed and removed for disposal. This will eliminate the residuals and any vapors in the tanks, rendering the tanks inert and ready for hot work based on LEL reading. Only a reading of less than 10-PPM LEL and a fire watch equipped with fire suppressant equipment will be acceptable prior to allowing cutting to begin.

### A4  Lead, Barium, Chrome, Beryllium, Cadmium and Chromium

The Project Manager and the ES&H Manager conduct the initial inspection. They will begin the process of identifying the materials in each compartment that will be reused, recycled or disposed of. The process of identification is based on data from the provider, professional experience of the Managers and physical samples when the material cannot be identified through other means. The quantities of such metals found are small and predictable from previous experience. In normal practice, these metals are recyclable and are RCRA exempt per 40 CFR part 261.6. An additional and significant concern is that workers wear appropriate PPE when these metals are processed. During the initial inspection and during the dismantling process, particular attention is paid to sources of Lead and Lead base metals, Zinc-bearing base or filler metals or metals coated with Zinc bearing materials, Cadmium-bearing filler materials, Chromium-bearing metals or metals coated with chromium-bearing materials and Beryllium-containing base or filler metals. If found, these metals are removed and processed for RCRA exempt recycling. If a situation exists where recycling is not feasible, a TCLP analysis will be run and the material disposed of accordingly. If found to be hazardous, the material will be stored in accordance with RCRA/TNRCC storage requirements, transported and disposed of per section 2.1C.

All felt gaskets are assumed to be PCB and chrome contaminated and are stored in accordance with TSCA/RCRA/TNRCC requirements. Transportation and disposal per section 2.1C

All Zinc Chromate Paint Coatings are identified to the cutters, appropriate PPE is assured, and all metals with Zinc Chromate Paint Coatings are recycled. We visually identify the paint by its characteristic yellow color/tint. Any liquid Zinc Chromate paint found will be handled as RCRA/TNRCC regulated waste, stored as such and transported and disposed of per Section 2.1 C.

### A 4a   Sodium Chromate

The Project Manager and the ES&H Manager will inspect the vessel and identify suspect ballast water. All suspect ballast water will be analyzed to determine the presence of chromium inhibitors. A total chromium method 6010 will be performed. For ballast water found to contain chromium, Safewater Technologies will conduct treatment on-site with methodologies approved by TNRCC. Because the treatment is on-site there is no transportation involved and disposal is on-site per TNRCC approval.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### BROWNSVILLE DIVISION

| | | |
|---|---|---|
| INTERNATIONAL SHIPBREAKING<br>LIMITED, L.L.C. | §<br>§<br>§<br>§ | |
| V. | §<br>§<br>§ | C.A. NO. B-01-048<br>(ADMIRALTY) |
| SMITH L.C. & SMITH MARITIME,<br>*In Personam*, and the TUG ELSBETH II,<br>her engines, tackle, and gear, etc., *In Rem* | §<br>§ | |

## AFFIDAVIT OF LATHAM SMITH

| | | |
|---|---|---|
| **STATE OF FLORIDA** | § | |
| | § | **KNOW ALL PERSONS BY THESE PRESENTS** |
| **COUNTY OF CLAY** | § | |

I, Latham Smith, being first duly sworn on oath, depose and say:

I am the Owner of Smith Maritime, Claimant/Defendant/Counter-Plaintiff in the above-captioned matter, and I am fully competent to make this affidavit for and on behalf of Smith Maritime;

Smith Maritime entered into a contract with Plaintiff/Counter-Defendant, International Shipbreaking Limited, L.L.C. ("ISL") for the towage of two decommissioned United States Navy guided missile destroyers, the Ex-USS STODDERT and the Ex-USS COCHRANE (the "Contract");

ISL agreed to pay Smith Maritime a total of more than $600,000.00 for the towage under the contract and also agreed to pay additional expenses incurred incident to the towage. To date, all amounts owing and outstanding under the contract total $300,566.42, exclusive of interest and other consequential damages;

A true and correct copy of the contract as executed and agreed to is attached to this affidavit;

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing information is true and correct based upon my personal knowledge.

_____
Latham Smith

SWORN TO AND SUBSCRIBED TO BEFORE ME under my hand and official seal of office this ___ day of _____, 2001.

_____

Mary B Diggins     Notary Public, State of Florida
MY COMMISSION # CC699727 EXPIRES
February 13, 2002
BONDED THRU TROY FAIN INSURANCE, INC.

19645*K Affidavit

**EXHIBIT**

B

"TOWCON" INTERNATIONAL OCEAN TOWAGE AGREEMENT (LUMP SUM)                          PART I

| | |
|---|---|
| 22. Nature of work (Cl. 1)<br>Towage of (2) "fast frigates"<br>430'x 42'x20' from Pearl Harbor<br>to Brownsville, TX | 24. Contemplation (Cl. 1)<br>Great Circle route to Hawaii;<br>return via southerly route for<br>optimization of favorable currents |
| 24. Place of departure (Cl. 3)<br>Jacksonville<br>/Pearl Harbor | 25. Place of destination (Cl. 3)<br>Brownsville, TX |
| 26. Free time at place of departure (Cl. 2g)<br>Panama Canal 5 days return<br>Pearl Harbor 4 days | 27. Free time at place of destination (Cl. 2g) |
| 28. Notices (Place of departure) (Cl. 7(a))<br>(a) Initial departure period (from/to)<br>(b) Initial departure notice (days notice/days period)<br>(c) Final departure period and notice (days notice/days period)<br>(d) Final departure time and date notice (days notice)<br>(e) Notices to be given to<br>Mutual convenience | 29. Daily Amount (Cl. 2(f))<br>$4600/day<br>(a) First rate<br>$4600/day<br>(b) Second rate<br>$8000/day |
| | 30. Riding crew to be provided by (who state number to be provided) (Cl. 9)<br>N/A |
| | 31. Riding crew provided by Tugowner under article 9 or men per day payable (Cl. 9)<br>N/A |
| 32. Lump sum towage price (state lump sum in each installment, sum and payable) (Cl. 2)<br>(a) Lump sum towage price<br>$648,000<br>(b) Amount due and payable on signing agreement<br>$ 35,000<br>(c) Amount due and payable on ___<br>depart JAX - $50 per Panama - 17,500<br>(d) Amount due and payable on ___<br>departure Pearl - $200,000<br>(e) Amount due and payable on ___<br>Panama - $130,000; bal on arrival | 33. Payment of lump sum & other amounts (state currency, mode of payment, place of payment, account no.) (Cl. 2)<br>Independent Bankers Bank<br>Orlando, FL  ABA#063111596<br>Further credit to:<br>Putnam State Bank ABA#063113219<br>Final credit to: SMITH MARITIME<br>Acct.#0110726 |
| 34. Interest rate (%) per annum to run from (state number of days) after amounts due (Cl. 2) | 35. Security (state by whom to be provided and when payable, amount) (Cl. 5)<br>(state in if separately agreed) (Cl. 5) |
| 36. Current cost of tug's bunker oil (state state type of bunkers) (Cl. 2(e))<br>#2 gas/oil capped @ $1.10;<br>differential to be paid/credited | 37. Cancelling date, if any agreed (Cl. 16(a))<br>25 Nov. 00 |
| 38. Notices of additional clauses, if any, should be stated, if agreed (Cl. 18)<br>$35,000 | 39. Numbers of additional clauses, covering special provisions, if agreed<br>Amend clause 25 to read: "U.S.<br>Maritime Law" & "U.S. District Court<br>State of Florida" |

It is mutually agreed between the party stated in Box 3 (the Tugowner) and the party stated in Box 4 (the Hirer) that the Tugowner shall use his best endeavours to perform the towage as set out in this Agreement. The place of departure is stated in Box 24 and the place of destination in Box 25, each subject to Clause 3 as stated in Box 27 (PART II) and the provisions of PART II which shall prevail over those of PART I to the extent of any conflict. In witness whereof the parties have caused this Agreement to be executed the day and year first mentioned above. If any special provisions and clauses are included and the blanks in the boxes appropriate thereto are filled in, the provisions of PART I and any additional clauses if agreed shall prevail over those of PART II to the extent of such inconsistency but no further.

_signatures_

Printed by The BIMCO Charter Party Editor

International Salvage Union (ISU)<br>European Tugowners Association (ETA)<br>The Baltic and International Maritime Council (BIMCO)

| | RECOMMENDED<br>INTERNATIONAL OCEAN TOWAGE AGREEMENT (L U M P  S U M)<br>CODE NAME: "TOWCON"    PART I |
|---|---|
| 1. Date and place of Agreement | 3. Hirer/place of business |
| 2. Tugowner/place of business<br><br>SMITH MARITIME<br>967 Bulkhead Road<br>Green Cove Springs, FL  32043<br><br>904-284-0503 ph<br>904 284-0508 fax | |
| 4. Tow (name and type) | 5. Gross tonnage/displacement tonnage |
| 6. Maximum length/maximum breadth & towing draught (fore and aft) | 7. Flag and place of registry |
| 8. Registered owners | 9. Classification society |
| 10. P. & I. liability insurers | 11. General condition of tow |
| 12. Particulars of cargo and/or ballast and/or other property on board the tow | |
| 13. Tug (name and type)<br><br>ELSBETH II, 6000HP Ocean Tug | 14. Flag and place of registry<br>U.S./ Palatka, FL |
| 15. Gross tonnage<br><br>139 GRT | 16. Classification society<br><br>ABS |
| 17. P. & I. liability insurers<br><br>Seaport Worldwide Associates (see attached) | |
| 18. Certificated bollard pull (if any)<br><br>72 T | 19. Indicated horse power<br><br>6000 HP |
| 20. Estimated daily average bunker oil consumption in good weather and smooth water<br>3200 gal/day<br><br>(a) at full towing power with tow<br>3900 gal/day U.S.<br><br>(b) at full sea speed without tow<br>2000 gal @ 8kts; 2200 gal @ 9 kts; 2700 gal @ 10 kts | |
| 21. Winches and main towing gear<br><br>double drum; 2 wires @ 2 1/4"; 2000' nylon towing spring emergency towlines & chain bridles sufficient for tandem tows; 1800' spare tow wire | |

(continued)

Copyright, published by<br>The Baltic and International Maritime Council (BIMCO)

Printed by The BIMCO Charter Party Editor

# PART II
## "Towcon" International Ocean Towage Agreement (Lump Sum)

**The Tow**
The 'Tow' shall include any vessel, craft or object of whatsoever nature including anything carried thereon as described in PART I to which the Tugowner agrees to render the service(s) as set out in Box 22.

**Price and Conditions of Payment**
(a) The Hirer shall pay the Tugowner the sum set in Box 32 (hereinafter called 'the Lump Sum').

(b) The Lump Sum shall be payable as set out in Boxes 32 and 33.

(c) The Lump Sum and all other sums payable to the Tugowner under this Agreement shall be payable without any discount, deduction, set-off, lien, claim or counter-claim, each instalment of the Lump Sum shall be fully and irrevocably earned at the moment it is due as set out in Box 32, Tug and/or Tow lost or not lost, and all other sums shall be fully and irrevocably earned on a daily basis.

(d) All payments by the Hirer shall be made in the currency and to the bank account specified in Box 33.

(e) In the event that the average price per metric tonne of bunkers actually paid by the Tugowner differs from the amounts specified in Box 36 then the Hirer or the Tugowner, as the case may be, shall pay to the other the difference per metric tonne for every metric tonne consumed during the voyage. The average price specified above shall be the average of the prices per metric tonne actually paid by the Tugowner on the basis of quantities purchased at the last bunkering port prior to the voyage, any bunkering port during the voyage, and the first bunkering port after completion of the voyage. The log book of the Tug shall be prima facie evidence of the quantity of bunkers consumed.

(f) Any Delay Payment due under this Agreement shall be paid to the Tugowner as and when earned on presentation of the invoice.

(g) The Free Time specified in Boxes 26 and 27 shall be allowed for the connecting and disconnecting of the Tow and all other purposes relating thereto. Free Time shall commence when the Tug arrives at the pilot station at the place of departure or the Tug and Tow arrives at the pilot station at the place of destination or anchors or arrives at the usual waiting area off such places. Should the Free Time be exceeded, Delay Payment(s) at the rate specified in Box 29 shall be payable until the Tug and Tow sail from the place of departure or the Tug is free to leave the place of destination.

**3. Additional Charges and Extra Costs**
(a) The Hirer shall appoint his agents at the place of departure and place of destination and ports of call or refuge and shall provide such agents with adequate funds as required.

(b) The Hirer shall bear and pay as and when they fall due:-

(i) All port expenses, pilotage charges, harbour and canal dues and all other expenses of a similar nature levied upon or payable in respect of both the Tug and the Tow.

(ii) All taxes, (other than those normally payable by the Tugowner in the country where he has his principal place of business and in the country where the Tug is registered) charges, dues or other taxes payable in respect of or in connection with this Agreement and the payments of the Lump Sum or other sums payable under this Agreement or the services to be performed under or in pursuance of this Agreement, any Customs or Excise duties and any costs, dues or expenses payable in respect of any necessary permits or licences.

(iii) The cost of the services of any assisting tugs when deemed necessary by the Tugmaster or prescribed by Port or other Authorities.

(iv) All costs and expenses necessary for the preparation of the Tow for towing (including such costs or expenses as those of raising the anchor of the Tow or lending or casting off any moorings of the Tow).

(v) The cost of insurance of the Tow shall be the sole responsibility of the Hirer to provide.

(c) All taxes, charges, costs, and expenses payable by the Hirer shall be paid by the Hirer direct to those entitled to them. If, however, any such tax, charge, cost or expense is in fact paid by or on behalf of the Tugowner (notwithstanding that the Tugowner shall under no circumstances be under any obligation to make such payments on behalf of the Hirer) the Hirer shall reimburse the Tugowner on the basis of the actual cost to the Tugowner upon presentation of invoice.

**4. War Risk Escalation Clause**
The Lump Sum is based and assessed on all war risk insurance costs applicable to the Tugowner in respect of the contemplated voyage in effect on the date of this Agreement.
In the event of any subsequent increase or decrease in the actual costs due to the Tugowner fulfilling his obligations under this Agreement, the Hirer or the Tugowner, as the case may be, shall reimburse to the other the amount of any increase or decrease in the war risk, confiscation, deprivation or trapping insurance costs.

**5. Interest**
If any amounts due under this Agreement are not paid when due, then interest shall accrue and shall be paid in accordance with the provisions of Box 34, on all such amounts until payment is received by the Tugowner.

**6. Security**
The Hirer undertakes to provide, if required by the Tugowner, security to the satisfaction of the Tugowner in the form and in the sum, at the place and at the time indicated in Box 35 as a guarantee for due performance of the Agreement. Such security shall be returned to the guarantor when the Hirer's financial obligations under this Agreement have been met in full. (Optional, only applicable if Box 35 filled in).

**7. Place of Departure/Notices**
(a) The Tow shall be tendered to the Tugowner at the place of departure stated in Box 24.

(b) The precise place of departure shall always be safe and accessible for the Tug to enter, to operate in and for the Tug and Tow to leave and shall be a place where such Tug is permitted to commence the towage in accordance with any local or other rules, requirements or regulations and shall always be subject to the approval of the Tugowner which shall not be unreasonably withheld.

(c) (i) The Tow shall be ready to sail from the Place of Departure between the dates indicated in Box 28 (a), hereinafter called the Initial Departure Period.

(ii) The Hirer shall give the Tugowner such notice as is stipulated in Box 28 in respect of Initial Departure Notice (Box 28 (b)), Final Departure Period Notice (Box 28 (c)) and Final Departure Time and Date Notice (Box 28 (d)).

(iii) The Tow shall be offered to the Tugowner, duly certificated and otherwise in accordance with the terms and conditions of this Agreement.

(d) If the Hirer fails to comply strictly with the provisions of Cl. 7(c) the date of departure shall be deemed to be either the last day of the Initial Departure Period or the last day of the Final Departure Period, whichever is earlier, and this date shall be binding for all consequences arising in respect of Delay Payments and any other payments due or charges incurred in the performance of this Agreement.

**8. Place of Destination**
(a) The Tow shall be accepted forthwith and taken over by the Hirer or his duly authorised representative at the place of destination stated in Box 25.

(b) The precise place of destination shall always be safe and accessible for the Tug and Tow to enter, to operate in, and for the Tug to leave and shall be a place where such Tug is permitted to redeliver the Tow in accordance with any local or other rules, requirements or regulations and shall always be subject to the approval of the Tugowner, which approval shall not be unreasonably withheld.

**9. Riding Crew**
(a) In the event that the Tug owner provides a Riding Crew for the Tow, such crew and their suitability for the work shall be in the discretion of the Tugowner. All expenses for such personnel shall be for the account of the Tugowner.

(b) In the event that any personnel are placed on board the Tow by the Hirer all expenses for such personnel will be for the account of the Hirer and such personnel shall be at all times under the orders of the Master of the Tug, but shall not be deemed to be the servants or agents of the Tugowner.

(c) The Riding Crew shall be provided at the Hirer's sole expense with sui-

Line numbers: 1–130 (right margin), 1–66 (left margin)

**computer generated form is printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the preprinted text of this document, which is clearly visible, the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss or damage caused as a result of discrepancies between the original BIMCO document and this**

# PART II
## "Towcon" International Ocean Towage Agreement (Lump Sum)

able accomodation, food, fresh water, life saving appliances and all other requirements to comply as necessary with the law and regulations of the territorial law of the Flag of the Tug and/or Tow and of the States through the territorial waters of which the Tug will pass or enter. It is a requirement that members of the Riding Crew provided by the Hirer shall be able to speak and understand the English language or any other mutual language.

### Towing Gear and Use of Tow's Gear

(a) The Tugowner agrees to provide free of cost to the Hirer all towing hawsers, bridles and other towing gear normally carried on board the Tug, for the purpose of the towage or other services to be provided under this Agreement. The Tow shall be connected up in a manner within the discretion of the Tugowner.

(b) The Tugowner may make reasonable use at his discretion of the Tow's gear, power, anchors, anchor cables, radio, communication and navigational equipment and all other appurtenances free of cost during and for the purposes of the towage or other services to be provided under this Agreement.

### Permits and Certification

(a) The Hirer shall arrange at his own cost and provide to the Tugowner all necessary licenses, authorisations and permits required by the Tug and Tow to undertake and complete the contractual voyage together with all necessary certification for the Tow to enter or leave all or any ports of call or refuge on the contemplated voyage.

(b) Any loss or expense incurred by the Tugowner by reason of the Hirer's failure to comply with this Clause shall be reimbursed by the Hirer to the Tugowner and during any delay caused thereby the Tugowner shall receive additional compensation from the Hirer at the Tug's Delay Payment rate specified in Box 29.

### 2. Tow-worthiness of the Tow

(a) The Hirer shall exercise due diligence to ensure that the Tow shall, at the commencement of the towage, be in all respects fit to be towed from the place of departure to the place of destination.

(b) The Hirer undertakes that the Tow will be suitably trimmed and prepared and ready to be towed at the time when the Tug arrives at the place of departure and fitted and equipped with such shapes, signals, navigational and other lights of a type required for the towage.

(c) The Hirer shall supply to the Tugowner or the Tugmaster, on the arrival of the Tug at the place of departure an unconditional certificate of tow-worthiness for the Tow issued by a recognised firm of Marine Surveyors or Survey Organisation, provided always that the Tugowner shall not be under any obligation to perform the towage until in his discretion he is satisfied that the Tow is in all respects trimmed, prepared, fit and ready for towage but the Tugowner shall not unreasonably withhold his approval.

(d) No inspection of the Tow by the Tugowner shall constitute approval of the Tow's condition or be deemed a waiver of the foregoing undertakings given by the Hirer.

### 3. Seaworthiness of the Tug

The Tugowner will exercise due diligence to tender the Tug at the place of departure in a seaworthy condition and in all respects ready to perform the towage, but the Tugowner gives no other warranties, express or implied.

### 4. Substitution of Tugs

The Tugowner shall at all times have the right to substitute any tug or tugs for any other tug or tugs of adequate power (including two or more tugs for one, or one tug for two or more) at any time whether before or after the commencement of the towage or other services and shall be at liberty to employ a tug or tugs belonging to other tugowners for the whole or part of the towage or other service contemplated under this Agreement. Provided however, that the main particulars of the substituted tug or tugs shall be subject to the Hirer's prior approval, but such approval shall not be unreasonably withheld.

### 5. Salvage

(a) Should the Tow break away from the Tug during the course of the towage service, the Tug shall render all reasonable services to re-connect the

towline and fulfil this Agreement without making any claim for salvage.

(b) If at any time the Tugowner or the Tugmaster considers it necessary or advisable to seek or accept salvage services from any vessel or person on behalf of the Tug or Tow, or both, the Hirer hereby undertakes and warrants that the Tugowner or his duly authorised servant or agent including the Tugmaster have the full actual authority of the Hirer to accept such services on behalf of the Tow on any reasonable terms.

### 16. Cancellation and Withdrawal

(a) At any time prior to the departure of the Tow from the place of departure the Hirer may cancel this Agreement upon payment of the cancellation fee set out in Box 36. If cancellation takes place whilst the Tug is en route to the place of departure or after the Tug has arrived at or off the place of departure then in addition to the said cancellation fee the Hirer shall pay any additional amounts due under this Agreement.

(b) In the event that the towage operation is terminated after departure from the place of departure, but before the Tow arrives at the place of destination without fault on the part of the Tugowner, his servants or agents, the Tugowner shall be entitled to be paid, and if already paid to retain all sums payable according to Box 32, accrued Delay Payments and any other amounts due under this Agreement. The above amounts are in addition to any damages the Tugowner may be entitled to claim for breach of this Agreement.

(c) The Tugowner may without prejudice to any other remedies he may have leave the Tow in a place where the Hirer may take repossession of it and be entitled to payment of the Lump Sum less expenses saved by the Tugowner and all other payments due under this Agreement, upon any one or more of the following grounds:

(i) If there is any delay or delays (other than delay caused by the Tug) at the place of departure exceeding in aggregate 21 running days.

(ii) If there is any delay or delays (other than a delay caused by the Tug) at any port or place of call or refuge exceeding in aggregate 21 running days.

(iii) If the security as may be required according to Box 35 is not given within 7 running days of the Tugowner's request to provide security.

(iv) If the Hirer has not accepted the Tow within 7 running days of arrival at the place of destination.

(v) If any amount payable under this Agreement has not been paid within 7 running days of the date such sums are due.

(d) Before exercising his option of withdrawing from this Agreement as aforesaid, the Tugowner shall if practicable give the Hirer 48 hours notice (Saturdays, Sundays and public Holidays excluded) of his intention so to withdraw.

(e) Should the Tug not be ready to commence the towage at the latest at midnight on the date, if any, indicated in Box 37, the Hirer shall have the option of cancelling this Agreement and shall be entitled to claim damages for detention if due to the wilful default of the Tugowner. Should the Tugowner anticipate that the Tug will not be ready, he shall notify the Hirer thereof by telex, cable or otherwise in writing without delay stating the expected date of the Tug's readiness and ask whether the Hirer will exercise his option to cancel. Such option to cancel must be exercised within 48 hours after the receipt of the Tugowner's notice, otherwise the third day after the date stated in the Tugowner's notice shall be deemed to be the new agreed date to commence the towage in accordance with this Agreement.

### 17. Necessary Deviation or Slow Steaming

(a) If the Tug during the course of the towage or other service under this Agreement puts into a port or place or seeks shelter or is detained or deviates from the original route as set out in Box 23, or slow steams because either the Tugowner or Tugmaster reasonably consider

(i) that the Tow is not fit to be towed or

(ii) the Tow is incapable of being towed at the original speed contemplated by the Tugowner or

(iii) the towing connection requires rearrangement, or

(iv) repairs or alterations to or additional equipment for the Tow are required to safeguard the venture and enable the Tow to be towed to destination, or

(v) it would not be prudent to do otherwise on account of weather conditions actual or forecast, or

because of any other good and valid reason outside the control of the Tug

This computer generated form is printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification being made to the preprinted text of this document, which is of clearly visible, the original BIMCO approved document shall apply. BIMCO assume no responsibility for any loss or damage caused as a result of discrepancies between the original BIMCO document and this document.

| | |
|---|---|
| 131 | 194 |
| 132 | 195 |
| 133 | 196 |
| 134 | 197 |
| 135 | 198 |
| 136 | 199 |
| | 200 |
| 137 | 201 |
| 138 | 202 |
| 139 | 203 |
| 140 | 204 |
| 141 | 205 |
| 142 | 206 |
| 143 | 207 |
| 144 | 208 |
| 145 | 209 |
| 146 | 210 |
| 147 | 211 |
| | 212 |
| 148 | 213 |
| 149 | 214 |
| 150 | 215 |
| 151 | 216 |
| 152 | 217 |
| 153 | 218 |
| 154 | 219 |
| 155 | 220 |
| 156 | 221 |
| 157 | 222 |
| 158 | 223 |
| | 224 |
| 159 | 225 |
| 160 | 226 |
| 161 | 227 |
| 162 | 228 |
| 163 | 229 |
| 164 | 230 |
| 165 | 231 |
| 166 | 232 |
| 167 | 233 |
| 168 | 234 |
| 169 | 235 |
| 170 | 236 |
| 171 | 237 |
| 172 | 238 |
| 173 | 239 |
| 174 | 240 |
| 175 | 241 |
| | 242 |
| 177 | 243 |
| 178 | 244 |
| 179 | 245 |
| 180 | |
| 181 | 246 |
| 182 | 247 |
| 183 | 248 |
| 184 | 249 |
| 185 | 250 |
| 186 | 251 |
| 187 | 252 |
| 188 | 253 |
| 189 | 254 |
| 190 | 255 |
| | 256 |
| 191 | 257 |
| 192 | 258 |
| 193 | 259 |
| | 260 |

Case 1:01-cv-00048   Document 43   Filed in TXSD on 08/17/2001   Page 192 of 338

## PART II
### "Towcon" International Ocean Towage Agreement (Lump Sum)

owner or Tugmaster, or because of any delay caused by or at the request of the Hirer, this Agreement shall remain in full force and effect, and the Tugowner shall be entitled to receive from the Hirer additional compensation at the appropriate Delay Payment rate as set out in Box 29 for all time spent in such port or place and for all time spent by the Tug at sea in excess of the time which would have been spent had such slow steaming or deviation not taken place.

(b) The Tug shall at all times be at liberty to go to the assistance of any vessel in distress for the purpose of saving life or property or to call at any port or place for bunkers, repairs, supplies, or any other necessaries or to land or take aboard any persons, but if towing the Tug shall leave the Tow in a safe place and during such period this Agreement shall remain in full force and effect.

(c) The Tug shall have liberty to comply with any orders or directions as to departure, arrival, routes, ports of call, stoppages, destination, delivery, requisition or otherwise howsoever given by the Government of the Nation under whose flag the Tug or Tow sails or any department thereof, or any person acting or purporting to act with the authority for such Government or any department thereof by the committee or person having under the terms of the War Risks Insurance on the Tug the right to give such orders or directions and if by reason of and in compliance with any such orders or directions anything is done or is not done the same shall not be deemed a deviation and delivery in accordance with such orders or directions shall be a fulfilment of this Agreement and the Lump Sum and/or all other sums shall be paid to the Tugowner accordingly.

(d) Any deviation howsoever or whatsoever by the Tug or by the Tugowner not expressly permitted by the terms and conditions of this Agreement shall not amount to a repudiation of this Agreement and the Agreement shall remain in full force and effect notwithstanding such deviation.

**8. Liabilities**

1. (a) The Tugowner will indemnify the Hirer in respect of any liability adjudged due or claim reasonably compromised arising out of injury or death occurring during the towage or other service hereunder to any of the following persons:

(i) The Master and members of the crew of the Tug and any other servant or agent of the Tugowner;

(ii) The members of the Riding Crew provided by the Tugowner or any other person whom the Tugowner provides on board the Tow;

(iii) Any other person on board the Tug who is not a servant or agent of the Hirer or otherwise on board on behalf of or at the request of the Hirer.

(b) The Hirer will indemnify the Tugowner in respect of any liability adjudged due or claim reasonably compromised arising from injury or death occurring during the towage or other service hereunder to any of the following persons:

(i) The Master and members of the crew of the Tow and any other servant or agents of the Hirer;

(ii) Any other person on board the Tow for whatever purpose except the members of the Riding Crew or any other persons whom the Tugowner provides on board the Tow pursuant to their obligations under this Agreement.

2. (a) The following shall be for the sole account of the Tugowner without any recourse to the Hirer, his servants, or agents, whether or not the same is due to breach of contract, negligence or any other fault on the part of the Hirer, his servants or agents:

(i) Loss or damage of whatsoever nature, howsoever caused to or sustained by the Tug or any property on board the Tug.

(ii) Loss or damage of whatsoever nature caused to or suffered by third parties or their property by reason of contact with the Tug or obstruction created by the presence of the Tug.

(iii) Loss or damage of whatsoever nature suffered by the Tugowner or by third parties in consequence of the loss or damage referred to in (i) and (ii) above.

(iv) Any liability in respect of wreck removal or in respect of the expense of moving or lighting or buoying the Tug or in respect of preventing or abating pollution originating from the Tug.

The Tugowner will indemnify the Hirer in respect of any liability adjudged due to a third party or any claim by a third party reasonably compromised arising out of any such loss or damage. The Tugowner shall not in any cir-

cumstances be liable for any loss or damage suffered by the Hirer or caused to or sustained by the Tow in consequence of loss or damage howsoever caused to or sustained by the Tug or any property on board the Tug.

(b) The following shall be for the sole account of the Hirer without any recourse to the Tugowner, his servants or agents, whether or not the same is due to breach of contract, negligence or any fault on the part of the Tugowner, his servants or agents:

(i) Loss or damage of whatsoever nature, howsoever caused to or sustained by the Tow.

(ii) Loss or damage of whatsoever nature caused to or suffered by third parties or their property by reason of contact with the Tow or obstruction created by the presence of the Tow.

(iii) Loss or damage of whatsoever nature suffered by the Hirer or by third parties in consequence of the loss or damage referred to in (i) and (ii) above.

(iv) Any liability in respect of wreck removal or in respect of the expense of moving or lighting or buoying the Tow or in respect of preventing or abating pollution originating from the Tow.

The Hirer will indemnify the Tugowner in respect of any liability adjudged due to a third party or any claim by a third party reasonably compromised arising out of any such loss or damage but the Hirer shall not in any circumstances be liable for any loss or damage suffered by the Tugowner or caused to or sustained by the Tug in consequence of loss or damage, howsoever caused to or sustained by the Tow.

3. Save for the provisions of Clauses 11, 12, 13 and 16 neither the Tug owner nor the Hirer shall be liable to the other party for loss of profit, loss of use, loss of production or any other indirect or consequential damage for any reason whatsoever.

4. Notwithstanding any provisions of this Agreement to the contrary, the Tugowner shall have the benefit of all limitations of, and exemptions from, liability accorded to the Owners or Chartered Owners of Vessels by any applicable statute or rule of law for the time being in force and the same benefits are to apply regardless of the form of signatures given to this Agreement.

**19. Himalaya Clause**

All exceptions, exemptions, defences, immunities, limitations of liability, indemnities, privileges and conditions granted or provided by this Agreement or by any applicable statute rule or regulation for the benefit of the Tugowner or Hirer shall also apply to and be for the benefit of demise charterers, sub-contractors, operators, master, officers and crew of the Tug or Tow and to and be for the benefit of all bodies corporate parent of, subsidiary to, affiliated with or under the same management as either of them, as well as all directors, officers, servants and agents of the same and to and be for the benefit of all parties performing services within the scope of this Agreement for or on behalf of the Tug or Tugowner or Hirer as servants, agents and sub-contractors of such parties. The Tugowner or Hirer shall be deemed to be acting as agent or trustee of and for the benefit of all such persons, entities and vessels set forth above but only for the limited purpose of contracting for the extension of such benefits to such persons, bodies and vessels.

**20. War and Other Difficulties**

(a) If owing to any Hostilities; War or Civil War; Acts of Terrorism; Acts of Public Enemies; Arrest or Restraint of Princes, Rulers or People; Insurrections; Riots or Civil Commotions; Disturbances; Acts of God; Epidemics; Quarantine; Ice; Labour Troubles; Labour Obstructions; Strikes; Lock-outs; Embargoes; Seizure of the Tow under Legal Process or for any other cause outside the control of the Tugowner it would be impossible or unsafe or commercially impracticable for the Tug or Tower both to leave or attempt to leave the place of departure or any port or place of call or refuge or to reach or enter or attempt to reach or enter the port or place of destination of the Tow and there deliver the Tow and leave again, all of which safely and without unreasonable delay, the Tug may leave the Tow or any part thereof at the place of departure or any other port or place where the Hirer may take repossession and this shall be deemed a due fulfilment by the Tugowner of this Agreement and any outstanding sums and all extra costs of delivery of such places and any storage costs incurred by the Tugowner shall thereupon become due and payable by the Hirer.

(b) If the performance of this Agreement or the voyage to the place of de-

computer generated form is printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the preprinted text of this document, which is clearly visible, the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss or damage caused as a result of discrepancies between the original BIMCO document and this document.

# PART II
## "Towcon" International Ocean Towage Agreement (Lump Sum)

pasture would in the ordinary course of events require the Tug and/or Tow 396
to pass through or near to an area where after this Agreement is made there 397
is or there appears to be danger of such area being blocked or passage 398
through being restricted or made hazardous by reason of War, Acts of Ter- 399
rorism, Trapping of Vessels, Civil War, Acts of Public Enemies, Arrest or Re- 400
straint of Princes, Rulers or People, Insurrection, Riots or Civil Commotions 401
or Disturbances or other dangers of a similar nature then: 402

    (i) If the Tug has not entered such area en route to the place of depar- 403
ture, or having entered has become trapped therein, the Hirer shall pay 404
a Delay Payment at the rate specified in Box 29 for every day of the re- 405
sulting delay. Provided that if the delay is for a period of more than 14 406
days either party hereto shall be entitled to terminate this Agreement by 407
telex, cable or other written notice in which event, save for liabilities al- 408
ready accrued, neither party shall be under any further liability to the 409
other but the Tugowner shall not be bound to repay to the Hirer any 410
payments already made and all amounts due shall remain payable. 411

    (ii) If the Tug and Tow whilst en route to the place of destination have not 412
entered such area during the course of the towage or other service the 413
Hirer shall pay Delay Payment at the rate indicated in Box 29 for every 414
day by which the towage is prolonged by reason of waiting for such area 415
to become clear and/or safe and/or by reason of proceeding by a lon- 416
ger route to avoid or pass such area in safety. 417

    (iii) If the Tug and Tow whilst en route to the place of destination have 418
become trapped in such area during the course of the towage or other 419
service, the Hirer shall pay a Delay Payment at the rate specified in Box 420
29 for every day of the resulting delay. Provided that if the delay is for a 421
period of more than 14 days either party hereto shall be entitled to ter- 422
minate this Agreement by telex, cable or other written notice in which 423
event, save for liabilities already accrued, neither party shall be under 424
any further liability to the other but the Tugowner shall not be bound to 425
repay to the Hirer any payment already made and all amounts due shall 426
remain payable. 427

**21. Lien** 428
Without prejudice to any other rights which he may have, whether in rem or 429
in personam, the Tugowner, by himself or his servants or agents or otherwi- 430
se shall be entitled to exercise a possessory lien upon the Tow in respect of 431
any sum howsoever or whatsoever due to the Tugowner under this Agree- 432
ment and shall for the purpose of exercising such possessory lien be enti- 433
tled to take and/or keep possession of the Tow, provided always that the Hi- 434
rer shall pay to the Tugowner all reasonable costs and expenses howsoever 435
or whatsoever incurred by or on behalf of the Tugowner in exercising or at- 436
tempting or preparing to exercise such lien and the Tugowner shall be en- 437
titled to receive from the Hirer the Tug's Delay Payment at the rate specified 438
in Box 29 for any reasonable delay to the Tug resulting therefrom. 439

**22. Warranty of Authority** 440
If at the time of making this Agreement or providing any service under this 441
Agreement other than towing at the request, express or implied, of the Hirer, 442
the Hirer is not the Owner of the Tow referred to in Box 4, the Hirer expressly 443
represents that he is authorised to make and does make this Agreement for 444
and on behalf of the Owner of the said Tow subject to each and all of these 445
conditions and agrees that both the Hirer and the Owner of the Tow are 446
bound jointly and severally by these conditions. 447

**23. General** 448
(a) If any one or more of the terms, conditions or provisions in this Agree- 449
ment or any part thereof shall be held to be invalid, void or of no effect for 450
any reason whatsoever, the same shall not affect the validity of the remain- 451
ing terms, conditions or provisions which shall remain and subsist in full 452
force and effect. 453
(b) For the purpose of this Agreement unless the context otherwise requi- 454
res the singular shall include the plural and vice versa. 455
(c) Any extension of time granted by the Tug owner to the Hirer or any indul- 456
gence shown relating to the time limits set out in this Agreement shall not be 457
a waiver of the Tugowner's right under this Agreement to act upon the Hi- 458
rer's failure to comply with the time limits 459

**24. Time for Suit** 460

Save for the indemnity provisions under Clause 18 of this Agreement, any 461
claim which may arise out of or in connection with this Agreement or of any 462
towage or other service to be performed hereunder shall be notified by te- 463
lex, cable or otherwise in writing within 6 months of delivery of the Tow or of 464
the termination of the towage or other service for any reason whatever, and 465
any suit shall be brought within one year of the time when the cause of ac- 466
tion first arose. If either of these conditions is not complied with the claim 467
and all rights whatsoever and howsoever shall be absolutely barred and ex- 468
tinguished. 469

    *U. S. maritime law*

**25. Law and Jurisdiction** 470
This Agreement shall be construed in accordance with and governed by 471
~~English law~~. Any dispute or difference which may arise out of or in connec- 472
tion with this Agreement or the services to be performed hereunder shall be 473
referred to the ~~High Court of Justice in London~~. 474
No suit shall be brought in any other state or jurisdiction except that either 475
party shall have the option to bring proceedings in rem to obtain conserva- 476
tive seizure or other similar remedy against any vessel or property owned by 477
the other party in any state or jurisdiction where such vessel or property 478
may be found. 479

*Agreement to be governed by Florida law*

*JS.*

This computer generated form is printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the preprinted text of this document, which is not clearly visible, the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss or damage caused as a result of discrepancies between the original BIMCO document and this document.

CMPDF - www.fesko.com

<div align="center">

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

</div>

| | | |
|---|---|---|
| INTERNATIONAL SHIPBREAKING<br>LIMITED, L.L.C. | §<br>§<br>§<br>§ | |
| V. | §<br>§ | C.A. NO. B-01-048<br>(ADMIRALTY) |
| | § | |
| SMITH L.C. & SMITH MARITIME,<br>*In Personam*, and the TUG ELSBETH II,<br>her engines, tackle, and gear, etc., *In Rem* | §<br>§ | |

<div align="center">

### AFFIDAVIT OF LATHAM SMITH

</div>

| | | |
|---|---|---|
| **STATE OF FLORIDA** | § | |
| | § | **KNOW ALL PERSONS BY THESE PRESENTS** |
| **COUNTY OF CLAY** | § | |

I, Latham Smith, being first duly sworn on oath, depose and say:

I am the Owner of Smith Maritime, Claimant/Defendant/Counter-Plaintiff in the above-captioned matter, and I am fully competent to make this affidavit for and on behalf of Smith Maritime;

Prior to the sinking of the Ex-USS STODDERT, I spoke to Bob Berry of ISL about the untowable condition of the vessel and its potential to become a hazard to navigation. During our conversation, Mr. Berry instructed me to expedite the sinking of the Ex-USS STODDERT should the condition of the vessel pose a threat of harm to the Tug ELSBETH II or her crew and/or should it become a hazard to navigation once the Ex-USS STODDERT was released from the tow line. Because the captain of the Tug ELSBETH II informed me that he perceived the Ex-USS STODDERT was an imminent threat to the safety of the Tug and the lives of the crew, I instructed him to release the Ex-USS STODDERT and to monitor the situation to see if she would sink on her own;

Pursuant to Bob Berry's authorization and taking into account the safety considerations attendant to the circumstances then existing, I ordered the crew to facilitate the sinking to avoid allowing the Ex-USS STODDERT from becoming a further hazard to navigation, a further hazard to the Tug ELSBETH II, and a further hazard to the captain and crew of the Tug ELSBETH II;

Attached to this affidavit is a true and correct copy of telephone records of Smith Maritime evidencing telephone calls made to International Shipbreaking Limited, L.L.C. ("ISL") just before, during and after the sinking of the Ex-USS STODDERT;

The attached telephone records evidence telephone calls to ISL concerning the sinking of the Ex-USS STODDERT;

<div align="right">

**EXHIBIT**

C

</div>

CSHPDF - www.fenlio.com

The attached telephone records were forwarded to Smith Maritime by its telephone service provider;

It is the regular practice of Smith Maritime to keep records of this sort in the course of its regularly conducted business activity;

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing information is true and correct based upon my personal knowledge.

Latham Smith

SWORN TO AND SUBSCRIBED TO BEFORE ME under my hand and official seal of office this ___ day of _____, 2001.

Notary Public, State of Florida

Mary B Diggins
MY COMMISSION # CC699727 EXPIRES
February 13, 2002
BONDED THRU TROY FAIN INSURANCE, INC.

19645*Phone Affidavit

**MCI WORLDCOM** SM 

IBA SMITH'S MARITIME
Account Number:       386 325-5859 001 0563
Bill Period Date:  Feb 22, 2001

☎ **For MCI WorldCom Billing Questions, call 1 800 444-2222
or visit Online Account Manager at:  www.mci.com/service** 🖥

## Detailed Statement of Charges

Long Distance (continued)
Calls from 904-325-5859:

| | Date | | Place Called | | Number Called | Rate* | Time | Min. | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 90. | FEB | 3 | HARLINGEN | TX | 956 345-7515 | N | 610PM | 1 | | .35 |
| 91. | FEB | 3 | PORTISABEL | TX | 956 943-5779 | N | 611PM | 3 | | 1.06 |
| 92. | FEB | 5 | BROWNSVL | TX | 956 831-2299 | D | 1011AM | 1 | | .47 |
| 93. | FEB | 5 | BROWNSVL | TX | 956 831-2299 | D | 1025AM | 1 | | .47 |
| 94. | FEB | 5 | BROWNSVL | TX | 956 831-2299 | D | 143PM | 2 | | .94 |
| 95. | FEB | 5 | FTLAUDERDL | FL | 954 747-3814 | D | 236PM | 17 | | 3.06 |
| 96. | FEB | 5 | BROWNSVL | TX | 956 831-2299 | D | 410PM | 21 | | 9.86 |
| 97. | FEB | 5 | TAMPACNTRL | FL | 813 209-4200 | D | 436PM | 1 | | .18 |
| 98. | FEB | 5 | TAMPACNTRL | FL | 813 677-5514 | D | 437PM | 1 | | .18 |
| 99. | FEB | 5 | TAMPACNTRL | FL | 813 677-5514 | D | 445PM | 1 | | .18 |
| 100. | FEB | 5 | BROWNSVL | TX | 956 831-4112 | D | 446PM | 1 | | .47 |
| 101. | FEB | 5 | BROWNSVL | TX | 956 831-4112 | D | 448PM | 3 | | 1.41 |
| 102. | FEB | 5 | HONOLULU | HI | 808 522-8264 | D | 456PM | 2 | | .94 |
| 103. | FEB | 6 | BROWNSVL | TX | 956 831-4112 | D | 147PM | 2 | | .94 |
| 104. | FEB | 6 | BROWNSVL | TX | 956 831-4112 | D | 152PM | 1 | | .47 |
| 105. | FEB | 6 | BROWNSVL | TX | 956 831-4112 | D | 202PM | 1 | | .47 |
| 106. | FEB | 6 | NEWPT NEWS | VA | 757 594-0231 | D | 316PM | 3 | | 1.41 |
| 107. | FEB | 6 | NEWORLEANS | LA | 504 522-3077 | D | 350PM | 1 | | .47 |
| 108. | FEB | 7 | TAMPACNTRL | FL | 813 209-4238 | D | 1123AM | 1 | | .18 |
| 109. | FEB | 7 | TAMPACNTRL | FL | 813 209-4200 | D | 1125AM | 3 | | .54 |
| 110. | FEB | 7 | TAMPACNTRL | FL | 813 209-4238 | D | 1236PM | 2 | | .36 |
| 111. | FEB | 7 | BROWNSVL | TX | 956 831-4112 | D | 1244PM | 1 | | .47 |
| 112. | FEB | 7 | BROWNSVL | TX | 956 831-4112 | D | 134PM | 1 | | .47 |
| 113. | FEB | 7 | BROWNSVL | TX | 956 831-4112 | D | 251PM | 1 | | .47 |
| 114. | FEB | 7 | BROWNSVL | TX | 956 831-4112 | D | 301PM | 1 | | .47 |
| 115. | FEB | 7 | TAMPACNTRL | FL | 813 209-4238 | D | 306PM | 1 | | .18 |
| 116. | FEB | 7 | TAMPACNTRL | FL | 813 209-4200 | D | 318PM | 6 | | 1.08 |
| 117. | FEB | 7 | TAMPACNTRL | FL | 813 677-5514 | D | 325PM | 1 | | .18 |
| 118. | FEB | 7 | TAMPACNTRL | FL | 813 209-4296 | D | 327PM | 6 | | 1.08 |
| 119. | FEB | 7 | TAMPA | FL | 813 924-9043 | D | 337PM | 2 | | .36 |
| 120. | FEB | 7 | CHTAMSTTHS | VI | 340 513-3336 | D | 404PM | 2 | | .94 |
| 121. | FEB | 8 | TAMPA | FL | 813 924-9043 | D | 916AM | 1 | | .18 |
| 122. | FEB | 8 | TAMPACNTRL | FL | 813 209-4204 | D | 922AM | 2 | | .36 |
| 123. | FEB | 8 | BROWNSVL | TX | 956 831-2299 | D | 932AM | 4 | | 1.88 |
| 124. | FEB | 8 | BROWNSVL | TX | 956 831-4112 | D | 944AM | 2 | | .94 |
| 125. | FEB | 8 | BROWNSVL | TX | 956 831-2299 | D | 958AM | 2 | | .94 |
| 126. | FEB | 8 | BROWNSVL | TX | 956 831-4112 | D | 1035AM | 2 | | .94 |
| 127. | FEB | 8 | COCOABEACH | FL | 321 799-9290 | D | 1042AM | 4 | | .72 |
| 128. | FEB | 8 | TAMPACNTRL | FL | 813 209-4238 | D | 1048AM | 1 | | .18 |
| 129. | FEB | 8 | TAMPA | FL | 813 924-9043 | D | 1048AM | 3 | | .54 |
| 130. | FEB | 8 | COCOABEACH | FL | 321 868-0161 | D | 1120AM | 1 | | .18 |
| 131. | FEB | 8 | EAU GALLIE | FL | 321 253-2005 | D | 1122AM | 3 | | .54 |
| 132. | FEB | 8 | TAMPA | FL | 813 924-9043 | D | 1129AM | 2 | | .36 |

**\* Rate Applied – See Back of First Page**

(continued)▶

**MCI WORLDCOM** SM

LATHAM SMITH DBA SMITH'S MARITIME
Account Number:      386 325-5859 001 0563
Bill Period Date:  Feb 22, 2001

☎ **For MCI WorldCom Billing Questions, call 1 800 444-2222
or visit Online Account Manager at:  www.mci.com/service**

## Detailed Statement of Charges

Long Distance (continued)

Calls from 904-325-5859:

| | Date | | Place Called | | Number Called | Rate* | Time | Min. | |
|---|---|---|---|---|---|---|---|---|---|
| 47. | JAN | 29 | BROWNSVL | TX | 956 831-4112 | D | 1110AM | 1 | .47 |
| 48. | JAN | 29 | BROWNSVL | TX | 956 831-4112 | D | 1227PM | 1 | .47 |
| 49. | JAN | 29 | FTLAUDERDL | FL | 954 524-5120 | D | 117PM | 8 | 1.44 |
| 50. | JAN | 29 | WASHINGTON | DC | 202 685-5850 | D | 255PM | 1 | .47 |
| 51. | JAN | 30 | DIR ASST | FL | 321 555-1212 | D | 716AM | 2 | 1.99 |
| 52. | JAN | 30 | COCOABEACH | FL | 321 784-4646 | N | 718AM | 1 | .18 |
| 53. | JAN | 30 | COCOABEACH | FL | 321 784-4646 | N | 759AM | 5 | .90 |
| 54. | JAN | 30 | COCOABEACH | FL | 321 784-4646 | D | 804AM | 3 | .54 |
| 55. | JAN | 30 | WASHINGTON | DC | 202 685-5850 | D | 331PM | 1 | .47 |
| 56. | JAN | 30 | BROWNSVL | TX | 956 831-4112 | D | 347PM | 1 | .47 |
| 57. | JAN | 31 | METUCHEN | NJ | 732 346-8455 | D | 849AM | 4 | 1.88 |
| 58. | JAN | 31 | FTLAUDERDL | FL | 954 747-4759 | D | 924AM | 1 | .18 |
| 59. | JAN | 31 | NEWORLEANS | LA | 504 522-3056 | D | 932AM | 1 | .47 |
| 60. | JAN | 31 | NEWPT NEWS | VA | 757 594-0231 | D | 1227PM | 4 | 1.88 |
| 61. | JAN | 31 | BROWNSVL | TX | 956 831-4112 | D | 114PM | 1 | .47 |
| 62. | FEB | 1 | BROWNSVL | TX | 956 831-4112 | D | 127PM | 1 | .47 |
| 63. | FEB | 2 | CHESAPKECY | MD | 410 885-5570 | D | 1046AM | 1 | .47 |
| 64. | FEB | 2 | HINSDALE | IL | 630 574-2956 | D | 1048AM | 1 | .47 |
| 65. | FEB | 2 | HOLLYWOOD | FL | 954 929-0102 | D | 1049AM | 1 | .18 |
| 66. | FEB | 2 | CRANFORD | NJ | 908 272-9161 | D | 1052AM | 1 | .47 |
| 67. | FEB | 2 | SANTURCE | PR | 787 722-1555 | D | 1053AM | 1 | .47 |
| 68. | FEB | 2 | MANDEVILLE | LA | 504 674-1225 | D | 1056AM | 1 | .47 |
| 69. | FEB | 2 | NEWORLEANS | LA | 504 522-3077 | D | 1057AM | 2 | .94 |
| 70. | FEB | 2 | HOUSTON | TX | 713 235-3609 | D | 1059AM | 1 | .47 |
| 71. | FEB | 2 | AIRLINE | TX | 281 260-4597 | D | 1100AM | 1 | .47 |
| 72. | FEB | 2 | FTLAUDERDL | FL | 954 747-4759 | D | 1101AM | 1 | .18 |
| 73. | FEB | 2 | HINSDALE | IL | 630 574-3000 | D | 1124AM | 5 | 2.35 |
| 74. | FEB | 2 | BROWNSVL | TX | 956 831-4112 | D | 158PM | 1 | .47 |
| 75. | FEB | 2 | HONOLULU | HI | 808 599-5581 | D | 442PM | 3 | 1.41 |
| 76. | FEB | 2 | HONOLULU | HI | 808 522-8264 | D | 445PM | 12 | 5.63 |
| 77. | FEB | 2 | HONOLULU | HI | 808 541-2500 | N | 1012PM | 5 | 1.76 |
| 78. | FEB | 2 | PORTISABEL | TX | 956 943-5779 | N | 1018PM | 5 | 1.76 |
| 79. | FEB | 3 | NEWPT NEWS | VA | 757 594-0231 | N | 814AM | 33 | 11.62 |
| 80. | FEB | 3 | HARLINGEN | TX | 956 345-7515 | N | 905AM | 11 | 3.87 |
| 81. | FEB | 3 | HARLINGEN | TX | 956 345-7515 | N | 936AM | 2 | .70 |
| 82. | FEB | 3 | HONOLULU | HI | 808 541-2500 | N | 942AM | 4 | 1.41 |
| 83. | FEB | 3 | HARLINGEN | TX | 956 345-7515 | N | 1050AM | 6 | 2.11 |
| 84. | FEB | 3 | HONOLULU | HI | 808 541-2500 | N | 1103AM | 3 | 1.06 |
| 85. | FEB | 3 | HARLINGEN | TX | 956 345-7515 | N | 1126AM | 2 | .70 |
| 86. | FEB | 3 | HARLINGEN | TX | 956 345-7515 | N | 445PM | 1 | .35 |
| 87. | FEB | 3 | HONOLULU | HI | 808 541-2500 | N | 446PM | 5 | 1.76 |
| 88. | FEB | 3 | HARLINGEN | TX | 956 345-7515 | N | 533PM | 1 | .35 |
| 89. | FEB | 3 | BROWNSVL | TX | 956 831-4112 | N | 604PM | 1 | .35 |

* Rate Applied - See Back of First Page

AA   A005802

(continued)▶

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### BROWNSVILLE DIVISION

| | | |
|---|---|---|
| INTERNATIONAL SHIPBREAKING LIMITED, L.L.C. | § § § § | |
| V. | § § | C.A. NO. B-01-048 (ADMIRALTY) |
| | § | |
| SMITH L.C. & SMITH MARITIME, *In Personam*, and the TUG ELSBETH II, her engines, tackle, and gear, etc., *In Rem* | § § § | |

## AFFIDAVIT OF LATHAM SMITH

| | | |
|---|---|---|
| **STATE OF FLORIDA** | § § | **KNOW ALL PERSONS BY THESE PRESENTS** |
| **COUNTY OF CLAY** | § | |

I, Latham Smith, being first duly sworn on oath, depose and say:

I am the Owner of Smith Maritime, Claimant/Defendant/Counter-Plaintiff in the above-captioned matter, and I am fully competent to make this affidavit for and on behalf of Smith Maritime;

A true and correct copy of the log of the Tug ELSBETH II for the voyage at issue in this case is attached to this affidavit;

The entries in the attached log were made at or near the time shown by them;

The attached log entries are kept in the course of Smith Maritime's regularly conducted business activity;

It is the regular practice of Smith Maritime to keep logs such as the attached aboard its Tugs;

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing information is true and correct based upon my personal knowledge.

_____
Latham Smith

SWORN TO AND SUBSCRIBED TO BEFORE ME under my hand and official seal of office this _15_ day of _Aug_, 2001.

_____
Notary Public, State of Florida

Mary B Diggins
MY COMMISSION # CC699727 EXPIRES
February 13, 2002
BONDED THRU TROY FAIN INSURANCE INC

19645*Log Affidavit

**EXHIBIT**

D

42 U.S. GAL. = 1 BARREL

1 U.S. GAL. = 3.78 LITRE

309 U.S. GAL. = 1 METRIC TON (DIESEL)

1 NAUTICAL MILE = 6,076 FT.

Bob Barry ell

956-345-751

Office 956·831-229

Jeff - 321 - 799 - 4425

Bill Hope

94_-931-470

954 - 929 - 0103

AJ Halifax

954 - 581 - 4050

IMT

813-971·6000

Lm #313

Lube    40wt Rotella T140 or Equivalent

Lube Oil 20 wt. Hydraulic

Fuel Consumption Lt Tug.  @ 950 RPM    150 GPH
                          @ 920 RPM    140 GPH
                          @ 880 RPM    120 GPH
                          @ 850 RPM    100 GPH

25 on charms
40 w/ow
198 items

900

25 on charms

709 731 7111
All Combs A. Bid                    730

1150
A. Phace

3

SAT.        JAN. 8, 2000

0730   u/w FROM SHIPYARD GREENCOVE SPRINGS FOR
STUART PETROLIUM DOCK. JAX.

1230   A/S FUEL DOCK. TOOK ON 30,000 gal. DIESEL FUEL

1415   u/w FOR GATEWAY SLIP - BLOUNT IS. JAX.

1505   ARRIVED BLOUNT IS. SURVEY BARGE ATLANTA BRIDGE

1700   u/w WITH BARGE ON HIP FOR BERTH 30 BLOUNT IS.
WITH TUG MISS OCIE ASSISTING.

1745   ALL FAST BERTH 30 TO LOAD RAMP

2130   u/w FROM BERTH 30 FOR PORTLAND MAINE
CREW: CAPT. DOMINIQUE SMITH  MATE. JEFFREY KEILUM
MATE. SHAWN WARD   ENG. ANDY BUTTS
AB. CHARLES CAMERON   AB. TERRY SMITH

2300   ABEAM JAX. S/B PUT WIRE TO 1100 FT.

2400   30°26.2'N  81°08.'W  CRS: 075°


SUN.        JAN. 9, 2000

0600   30°54.8'N   80°25.'W   SPD: 8.6 KTS.  MTG: 979  CRS: 048°

0800   31°08.2'N   80°11.3'W   SPD: 8.1   MTG: 963   CRS: 044

1200   31°24.3'N   79°47.6'W   SPD: 9.2   MTG: 937   CRS: 060
PUT WIRE TO 1760 FT.

1400   31°-35.6'N,  079°-30.8'W,  SPD: 9.8, MTG: 919, CRS: 049

1600   31°-46.3'N,  079°-11.4'W,  SPD: 10.5, MTG: 900, CRS: 046

1800   32°02.6'N,   78°47.6'W   SPD: 9.4   MTG: 883  CRS: 077

2000   32°11.9'N,  78°38.7'W   SPD: 8.5   MTG: 870   CRS: 046

2200   32°21.8'N   78°23.6'W   SPD: 8.2   MTG: 854   CRS: 055°T

2400   32°31.3'N   78°07.4'W   SPD: 8.5   MTG: 837   CRS: 055°T
WIND: SE-14 KTS.  SEAS 2-4 FT.  BAR: 30.05


MON.        JAN. 10, 2000

0200   32°-40.1'N,  077°-50.6'W,  Spd - 8.8,  Mtg - 821nm Crs - 055 T

0400   32°-49.7'N,  077°-33.6'W,  Spd - 8.9,  Mtg - 804nm Crs - 060 T

0600   33°03.1'N,  77°17.'W   Spd: 9.4,  MTG 788,  CRS 050°T

0800   33°14.9'N   76°56.'W   Spd: 10.6,  MTG: 767,  CRS 060°T

4

TUE.    11 January 00

0200  35°-21.3'N , 074°-32.2'W  Spd: 9.9, Mtg: 590, Crs: 03
0400  35°-37.8'N , 074°-17.6'W  Spd: 11 , Mtg: 570, Crs: 05
0600  35°55.5'N  74°01.3'W  Spd: 10.1  MTG: 578 , CRS: 038
0800  36°08.8'N  73°48.4'W  Spd: 8.5  MTG: 531 , CRS: 039
1000  36°22.2'N  73°35.5'W  SPD: 7.6  MTG: 514  CRS: 038°T
1200  36°36.'N  73°23.'W  SPD: 4 KTS  MTG: 497  CRS: 038°T
1415  36°-52.0'N , 073°-07.0'W  Spd: 8.8  Mtg: 477  Crs: 037°T
1600  37°-04.4'N , 072°-54.5  Spd: 9.0  Mtg: 461  Crs: 039°T
1700  REDUCE RPM TO  720  WX  WINDS  WSW  40 to 50 knots
      SEAS TO  18'
1800  37°-17.2'N  72°42.2'W  Spd: 8. KTS  MTG: 445  CRS: 038°T
2000  37°28.'N  72°31.3'W ,  Spd: 6.8 KD  MTG: 431  CRS: 040°T
2200  37°37.'N  72°22.35'W  SPD: 5.8K  MTG. 419  CRS. 038"T
2400  37°45.'N  72°15.1'W  SPD: 5 KTS  MTG 410  CRS. 038°T
0200  37°-52.8'N , 072°-07.1'W , Spd: 5.2  Mtg: 399  Crs: 049°T

      WED      12 January 00
0200  37°-52.8'N , 072°-07.1'W , Spd: 5.2  Mtg: 399  Crs: 049°T
0400  37°-59.7'N , 072°-07.1'W , Spd: 5.2  Mtg: 399  Crs: 049°T
0600  38°06.3'N  71°53.'W ,  Spd: 4.2  Mtg: 390  Crs: 043°T
0800  38°13.7'N  71°45.3'W  SPd: 4.5  MTG: 382  CRS: 043°T
1000  38°22.7.'N  71°35.4'W  SpD: 4.7, MTG: 372  CRS: 043°T
1200  38°31.6'N  71°24.7'W  SPD: 6 KTS  MTG: 360  CRS: 044"T
1400  38°41.7'N , 071°-15.8'W  Spd: 6.2  MTG: 348  CRS: 039"T
1600  38°52.2'N  071°05.4'W  Spd: 6.2  MTG: 336  Cmg: 038'T
1800  39°02.3'N  70°54.9'W  Spd: 6.6  Mtg: 323  Cmg: 025°T
2000  39°13.3'N  70°43.6'W  SPD 7.1  MTG: 310  CRS: 040°T
2200  39°24.6'N  70°31.6'W  SPD 6.5  MTG: 296  CRS: 040°T
2400  39°36.1'N  70°19.1'W  SPD: 7.5  MTG: 281  CRS: 040°T
      39°36.1'N  70°19.1'W  SPD: 7.5  MTG: 266  Cmg: 040°T

      THUR.    13 January 00
0200  39°-47.5'N , 070°-06.5'W , Spd: 7.8  mtg: 251  Cmg: 038°
0400  39°-59.6'N , 069°-53.7'W , Spd: 8.3  mtg: 235  Cmg: 042°
0600  40°12.'N  69°39.6'W  SPd: 8.2  MTG: 219  Cmg: 042°
0800  40°23.3'N  69°27.1'W  SPd: 8.3  MTG: 219  Cmg: 040°T

2000   41°14.9'N   70°56.2'W   Spd: 5.9   Mtg: 27, Cmg: 340°T

Friday          JANUARY  14  2000

0150   ANCHOR DOWN  ANCH AREA "D"  NORTH END  ½ mile from
WUA21 CAPE COD CONTROL TOWER – WAITING FOR STORM TO PASS
TO START TRANSIT THROUGH CANAL – W/ NNW WINDS 35·40
WIND CHILL TO -25°F BOAT DECKS ICED – SHUTDOWN START ANCHOR
WATCHES

1615   ANCHOR UP AND UNDERWAY FOR TRANSIT THRU
CAPE COD CANAL.

1900   REACH SEA BUOY IN CAPE COD BAY

1945   BAY OUT OF WIRE TO 1200 FT.

2000   41°52.6'N   70°27.2'W   Spd: 7.5, Mtg: 102, Cmg: 104°T

2205   42°01.'N   70°27.'W   Spd: 6   Mtg: 92.5  Cmg: 357°T

2400   42°11.27'N   70°27.95'W   Spd: 4/kts   Mtg: 8.3   Cmg: 358°T

Saturday        15  JANUARY  00
0100   Crossing Boston harbor traffic lanes · Mass Bay.
0200   42°-18.9'N,  070°-28.4'W,  Spd: 3.5, Mtg: 75.5 Cmg: 001
0400   42°-26.8'N,  070°-28.6'W,  Spd: 4.1, Mtg: 67.6 Cmg: 355?
0600   42°37.'N   70°29.4'W   Spd 5.6   Mtg: 58   Cmg: 356°T
       SEA SUBSIDE TO  4' TO 6'  PASS CAPE ANN
0715   KNOCKING FROZEN ICE OFF PILOT HOUSE WINDOWS
       WX WINDS  NW 22 KNOTS  OUTSIDE TEMP 13°F with wind
       chill to  -38°
0800   42°50.6'N   70°26.7'W   Spd: 7.8   Mtg: 44.3  Cmg: 007°T
1445   PASSED  PORTLAND MAINE  SEA BUOY
1620   ANCHOR DOWN  ANCH A

Sun.            16  JAN. 2000
0630   ANCHOR UP
0700   u/w  FOR MERRILL MARINE TERMINAL

6

FRI                    21 JAN  2000
0900 COMMENCE SHIFTING BARGE WEST ONTO
MAIN DOCK TO LOAD
1200 BARGE ALL FAST IN POSITION

SAT           22 JAN  2000

0800 STAND BY / DUE TO WX LOADING STOP
      LOADING CRANE MATS & HEAVY MACH.

SUN       23  JAN  2000

0800  STAND BY
2000  STAND BY

MON     24  JAN  2000

0800  STAND BY
2000  STAND BY

TUES    25  JAN  2000

0800 WINTER STORM "BARRY" APPROACHES
2000 8" SNOW FALL PORTLAND AREA

WED     26  JAN  2000

0800 START LOADING CRANE MATS
2000 STAND BY MERREC TERMANIL

THURS   27ᵗʰ JAN  2000

0800 STAND BY / LOADING ON BARGE COMMENCES

SAT          29th   JAN   2000

0800      LOADING   STARTS
1130      DISCONNECT TOWLINE / DEPART FOR WATER AT FISHING BOAT
          DOCKS EAST OF CASCO BAY BRIDGE
1700      WATER ON / PROCEED BACK TO BARGE
1820      LOADING FINISHED   START TIE DOWNS ON HEAVY MACH
2120      TIE DOWN FINISHED / DUE TO THE NATURE OF TIE DOWN CARE
          TO BE TAKEN TO AVOID EXCESSIVE WEATHER
          PREPARE BARGE FOR SEA / INSPECT NAV LIGHTS, STORE LINES,
          DEPLOY EMER FLOAT LINE
2130      SINGLE UP LINES, NOFITY PILOT READY FOR DEPARTURE AT 2200
2200      UNDERWAY FROM MERRIL TERMANIC ASSIST TUG
          FOURNAIR BOYS TAILING ASTERN.
2245      CLEAR CASCO BAY BRIDGE
2310      PILOT AND TUG CLEAR / CREW BACK ON TUG
2315      PASS SPRING POINT


SUN          30th   JAN   2000   UNDERWAY FOR CAPE CANAVERL, FL

0815      PASS WEST COD LEDGE
0835      CABLE TO 1175' CRS FOR CAPE COD CANAL
0830      PASS CAPE ANN
1545      APPROACH EAST ENT CAPE COD CANAL
1615      INSIDE BREAK WATER
1730      CLEAR BOUANE BRIDGE
1800      ANCHOR DOWN NORTH END ANCH. AREA "D" DUE TO
          STRONG LOW PRESSUE OFF EAST COAST


MON   31st JAN 2000 ANCH DOWN BUZZARDS BAY, MASS

0800      STAND BY WAITING ON WX TO SUBSIDE
          WX SE WINDS 35-40 KNOTS
2000      STAND BY WITH WEST WINDS 22 K

8

WED    2ⁿᵈ FEB 2000 ANCH. BUZZARDS BAY, MASS

0800    STAND BY while strong NW winds approach.
2010    START MAIN ENG. Prepare to raise anchor
     winds subside to 20-25 knots NW seas 5-8'
2120    ANCHOR UP /UNDERWAY
2150    PASS CLEVELAND LEDGE B

THURS    3 FEB 00 UNDERWAY FOR CAPE CANAVERL, FL

0200    Buoys 5 & 6 outbound Buzzards Bay.
0400    41°-21.8'N , 071°-06.8'W
0600    41°15'N, 71°15.3'W  SPD: 6.3  CRS 220°T
0800    41°05.3'N  71°27.'W  Spd: 6.1  CRS 229°T
1000    40°57.6'N  71°39.'W  SPD: 6.5 KTS  CMG: 223°T
1200    40°46.8'N  71°50.6'W  SPD: 7.KTS  CMG: 223°T
1400    40°-35.3'N , 072°-04.1'W  Spd: 7.8 kts  CMG: 220°T
1600    40°-24.0'N , 072°-17.8'W  Spd: 7.7 kts  CMG: 218°T
     WX WINDS WSW 12 k  SEAS SLIGHT  SKIES OVERCAST
1825    40°10.5'N  72°33.9'W  CRS: 220°T  SPD 7.5 K
2200    39°49'N  72°53.9'W  CRS: 209°T  SPD: 7.1 KTS
2400    39°36.75'N  73°02.6'  CRS: 209°T  SPD: 7.1 KTS

FRI.    4 FEB 00 BOUND FOR CAPE CANAVERL, FL
0200    39°-24.2'N , 073°11.8'W.  Spd: 7.4 kts  Crs: 211°T
     wind - 3 kts NE  Sea : 1-2 Ft Ground Swell, MTG: 143
0400    39°-11.4'N, 073°-20.2'W  Spd: 7.4  Cmg: 214°T
0800    38°44.5'N  73°37.5'W  SPD: 7.2 k  Crs 199°T
     WX WINDS NW 13k , SEAS TO 2', SW SWELL TO 4', SKIES CLOUDY
     MTG CAPE SANAVERS 740
1000    38°32.2'N  73°43'W  SPD: 7.5 KTS  CRS: 200°T
1200    38°17.65'N  73°50'W  SPD: 7.7  CRS: 200°T
1400    38°-03.3'N , 073°-56.8  Spd: 7.7,  Crs: 200°T

Towing Loaded barge Atlantic Bridge

SAT.                5 FEB 00

0200   36° - 33.7'N, 074° - 36.9'W  Spd : 8.2 , Crs. 200°T, MTG. 607 NM
Wind - SE - 18 kts , Following Sea 1-2 Ft.

0400   36° - 19.7'N , 074° 42.8'W , Spd: 8.5 , Crs. 199°T, MTG. 592 NM

0600   36° 03.8'N   74° 49.7'W     SPD: 8.2    CRS 199°T

0800   35° 48.6'N   74° 56.3'W     SPD: 8.2    CRS. 199°T   MTG 560
Wx  Winds  NW  22 knots   SEAS TO 5' SKIES PARTLY CLOUDY

1000   35° 34.'N   75° 01.9'W   SPD: 8. KTS   CMG: 196°T   MTG: 545

1200   35° 18.2'N   75° 07.6'W   SPD: 8.3 KTS   CMG: 196°T   MTG: 528

1255   WPT#51  Diamond Shoal  35° - 41.1'N, 075° - 10.0'W

1400   35° - 05.3'N, 075° - 17.1'W, Spd: 6.7 , Crs: 217°T   M.tg: 513

1600   34° - 55.9'N, 075° - 28.8'W, Spd: 7.8 , Crs. 227°T   M+g: 516

2000   34° 36.4'N   75° 56.2'W   SPD: 7.5   CRS: 229°T   MTG: 486 N.M.

2200   34° 26.'N   76° 10.5'W   SPD: 7.8   CRS: 229°T   MTG: 471 N.M.

2400   34° 16.'N   76° 24.4'W   SPD: 7.8   CRS: 225°T   MTG: 455


SUN               6 FEB 00

PORTLAND MAINE TO CAPE CANAVERAL FL.

0200   34° - 06.2'N, 076° - 36.4'W , Spd - 7.2 , Crs - 226°T, MTG: 442
Wind: NE - 20 kts , Sea - 2-3 Ft, Visibility - good

0400   33° - 55.8'N, 076° - 48.9'W , Spd. 7.5 , Crs - 224°T , M.g. 427

0600   33° 45.5'N   77° 01.5'W   SPD: 7.2 K   CRS 225°T

0800   33° 35.6'N   77° 12.8'W   SPD: 7.2   CRS: 225°T   MTG: 398
WX  WEST WINDS  18K   SEAS 3'   SKIES MOS LY CLEAR

1000   33° 25.6'N   77° 24.9'W   SPD: 7.2   CRS: 225°T   MTG: 384

1200   33° 17.3'N   77° 39.4'W   SPD: 7.7   CRS: 240°T   MTG: 369

1400   33° 09.1'N, 077° 55.8'W   Spd: 8.1   Crs: 239°T   M+g: 353

1600   33° 01.2'N, 078° 12.5'W   Spd: 8.0   Crs: 244°T   M+g: 337

1825   32° 51.4'N   78° 32.1'W   Spd 7.5   CRS: 240°T   MTG 318

2000   32° 45.0'N   78° 44.0'W   Spd 7.7   CRS: 239°T   MTG 306
WX: WINDS SW 6 knots , SEAS SLIGHT , SOUTH CAROLINA COAST

2200   32° 37.6'N   78° 59.'W   SPD: 7.5   CRS: 241°T   MTG: 291

2400   32° 29.65'N   79° 13.4'W   SPD: 7.5   CRS:   MTG: 277

**10**

CSUPDF-review-festval-here!

MON

## 7 FEB 2000

### PORTLAND MAINE TO CAPE CANAVERAL FL

| | | | | |
|---|---|---|---|---|
| 1200 | 31°30.5'N 80°16.4'W | SPD: 7.9 | CMG: 201°T | MTG: 189 |
| 1400 | 31°-05.6'N, 080°28.2'W | Spd: 8.1 | Crs: 208°T | mtg: 173 |
| 1600 | 30°-50.7'N, 080°30.3'W | Spd: 8.3 | Crs: 201°T | mtg: 157 |
| 2000 | 30°20.9'N 80°33.9'W | SPD: 7.1 | Crs: 173°T | |

WX WINDS NW 4 knots, seas calm

| | | | | |
|---|---|---|---|---|
| 2200 | 30°07.3'N 80°32.'W | SPD: 7 KTS. | CMG: 173°T | MTG: 112 |
| 2400 | 29°52.5'N 80°29.7'W | SPD: 7.5 KTS | CMG: 173°T | MTG: 98 |

TUE

## 8 FEB 2000

### PORTLAND MAINE TO CAPE CANAVERAL FL

| | | | | |
|---|---|---|---|---|
| 0200 | 29°-37.2'N, 080°-27.6'W | Spd: 7.8 | Crs: 173 | mtg: 82.2 |
| 0400 | 29°-21.4'N, 080°-25.2'W | Spd: 7.8 | Crs: 170 | mtg: 66.4 |
| 0610 | 29°04.7'N 80°23.1'W | Spd: 7.6 kts | Crs 173°T | |

WX - WINDS CALM, SEAS CALM

| | | | | |
|---|---|---|---|---|
| 0800 | 28°50.65'N 80°21.2'W | SPD: 7.5 | CMG: 173°T | MTG: 35.5 |
| 1000 | 28°36.4'N 80°20.'W | SPD: 7.1 | CMG: 199°T | MTG: 19.4 |
| 1203 | 28°24.05'N 80°24.7'W | SPD: 7.4 | | MTG: 9.5 |

1340  BARGE ATLANTIC BRIDGE ON H/P AT CANAVERAL
BOUY 9&10 ↑ U/W FOR BERTH N. 3

1500  All FAST / SHIPYARD CREW WAITING ON DOCK. Allen Bloom, Terry Nanch

1530  CARGO OPS COMMENCE

WED

## 9 FEB 2000 Port CANAVERAL, FL

0800  CARGO OPERATIONS / UNLOADING ATLANTA BRIDGE

1000  OVERHAULING FWD GEN SET WITH NEW PISTONS, LINERS, AND
MAIN BEARINGS

THU

## 10 FEB 2000 Port CANAVERAL DOCK, FL

11 FEB 2000 UNDERWAY FOR JAX, FL
Towing DECK BARGE Atlanta Bridge Empty

| | | | | | |
|---|---|---|---|---|---|
| 1600 | U/W O/BOUND FROM PORT CANAVERAL | | | | |
| 1800 | 28°28.3'N | 80°23.1'W | SPD: 9 KTS | CRS: 019° | MTG: 128 |
| 1915 | PASS HETZEL SHOAL | | | | |
| 2000 | 28°45.8'N | 80°23.1'W | SPD: 10 KTS | CRS: 334°T | MTG: 109 |
| 2200 | 29°03.2'N | 80°33.5'W | SPD: 10 KTS | CRS: 334°T | MTG: 89 |
| 2400 | 29.22.2'N | 80°43.8'W | SPD: 9.9 KTS | CRS: 334°T | MTG: 69 |

SAT.      12  FEB  2000  CAPE CANAV. TO JAX.

| | | | | | |
|---|---|---|---|---|---|
| 0200. | 29°-37.4'N, | 080°-52.5'W | Spd: 9.8 | Crs: 331°T | mtg: 51.4 |
| 0400 | 29°-53.2'N, | 081°-01.7'W | Spd: 8.8 | Crs: 335°T | mtg: 33.7 |
| 1540 | ALL MAN HOLD COVER OFF, BARGE ATLANTA BRIDGE | | | | |
| 1610 | UNDERWAY FOR GREEN COVE SPRINGS ; SMITH MARITIME SHIPYARD | | | | |
| 2000 | ALL FAST BULKHEAD / SHUTDOWN | | | | |

13. FEB      TO   APRIL 1ST
STAND BY SHIPYARD

APRIL 1ST 2000

| | |
|---|---|
| 1600 | PREPARE TUG FOR SEA : M/V "SEABOARD STAR" DISABLED OFF MELBOURNE, FL |
| 2115 | LINES OFF OUTBOUND ST. JOHN'S RIVER |
| 2345 | CLEAR BRIDGES |

APRIL 2ND 2000

| | | | |
|---|---|---|---|
| 0305 | CLEAR ST JOHN'S RIVER / SET CRS: FOR SHIP | | |
| 0800 | 29°40'N | 80°56'W | SPD 10.5 Kts. CRS |
| 1000 | 29°21.9'N | 80°43.5'W | SPD 11.1 Kts |
| 1035 | TALK TO SHIP'S CAPTAIN VIA SSB | | |
| 1625 | ARRIVE ON SCENE AT POSITION 28°29'N 080°21'W | | |

12

April 2ND 2000 Towing Disabled Ship SEABOARD STAR

| 2030 | Engines To 900 RPM |
| 2045 | Norman pins up / CRS SET To WPT 27°30.0'N 079°59.0'W |
| | CRS To STEER 170° True SPD: 6.3 kts / ALL OK |
| | WX WINDS EAST 20 knots / SEAS To 7' |
| 2200 | 28°19.7'N 80°07.5'W SPD: 6.7 CRS: 170°T |
| 8400 | 22°07.5'N 80°05.2'W SPD: 6.2 CRS: 170°T |
| | ADJUST CLOCKS AHEAD 1 HOUR FOR DAYLIGHT SAVINGS |

April 3RD 2000 Towing ship "SEABORD STAR"
Bound For Miami, Florida

| 0200 | 28°00.5'N 080°04.3'W SPD: 6.4 kts CRS: 171°T |
| 0400 | 27°48.7'N 080°01.4'W SPD: 6.1 kts CRS: 170°T |
| 0600 | 27°36.5'N 79°59.4'W SPD: 6.0 kts CRS: 171°T |
| 0800 | 27°24.7'N 79°58.1'W SPD 5.5 kts CRS: 179°T |
| 1000 | 27°13.8'N 79°58.1'W SPD 6.3 kts CRS: 179°5 |
| 1200 | 27°03.4'N 79°57.7'W SPD 4.8 kts. CRS: 180°5 |
| 1310 | SLOW To 730 RPM Miami PILOTS INFORM Channel clew |
| | at 0900 April 4th 2000 ADJUST SPEED To 3.8 knots Avg |
| | FOR ARRIVAL AT 0900 MIAMI SEA BUOY |
| 1400 | 26°55.2'N 079°57.7'W SPD: 3.9 kts CRS: 180°T |
| 1600 | 26°48.2'N 079°57.7'W SPD: 3.6 kts CRS: 176°T. |
| 1800 | 26°40.1'N 79°57.9'W SPD: 4 kts, CRS: 183°T |
| 2000 | 26°34.3'N 79°58.4'W SPD 3.9 kts, CRS 183°T |
| 2200 | 26°27.4'N 79°59.2'W SPD 4 kts, CRS: 184°T |
| 2400 | 26°20.4'N 80°00'W SPD 3.5 kts, CRS 184°T |

April 4th 2000 Towing ship "SEABOARD STAG"
Bound For Miami, Florida

| 0200 | 26°13.4'N 20°02.2'W SPD: 3.8 CRS: 198°T |
| 0400 | 26°05.4'N 80°03.4'W SPD: 3.9 CRS: 182 |
| 0600 | 25°57.5'N 80°03.9'W SPD: 4.2 CRS: 180 |

13

April 4ᵗʰ conᵗ.

| | |
|---|---|
| 1030 | ENTER MIAMI SETTYS |
| 1055 | ENTER SOUTH CHANNEL |
| 1130 | MANEUVERS TO DOCK |
| 1200 | TOW BRIDLES OFF / SHIP SECURE |
| 1230 | PROCEED TO WEST END DODGE ISLAND |
| 1245 | ALL SECURE / SHUTDOWN MAINS |
| 1645 | UNDERWAY FROM DOCK BOUND FOR PORT CANAVERAL |
| 1705 | CLEAR BOUYS |
| 2000 | 26°21.1'N  79°59.8'W  SPD 12.2 KTS  CRS 006 |
| 2200 | 26°45.7'N  79°57.2'W  SPD 12.4 KTS  CRS 006 |
| 0124 | 27°22.1'N  80°07.2'W  SPD 10 KS, CRS 008 |

FRI APRIL 21 2000

| | |
|---|---|
| 1315 | UNDER WAY FROM GREEN COVE SPRING FROM FOR SAVANNAH. ENTRANCE TO PICK UP DREDGE LININGS AND DECK BARGE |
| 2040 | 30°41.0 N  81°14.0 W  COG 19  SOG 7.7 |

SAT APRIL 22

| | |
|---|---|
| 2:05 | 31°04.5 N  _____ W  _____ _____ 7.2 |
| 2240 | 31°__.6 N  80°__.7  SOG 13  SOG 6.1 |
| 2400 | 31°28.2 N  80°53.4 W  COG 15  SOG 6.2 |
| 2600 | 81°40.0 N  80°51.5 W  SPD 6.2 KTS, MTG 17, CRS 016°T |
| 0930 | HOOK DOWN WAITING FOR DREDGE LININGS TO BE POWER TOWED TO US NOT ENOUGH WATER |
| 1130 | RAISE HOOK W/ TO DREDGE PICK ANCHOR WATER WAY TO CHARLESTON |

Z W

14

10:30 - Start Eng 11:00 u/way
14 00 finish Ø drydocking. Delivers
of Oysters

15 3/4 Hrs.

3:15    JOB FOR GREAT LAKES —
APRIL 26, 00 WED
0730    GO TO GET FUEL
0830    START FUELING TIE UP
10:45   FUEL DONE!! 35,000 GAL.
11:15   TIE BACK UP TO SHIPYARD CREEK DOCK

APRIL 27 THUR

0600    DEPART EDDIES AT SHIPYARD CREEK
0       ROUND FOR TUG BREAK OF DAWN TO ASSIST
0930    AT ASSIST WP.
1000    TIE UP TO BREAK OF DAWN NO ANCHOR
1030    START LET THINGS SETTLE START PUMP
1400    FINISH WITH PUMP
1415    UNTIE FROM TUG BREAK OF DAWN.
1420    STAND BY FOR BARGE SWAP ASSIST
        FRONT BARGE GOING AFT, AFT GOING FWD
1445    FINISH SWAP HEADING BACK TOWARDS CHARLESTON
1830.   TIE UP AT SHIPYARD CREEK

SAT APRIL 29 2:00

1230    DEPART SHIPCREEK C.HARLESTON, SC. TOWARDS
        JACKSONVILLE FL
1400    CLEAR CHARLESTON SEA BOUY HEADING TOWARDS JACKSON
1800    32 12.3 N   50° 05.3 W   SOG 8.6 COG 215

5/8 — Sun [?]
Mon [?]

Mon — Hook up + Tow barge [?] Loading Skou for
Corp Lakes towards Charleston S.C.
2300 — AT ST Johns SB [?] towards Charleston

0800 — 30°38'? N 8°06.5'? [?] 006-55
0815 — 31 10 X 80 40   6 Kts   103 mi to Buoy
1200 — 31°30.0 N 8 29.3 [?] 5.8 006 030

TUES MAY 30

0844 — 32°34.5 N 79°49.9 W 006 022 80-3.6
Charleston Jetty 2.5 mi
[?] — [?]
[?] — [?] Anytime [?]
[?] O?

1700 — [?] [?] [?] [?] [?] NE ST

WED [?]

[?]
0700 — 31 [?] 81 [?]

1055 — Outside jetties [?] [?]
[?] — Tie up [?] [?]

21 June — 184 [?]
22:40 Tie up at ST [?]

16

Jun. 23rd

12h 50  undock from City Dock Marina, St Augustine bound fr
        Miami, Tampa (?)
20h 05  29° 06.5'N, 80° 40'W, or 12 nm  N by E off Ponce de Leon,
        skies overcast, drizzle, wind variable, light
2130    28° 56.8'N, 080° 34.8'W  7.4 KT on  ctr engine @ 800RPM, PtsEng. Shutdown
2400    28° 40.7'N, 080° 24.5' - Skies clearing, vis 10mi.  Sp 7.5KT

Jun. 24th

04h 00  28° 13.5'N, 80° 14.5 W, spd: 7.6 kts,
06 10   27° 58'N, 80. 12, W, spd: 7.2 ", cog: 170°
0900    26° 36.7'N, 080° 08.2'W  increase turns to 840 - making
           8 kts  on ctr eng alone
12 05   27° 13.4N, 80° 03.5 W, cog: 170°, spd: 7.4 kts, RPM 840 C. Eng.
15 00   26° 54' N, 80 00.8 W, cog: 172, "  6.6 kts, "  840 "
16 00   26° 48'N, 80 00 W, " 173  " 5.7 "  RPM 840 "
        or about 2 nm NE of F. Worth Jul.
18 00   26 38.2 N, 80° 01 W
20 00   26° 27.1'N, 080° 02.3'W
22 00   26° 12.6'N, 080° 04.5 W   Sp. 7.5 KT
2400    25° 56.3'N, 080° 05.0'W

June 25th

0130    off. Miami Sea Buoy, inbound for Dodge Island
0230    Alongside at NW corner of Dodge Island
0315    Andy & Suplies aboard, underway for the
        Gulf of Mexico
0400    Depart Miami Sea Buoy
0530    1.25 nm E of Fowey Rks, sog: 6.5 kts, cog 180°-185°
        Wx fine, mostly clear, except to the N, wind SSE 10 kts, depth 320ft
        on 1 Eng (Ctr) at 845 RPM
0900    the Elbow abeam 1.25 miles
1400    Pos. L 24° 48.3'N ʌ 080° 40.0'W   making 7KT on ctr eng @ 800

June 26ᵗʰ

| | |
|---|---|
| 0100 | Leave N.W. Channel, Entered Gulf of Mexico, Bound for Tampa. |
| 02.00 | 24°46.2 N, 81°54.8 W or 3.4 nm N of Smith Shoal skies overcast, scattered showers + thunderstorms, wind NNE 10 Ks |
| 0400 | 24°59.7' N  81°59.5' W |
| 0800 | Pos L 25°27.0'N, λ 082°09.0'W  Sp. 7.5 KT  course 343° T |
| 1000 | Pos L 25°41.0'N, λ 082°14.3'W |
| 1200 | Pos L 25°56' N, λ 082°19.5'W  "  " |
| 1800 | 26°38.8 N, 82°33.8 W or aprx 13 nm W of Boca Grande Seaboy sog: 7.4 Kts, cog 339, Ctr Eng only at 770 RPM |
| 20 00 | 26°52'3 N, 82°39'1 W, sog: 7.3 Kts, cog: 344° Wx fine, skies mostly overcast, cirrostratus, wind E-S 9 Kts |

June 27ᵗʰ

| | |
|---|---|
| 0200 | Entered SW Channel, Tampa Bay at "L" |
| 0730 | Made fast alongside m/v Bluenose at Berth 206, East Bay, Tampa. |
| | — Spent Day Rigging Bluenose for Towing. |

June 28ᵗʰ

| | |
|---|---|
| 0930 | Tug Shannon arrives to assist, Pilot on Board (Frank) |
| 0955 | Underway with m/v Bluenose in tow, Tug Shannon assisting as Tail Boat |
| 1015 | Strong Cross Current Set m/v Bluenose Down on Buoy "5" at Port Sutton despite efforts of Tug Shannon, obstructions near the stern of The Bluenose made contact with the Buoy and dragged it off station. The |

# Jun. 29th

18

| Time | Entry |
|---|---|
| 06 00 | 27° 01.2 N, 84° 24.8 W, sog: 6.4 kts, cog: 246°, RPM 880 |
| 08 00 | 26° 56.2 N, 84 37.2 W, " "  " "  " |
| 18 00 | 26° 37.8 N, 85° 23.4 W, sog 5.1 kts, cog: 246° RPM 880 |
| 20 00 | 26° 32.8 N, 85° 34' W, " 5.5 " " 246°, " " |

wx Fine, skies mostly clear, wind W 6 kts, Bar 30.18 inch.

| 2400 | 26° 23' N, 085° 57' W |

## Jun 30th

| 06 00 | 26° 12.2 N, 86° 21.8 W, sog: 4.1 kts, cog: 245° |
|  | on Stb eng + Pt engine at 569 + 875 RPM respectively |
| 08 00 | 26° 08.8 N, 86° 30.1 W, sog: 4.2 kts, cog: 244° |

wx Fine, skies mostly clear, wind SE 7 kts, Bar: 30.14 inch.

| 20 00 | 25° 46.6 N, 87° 19 W, sog: 5.6 kts, cog: 245°, Pt Eng - 876, Stb Eng 567 " |

wx fine, skies mostly clear, wind WNW 3 kts, Bar 30.20 inch.

| 2200 | L 25° 41' N, λ 087° 32' W   making 6 kts on P&S Eng Cyl Eng Down |
| 2400 | L 25° 36' N, λ 087° 43' W   Course 244° T   Sp. 6.5 kt |

## Jul. 1st

| 04 00 | 25° 25.2 N, 88° 09.8 W, sog: 6.2 kts, cog: 243° RPM 876 + 560 |
| 08 00 | 25 15.4 N, 88° 33' W, sog: 5.6 kts, cog: 244° " " " |

wx Fine, skies mostly clear, wind calm, Bar: 30.18 inch.

MTG - 540   ETA 7/5/1200

| 1200 | POS L 25° 05' N, λ 088° 54' W   Course 243° T, Speed 5.4 kt |
| 20 00 | 24° 47.9 N, 89° 32.2 W, sog: 5 kts, cog: 244°, mtg: 480, 1 eng 892 RPM |

wx fine, skies mostly clear, wind WSW 2 kts, Bar: 30.20 inch.

| 2200 | STBD ENG ON LINE. MAKING 6.5 kt @ 825 RPM   P&S ENG's |
| 2400 | POS: L 24° 33.5' N, λ 089° 55.1 W   Sp. 6.5 kt   Course 243° T |

## Jul 2nd

| 06 00 | 24° 18.4 N, 90° 36' W, spd: 6.8 kts, cog: 243°, mtg: 414, RPM 825 Stb + |
| 08 00 | 24° 12.2 N, 90 48.7 W, " 6.7 kts, " 243 " 401, " " " " |

wx Fine, skies mostly clear, wind SE 8 kts, seas 2 ', Bar 30.14 inch.

## Jul. 3 rd

06:10   23° 12' N , 92° 52.3 W , sog: 6 Kts, cog: 242° RPMs Std. + PP 802
PP eng. on line again after being down for ½ hr for exchange of fuelpumps

0800   23° 07' N , 93° 03.8 W , sog: 6.5 Kts, mtg: 261, cog: 243°, Bar: 30.14
RPM 802, PP + Std., wx fine, skies mostly clear, wind ESE 14 Kts

       22° 32.2 N , 94° 13.4 W , sog: 6.1 Kts, cog: 241°, RPM 740
       mtg: 188, wx fine, skies half clear, wind E-S 14 kts, seas 3ft.
1000   Pos L 23° 01.0'N λ 093° 16' w
1400   Pos. L 22° 50.1'N λ 093° 38.7' w
2400   Pos L 22° 20'N λ 094° 36' w   Sp. 6 KT   Course 241° T

## Tue   Jul. 4 th

0800   21° 56' N, 95° 24' W, sog: 6.4 Kts, cog: 241°, mtg: 113, RPM 740
       wx fine, skies mostly clear, wind E-S 14 Kts, Bar: 30.11 inch.
       MTG 113        ETA 7/5/0800 Local Time
1200c  21° 46' N , 095° 45' w   Reduce Sp. to 5 KT, Course 240° T
20 00  21° 27.9' N, 96° 17.1 W, sog: 4.4, cog: 240°, RPM 635, mtg: 57
2400   L 21° 17'N , λ 096° 36' w   Making turns for 5 kts   Course 241° T

## Wed   Jul. 5 th

0805 R (0805 CDT)   Pilot Aboard
0945   (0845 Local)   Enter Tuxpan River
1200   (1100 Local)   M/v Bluenose all fast at Demeresa Yard, Tuxpan
1250   (1150 Local)   Cleared Customs, stby at Demeresa
2205   (2105 Local)   Pilot Aboard , underway for Brownsville, T,
2300   (2200 Local)   Pilot off at Jetties , Tuxpan River ent.
2400   Pos. L 21° 06'N , λ 097° 11'w   Course 031° T , Sp. 10 KT

## Thu   Jul. 6 th

08:00   22° 20' N , 97° 00.3 W , sog: 9.1 Kts, cog: 359°, mtg: 222 , RPM 830
        wx fine, half cloudy, wind ESE 10 kts, Bar: 30.08 inch.

20

FRI        JULY 7⁰ᵗ

1400       FINISHED  TAKING  BUNKERS
1800-1900  MAKE UP TO  BARGE "AMT TRANSPORTER  - STBY
           AT PORT  ISABEL  BANANA DOCK


SAT        JULY 8ᵗᴴ

0630 (CDT) PILOT  aboard,  ASSIST TUGS "RANGER" & DEFENDER
           STANDING BY
0645 (CDT) UNDERWAY  FROM  PORT ISABEL   WITH BARGE "AMT TRANSPORTER"
           IN TOW ASTERN - TUGS "RANGER" & DEFENDER  ASSISTING
0825 (CDT) PILOT DISEMBARKED, ASSIST TUGS RELEASED, EMERG. LINE STREAMED
0900 (1000 EDT) - TOOK DEPARTURE FROM "BS" BUOY WITH TOW
           1100' ASTERN.  COURSE 080°,  Sp. 6KT - WX FINE

1800       26° 11.8 N, 95° 18 W, sog: 4.6 Kts, cog: 80° mtg: 717 nm, RPM 876 Portly
           wx fine, skies mostly clear, wind NE 13 Kts, Bar 30.16 inch.
20 00      26° 13.1 N, 96° 08 W, sog: 4.5 Kts, cog: 80°, RPM 881 on Pt eng. only


Sun        Jul 9ᵗʰ

08ʰ00      26° 22.5 N, 95° 04' W, sog: 5.1 Kts, cog: 81° mtg: 650, RPM: Stb 510, Pt 882
           wx fine, skies mostly clear, wind ESE 12 Kts, Bar 30.14 inch
18 00      26° 28.8 N, 94° 19.7 W, sog: 5 Kts, cog: 81°, mtg: 608 nm, RPM 877, Pt eng. only
18 15      Stb. eng. on line again at 520 RPM, sog: 5.6 Kts
20 00      26° 30.6 N, 94° 07.4 W, sog: 5.9 Kts, cog: 81°, mtg: 598, RPM: Stb. 635, Pt 876
           wx fine, skies mostly clear, wind SE 13 Kts, seas 3 ft, Bar: 30.20 inch.


Mon        Jul 10ᵗʰ

06ʰ00      26° 38.2 N, 93° 06.8 W, sog: 5.4 Kts, cog: 82°, mtg: 544, RPM: Stb 635, Pt 873
08 00      26° 40.2 N, 92° 55.2 W, sog: 5.5 Kts, cog: 82° mtg: 533,

Tue        Jul 11th

06h00    26° 56.9' N, 90° 48' W, sog: 5.5 kts, cog: 82°, mtg: 413, RPM Stbd 625
.0800    26° 58' N, 90° 35.6' W, sog: 5.6 kts, " " " 407        P 880
         wx fine, skies clear, wind calm, swell 1ft, Bar. 30.20 inch.
18 00    27° 03.5' N, 89° 32' W, sog: 5.8 kts, cog: 83°, mtg: 350, RPM; Stbd 645, P 882
20 00    27° 05' N, 89° 19.5' W, sog 5.8 kts, cog: 83°, mtg: 339, " " " "
         Wx fine, skies mostly clear with some small showers, wind ENE 7kts, Bar: 30.19 inch.

Wed        Jul 12th

06h00    27° 11.2' N, 88° 20.7' W, sog: 5.5 kts, cog: 83°, mtg: 286
0800     27° 12' N, 88° 08.9' W, " " " " 275
         Wx fine, skies clear, wind W·N 6 kts, Bar. 30.19 inch.
1835     encounter mex. fishing skiff-type drifting upside down, of fiberglass, circa 18 ft long
         pos: 27° 18.3' N, 87° 02.3' W.        └ with 2 large holes in bottom
20 00    27° 18.8' N, 86° 54.7' W, sog: 5.3 kts, cog: 83°, mtg: 209.
         Wx fine, skies clear, wind variable, mostly calm, Bar: 30.20 inch.
2400     Pos  └ 27° 21' N, 086° 31' W      Speed 5.3 kt, Course 085° T

Thur       Jul 13th

08h00    27° 24.6' N, 85° 41.2' W, sog: 5.7 kts, cog: 85°, mtg: 143
         Wx fine, skies mostly clear, wind W 10 kts, Bar. 30.18 inch.
18 00    27° 29.6' N, 84° 32.3' W, sog: 6.2 kts, cog: 86°, mtg: 52 ~~~ Bar. 30.20
         Wx fine, skies clear, wind W-ly 5 kts, swell 2ft
20 00    27° 30.6' N, 84° 17.7' W, sog: 6.6 kts, cog: 86°, mtg: 69

Fri.       Jul 14th

06h00    3.5 nm W of seaboy (Tampa), skies mostly clear, wind W 11kts, sea to 2 ft.
06 45    shortened tow to 620 ft of wire + bridles -
0830     Pilot Aboard
1600     Docked at berth 265 Ybor City
1805     Moored in front of Tug "Valiant" in Ybor Channel
         STBY.

22

<u>Friday</u>
<u>21 July 2000</u>

0001   STby @ Int'l Ship Repair Tampa, Fla
2400   ~~sbby~~ as above.

<u>Saturday</u>
<u>22 July 2000</u>

0001   ~~stby~~ @ Int'l Ship Repair Tampa, Fla.
2400   ~~stby~~ as above

<u>Sunday</u>
<u>23 July 2000</u>

0001   ~~stby~~ @ Int'l Ship Repair Tampa, Fla.
2400   ~~stby~~ as above

<u>Monday</u>
<u>24 July 2000</u>

0001   ~~stby~~ @ Int'l Ship Repair Tampa Fla.
2400   ~~stby~~ as above

<u>Tuesday</u>
<u>25 July 2000</u>

0001   ~~stby~~ @ Int'l Ship Repair Tampa, Fla.
0940   let go, conduct maneuvering trials
      in East Bay
1040   made fast alongside Int'l Ship
      Repair, conduct test & inspections as
      per USCG UTV circular Rev III, page
      8:
✓ - steering control, links, rudder &, &
✓ - ass. components
✓ - installed nav. equip

23

Wednesday
26 July 2000

| | |
|---|---|
| 0001 | stay @ Int'l Ship Repair Tampa, Fla. |
| 0940 | Fire Safety personnel aboard to inspect fire supression systems |
| 1415 | fire equipment compliance certificate # TPA-222/7573 issued to vessel |
| 2400 | stay @ berth |

Thursday
27 July 2000

| | |
|---|---|
| 0001 | stay @ Int'l Ship Repair Tampa, Fla. |
| 1340 | let go, u/w to Misener Marine |
| 1715 | all secure @ Misener Marine |
| 2400 | stay as above |

Friday
28 July 2000

| | |
|---|---|
| 0001 | stay @ Misener Marine in Tampa, Fla. |
| 0915 | let go, u/w to assist the "E-III" |
| 0950 | barge all secure, back to the dock |
| 1035 | all secure @ Misener slip |
| 2400 | stay as above    JEFF KEITH    ON |

Saturday
29 July 2000

| | |
|---|---|
| 0001 | stay @ Misener Marine Tampa, Fla. |

34

CutePDF · www.twstco.com

TUESDAY
AUGUST 1, 2000

| | |
|---|---|
| 0950 | u/w TO SHIFT AMBROSE BARGE AT HARDAWAY CEMENT CO. |
| 1020 | ON STATION |
| 1055 | All FAST ON HIP, MIESNER STILL LOADING ELSBETH III & BAYOU BANDIT TO ASSIST |
| 1145 | COMMENCE SHIFT |
| 1220 | AMBROSE TURNED 180° All FAST - ST. BY TO ASSIST BAYOU BANDIT |
| 1330 | BARGE SHIFT COMPLETE |
| 1348 | All FAST MEISNER MARINE |
| 1625 | U/w TO ASSIST BAYOU BANDIT |
| 1640 | ON STATION |
| 1645 | START BARGE SHIFTS |
| 1710 | SHIFT COMPLETE & RETURN TO MIESNER YARD |
| 1730 | All FAST MIESNER YARD |

WEDNESDAY
AUGUST 2, 2000

| | |
|---|---|
| 1640 | u/w LIGHT BOAT FOR CAPE CANAVERAL 😊 |
| 1850 | CLEARED SKYWAY BRIDGE |
| 1940 | PASSED SW CHANNEL S/B TAMPA |
| 2200 | 27°12.4'N, 82°42.3'W, sog: 9.5 Kts, cog: 163° RPMs 760 |
| 2400 | 26°54.2'N, 82°36.4'W, sog: 9.7 Kts, cog: 164°, " " |

THURSDAY
3 AUGUST 2000

25

THURSDAY
3 AUGUST 2000

2000  24°32.6´N    081°08.2´W   SPD: 9.7 KTS.     MTG: 279
22ʰ00  24°42.3 N , 80°46.7 W, sog: 11.1 Kts, cog: 62°, mtg: 257
       24°52.3 N , 80 26.1 W, sog: 10 Kts, cog: 62°, mtg: 236

FRIDAY
4 AUGUST 2000

0200  25°03.25´N    080°07.25´W
0400  25°13.2´N     079°58.4´W    SPD: 11.7 KTS   MTG: 194 NM
0600  25°47.4´N     079°52.6´W    SPD: 12.4       MTG: 169
0800  26°13.3´N     079°49.3´W    SPD: 13. KTS    MTG: 143 N.M.
10ʰ02  26°40.4 N, 79°45.4 W, cog: 6°, cog: sog: 13.7, mtg: 115
12 08  27 06.5 N, 79 46  W, cog: 232°, sog: 13 Kts, mtg: 89
1400  27°27.4´N   079°59.8´W    SPD: 10.5        MTG: 63.7
1600  27°44.25´N   080°10.9´W    SPD: 9.5         MTG: 45.8
1800  28°01.8´N    080°20.5´W    SPD: 9.9         MTG: 25.9
2020  ENTERED  BOUYS 3&4 CANAVERAL  SHIP CHANNEL
2120  All FAST  BEYEL BROS. YARD. CAPE CANAVERAL

SATURDAY
5 AUGUST 2000

All SECURE - SHIPBOARD  MAINT. PERFORMED

SUNDAY
6 AUGUST 2000
All SECURE  AS  BEFORE

MONDAY
7 AUGUST 2000

Case 1:01-cv-00048    Document 43    Filed in TXSD on 08/17/2001    Page 224 of 338

26

WENSDAY
9 AUGUST 2000

J. KENUM, A. BUTTS, C. CAMERON, P. NEWEY, A. BLOUNT.

| | | | | | |
|---|---|---|---|---|---|
| 1230 | GROCERIES ON BOARD |
| 1300 | u/w LT. BOAT FOR SAVANNAH GA. |
| 1600 | 28°33'N | 80°18.3'W | SPD. 8.7 | CRS: 355° | MTG: 204 N.M. |
| 1800 | 28°50'N, | 80°20.2'W, | SOG 8.9 Kts, | Cog: 355°, | mtg: 187 |
| 2000 | 29°08'N, | 80°22.2'W, | SOG 9.3 Kts, | Cog: 355°, | mtg: 169 |
| 2200 | 29°27'N, | 80°24.2'W | SOG: 9.9 KTS | Cog: 354 | MTG 148 |
| 2400 | 29°47.2'N | 80°26'49W, | SOG: 9.9 Kts | Cog: 355 | MTG 130 |

THURSDAY
10 AUGUST 2000

| | | | | | |
|---|---|---|---|---|---|
| 0200 | 30°07.7'N | 080°28.2'W | SPD: 10.2 | | MTG: 109 |
| 0400 | 30°27.3'N | 080°30.9'W | SPD: 9.7 | | mTG: 89.9 |
| 0600 | 30°46.2'N | 80°33'W, | SOG: 9.3 Kts, | Cog: 355° | mtg: 71 |
| 0800 | 31°04.4'N | 80°35'W, | SOG: 9.1 Kts, | Cog: 355° | mtg: |
| 1000 | 31°22.6'N, | 80°37'W, | SOG: 9.2 Kts | Cog: 355° | MTG 34.3 |
| 1200 | 31°40.9N | 80°39'W | SOG: 9.2 Kts | Cog: 355° | MTG 16. |

1350   ENTERED BOUYS 1&2 SAVANNAH RIVER ENT.
BOUND FOR OCEAN TERMINAL
1600   MADE TALMADGE BRIDGE
1615   A/S OCEAN TERMINAL
1700   MADE TOW CONNECTION TO BARGE COLUMBIA NEW
YORK, BARGE TIED. BOW OUT OF SLIP - CHECKING
BARGE LGTS. ASSIST TUG ORDERED FOR 0700
8-11-2000

FRIDAY
11 AUGUST 2000

0630   MAKE READY TO SAIL
0700   TUG MISS ANGIE ON STA. - PIN BARGE TO
DOCK WHILE LETTING GO

Case 1:01-cv-00048   Document 43   Filed in TXSD on 08/17/2001   Page 225 of 338

FRIDAY 11, AUG. 2000

2000 | 31° 04.3 N, 81° 00.5 W, sog: 6 kts, cog: 199°, mtg: 44
skies overcast, rain, thunderstms, visib: improved to 3 nm, earlier near 0, wind NW 10 kts, in squalls to 50 kts, seas 3 ft, Bar: 30.09 inch.

2200 | 30° 52.9 N  081° 04.9 W   SPD: 5.8   MTG: 32   CRS: 198° T

2300 | SHORTEN TOW WIRE TO 400 FT. SEAS CALM

2400 | 30° 42.2 N   81° 09. W   SPD: 5.7    MTG: 20.5

SATURDAY
12 AUGUST 2000

0400 | JAX S/B  ON SHORT WIRE

0640 | BARGE COLUMBIA NEW YORK A/S BERTH #34 Blount FS.

0700 | BARGE AII FAST

0730 | DISCONNECTED  & A/S BERTH WAITING FOR PARTS

0850 | AllEN Blount OFF, u/w LT. BOAT FOR TAMPA FL

0950 | EXIT JAX JETTYS

1200 | 30° 05.35 N   81° 10.4 W   SPD: 10.2   CRS: 153   MTG: 633

1400 | 29° 45.6 N   80° 58.7 W   SPD 10.6   CRS 153   MTG 610

1600 | 29° 28.6 N   80° 48.5 W   SPD 10.4   CRS 153   MTG 54.4.

1800 | 29° 11' N, 80° 37.7 W, sog: 9.9 kts, cog: 153°

2000 | 28° 52.7 N', 80° 27.5 W, sog: 10 kts, cog: 153°

2200 | 28° 33.6 N, 80° 18.9 W   SPD: 10.25   MTG: 530

2400 | 28° 13.7 N   80° 14.8 W   SPD: 10.2   MTG: 510   CRS: 170° T

0200 | 27° 53.3 N   80° 10.7 W   SPD 10.2   Cog 170.   Sun 13. Aug.

0400 | 27° 33.8 N   80° 07.9 W   SPD 10.1   cog 169.

0600 | 27° 15.6 N, 80° 02.9 W or 7.5 nm NE of St. Lucie Julet
sog: 8.4 kts, cog: 170°, skies overcast, wind SSW, 13 kts, seas 2-3 ft, Bar: 30.09 inch.
26° 58.6 N, 80° 00.6 W or 4 nm NE of Jupiter Julet, sog: 9 kts, cog: 172°

1000 | 26° 40.6 N   80° 00. W   SPD: 9 kts   MTG: 416

1200 | 26° 21.8 N   80° 01.5 W   SPD: 9.5   MTG: 397

1400 | 26° 02.5 N   80° 03.9 W   SPD 10.4   MTG 378

1600 | 25° 42.8 N, 80° 04.5 W, sog: 8.7 kts, cog: 183, mtg:

1800 | 25° 24.9 N, 80° 06.6 W, sog: 8.3 kts, cog: 191°

2000 | 25° 09.1 N, 80° 13.7 W, sog: 9.3 kts, cog: 216

28

MONDAY
14 AUGUST 2000

0200  24°34.9'N  80°10.9'W  SPD 11 KTS  MTG
0400  24°28.79'N  81°32.2'W  SPD 10.5 KTS  MTG 145
0527  ENTERED BOUYS 2&3 KEY WEST SHIP CHANNEL
0640  emerged N end of Key West – NW Channel
0800  24°52'N, 81°56.7W, sog: 10 Kts, cog: 343°, mtg: 198
skies clear, wind S 4 Kts, sea calm, Bar. 30.21 inch.
0820  ROCKER ARM ASSMB. ON CENTER ENGINE BROKE AGAIN
SHUT DOWN CENTER MAIN ENG.
1000  25°12.9'N  82°03.1'W  SPD: 9.5  MTG: 177
1200  25°29.3'N  82°08.5'W  SPD: 9.5  MTG: 159
1400  25°47.8'N  82°14.6'W  SPD: 9.7 Kts Cog 343  MTG 109
1600  26°06.31'N  82°21.1'W  SPD 9.7 KTS Cog 344  MTG 89.
1800  26°25.3'N  82°26.2'W
2000  26°43.8'N, 82°32.1W, sog: 9.6 Kts, cog: 344°, mtg: 70
2200  27°02.35'N  82°38.3'W  SPD: 9.5 KTS  MTG: 62.7
2400  27°20.8'N  82°44.1'W  SPD: 9.5  MTG: 43.7

TUESDAY
15 AUGUST 2000

115  PASSED S.W. CHANNEL S/B  TAMPA BAY I/B
220  SKYWAY BRIDGE I/B
535  ALL FAST INT. SHIP REPAIR WAITING FOR BUNKER
BERTH AT MARTIN GAS CO.
645  U/W TO MARTIN GAS DOCK.
717  A/S MARTIN GAS DOCK.
815  BEGIN PUMPING DIESEL FUEL/JOHN McLURE ON
00  BUNKERS COMPLETE – TOOK 47,000 GAL. DIESEL
125  U/W FOR SOUTH SLIP – 85,000 GAL. F.O.B.
200  ALL FAST SOUTH SLIP TO MAKE READY BARGE
THELMA COLLINS (JOHN McLURE ON AS MATE)
315  TOW CONNECTION COMPLETE – REMOVED 300 FT. OF
15" NYLON

2015   RADAR TECH OFF RADAR FIXED (SCANNER GOING BACKWARDS)
2230   SKYWAY BRIDGE OVERHEAD
2350   ABEAM SW PASSAGE BOUY #1 / CHANGE COURSE TOWARDS
      DRY TORTUGAS *LET TOW WIRE OUT TO (1000 FT) BOUND FOR HALIFAX
      NOVA SCOTIA - 1822 MI. 85,150 GAL. F.O.B.

                              WED

      TAMPA TO HALIFAX         16 AUGUST 2000

0200   27°17.1 N   82°47.6 W   COG 177. SOG 8.9
0400   27°00.6 N   82°46.4 W   MTG 134 SOG 8.0
06 00   26°44.7 N,   82°45.5 W,   sog: 8.2 Kts, cog: 177°, RPM: Stb.+ Pt. 950
08 00   26°28.7 N,   82°44.5 W,   sog: 8.1 Kts,   cog: 177°   "   "   "   "
1410   25°43.6 N   82°41.7 W   SOG 8.3
1600   25 28.8 N   82 40.7 W   SOG 8.0 WIND E 12 KTS SEA 2'
20 00   24°57.6 N,   82°39.9 W,   sog 7.9 Kts,   cog: 187°,   mtg: 1669
2200   24°42.3 N   82°41.8 W   SPD. 7.8   MTG 1653   CRS. 191° T
2400   24°27.3 N   82°45. W   SPD. 7.5   MTG. 1638

                              THURSDAY

      TAMPA TO HALIFAX       17 AUGUST 2000

0200   24°22.0 N   82°32.8   SOG 7.0   MTG 1624
0400   24°21.8 N   82°17.2   SOG 7.2   MTG 1610
06 00   24°22.3 N,   82°01.3 W,   sog: 7.1 Kts,   cog: 88°
08 00   24°22.6 N,   81°44.7 W,   sog: 8.1 Kts,   cog: 88°,   mtg:
1000   24°24.25 N   81°26.25 W   SPD: 8.5   MTG: 1563
1410   24°36.0 N   80°50.0 W   SOG 8.2   MTG 1528
16 00   24°41.7 N   80°33.0 W   SOG 8.7   MTG 151'
1800   24°52' N,   80°18.4 W,   sog: 9.2 Kts,   cog: 49°
20 00   25°06.7 N,   80°05.8 W,   sog: 9.9 Kts,   cog: 22°,   mtg: 1476
2200   25°25.5 N   79°57. W   SPD: 10.5   MTG: 1455   WIND: ENE
      20-25 K. SEAS 1-3 FT. SCATTERED SHOWERS
2400   25°47. N   79°52.7 W   SPD: 10.8 KTS.   MTG: 1433 N.M.

30

FRIDAY        TAMPA   TO   HALIFAX
18   AUGUST   2000

| | | | |
|---|---|---|---|
| 0200 | 26° 09'·4 N | 79° 49'·6 W | SOG 11·5 | MTG 1410 |
| 0400 | 26° 30'·5 N | 79° 45'·1 W | SOG 10·5 | MTG 1389 |
| 06.00 | 26° 53'·4 N | 79° 43'·7 W, sog: 12 Kts, cog: 007° |
| 08.00 | 27° 17·2 N | 79° 42' W, sog: 12 Kts, cog: 003°, mtg: 1342 |

skies mostly clear, wind NE 7 Kts, sea+swell 3 ft. Bar: 30.20 inch.

| | | | |
|---|---|---|---|
| 1000 | 27° 40·4 N | 79° 40·6 W | SPD: 11·5 | MTG 1319 |
| 1200 | 28° 03·5 N | 79° 39·7 W | SPD: 11·6 | MTG 1296 |
| 1400 | 28° 26'·7 N | 79° 38'·0 W | SOG 11·5 | MTG 1273 |
| 1645 | 28° 55·8 N | 79° 37·8 W | SOG 11·2 | MTG 1244 |
| 20.00 | 29° 30.1 N | 79° 39.6 W, sog: 11 Kts, cog: 358°, mtg 1210 |
| 2200 | 29° 54·4 N | 79° 40·5 W | SPD· 10·5 | MTG: 1189 |
| 2400 | 30° 12·7 N | 79° 41·2 W | SPD· 10·5 | MTG: 1167 |

SATURDAY.
TAMPA TO HALIFAX     19  AUGUST  2000

| | | | |
|---|---|---|---|
| 0200 | 30°34'·5 N | 79° 41·4 W | SOG 11·0 | MTG 1145 |
| 0400 | 30° 53·5 N | 79° 30·7 W | SOG 11·5 | MTG 1122 |
| 06.00 | 31° 09' N | 79° 15·4 W, sog: 9 Kts, cog: 42°. Bar: 30.19 inch. |

Front over us, moving S, heavy tstrms, wind S.W. 17 Kts, veering to N-E, gusting to 45 Kts in squalls, seas to 6 ft

| | | | |
|---|---|---|---|
| 08.00 | 31° 22·3 N | 79° 01' W, sog: 9.2 Kts, cog: 45°, mtg: 1083, RPM Stb+P.940, C 602 |

skies overcast, light rain, cloud-cloud lightning, wind SW 5 Kts, Bar: 30.19 inch.

| | | | |
|---|---|---|---|
| 1000 | 31° 35·1 N | 78° 43.75 W | SPD· 9.8 Kts | MTG 1064 N.M. |
| 1140 | PUT WIRE OUT TO 1822 FT. SWELLS 4-5' FOLLOWING. |
| 1200 | 31° 47.25 N | 78° 27.1 W | SPD: 9.5 | MTG 1045 |
| 1400 | 32° 01·7 N | 78° 07·9 W | SOG 11·0 | MTG 1023 |
| 1600 | 32° 15·4 N | 77° 49·0 W | SOG 10·5 | MTG 1002 |
| 1800 | 32° 27·8 N | 77° 31·9 W, sog: 9.5 Kts, cog: 50° |
| 20.00 | 32° 39·7 N | 77° 15·6 W, sog: 9.3 Kts, cog: 45°, mtg: 965 |
| 2200 | 32° 55· N | 76° 59· W | SPD: 10.2 | MTG: 944 |
| 2400 | 33° 11.3 N | 76° 42.1 W | SPD: 10.8 | MTG: 923 |

31

SUNDAY

TAMPA TO HALIFAX     20 AUGUST 2000

0200   33° 26'.1 N   76° 27'.5 W   SOG 10.0   MTG 903 (wind NNE 25 KB) (RPM 860)
0400   33° 39.1 N   76° 14'.0 W   SOG 8.5   MTG 886   (RPM 830) SEA 8' to 10'
0600   33° 51'.9 N   76° 01' W, sog: 8.6 Kts, cog: 41°, mtg: 869
0800   34° 05'.0 N, 75° 47.3 W sog 8.9 Kts, cog: 41° mtg: 852
       65 %₀₀ overcast, head wind NE 18 kts, head seas to 7 ft, short, steep, Bar: 30.21
1000   34° 18.4 N   75° 33.2 W   SPD: 8.9 kts.   MTG: 834
1200   34° 31.8 N   75° 19'.0 W   SPD: 9 KTS.   MTG: 817
1400   34° 45.0 N   75° 04'.9 W   SOG 9 kts   MTG 799
1600   34° 58'.3 N   74° 50'.7 W   SOG 9 kts   MTG 781
1800   35° 11.7 N   74° 36.2 W, sog: 9 Kts, cog 41°
2000   35° 25'N, 74° 21.3 W', sog 9 Kts, cog 41°, mtg: 745
       skies mostly cloudy, wind NE 20 kts, seas to 8 ft, Bar: 30.22
2200   35° 39'.0 N   74° 06.6 W   SPD: 8.9   MTG: 727
2400   35° 52.7 N   73° 51.4 W   SPD: 9 KTS.   MTG: 709


MONDAY

TAMPA TO HALIFAX     21 AUGUST 2000

0208   36° 06'.4 N   73° 35'.9 W   SOG 8.6   MTG 690 (RPM 830)
0400   36° 17'.0 N   73° 24'.1 W   SOG 7.8   MTG 676 (RPM 770)
0600   36° 28.5 N, 73° 11' W, sog: 8 kts, cog: 42°, mtg: 660, RPM st'd + P 775, C 605
       skies half clear, wind NE 28 kts, seas to 10 ft, Bar: 30.24
0800   36° 40.7 N, 72° 57'.2 W, spd: 8.6 kts, cog: 42°, mtg: 643
       skies mostly clear, wind to 30 kts, seas to 12 ft fr. the NE, Bar: 30.28, rising
1000   36° 54.8 N   72° 42.1 W   SPD: 8.5 KTS   MTG: 625
1200   37° 09.3 N   72° 26.3 W   SPD: 9.5   MTG: 606
       WINDS N.N.E 20-25 K.   SEAS: CALMING TO 5-7 FT.
1400   37° 23'.6 N   72° 09.7   SOG 10 KTS   MTG 586
1600   37° 37'.5 N   71° 53'.3   SOG 9.5   MTG 567
1800   37° 50.5 N, 71° 38.3 W, sog: 8.9 Kts, cog: 42°, mtg 549

32

TAMPA TO HALIFAX

TUESDAY
22 AUGUST 2000

0200    38° 39.5 N        70° 39.5 W      SOG 8.5      MTG 482
0400    38° 51.9 N        70° 24                       MTG 482
06 00   39° 02' N,  70° 11' W,  SOG 8.5      MTG 465
08 00   39° 13.2 N,  69° 59 W,  sog: 7.8 Kts,  cog: 44°, mtg: 436, Bar: 30.38"
skies mostly clear, fair wx clouds, wind W-S 4 kts, seas calm.
1000    39° 22.8 N    69° 46.8 W      SPD: 7 KTS.    MTG: 423    SERVICE
1200    39° 34.1 N    69° 32.65 W     SPD: 8. KTS.   MTG: 407    ENGINES
1406    39° 45.4 N    69° 18.7 W      SOG 7.8 KTS    MTG 391     SERVICE
1600    39° 56.4 N    69° 05.7 W      SOG 7.7        MTG 376     STARB M.
18h30   40° 09.8 N,  68° 48.0 W,  sog: 6.8 Kts, cog: 45°, mtg: 357,  Bar. 30.39 inch.
Stb. engine down fr. filter change.
20 00   40° 18.4 N,  68° 37.6 W,  sog: 8.3 Kts, cog: 46°,  mtg: 345
2210    40° 29.9 N    68° 28.4 W      SPD: 7.3       MTG: 329
2400    40° 39.25 N   68° 08.8 W      SPD: 7.3       MTG: 315


TAMPA TO HALIFAX

WEDNESDAY
23 AUGUST 2000

02.00   40° 50.1 N    67° 54.0 W      SOG 7.5       MTG 300
04.00   41° 01'. N    67° 37.6 W
06 00   41° 14' N,  67° 21.4 W, on SE St. Georges Bnk, sounding: 165 ft, Bar: 30.36
                                                         visib: 10.5 nm
skies mostly clear, some cirrus + c-stratus, wind + sea calm, sog: 8.7 kts, cog: 48°, mtg: 265
08 00   41° 26.3 N,  67° 06.4 W,  sog: 8.3 Kts,  cog: 46°, mtg: 249
1000    41° 38.4 N    66° 52.6 W      SPD: 7.75 Kts;     MTG: 233
1225    41° 52.0 N    66° 36.4 W      SOG 7.6           MTG 214
1700    42° 01.3 N    66° 23.6 W      SOG 8.2           MTG 204
16 00   42° 13.2 N    66° 06.5 W      SOG 8.3           MTG 192
18.00   42° 25.3 N,  65° 49.7 W,  sog: 9.4 Kts,  cog: 44°, mtg: 157 to Sambro, Bar: 30.31
skies overcast, alto + cirro-stratus, wind S 12 kts, seas 3 ft
20.00   42° 38.9 N,  65° 32.4 W, sog: 9.4 Kts, cog: 44°, mtg to Smbr., wx same as at 1800
22.00   42° 52. N    65° 15.5

33

THURSDAY
TAMPA TO HALIFAX          24 AUGUST 2000

0200    43° 16'.W    64° 43.2 W    SOG 8.5    MTG 104
0400    43 28.0 N    64° 27'.1 W    SOG 8.3    MTG 87.4
06 00   43° 40' N, 64° 11' W, sog: 8.4 kts, cog: 44°, mtg: 52 to Smbr, Bar: 30.21
skies overcast, wind S 17 kts, seas to 5 ft, pos. aprx. 48 nm E off C. Sable.
08 00   43° 51'.4 N, 63° 55' W, sog: 8.1 kts, cog: 44° mtg: 54 to H/x Hbr, Bar: 30.19
overcast, wind S 20 kts, seas to 6 ft.
1000    44° 03'.N    63° 38.6 W    INFORMED  BY  OFFICE
(LATHEM SMITH) ENTIRE JOB CANCELLED 37 MILES
FROM HALIFAX NOVA SCOTIA. MADE U-TURN BOUND
FOR TAMPA FL. CRS: 225°T    SPD: 6.7 KTS. OH WELL!!
FUEL ON BOARD: 4B,894 GAL.
1200    43° 57'.9 N    63° 46'.6 W    SOG 6.5    MTG 1780
1400    43° 48'.9 N    63° 58'. 2 W    SOG 6.5    MTG 1773 (wind 25 kts SSW
1830    43° 32' N, 64° 20'.6 W, sog: 5.6 kts, cog: 225°, Fog, visib: ¼ nm
overcast, wind SW 16 kts, seas to 6 ft.
20 00   43° 25'.2 N, 64° 30.2 W, sog: 6.8 kts, cog: 225°, wind SW 15 kts, seas 5ft, vis. 1 m
2200    43° 16'.N    64° 43.6 W    SPD: 6.8 kts.    MTG: 1727 TO SW CHANNEL
2400    43° 06.2 N    64° 57'. W    SPD: 6.8 kts.    MTG: 1713


FRIDAY
25 AUGUST 2000

0200    42° 55'.7 N    65° 10'.7 W    SOG 7.3    MTG 1698
0400    42° 45'.3 N    65° 24'. 5 W    SOG 7.2    MTG 1684
0700    42° 31'.3 N, 65° 42.5 W, sog: 5.8 kts, cog: 224°
dense fog, visib. 200 ft horizly, 400,000 mil ms vertly.
08 00   65° 48.8 N, 42° 26.9 N, 65° 48.4 W, sog: 6.7 kts, cog: 224°, mtg: 1658
Fog lifting, wind + sea calm, S'ly swell 4 ft.
1000    42° 18.5 N    65° 59.5 W    SPD: 5.75    MTG: 1647    SHUT
DOWN STBD. MAIN ENG. TO LOCATE OIL LEAK

34

SATURDAY

BACK TO TAMPA        26 AUGUST 2000

| | | | | |
|---|---|---|---|---|
| 0200 | 40°55'.4 N | 67°46.1 | SOG 8:8 | MTG 1531 |
| 0400 | 40°43.2 N | 68°02.3 | SOG 8:6 | MTG 1514 |

06ʰ00   40°32' N, 68°17' W, sog: 7.4 Kts, cog: 225°, mtg: 14.98, visib: good

08 00   40 21.8 N, 68 30.4 W, Sog: 7.5 Kts, cog: 225°, mtg: 1485, Bar.: 30.13

overcast, wind NE 11 Kts, sea + swell comb. to 4 ft

| | | | | |
|---|---|---|---|---|
| 1000 | 40°10.65 N | 68°44'.W | SPD: 7.7 KTS. | MTG: 1468 |
| 1200 | 40°01.9 N | 69°00'.W | SPD: 7.7 | MTG: BEING MODIFIED |

1300   MTG. 1488 TO SW CHANNEL #1 TAMPA BAY, NEW ROUTE

RETURNING. TOTAL DIST. FROM U-TURN TO SW CHANNEL 1840 NM.

| | | | | |
|---|---|---|---|---|
| 1400 | 39°53'.2 N | 69°17.0 W | SOG 7.8 | MTG 1481 |
| 1600 | 39°44.5 N | 69°32.9 W | SOG 7.5 | COG 234      MTG 1766 |

20 00   39°27.1 N, 70 05.9 W, sog: 8.1 Kts, cog: 234°, mtg: 1436, Bar.: 30.11 ind.

half overcast, clearing, wind N 7 Kts, sea + swell comb. 3 ft

| | | | | |
|---|---|---|---|---|
| 2200 | 39°18.2 N | 70°21.4 W | SPD: 8. KTS. | MTG: 1420 NM. |
| 2400 | 39°11.12 N | 70°35'.W | SPD: 6.2 | MTG: 1407 NM. |

SUNDAY
27 AUGUST 2000

| | | | | |
|---|---|---|---|---|
| 0200 | 39°04'.8 N | 70°46'.8 W | SOG 5.5 | COG 236   MTG 1396 |
| 0400 | 38°59'.1 N | 70°52'.4 W | SOG 5.2 | COG 235   MTG 1386 |

0600   38°53.8 N, 71°07.5 W, sog: 4.6 Kts, cog: 234°, mtg: 1377, Bar.: 30.13

crossing length axis of Hudson Canyon, 60 nm ENE, fair wx clouds, wind N-W 7 Kts

08 00   38°48.1 N, 71°16.9 W, sog: 4.9 Kts, cog: 234°, mtg: 1367   Bar.: 30.18

0900   CHANGED COURSE TO 247°.T. TO GET OUT OF GULF STREAM

CURRENTS.

| | | | | |
|---|---|---|---|---|
| 1025 | 38°42.3 N | 71°30.7 W | SPD. 5.2 | MTG 1365 |
| 1200 | 38°38.85 N | 71°41.3 W | SPD: 5.4 | MTG: 1356 |
| 1400 | 38°34'.6 N | 71°54.7 W | SOG 5.7 | COG 245   MTG 1345 |

STOPPED TO RESTORE BARGE LIGHTS

35

MONDAY
28 AUGUST 2000

| 0200 | 38° 00.6 N | 73° 31.0 W | SOG 8.2 | COG 244 | MTG 1262 |
| 0400 | 37° 53.6 N | 73° 49.9 W | SOG 8.8 | COG 244° | MTG 1244 |
| 06 00 | 37° 43.7 N | 74° 03.5 W | sog 7.8 Kts | cog: 208° | mtg: 1230 |
| 0800 | 37° 29.3 N | 74° 12.8 W | sog 8.5 Kts | cog: 207° | mtg 12 13, Bar: 30.13 |

overcast, wind ESE 10 kts, backing, seas 3-4 ft

| 1000 | 37° 14.7 N | 74° 22.6 W | SPD: 8.2 KTS | | MTG: 1197 NM. |
| 1200 | 37° 00.6 N | 74° 31.2 W | SPD: 8. KTS | | MTG: 1181 |
| 1400 | 36° 45.9 N | 74° 39.2 W | SOG 8.0 KTS | COG 195 | MTG 1165 |
| 1600 | 36° 30.5 N | 74° 44.5 W | SOG 8.1 | COG 195 | MTG 1149 |
| 1800 | 36° 16.5 N | 74° 49.1 W | sog: 8.1 Kts | cog: 195° | mtg: 1135, Bar: 30.11 |
| 2000 | 36° 01.8 N | 74° 53.6 W | sog 7.6 Kts | cog: 195° | mtg: 1120 |

overcast, wind calm, S'ly swell to 3 ft.

| 2200 | 35° 46.4 N | 74° 59 W | SPD: 8 KTS. | | MTG: 1104 |
| 2400 | 35° 31.1 N | 75° 03.7 W | SPD: 8. KTS. | | MTG: 1088 |

TUESDAY
29 AUGUST 2000

| 0200 | 35° 16.6 N | 75° 08.2 W | SOG 7.5 | COG 194 | MTG 1073 |
| 0400 | 35° 07.5 N | 75° 14.8 W | SOG 5.5 | COG 238 | MTG 1062 |
| 06 05 | 34° 59.7 N | 75° 25.7 W | sog: 6.6 Kts | cog: 228° | mtg: 1050 |
| 08 00 | 34° 51.5 N | 75° 36.7 W | sog 6.2 Kts | cog: 228° | mtg: 10 38 |

overcast, contin. rain or drizzle, wind S 14 Kts, seas 4 ft, Bar. 30.13

| 1000 | 34° 32.8 N | 75° 48.6 W | SPD: 6.7 KTS | | MTG: 1025 NM. |
| 1200 | 34° 33.6 N | 76° 00.9 W | SPD: 6.2 KTS. | | MTG: 1011 NM. |
| 14 00 | 34° 23.7 N | 76° 14.1 W | SOG 7.5 | COG 227 | MTG 996 |
| 1600 | 34° 13.3 N | 76° 27.2 W | SOG 7.4 | COG 226 | MTG 981 |
| 1800 | 34° 02.8 N | 76° 40.5 W | sog: 7 Kts | cog: 225° | mtg: 966 |

overcast, rain + drizzle, wind SE-E 20 Kts, seas to 9 ft, Bar. 30.10

| 20 00 | 33° 53.9 N | 76° 51 W | sog: 7.1 Kts | cog: 225° | mtg: 954 |

36

BACK TO TAMPA

WEDNESDAY
30 AUGUST 2000

| | | |
|---|---|---|
| 0200 | 33° 23'.3 N   77° 28.0 W   SOG 7.8   COA 225   MTG 910 |
| 0400 | 33° 15'.3   77° 42.5 W   SOG 7.3   COG 242   MTG 896 |
| 06 00 | 33° 07.5'N, 77° 59' W, sog: 7.8 kts, cog: 240° |
| | overcast, some break in cloud to the S, wind NE 23 kts, seas 4-6 ft, Bar: 29.96 inch. |
| 08 00 | 33° 00. N   78° 14.3 W, sog: 7.2 kts, cog: 240°   mtg: 865 |
| 1000 | 32° 52.2'N   78° 30.3 W   SPD: 7.75   MTG: 849 |
| 1200 | 32° 44.1'N   78° 46.5 W   SPD: 7.8   MTG: 833 |
| 1400 | 32° 35.5 N   79° 04.0 W   SOG 8.5   COG 239   MTG 8,6 |
| 1600 | 32° 24.0 N   79° 19.0 W   SOG 8.5   COG 220   MTG 799 (BAR 1012) |
| 1800 | 32° 11.2 N, 79° 32.5 W, sog: 8.4 kts, cog: 219° |
| 2000 | 31° 58.2 N, 78° 44.1 W, sog: 8.2 kts, cog: 219°, mtg: 766, Bar: 30.03 |
| 2200 | 31° 45.8'N   79° 56.3 W   SPD: 8. kts   MTG: 750 |
| 2400 | 31° 33.8'N   80° 07.8 W   SPD: 7.6 kts.   MTG: 734 |
| | All BARGE LIGHTS OUT |

THURSDAY
31 AUGUST 2000

| | | |
|---|---|---|
| 0200 | 31° 19'.6 N   80° 16.4 W   SOG 8 kts   COG 201   MTG 718 |
| 0400 | 31° 04.4 N   80° 23.7 W   SOG 8.1 kts   COG 202   MTG 702 |
| 06 00 | 30° 49.1 N, 80° 31' W, spd: 8.2 kts, cog: 202° |
| 08 00 | 30° 34.3   80° 36.1 W, sog: 7.5 kts, cog: 173°, mtg: 669, Bar: 30.06 |
| | skies mostly clear, wind NNW 6 kts, sea+swell 3 ft |
| 0915 | STOPPED TOW TO SERVICE BARGE LIGHTS. |
| 1015 | STARTED GEN. SET ON BARGE TO CHARGE BATTERIES FOR RUNNING LGTS. — U/W WITH TOW WIRE TO 1400 FT. |
| 1200 | 30° 13.1 N   80° 33.2 W   SPD: 7.9 kts.   MTG: 648 |
| 1400 | 29° 57.1 N   80° 30.8 W   SOG 8.3   COG 173°   MTG 632 |
| 1600 | 29° 40.7 N   80° 28.5 W   SOG 8.2   COG 174°   MTG 616 |
| 18 00 | 29° 24.8 N, 80° 26.2 W, sog: 7.9 kts, cog: 173° |
| 1820 | STOPPED TO SHUT DOWN BARGE BATT. |

BACK TO TAMPA

FRIDAY
1 SEPTEMBER 2000

0200 | 28°28'.8 N    80°17.7 W   SOG 7.5   COG 171   MTG 543
0400 | 28 14.0 N    80°15'.0 W   SEG 7.5   COG 172   MTG 528
06 00 | 27° 58.9 N, 80°12.4 W   MTG: 513
08 00 | 27° 44.6 N', 80°10' W, sog: 6.8 Kts, cog: 170° mtg: 498, Bar. 30.10
skies clear, wind SSW 15 Kts, passing Bethel Shoal, bearing W, 2/3 nm dist.
1000 | 27°30.35 N    80°07'. W   SPD: 7.2 Kts.   MTG: 484
1200 | 27°15.6 'N    80°04.4 W    SPD: 7.5 Kts    MTG: 469
1400 | 27 00.5 N    80°01.6 w   SOG 7.6   COG 171    MTG 453
1600 | 26° 47'.8 N   79°59.4 w   SOG 7.0   COG 172    MTG 440
1800 | 26°36' N, 80° W, sog: 7.2 Kts, cog: 183° passing Lake Worth
20 00 | 26 21.4 N, 80 01.5W, sog 6.8 Kts, cog: 186°, mtg: 413, aprx. 2.5nm E of B. Raton
2200 | 26°08.8 N   80°03. W    SPD: 6.25Kts.   MTG: 401 NM.
2230 | 1 mile ABEAM FT. LAUDERDALE SEA Bouy
2400 | 25°57.6 N   80°03.7 w    SPD:5.6 KTS.   MTG: 389 N M.

SATURDAY
2 SEPTEMBER 2000

0200 | 25°46.1 N   80°04.0 W   SOG 5.5   MTG 378
0400 | 25 33.5 N   80°04.7 W   SOG 6   MTG 366
06 07 | 25°19.5 N, 80°07.3 W, sog: 6.7 Kts, cog: 196°
08 00 | 25 08.1 N, 80 13.7 W, sog 7 Kts, cog: 215°   mtg: 338
1000 | 24°57.8 N   80°24.8 w    SPD: 7.2 Kts.   MTG: 320 NM.
1200 | 24°48.4 N   80°37.6 w    SPD: 7.5    MTG: 309 N M
1400 | 24° 40'.8 N   80°52.3 w   SOG 7.6   COG 251   MTG 294 (BAR 1016.4)
1600 | 24°35.6 N   81°09.0 w   SOG 8.2   COG 251   MTG 277
1800 | 24°30.2 N, 81°25.8 W sog: 7.9 Kts, cog: 252°, mtg: 261
2000 | 24°25.7 N, 81°42.2 W, sog: 8 Kts, cog: 255°, mtg: 246
2200 | 24°24. N   81°59.4 w    SPD: 8.2    MTG: 229
2400 | 24°22.5 N   82°17.5 w    SPD: 8.1    MTG: 213

38

SUNDAY
3 SEPTEMBER 2000

| | | | | | |
|---|---|---|---|---|---|
| 0200 | 24°22.9 N | 82°36.0 W | SOG 8.5 | COG 285 | MTG 196 |
| 0400 | 24°33.2 N | 82°43.7 | SOG 8.3 | COG 011 | MTG 179 |
| 0600 | 24°48.5 N | 82°41.4 W | SOG: 358° | SOG: 7.7 Kts | |
| 0800 | 25°04' N | 82°42' W | SOG: 7.8 kts | COG: 358° | MTG: 148, Bar: 30.09 |

skies clear, wind + sea calm

| | | | | | |
|---|---|---|---|---|---|
| 1000 | 25°19.6 N | 82°42.6 W | SPD: 7.8 KTS. | MTG: 133 Nm |
| 1200 | 25°35.4 N | 82°43.2 W | SPD: 8.1 | MTG: 117 Nm |
| 1400 | 25°51.3 N | 82°43.8 W | SOG: 7.7 | COG 358 | MTG 101 |
| 1608 | 26°08.2 N | 82°44.4 W | SOG 7.8 | COG 359 | MTG 84 |
| 1800 | 26°23.1 N | 82°45' W | SOG: 7.8 Kts | COG: 358° | MTG: 69 |
| 2000 | 26°38.6 N | 82°45.7 W | SOG: 7.8 Kts | COG: 358° | MTG: 54, Bar: 30.06 inch |
| 2200 | 26°54.3 N | 82°46.4 W | SPD: 7.7 Kts. | MTG: 38 Nm |
| 2400 | 27°10' N | 82°47' W | SPD: 7.8 KTS | MTG: 22.4 |

MONDAY
4 SEPTEMBER 2000

| | |
|---|---|
| 0005 | SHORTEN TOW WIRE TO 600' |
| 0035 | UNDERWAY TO SWI |
| 0200 | 27°22.8 N  82°47.5 W   SOG 6.8   MTG 9.3 |
| 0325 | PASSED SW CHANNEL S/B |
| 0430 | PASSED SKYWAY BRIDGE I/B |
| 0600 | SLOWED DOWN FOR TUG GULF COAST & BARGE CREW TO ORGANIZE. |
| 0950 | THELMA COLLINS ALL FAST SOUTH SLIP-YBOR CHANNEL |
| 1015 | DISCONNECTED FROM BARGE THELMA COLLINS ALL FAST ACROSS CREEK FROM INT. SHIPREPAIR |
| 1045 | SHUT DOWN |

( FUEL ON BOARD   25,870   WITHOUT #3 & DTS )

WED SEPT 6, 2000

1305   DEPART INT SHIPYARD TO MISSIENER OLD PORT
       TAMPA

1500   RE CALIBRATE FLEX/GATE COMPASS
1615   TIE UP MISSIENER DOCK   SHUT DOWN


FRIDAY
8 SEPTEMBER 2000

1730   DEPART MISSIENER OLD PORT TAMPA
       BOUND FOR HOUSTON (LIGHT TUG)
1440   CLEAR SKYWAY BRIDGE
2015   ABEAM EGMONT KEY LIGHT

SAT 9 SEPT 2000
0000   27°44'.5 N   83°28.2 W   SOG 10.4 COG 284  MTG 6
0200   27°48'.4 N   83°51.3 W   SOG 10.6 COG 282  MTG 578
0400   27°52'.1 N   84°15.0 W   SOG 10.7 COG 280  MTG 55 7
0600   27°55.3 N, 84°38.9 W, sog:10.4Kts, cog:276°, Bar:30.07 indi
0800   27°59 N, 85°02 W, sog:11 Kts, cog:281°, mtg:490
       wx fine, wind NE 9Kts, seas to 3ft, Bar: 30.10 indi
1225   28°03.5 N 85°55.6 W   SOG 10.9  COG 276   MTG 478
1411   28°04.4 N 86°16.7 W   SOG 10.6 COG 273  MTG 460
1600   28 05   86 37        9.8/Kts      274   MTG 339.
1800   28°06.2 N, 87°00.1 W, sog:10 Kts, cog:276°
2000   28°07.9 N, 87°23.6 W, sog:10.5Kts, cog:273°, mtg:297 Wpt
2400   28°10.5 N  88°11.0 W   SOG 10.4 COG 275,  MTG 359

SUN 10 SEPT 2000
0200   28°11'.8 N   88°34.0 W   COG 271  SOG 10.0 MTG 339
0400   28 12.1 N   88 56.6 W   COG 272 SOG 10.1 MTG 318

Case 1:01-cv-00048   Document 43   Filed in TXSD on 08/17/2001   Page 238 of 338

40

MONDAY 11 SEPT 2000

0020  28° 45.1 N    92° 58.5 W    SOG 10.7 COG 288    MTG 92.6
0230  28° 51.6 N    93° 23.6 W    SOG 10.8 COG 285    MTG 69.5
0400  28° 55.9 N    93° 41.2 W    SOG 10.7 COG 286    MTG 53.5
0600  29° 01.5 N, 94° 04.3 W, sog:11 Kts, cog: 287°
0800  29° 11.5 N, 94° 25.7 W, sog: 11 Kts, cog: 306°, mtg: 16    Bar: 30.10
      16 mm to Galveston Jetties

1030  A/L dock - S.J. Glory, Galveston Pier 34
1150  - Meeting with capt & owners super.
      Examine foredeck, make towing arrangements,
      all hooked up for sea    ETA 1700
1700  Pilot on board, lines fore + aft from S&J Glory + tug Elsbeth II
1705  2 Hbr tugs pulling S&J Glory from Pier 34
1710  under way in Galveston Channel, 1 asist tug trailing S&J Glory
      bound out for C Cristy, Texas.
1745  Trailing tug off
1825  Pilot off, letting out wire to 1000 ft
2000  29° 08 N, 94° 48.6 W, sog: 8.9 Kts, cog: 220

                          TUES 12 SEPT 2000
0025  28° 40.0 N    95° 19.5 W    COG 237    SOG 8.9    MTG 102
0200  28° 31.8 N    95° 33.1 W    COG 236    SOG 8.8    MTG 88
0400  28° 23.0 N    95° 50.7 W    COG 241    SOG 9.0    MTG 70
0800  28° 06.5 N, 96° 27.1 W, sog: 9 Kts, cog: 234°, mtg: 34, Bar: 30.04
1000  SLOW DOWN SHORTEN WIRE (WAIT FOR PILOT CLEARANCE
      MAY BE TO BUSY MAY ANCHOR)
1100  27° 57.3 N    96° 51.2 W    SOG 6.0 KTS    COG 237    MTG 9
1300  SHUT DOWN ANCHOR ON HAWSER NEXT TO SHIP
1230  ANCHOR ON TOW WIRE AWAITING PILOTS

                          WED 13 SEPT 2000
      PICK UP SHIP ANCHOR PROCEED TO PILOT STATION
0800  On our way tow. Aransas Pass to pick up Pilot, 3.1 mmms to Jetties
0812  Pilot on board

FRI SEPT 15 2000

| | | |
|---|---|---|
| 2-6 | 0745 | START UP DEPART FOR FUEL DOCK |
| -5 | 1030 | TIE UP FUEL DOCK |
| 5 | 1145 | START FUELING TESORO FUEL DEPOT |
| | 1315 | FINISH FUELING  30,000 GAL  55 GAL GEAR OIL |
| | 1330 | DEPART FUEL DOCK BOUND FOR ? |
| | 1600 | 27° 48'.4 N  96° 42'.3 W  SOG 9.3 COG 102  HEADING FOR |

CAPE CANAVERAL

| | | |
|---|---|---|
| 4 | 1805 | 27° 44'.6 N, 96° 21.2 W, sog: 9.6 Kts, cog: 102° |
| 4, | 20 00 | 27° 40.7 N, 96° 02.1 W, sog: 10 Kts, cog: 102°, mtg: 1114, Bar: 30 |

SAT SEPT 16, 2000

| | | |
|---|---|---|
| II | 0010 | 27° 30'.9 N  95° 16'.8 W  SOG 9.8  COG 104  MTG 1073 |
| | 0200 | 27° 26'.9 N  94° 56'.5 W  SOG 10.7  COG 102  MTG 1054 |
| 4 | 0400 | 27° 22'.2 N  94° 32'.6 W  SOG 11.0  COG 103  MTG 1032 |
| | 0600 | 27° 17.7 N, 94° 10' W, sog: 9.8 Kts, cog: 103° |
| | 08 00 | 27° 12'.6 N, 93° 49' W, sog: 9.5 Kts, cog: 103°, Bar 30.07 inch, mtg: 992 |

27° ...

...

...

T.D ...

| | | |
|---|---|---|
| | 1200 | 27° 04'.3 N  93° 08'.6 W  SOG 9.1  COG 103  MTG 955 |
| | 1420 | 26° 59'.5 N  92° 45'.7 W  SOG 9.0  COG 103  MTG 935 (Bar 1012.8 |
| | 1600 | 26° 55'.7 N  92° 29'.4 N  SOG 9.2  COG 104  MTG 922 |
| | 20 00 | 26° 47' N,  91° 50.1 W, sog: 9 Kts, cog: 104°, mtg: 883, Bar: 30.05 |

skies partly cloudy, squall line appr. fr NE, wind ENE 24 Kts, seas 5 ft, building

SUN SEPT 17 2000

| | | |
|---|---|---|
| 0030 | | 26° 35'.1 N  91° 08'.0 W  SOG 8.4  COG 112  MTG 843 |
| 0400 | | 26° 27'.1 N  90° 36'.9 W  SOG 8.3  COG 104  MTG 815 |
| 06 00 | | 26° 22.5 N, 90° 18'.6 W, sog: 8.4 Kts, cog: 105°, Bar 30.03 |
| 08 00 | | 26° 18'.4 N,  90° 2 W, sog: 8.5 Kts, cog: 105°, Bar: 30.07 |

skies mostly clear, wind NNE 20 Kts, sea + swell to 10 ft

42

Mon SEPT 18 2000

| | | | | | |
|---|---|---|---|---|---|
| 0005 | 25°43'.0 N | 87°24'.1 W | SOG 9.3 | COG 105 | MTG 636 |
| 0200 | 25°38'.1 N | 87°05'.9 W | SOG 9.7 | COG 107 | MTG 619 |
| 0400 | 25°32'.5 N | 86°45'.7 W | SOG 9.6 | COG 106 | MTG 600 |
| 0600 | 25°26'.5 N | 86°25' W | sog 9.6 Kts, | cog 106° | |
| 0800 | 25°21' N | 86°04'.6 W, | sog 9.7 Kts, | cog 107°, mtg 560, Bar 30.08 | |

cloudy, rain squalls all around, wind E 15 Kts, seas to 6 ft.

| | | | | | |
|---|---|---|---|---|---|
| 1200 | 25°09'.8 N | 85°21'.1 W | COG 107 | SOG 10.2 | MTG 589 |
| 1400 | 25°03'.3 N | 85°01'.6 W | COG 108 | SOG 9.8 | MTG 501 |
| 1600 | 24°46'.8 N | 84°39'.3 W | COG 107 | SOG 10.6 | MTG 479 |
| 2000 | 24°44.5 N, | 83°56'.9 W, | sog 9.1 Kts, cog 108°, mtg 439, Bar 30.12 | | |

TuES SEPT 19, 2000

| | | | | | |
|---|---|---|---|---|---|
| 0200 | 24°27'.0 N | 82°59'.0 W | COG 9.9 | SOG 9.2 | MTG 386 |
| 0400 | 24°21'.3 N | 82°39'.9 W | COG 100 | SOG 8.7 | MTG 366 |
| 0600 | 24°20' N, | 82°20.7 W, | sog 9.1 Kts, | cog 92° | |
| 0800 | 24°19.6 N, | 82°— W, | sog 10 Kts, | cog 91°, mtg 330, Bar 30.12 | |

skies mostly cloudy, wind E-N 15 Kts, seas 2-3 ft, pos. aprx 20 SE of Sand Key, KW°

| | | | | | |
|---|---|---|---|---|---|
| 1205 | 24°24'.5 N | 81°09'.3 W | COG 071 | SOG 11.7 | MTG 283 |
| 1400 | 24°33'.6 N | 80°48'.7 W | COG 061 | SOG 10.2 | MTG 261 |
| 1600 | 24°44'.3 N | 80°24'.7 W | COG 049 | SOG 10.7 | MTG 240 |
| 1800 | 24°57'.9 N | 80°11.7 W, | sog 11 Kts, cog 46° | | |
| 2000 | 25°18' N, | 79°59' W, | sog 12.6 Kts, cog 17°, mtg 196 | | |

rain + thunder squalls, wind E 15 Kts, seas 5 ft.

2145  Heavy squalls brightening obscuring Miami — Ø offshore Miami on line !!!

WED SEPT 20, 2000

| | | | | | |
|---|---|---|---|---|---|
| 0215 | 26°37'.4 N | 79°49'.5 W | SOG 13.1 | COG 007 | MTG 116 |
| 0400 | 27°00'.7 N | 79°49'.0 W | SOG 12.9 | COG 338 | MTG 92 |
| 0600 | 27°21.9 N, | 80°— W, | spd 11 Kts, | cog 334° | |
| 0800 | 27°40.7 N, | 80°10.3 W, | sog 10 Kts, cog 334°, mtg 47.5 mm, Bar 30.17 | | |

cloudy, wind SE 23 Kts, seas 3-5 ft, aprx 10 mm E of Vero Beach

| | | | | | |
|---|---|---|---|---|---|
| 2130 | 28°22'.5 N | 80°32'.3 W | SOG 10.5 | COG 339 | |
| 2155 | AT GREAT LAKES DREDGE 54   TIE UP | | | | |
| 3000 | all secure   1400: JEFF KENUM   ON | | | | |

THUR SEPT 21, 2000

0645    TAKE D,S 401 TO DREDGE 54
0730    UNHOOK FROM 401 RETURN TO DS 402
0800    TIE UP TOO 402 READY TO TAKE TO DREDGE 54
1030    TAKE 402 TO DR 54
        TIE UP 402 TO DR 54 PS BOW TO STERN

1900
2000    DUMP 401
        TIE UP 401 TO 54 & UNHOOK

SAT
23   0800   TIE UP 402 TO 54 GO TO PICK UP 401

Mon. Sept. 5th, 00

44

TUES SEPT 26, 2000
CONT WORK GREAT LAKES DREDGE 54 CANUERAL
WED SEPT 27, 2000

0001   HAULING SCOWS CANAU. ENTRANCE TO
6 MI. SOUTH

1200   SAME AS BEFORE

2300   SEAS 4 FT. + WINDS NE 20-25 KTS
IN RAIN SQUALLS 35 TO 40 KTS. BOUND FOR
MIDDLE BASIN TO HIP TO SCOW 402

2300   WHILE DOCKING A/S DREDGE 54 AT MOUTH
OF E. BASIN STBD. CLUTCH BURNED UP
CENTER CLUTCH EXTREMLY SLOW &
PORT ENGAGEMENT HAS LOUD BANG.
NOTIFIED CAPT. SMITH & DECIDED TO SHUT
DOWN FOR REPAIRS. SECURED SCOW 402
A/S EI END OF CRUISE TERMINALS.
TUG ALL FAST CENTER OF COMMERCIAL WARF

THUR SEPT 28, 2000

0630   BACK TO SCOW WORK

FRI SEPT 29, 2000

0100   HAULING SKOWS FOR GREAT LAKES

SAT SEPT 30, 2000

0200   TIE UP 402 TO CRUISE TERMANAL
WEATHER TURNED BAD 30 KTS E 8 TO 10' SEAS
SHUT DOWN WAITING FOR WEATHER TO TURN

0700   REPLACING FWD. CLUTCH RING ON
PORT ENG.

1000   CHANGED RURONG ONE

1230   CLUTCH CHANGED OUT - REPAIR AIR LINE TO GOVENER

1325   START UP - CLUTCH APPEARS OK

1400   SHIFT SCOW 402 TO DREDGE - PORT CLUTCH
HAS NO FWD. AGAIN

45

SUN OCT 1, 2000

0300 (WEATHER CALMED DOWN) HOOK UP TO 402
TAKE TO 54 PICK UP 401 TAKE TO
PUMP (WIND SPEED 15 NNW SEAS 6'to7')

MON. OCT. 2nd 2000

0145 Bucket wire on dredge 54 broke, standing by with skow 401
beached stern first at entrance of Trident basin

TUE. OCT. 3rd 2000

2100 docked skow 401 and Elsbeth II at Fla Freezers in Pt Canaveral

WED OCT 4, 2000
0630 UNHOOK FROM SKOW 401 GO TO FUEL DOCK
0700 TIE UP FUEL DOCK 701
0850 DONE FUELING (34,590) GAL TIE IN FREEZE DOCK
FIX WATER LEAK ON HEAD CENTER ENGINE

THUR OCT 5, 2000
0200 TAKE 401 TO 54
0300 PICK UP 402 AND TAKE TO MID PUMP
1300 ( 220 GAL HYDRO OIL 4TO LUBE OIL PUT ON )
FRI OCT 6, 2000
0000 CONT. WORK AT DREDGE 54

FRI OCT 6 2000
2200 FINISH DREDGEING ALL PACK UP FOR
TRIP TO CHARLESTON
2300 FORCAST BAD WOULD GET 1/2 WAY AND GET
NE WIND 35 to 70 . . .

46

TUES OCT 10, 2000

1000  START UP  GO TO BH & SCOW 401 To Hook up
1142  DEPART PORT CANAVERAL WITH DREDGE 54 & SCOW 401
      BOUND FOR CHARLESTON SC
1600  Pos. 28°23.6'N 80°19.6'W Speed 3.9K C 040°T
      Wind NNE 18-20 KTS Seas 8-10'
1630  Arrived WP#58 C/C For WP#81
1800  Pos. 28°55.7'N 80°14.6'W S.3.7K C 017°T
      Wind NNE 18-20KTS Seas 8-10'
2000  Pos. 28°43.6'N 80°15.3'W S4.8K C 354° Dist To go 244 NM
      Wind NNE 15-18KTS Seas 8-10'
2200  28°53.7N  80°14.8W  SOG 4.9 COG 005 MTG 234
0000  29°03.2N  80°13.5W  SOG 4.9 COG 006 MTG 224

      WED OCT 11, 2000

0200  29°13.7'N  080°12.1'W  SOG 5.0  COG 007 MTG 214M
      29°____N 80°02.3W S6.2K  MTG 191 MMG 95 Av.Speed 5.2 (18 hrs
1000  29°59.6'N  80°05.3'W  Spd: 6.6 MTG: 167 Cog: 007°
1200  30°12.4N  80°03.3W  Spd: 6.6 MTG: 167 Cog: 007°
1400  30°25.7'N  080°01.6'W SOG 6.5  MTG 155 CoG 008
1600  Pos. 30°38.9'N 79°57.5'W  S6.7K C007°T  MTG 142  COG 007°
      Wind ENE 10-12Kt Seas 3-5'  MTG 121
2000  Pos. 31°05.6'N 74°55.1'W S.6.8K C007°T  DTG 101
      Wind ENE 10-12' Seas 3-5'
2200  31°18.1'N  79°53.3W  SOG 6.0  CoG 009  MTG 88
0000  31°29.6N  79°51.6W  SOG 5.8  CoG 005  MTG 77

      THURS OCT 12, 2000
      31°41.1'N  079°50.2W  SOG 5.8  COG 003°  MTG 59
0400  Pos. 31°52.4'N 79°48.7'W S.5.8K C007°T  MTG 54.1
      Wind NNE 8-10Kt Seas 2-3'
0800  Pos. 32°04.2'N 79°46.5'W S6.0K C007°T  MTG 42.3
      Wind NNE 8-10Kt Seas 2-3'
0800  Pos. 32°16.2'N 79°44.4'W S6.0

47

THUR OCT 12, 2000        CONT
CAPE CANAVERAL FL TO CHARLESTON SC (DREDGE 54 & SCOW 40

1215   ARRIVE CHARLESTON SEA BOUY   START SHOALING TOWS
1540   Fort Sumpter anchorage - separate Two Dredge 54 & Scow 402
1550   Scow 402 away picked up by Robert C. Lynn
1605   Made up alongside Dredge 54
1650   Dredge 54 alongside dock - Terminal Coal Rental
1830   Secured to dock - end of Sea day

FRI OCT 13, 2000
2200   START MOVEING SCOWS FOR GREAT LAKES
       DREDGE 54   DUMP SKOWS 401, 402

       FRI OCT 13, 2000
0400   TRIP 2 WITH SCOW 402
       ROUND TRIP ABOUT 4 1/2 Hrs

1600   Dump on Trip 5 w/ Scow 402
2105   LEAVE Dredge To pick-up Scow 401 From Lynn
0150   BACK TO 54 WITH SCOW 401
1400   S   Saturday - N - Sunday   10-14, 10-15
1130   Steam Working Great Lakes ( Trip 13 )
       Dump Time 11:30

       SAT OCT 14, 2000
       CONTINUE WORK FOR GREAT LAKES

       SUN OCT 15, 2000
       CONTINUE WORK FOR GREAT LAKES

       MON OCT 16, 2000
       CONTINUE WORK FOR GREAT LAKE

       TUES OCT 17 2000

48

TUES. OCT 17TH/2000     CON'T.

1540  TO WILMINGTON N.C.
1830  32° 42.9 N X 079° 29.7 W
2000  32° 47.9 N & 079° 17.5 W
2200  32° 54.5 N  079° 00.4 W  SPD: 8.2 KM MTG: 66, COY: 065
2000  33° 01.5 N  078° 46.9 W  SPD: 65  MTG: 53  COY: 031°

      WED OCT 18, 2000
0200   33° 14.6 N  78° 36.7 W  SOG 7.6  MTG 37 COG 034
0400   33° 26.5 N  78° 25.7 W  SOG 7.5  MTG 25  COG 039
0600   33° 38.5 N  079 14.4 W  SOG 7.8  MTG 9.5  COG 039°
0800   33 46.75 N 078 07.3 W  ANCHORED ON BARGE WIRES
      AWAITING FOG TO LIFT. SHORTEN TOW WIRE
      IN COMMUNICATION WITH RICK AT GREAT LAKES
      ~~WITH~~ AT WIL. N.C. OFFICE
1000  ENTERING BUOY LINE
1615  DISCONNECTING 402    STANDING BY
      FOR ASSIST TUG FOR TAKING BARGE INTO SHALLOW
      WATERS
1630  ~~ATL~~ DISCONNECTED FROM 402  UNDERWAY TO CAPE FEAR Towing
1655  TIED UP AT CAPE ~~FEAR~~ FEAR TOWING FOR RESUPPLY
      AND CREW CHANGE

      THUR OCT 19 2000
0800  DEPART WILMINGTON NC BOUND GREEN COVE SPRINGS FL
1745  CAPE FEAR S/B ABEAM, WRONG?
200   FUEL ONBOARD (48,500) LOT INCLUDING #3 & DAY TS
400   33° 30.3 N  078° 21.1 W  SOG 10.4 KTS  COG 217°
605   33° 12.7 N  078° 37.4 W  SOG 10.4 KTS  COG 214°
00    32° 56.1 N  078° 51.6 W  SPD: 10.8 KNS COY: 220°  MTG: 198
00    32° 40.0 N  079° 08.2 W  SPD: 10.4 KNS COY: 220°  MTG: 177
00    32° 23.7 N  79° 24.7 W  SOG 10.8  COG 220  MTG 155
00    32° 07.5 N  079° 40.9 W  SOG 10.6 COG 220  MTG 134

      FRIDAY OCT 20, 2000

CUtePDF – www.fastio.com

WEDNESDAY
25 OCT 2000

| | |
|---|---|
| 01:00 | Dept GREEN COVE SPRING with ELSBETH ALONG SIDE for ATLANTIC DRY DOCK |
| 06:30 | Arrived at ATLANTIC DRY DOCK and Secured |
| 09:00 | Tow cable on to DREDGE ALASKA |
| 09:15 | u/w With DREDGE ALASKA in Tow |
| 1645 | DISCONNECTED TO ALASKA IN GREEN COVE AWAITING POSSIBLE ASSIST TO TUG ELSBETH DOCKING TUG |
| 1815 | DOCKING COMPLETED GREAT LAKES DISCHARGE TUGS. |

MONDAY
30 OCT 2000

| | |
|---|---|
| 09:20 | Dept Green Cove-spring dock for Great Lakes dock |
| 09:40 | tie to GL #33 Barge to shift it |
| 10:25 | Compleat shifting GL #33 and the Crane Barge around |

TUESDAY
31 OCT 2000

| | |
|---|---|
| 08:00 | Dept Green Cove spring dock for Great Lakes dock |
| 08:20 | Alongside GL #33 |
| 09:20 | Secured Barge GL #33 to Pier #5 |
| 09:45 | take Great Lakes Crain Barge alongside the dredge Alaska |
| 10:00 | Compleat shifting all Barges |

ENROUTE JAX - PEARL HBR.

## Monday Nov 27 - Cont'D

1500 | 25° 19.9 N   79° 26.2 W   Speed 10.4   Crossing Straits to Bimini, Seas 2-3'
Miles to go to Panama 1195

1600 | 25° 13.2 N   79° 29.6 W   speed 7.3   Shut Down P/S Engines, Seas 2-3'
Vis 10 mi, Overcast + M.J.G. 1187 - Average speed 7.5

1900 | POSIT. 24°53 N   079°15 W   C/c 180°   ORANGE CAYE

2140 | POSIT. 24°32' N - 079°18 W   C/c   170°

2330 | Posit 24°17' N   079°16   S: 7.5

## Tuesday Nov 28, 2000

0200 | 23° 58.4 N - 79° 11.9 W - speed 8.0 Kts, course 171°, Seas 1-2', clear
MTG   1110, Vis U/L

0230 | Pos. 23°55.0 N - 79° 11.3 W - changed Course to 159°, speed 8.0 Kts
MTG - 1107 - Average speed 40.5 Hrs - 301 mi = 7.4 Kts

0400 | Pos. 23°41 N   79° 05 W - speed 8.5 Kts, course 157°, MTG 1094

0720 | POSIT 23°16 N   78° 55' W   S = 7.5 Kt   C/c   143°

1200 | 22°50.8 N - 78°33.9 W - speed 7.4 Kts, course 146° - MTG 1033

1345 | Pos. 22°40.3 N - 78°26.2 W - Course change to 115°, speed 6.8 Kts

16.25 | Pos. 22°32.7 N - 78°07.9 W: Course change to 126°, speed 7.3 Kts

1800 | POS 22° 25.6 N - 77° 59.7 W - course 125°, speed 8.1 Kts, MTG 991   Av speed 7.4 Kt

1900 | POS 22°21 N   77° 50 W   "   125   S = 7.7   AVG for Trip 7.4

2000 | Pos. 22°17 N   77°44 W   " "   ...7.5

2115 | CHANGE COURSE FROM   WPT. 144   TO   NEW COURSE   130°

2400 | POSIT.   21°59 N - 077°20" W   S: 7.2 Kt   Clear, 4-5' NE wind 20 NE

## WEDNESDAY NOV. 29th 00

0200 | Pos. 21°49.7 N - 77°08.7 W, Course 131°, speed 7.3 Kts, Seas 4-6' - MTG 93

0300 | Pos. 21°45.8 N - 77°02.8 W, changed Course to 114°, speed 7.4 Kts

0500 | Pos. 21°38.9 N - 76°48.0 W, speed 7.5 Kts, course 114°, Seas 8-10', Wind NE 20 Kts

0600 | Pos. 21°36 N - 76°41' W   AVG GHr 7.25

0800 | Pos. 21°30 N - 76°27 W   SPD. 7.3 Kt.

1100 | Pos 21°20' N - 76°04' W   AVG SpD = 7.9 Kt.

1200 | Pos 21° 17 N - 75°56 W - speed 8.1 Kts, course 114° - MTG 858

1400 | Pos. 21° 11 N - 75° 41 W - speed 8.1 Kts, course 115° - MTG 842

1450 | Pos 21° 05 N - 75° 41 W - changed Course to 119° speed 8.1 Kts - WPT #146

8.2X - PEARL-HARBOR

52

## THURSDAY   11/30/00

| | |
|---|---|
| 0220 | Pos 20°17 N - 74°04 W - changed Course To 180° WPT #178, speed 8.6 kts |
| 0400 | Pos 20°04 N - 74°03 W - speed 9.2 kts, Course 178°, approaching WPT #149 |
| 0412 | Pos 20°00. N - 74°03 W - changed Course @ WPT #149 to 209°, speed 9.3 kts |
| 0600 | Pos 19°45 N - 74°12 W - course 209°, speed 9.4 kts, Seas 1', Wind SW 5 kts MTG 201 |
| 1100 | POS 19°03.5 N - 074°35' W   COURSE 209   SP = 8.5 |
| 1400 | POS. 18°43 N - 074°46' W         SP = 9.7 |
| 1545 | POS 18°30 N - 074°55 W   changed Course To 195° Approaching Navassa Is. |
| 1600 | Pos 18°29 N - 74°54 W, speed 7.5 kts, course 209°, shutdown center engine |
| | brought P/S main on Line |
| 1645 | Pos 18°23 N - 74°57 W, changed Course To 209°, speed 9.7 kts |
| 1800 | Pos. 18°14 N - 75°04 W, speed 9.0 kts, Course 209°, Seas 4-6' |
| 2000 | Pos. 17°58' N 075°4' W   SP = 8.7 Kts     "     " |
| 2200 | POS. 17°43' N - 075°22' W   SP = AVG 8.6   C = 209 |
| 2400 | Pos. 17°29 N - 075°53' W   SP = AVG 8.8   C. 209° |

## FRIDAY   12/1/00

| | |
|---|---|
| 0005 | shut down STBD main For A/R Leak Repair - Running on Port & Center Mains. |
| 0200 | Pos 17°11 N - 075°40 W, speed 9.7, course 209° MTG 527, Seas 6-8' |
| 0400 | Pos 16°54 N - 075°50 W, speed 9.6, course 209° MTG 507, Seas 6-8' |
| 0600 | Pos 16°36' N - 076°00 W   SPEED 9.8     " |
| 0800 | Pos. 16°20' N - 076°04 W   SPEED 9.2     "   "   " 470   "   " |
| 1100 | POS 15°56.2 N - 076°23 W |
| 1200 | POS 15°48 N   076°27 W   SPD. 9.2 Kt |
| 1400 | POS. 15°31 N - 076°37 W   speed 9.4 kts, course 209, MTG 413 |
| 1600 | Pos. 15°15 N - 076°46 W   speed 8.6 kts, course 208, MTG 395 |
| 1800 | Pos. 14°58.8 N - 076°55 W   Speed 9.4 Kt.     "   " 376 |
| 2100 | Pos. 14°34' N - 077°09 W |
| 2400 | Pos. 14°09.6 - 077°22.2 W   SPD = 9.5 Kt COURSE 208°T 320 MTG |

## SATURDAY   12/02/00

| | |
|---|---|
| 0200 | Pos. 13°52 N - 77°31 W, SPD 9.4 kts, course 208°, MTG 302 |
| 0400 | Pos. 13°36 N - 77°42 W, speed 9.3 kts, course 208°, MTG 284 |
| 0600 | POS. 13°19.8' N - 077°49.7 W   Spd = 9.6 Kts   208° MTG 263 |
| 1000 | POS. 12°48' N - 078°07 W   Spd = 9.5 Kts   208°  MTG 227 |
| 1200 | POS 12°39.9 N - 078°11.8 W |

SUNDAY 12/03/00 ENROUTE JAX - PEARL HBR.

0200  Pos 10° 42 N 079° 13 W, Speed 8.0 Kts, Course 208°, 88.5 MTG

0400  Pos 10° 27 N 079° 21 W, Speed 9.5 Kts, Course 208°, MTG 72.4

0438  Shut down GTCO MAIN & Brought on Carton main to Repair AIR Leak $5/DD Eng

0600  Pos. 10° 12' N · 079° 29' W    Spd = 8.1 Kt    MTG = 55.4

0800  Pos 09° 58.6 N -079° 36.6 W    Spd = 7.9 Kt.   MTG = 39.4

1000  Pos 09° 44.3 N -079° 44.3 W    7.16    MTG = 23.0

1245  PANAMA  BREAKWATER  ENTRANCE

1745  UEE,

1815  UEE  ANCHOR DOWN  ANCHORAGE "F"

2400  ST/BY ALL SECURE


MONDAY  12/04/00

0001- 2400  ST BY ANCHORAGE F  AWAITING
            Clearance for Transit    Clearance 1100
                Ships work & Maintainence
                SEE ENGINEER'S LOG

TUESDAY  12/05/00

0001-  ST BY AWAITING TRANSIT SCHEDULE
       CHARLES, JIM, TERRY  ASHORE FOR SUPPLIES

1030  Received  OE-RAT  CERTIFICATE FOR PANAMA
      Received

1300  CREW BACK ABOARD & ST BY FOR CANAL TRANS

1630  TEST ALL NAV, COMM. GROUND TABLE TERMINAL
            & STEERING GEAR IN ACCORDANCE W/FCR 46

1645  PILOT ABOARD SENOR "TUNON"

1805- 1910  GATUN LOCKS

2020  2130  Mira Flores LOCKS Pedro Miguel

2310  Mira Flores Locks

ENROUTE ~ PANAMA — PEARL HARBOR

54

## Wednesday 12/06/00

| | |
|---|---|
| 0021 | Cleared MIRAFLORES LOCKS — Panama Canal |
| 0100 | Pilot off |
| 0200 | Dropped Anchor at Pos. 08°50.9 N — 079° 33.3 W |
| 0205 | F.W.E. All SECURE |
| | |
| 0600 | START UP & PREPARE FOR SEA |
| 0700 | c/w |
| 0800 | Posit 0.8° 45' N 079° 30' W spd = 8.0 kt |
| 1100 | POS. 08°19.8'N -079°38.0'W spd.9.4 Course 198°T |
| ✱ 1200 | 08°10.8 N 079°41.3 W spd.8.1 mtg: 4631, coy 198° |
| 1400 | 07°52.3 N , 079° 46.3 W , spd. 9.5 knts, mtg: 4612 , coy: 198°T° |
| 1600 | Pos 07°33.7 N — 079°52.2 W , speed 9.8 kts, course 198°, MTG 4592 |
| 1700 | Pos 07° 24 N — 079° 36 W , changed course To 242° |
| 2000 | 07°11.6 N — 080° 21. W , spd = 8.9 mtg: 4555 coy: 245 T° |
| 2200 | 07°09.0 N — 080° 38.4 W spd = 8.8 Course 268°T |
| 2300 | 08°03' N — 080° 48.2 W spd = 9.4 Course 267°T |
| 2400 | Pos 07°07.9 N — 80° 56.3 W , speed 8.6 kts, Course 267, MTG 4519 |

## THURSDAY · 12-07-00

−5Z

| | |
|---|---|
| 0200 | Pos 07°06.9 N — 081° 14.1 W , speed 8.7 kts, Course 266°, MTG 4501 |
| 0400 | 07°05.8 N 081°31.9 W spd:8.8 kts , MTG 4484 , coy: 268 T° |
| 0600 | 07°05.9 N 081° 49.5 W spd:8.4 kts , mt 6:4466, coy 285T° |
| 1000 | 07° 14 N 082°24 W spd = SPd 9.4 kt |
| ✱ 1200 | 07°20. N 082°42.3 W spd (9.1 AV) mtg: 4412 coy: 285 T° |
| 1400 | Pos 07° 24 N — 083° 01 W spd 9.3, MTG 4392, Course 285 |
| 1600 | Pos 07° 29 N — 083° 20 W spd 10.4, MTG 4373, Course 285° |
| 1800 | 07°34.7 N 083° 39.5 W spd 10 kts mtg: 4353 coy: 285T° |
| 2000 | 07°39.6 N — 083° 59. W spd: mtg 4333 , coy: 285T° |
| 2300 | 07° 47 N — 084° 27 W spd: = 9.7 |
| ✱ 2400 | Pos 07° 49 N — 084° 37 W spd 10.2 mtg 4294 , Course 284 |
| | Average speed 36 hrs 9.4 kts |

— 5ʰʳˢ Z

## FRIDAY 12-08-00

| | |
|---|---|
| 0000 | L/R Hawaii From Panama |
| 0200 | Pos. 07°54 N – 084°59 W, speed 10.3 Kts, course 284°, MTG 4277 |
| 0400 | Pos 07°59 N – 085°16 W – speed 9.9 Kts, course 284, MTG 4254 |
| 0600 | 08°04.3'N, 085°36.6' W spd 9.8 Kts cog 8(284°T) MTG: 4233 |
| 0800 | 08°09' N 085°56' W Spd. 9.9 Kts Course 284°T |
| 1200 | 08°18' N 086°34' W Spd 9.9 Kts Course 284°T MTG. 4173 |
| 1400 | Pos. 08°23 N – 086°53' W spd 9.0 Kts course 284° – MTG 4155 |
| 1600 | Pos. 08°28' N – 087°11 W – spd 9.3 Kts, course 284° MTG 4137 |
| 1800 | 08°32.5'N – 087°29.6'W spd 9.1 Kts, cog: 285.7°, MTG: 4118 |
| 2000 | 08°36.9N – 087°47.7 W spd: 9.2 Course 285.7 MTG: 4099 |
| 2120 | C/C 285° to 290°T Pos. 08°40.0N – 088°.0 W Spd. 9.7 MTG. 4087 |
| 2400 | Pos. 08°48' N – 088°25' W spd 10 Kts, MTG 4060 course 290° |

## SATURDAY 12-09-00

| | |
|---|---|
| 0200 | Pos 08°55'N – 088°44'W, spd 10.4 Kts, course 289°, MTG 4040 |
| 0400 | Pos. 09°02' N – 087°04'W, spd 10.5 Kts, course 289°, MTG 4019 |
| 0600 | 09°09.2'N – 089°23.7'W spd: 9.7 Kts cog: 290°, MTG: 3999 |
| 0800 | 09°15 N – 089°42 W spd 9.6 Kts Course 290 MTG – 3979 |
| 1200 | 09°20' N – 090°30 W spd 9.7 Kts Course 289°T MTG – 3934 |
| 1600 | Pos. 09°40 N – 090°51' W – spd 10.5 Kts, course 289° MTG 3902 |
| 1800 | 09°47.9'N – 091°17.3'W, spd: 10.7 Kts, cog: 289°T, MTG: 3886 |
| 2300 | 10°05' N – 092°07 W spd: 10.7 Kts C: 289°T MTG. 3828 |
| 2400 | 10°08'N – 092°17 W – spd 10.2 Kts, Course 287°, MTG 3819 |

## SUNDAY 12-10-00

| | |
|---|---|
| 0200 | Pos. 10°14'N – 092°36' W –, spd 9.5 Kts, course 289°, MTG 3798 |
| 0400 | Pos. 10°20'N – 092°53' W – spd 9.7 Kts, course 289°, MTG 3780 |
| 0600 | 10°26.6'N – 093°12.9'W, spd: 9.6 Kts, cog: 289°T, MTG: 3760 |
| 0800 | 10°32.4'N – 093°29.8'W spd 9.2 Kts cog: 289°T, MTG: 3742 |
| 1100 | C/C 288°T Posit 10°41.5'N – 93°56.9'W spd 9.3 MTG 3714 |
| 1200 | 10°44 N – 094°05 W |
| 1400 | Pos. 10°50'N – 094°24' W, spd 9.4 Kts, course 289° MTG 3686 |
| 1600 | 10°56.1'N – 094°42.8'W, spd: 9.6 Kts, cog: 289°T, MTG: 3667 |
| 1800 | 11°02.1'N – 095°00.7'W, spd: 9.3 Knts, cog: 289°T MTG 3649 |

56

## Monday 12-11-00

| | |
|---|---|
| 0200 | Pos. 11° 26' N - 096° 15' W, Spd 10.0 kts, Course 288°, MTG 3570 |
| 0400 | Pos 11° 32' N - 096° 35' W, spd 10.2 kts, Course 288°, MTG 3550 |
| 0600 | 11° 38.7' N : 096° 55.1' W Spd 9.9 kts, coy: 288° T, mtg 3530 |
| 0800 | 11° 44.9 N - 097° 14.8' W Spd = 9.9 kts, coy: 288° T MTG 3510 |
| 1200 | 11° 57' N - 97° 54 W Spd = 10.0 kts Coy. 288° T MTG = 3469 |
| 1400 | Pos 12° 03' N - 098° 12' W Spd 9.9 kts, Course 288°, MTG 3450 |
| 1600 | Pos 12° 09' N - 098° 32' W. spd 10.1 kts, Course 288°, MTG 3430 |
| 1800 | 12° 15.22'N - 098° 51.4' W, spd: 9.8 kts, coy: 288° T / MTG 3410 |
| 1845 | COARSE NOW AT 287° |
| 2000 | 12° 21.2' N 099° 11.1' W Spd: 9.7 kts coy 287° T, mtg 3390 |
| 2400 | Pos 12° 32' N - 099° 47' W, speed 9.0 kts Course 287°, MTG 3353 |

## Tuesday 12-12-00

| | |
|---|---|
| 0200 | Pos. 12° 37' N - 100° 04' W - spd 9.0 kts, Course 287°, MTG 3335 |
| 0400 | Pos 12° 43' N - 100° 22' W - spd 8.9 kts, course 287°, MTG 3317 |
| 0600 | 12° 48' N - 100° 39.3 W - spd: 8.6 kts, coy: 287° T, mtg: 3300 |
| 0800 | 12° 53 N 100° 56 W Spd 8.5 kts coy: 287° MTG 3270 |
| 1200 | 13° 04 N 101° 34' W Spd 9.3 kts Coy 287° MTG 3244 |
| 1400 | Pos 13° 9' N - 101° 51' W spd 9.1 kts, Course 287° MTG 3226 |
| 1530 | Stopped engines 1000 at pumps. Left on Port/Center Engines, Too much dirt in Engines, over drawing. Pos 13° 13' N - 102° 05' W |
| 1600 | Pos 13° 13' N - 102° 05' W - Restart main engines Port/Center underway |
| 1815 | 13° 19.5' N - 102° 25.5' W, spd: 9.6 kts, coy 287°, mtg 3192 |
| 2000 | 13° 24 N 102° 41 W spd = 8.6 kts coy 287° MTG 3175 |
| 2400 | 13° 34 N 103° 18' W spd = 9.3 Coy. 287° MTG. 3138 |

## Wednesday 12-13-00

| | |
|---|---|
| 0000 | Pos. 13° 33' N - 103° 26' W - Course change to 286°, spd 9.1, MTG 3130 |
| 0200 | Pos 13° 40 N - 103° 36 W - Course 286°, spd 9.3 kts, MTG 3119 |
| 0400 | Pos 13° 45 N - 103° 54 W - course 286°, spd 9.1 kts, MTG 3101 |
| 0600 | 13° 50 2'N, 104° 12.4' W - coy 286°, Spd: 9.3 kts, MTG 3083 |
| 0800 | 13° 55° N 104. 38 W Coy 286° Spd: 9.1 kts MTG 3065 |
| 1115 | 14° 03' N 105.00 W Coy 286° Spd 9.3 kts TIME CHANGE - 7 hrs FROM G.M.T. LOCAL |

## THURSDAY 12-14-00

| | |
|---|---|
| 0200 | Pos. 14° 42' N - 107° 21' W - Spd 9.7 Kts, Course 286°, MTG 2872 |
| 0323 | Changed Course To 285° T @ 14° 46' N - 107° 34' W |
| 0400 | Pos 14° 47' N - 107° 40' W, Spd 9.4 Kts, Course 285°, MTG 2873 |
| 0600 | 14° 52.6' N - 107° 59.2' W, Spd: 9.7 Kts, cog: 285°, MTG: 2854 |
| 0800 | 14° 57.2' N - 108° 18.' W. Spd: 9.7 Kts, cog: 285°, mtg: 2835 |
| 1200 | 15° 07.8 N - 108° 56.4 W Spd 9.6 Kts, Cog 285° MTG - 2797 |
| 1415 | 15° 13' N - 109° 18' W. Spd 9.6 Kts, Course 285°, MTG 2775 |
| 1600 | 15° 19' N - 109° 35' W, Spd 9.5 Kts, Course 285°, MTG 2758 |
| 1800 | 15° 22.8 N - 109° 54' W Spd: 9.8 Kts, cog: 285°, MTG = 2737 |
| 2000 | 15° 28' N 110° 14' W   Spd = 9.9 Kts  C: 285°  MTG - 2719 |
| 2300 | 15° 35. N  110° 43 W   Spd 9.8 Kts  C 285°  MTG = 2690 |
| 2400 | Pos 15° 39' N - 110° 52' W, Spd 9.5 Kts, Course 285°, MTG 2681 |

## FRIDAY 12-15-00

| | |
|---|---|
| 0200 | Pos 15° 42' N - 111° 11' W - Spd 9.4 Kts, Course 285°, MTG 2661 |
| 0251 | changed Course To 284° T at Pos, 15° 44' N - 111° 20' W - MTG 2653 |
| 0400 | Pos 15° 46' N - 111° 31' W, Spd 9.4 Kts, Course 284°, MTG 2642 |
| 0600 | 15° 52. N - 111° 50.5' W, Spd: 9.7 Kts cog 284°, MTG 2623 |
| 0800 | 15° 56. N - 112° 10' W  Spd 9.7 Kts, cog 284°  MTG - 2604 |
| 1100 | 16° 03.8 N  112° 39 W   Spd 9.6 Kts  Cog. 284°  MTG - 2575 |
| 1200 | Pos 16° 05' N - 112° 48' W  Spd 9.6 Kts, Course 284°, MTG 2565 |
| 1400 | Pos 16° 10 N - 113° 07' W Spd 9.4 Kts, Course 284°, MTG 2547 |
| 1600 | Pos 16° 15' N - 113° 26', W, Spd 9.3 Kts, Course 284°, MTG 2528 |
| 1800 | 16° 19.8 N - 113° 45.4' W Spd: 9.7, cog 284°, MTG 2509 |
| 2000 | 16° 24 N - 114° 03' W   Spd. 9.6   cog 284°  MTG 2490 |
| 2400 | Pos, 16° 32' N - 114° 42' W - Spd 9.2 Kts, Course 284  MTG 2455 |

## SATURDAY 12-16-00

| | |
|---|---|
| 0155 | Course change To 283° T @ Pos. 16° 37' N - 115° 00' W, Spd 9.2 Kts |
| 0200 | Pos 16° 37' N - 115° 01' W, Course 283°, Spd 9.4 Kts, MTG 2434 |
| 0400 | Pos 16° 41' N - 115° 19' W, Course 283°, Spd 9.3 Kts, MTG 2416 |
| 0600 | 16° 46. N - 115° 39.2' W cog: 283° Spd. 9.6 Kts, mtg 2397 |
| 0800 | 16° 50' N - 115° 58' W  Spd. 9.7 Kts. Cog 283° MTG - 2378 |
| 1200 | 16° 58' N - 116° 37 W   Spd 9.6 Kts Cog 283° MTG 2340 |

58

PANAMA — PEARL HARBOR

## SUNDAY 12-17-00

| | |
|---|---|
| 0022 | changed Course To 282° T, Pos. 17°25' N - 118°38' W, MTG 2221 |
| 0200 | Pos 17°27' N - 118°54' W - spd 9.5 Kts, Course 282°, MTG 2205 |
| 0400 | 17°32.3' N - 119°13.3' W spd: 9.8 Kts Coy: 282°, mTG: 2186 |
| 0600 | 17°36.6' N 119°33.8' W spd 10 Kts, Coy: 282°, m.TG: 2166 |
| 0800 | 17°41' N - 119°54' W spd 10.0 Kts, C = 282° MTG 2146 |
| 0837 E.S.T. | ENTER PACIFIC TIME 1742' N - 120.0 W - 8 hrs C TC |
| 1220 | 17°49' N 120°36' W Spd 9.4 COG 282° TMG 2106 |
| 1400 | Pos 17°52' N - 120°52' W, spd 9.6 Kts, Course 282°, MTG 2089 |
| 1600 | 17°56.4' N -121°12.8' W spd: 9.7 Kts, Coy: 282°, mTG: 2070 |
| 1800 | 18°00.2' N -121°32.5' W spd: 9.7 Kts, Coy: 282°, mTG: 2051 |
| 2000 | 18°04' N 121°52' W spd 9.7 Kts C = 282° MTG 2032 |
| 2400 | Pos 18°11' N - 122°32' W - spd 9.9 Kts, Course changed To 281°, MTG 1992 |

## Monday 12-18-00

| | |
|---|---|
| 0200 | Pos 18°15' N - 122°53' W, spd 9.8, Course 281°, MTG 1972 |
| 0400 | Pos 18°19' N - 123°13' W, spd 9.7 Kts, Course 281°, MTG 1953 |
| 0600 | 18°22.9' N - 123°33.2' spd 9.8 Kts coy 281°, mTG: 1934 |
| 0800 | 18°26' N - 123°54' spd 9.9 Kts, coy 281° T MTG 1913 |
| ~~1000~~ | ~~blacked out~~ |
| 0800 | Position 18°36' N - 124°45' W spd = 9.7 COG 281° MTG 1865 |
| 1000 | 18°39' N - 125°05' W spd 10.0 Co G 280° MTG 1845 |
| 1200 | Pos 18°42' N - 125°25' W - spd 9.5 Kts, Course 280°, MTG 1825 |
| 1400 | Pos 18°46' N - 125°44' W - spd 9.7 Kts, Course 280°, MTG 1807 |
| 1600 | Pos 18°49' N - 126°04' W - spd 10.1 Kts, Course 280°, MTG 1788 |
| 1800 | 18°52.9' N - 126°24.9' W spd: 9.7 Kts coy 280° mTG: 1768 |
| 2000 | 18°56' N 126°45' spd 9.8 COG 280° MTG 1728 |
| 2400 | Pos 19°02' N - 127°27' W spd 9.5 Kts, Course 280°, MTG 1710 |

## Tuesday 12-19-00

| | |
|---|---|
| 0200 | Pos 19°06' N - 127°45' W spd 9.7 Kts, Course 280°, MTG 1691 |
| 0247 | changed Course To 279° T Pos 19°07' N - 127°53' W, spd 9.7, MTG 1683 |
| 0400 | Pos 19°09' N - 128°04' W spd 9.5 Kts, Course 279°, MTG 1672 |
| 0600 | 19°12.3' N - 128°25.8' W spd 9.4 Kts coy 279°, mTG: 1652 |
| 0800 | 19°15' N - 128°44' W spd 9.5 Kts coy 279° mTG 1632 |

59

## Wednesday 12-20-00

| | |
|---|---|
| 0200 | Pos. 19° 40' N — 135° 41' W, Spd 9.3 kts, Course 278°, MTG 1465 |
| 0400 | 19° 43.4' N - 132° 01' W Spd: 9.9 kts cog: 278°, MTG 1446 |
| 0600 | 18° 46.3' N - 132° 22' W Spd: 9.8 KTS cog: 278°, MTG: 1426 |
| 0800 | 19° 49 N - 132° 42 W Spd - 9.8 kts Cog: 278° MTG 1406 |
| 1200 | Pos. 19° 54' N - 133° 23' W Spd 9.9 kts, Course 278°, MTG 1368 |
| 1410 | Pos 19° 5' N - 138° 45' W Spd 9.4 kts, Course 278°, MTG 1347 |
| 1540 | Changed Course to 277°, Spd 9.1 kts, Pos. 19° 58' N - 133° 59' W, MTG 1338 |
| 1600 | 19° 58.9' N - 134° 02.5' W Spd 9.9 KTS, cog: 277°, MTG 1330 |
| 1810 | 20° 01.6' N - 134° 23.8' W Spd: 9.5 KTS, cog: 277, MTG: 1310 |
| 2000 | 20° 04 N - 134° 42 W Spd 10.0 KTS Cog: 277° TTG 1292 |
| 2145 | ENTER YUKON TIME ZONE OFFICIALLY @ 135° West Lot (NO CHANGE) |
| 2400 | Pos. 20° 08' N - 135° 24' W Spd 9.6, Course 277°, MTG 1253 |

## THURSDAY 12-21-00

| | |
|---|---|
| 0200 | Pos. 20° 11' N - 135° 44' W Spd 9.6 kts, Course 277°, MTG 1233 |
| 0400 | Pos 20° 13' N - 136° 05' W Spd 9.8 kts, Course 277°, MTG 1214 |
| 0600 | 20° 15.6' N - 136° 25.5' W Spd: 9.4 KTS, cog: 277, MTG: 1195 |
| 0800 | 20° 18' N - 136° 46 W Spd 9.6 kts, Cog 277° MTG. 1176 |
| 1030 | 20° 20' N - 137° 10' W C/C New Course 276° T MTG. 1152 |
| 1200 | 20° 22 N 137° 29' W Spd: 9.9 Course 276° T MTG : 1135 |
| 1400 | Pos 20° 24' N - 137° 49' W - Spd 9.6, Course 276°, MTG 1119 |
| 1600 | Pos. 20° 26' N - 138° 09' W - Spd 7.9 kts, Course 276°, MTG 1098 |
| 1805 | 20° 28.4' N - 138° 29.8' W Spd 10.1 KTS cog: 276, MTG 1077 |
| 2000 | 20° 30. N 138° 49' W Spd 9.7 kts Cog 276° MTG. 1059 |
| 2400 | Pos. 20° 34' N - 139° 27' W, Spd 9.3 kts, Course 276°, MTG 1021 |

## FRIDAY 12-22-00

| | |
|---|---|
| 0050 | Changed Course to 275° @ Pos. 20° 35' N - 139° 38' W, Spd 9.1, MTG 1013 |
| 0200 | Pos. 20° 35' N - 139° 49' W, Spd 8.8 kts, Course 275°, MTG 1002 |
| 0400 | Pos. 20° 37' N - 140° 08' W, Spd 9.2 kts, Course 275°, MTG 985 |
| 0600 | 20° 39.2' N - 140° 28.2 W Spd: 9.4 KTS cog: 275°, MTG: 966 |
| 0800 | 20° 41 N - 140° 49' W Spd 10.1 Cog 275° MTG. 946 |
| 1200 | 20° 44 N - 141° 30 W Spd 9.8 Cog 275 MTG 907 |
| 1400 | 20° 46' N - 141° 51' W, Spd 10.0 kb, Course 275° MTG 887 |

60

## SATURDAY 12-23-00

| | | |
|---|---|---|
| 0200 | Pos 20°54' N – 143°53' W – Spd 9.3 Kts, course 274°, MTG 773 |
| 0400 | Pos 20°56' N – 144°15' W – Spd 9.3 Kts, course 274°, MTG 754 |
| 0430 | Shut Down Port Main Engine To change Fuel Filters |
| 0600 | 20°57' N – 144°31' W – Spd: 93 Kts, cog: 274°, MTG: 737 |
| 0800 | 20°58.0 N – 144°51' W Spd 9.3 Kts Cog 274 MTG 719 |
| 1040 | C/C 273° 9 20°59' N 145°18' W Spd=9.1 MTG 693 |
| 1200 | 21°00' N 145°30 W SOG 9.8 Cog 273° MTG 682 |
| 1400 | Pos 21°01' N – 145°50' W – Spd 7.5, course 273°, MTG 663 |
| 1600 | Pos 21°02' N – 146°11' W – Spd 9.7 Kts, course 273°, MTG 644 |
| 1800 | 21°03.8' N – 146°31.2' W – Spd: 9.7, cog: 273° MTG: 625 |
| 2000 | 21°04.7' N – 146°52.5' W Spd: 9.9 Kts cog: 273°, MTG: 605 |
| 2400 | Pos 21°06' N – 147°35' W, Spd 10.0 Kts, course 273, MTG 565 |
| | ETA 0800 Hrs 12/26/00 |

## SUNDAY 12-24-00

| | | |
|---|---|---|
| 0230 | 21°07' N – 148°08' W, Spd 9.7 Kts, course 273°, MTG 540 |
| 0247 | changed course to 272°, Pos 21°08' N – 148°06' W, MTG 536 |
| 0400 | Pos 21°08' N – 148°18' W, Spd 10.1 Kts, course 272°, MTG 535 |
| 0600 | 21°09.3' N – 148°39.5' W, Spd: 10 Kts, cog: 272°, MTG: 505 |
| 0800 | 21°10 N – 149°01 W Spd 10 Kts Cog 272° MTG 485 |
| 1200 | 21°11 N – 149°42 W Spd 9.3 Kts Cog 272° MTG 446 |
| 1400 | Pos 21°11' N – 150°01' W – Spd 9.5 Kts, course 272°, MTG 428 |
| 1600 | 21°12.5' N – 150°21.8' W – Spd: 9.7 Kts, cog: 272° MTG: 409 |
| 1800 | 21°13.2' N – 150°44' W Spd 9.6 Kts cog: 272° MTG: 388 |
| 2000 | 21°13.5' N – 151°03 W 9.4 Kts COG 271° MTG 371 |
| 2400 | Pos: 21°14' N – 151°43' W, Spd 9.1 Kts, course 271°, MTG 333, |

## Monday 12-25-00

| | | |
|---|---|---|
| 0200 | Pos 21°15' N – 152°03' W –, Spd 9.4 Kts, course 271°, MTG 314 |
| 0400 | 21°14.9' N – 152°23.7' W, Spd: 9.8 Kts cog: 270°, MTG: 295 |
| 0600 | 21°15.5' N – 152°45.2' W Spd: 9.6 Kts cog: 271° MTG: 275 |
| 0800 | 21°15 N – 153°05 W Spd 9.3 Kts Cog 271° MTG 257 |
| 1000 | 21°15.9' N – 153°35 W C/C 270° MTG 228 |
| 1200 | Pos 21°15' N – 153°44' W – course 270°, Spd 9.4 Kts MTG ─── |

61

Tuesday 12-26-00

| | |
|---|---|
| 0200 | Pos: 21°15'.75 N - 156°03'.34 W - Spd 9.8 Kts, course 270°, MTG 90. 2 |
| 0400 | 21°15.8'N - 156°24'.W Spd: 9.9 KTS, coy: 270° MTG 70.9 |
| 0600 | 21°15.8'N - 156°45.3 Spd: 9.9 KTS coy: 269° MTT 51 |
| 0800 | 21°15.0 - 157°07 Spd. 9.9 Kts COY 269° MTG 70 |
| 1230 | ENTER HONORULU HAR @ SEA BUOY |
| 1320 | All FAST SAUSE BROS. BERTH 20 |

Wednesday 12-27-00

| | |
|---|---|
| 0001 — | ALL Secure at Sause Bros. Berth 20 |
| 2400 | |

THURSDAY 12-28-00

| | |
|---|---|
| 0645 | E/R Pearl Harbor |
| 0815 | ARRIVED Pearl Harbor alongside 2-Destroyers |
| | R+R With Destroyers |

R/R

Till New YEAR

* TERRY SMITH OFF to Airport 1100

62

Monday 01-01-01

0700 STOW GEAR + PREPARE FOR
UNDERWAY to HONOLULU

0730 Lt TUG to Honolulu

1100 ALL FAST @ SAUSE BROS. Pier 20

01 / 11 / 0 ∅ ST/BY @ HONOLULU

0700 PREPARE FOR UNDER WAY & Potable Water 4800

1030 W/W Lt TUG.

1200 TRANSLD Pearl Harber - Secure

THURSDAY 1-11-01

0630 E/R Pier 34 Honolulu

0830 S/B Fuel Dock Pier 34 Honolulu - Took on 100,000 Fuel, 500 Lube, 150 Hydr.

1945 E/R Pier #20

2015 ALL FAST PIER 20

FRIDAY 01/12/01

0700 SHIPS WORK PREPARE FOR U/W

1400 SINGLE UP & WARM UP

1445 U/W FOX MARINE - ANDY

2400 Pos. 21° 48' N - 158° 26' W - Sped 16 Kts - E/R Rendezvous "/Mas. Giant
Course 340°

SATURDAY 01-13-01

0001. E/R M/V Pres Grant, course 320°, spd 10 kts.

0400 Pos 22°30' N - 158°41' W - spd 11 kts, course 348 M/G 805

0830 POS 23°17' N 159°00 W - RELEASED FROM

PRESIDENT GRANT by Capt. John Reynolds

RETURN TO PEARL HBR. Course 160°

1200 Pos 22°47' N - 158°49' W - spd 9.0 kts, course 160°

1600 Pos 22°16' N - 158°36' W - spd 9.1 kts, course 160°

2100 ABEAM N.W. Point OAHU

2330 ENTER R.H. @ 1 & 2 Buoys

2400 ENROUTE

SUNDAY 01-14-01

0100 All FAST A/S Stoddard @ Pearl Harbor

SWIG. WORK RE-Rig. Tow

Wednesday 17th January 01

0500 PREP FOR U/W with Stoddard & Crowtan

TUGS ALONG-SIDE, PRE TOW CONFERENCE

0600 Pilot Aboard Mike Toome

0630 U/W with Tow From Inactive Fleet West/Middle Lock

0930 Pilot off @ 1 & 2 Buoys

1000 Release Tugs

1030 CHANGE GEAR 84 & Towing 900 RPM @ 5.0 kts 3 ENGINES

2200 POSIT. 20°28' N - 157°37" W   AVG Spd 12 hrs 4.1 Course 156°

2400 Pos 20°21' N - 157°33' W - spd 3.7 kts, course 156°

64

Thursday 18 Jan 2001

0001  E/R Panama w/ 2 Destroyers on Tandem Tow

0600  Position - 20°-02.4'N x 157°-23.5'W
      course - 156°              speed - 3.8
      wind - ESEly @ 10-15       seas - 3-5'
      bar - 1023 mb              vis - clear

0800  19°54 N  157°19 W     SPD 4.3
1200  19°41 N  157°08 W  4-8' swell Spd. 4.3 Avg. Course 157

1800  Position - 19°-18.3'N x 156°-50'W
      course - 157°             speed - 5.6
      wind - Sly @ 10-15        seas - 6-8'
      bar - 1023 mb             vis - clear

2400  Posit. 18°50'N  156°36'W

FRIDAY  19  Jan  2001

0001  E/R Panama, course 151°, spd 4.2 kts, seas 3-5', vis clear, wind 10-15

0600  Position - 18°-27.9'N x 156°-22.6'W
      course - 152°             speed - 4.4
      wind - SEly @ 10-15       seas - 4-6'
      bar - 1024 mb             vis - clear

1800  Position - 17°-52.5'N x 155°-45.7'W
      course - 153°             speed - 4.5
      wind - Ely @ 10-15        seas - 4-6
      bar - 1023 mb             vis - clear

2400  Pos. 17°30'.18 N - 155°32'.39 W, speed 4.5 kts, course 145°
      Wind E @ 10-15, Seas 4-6, Bar. 1022 mB, Vis clear
      MTG To Panama 4962

SATURDAY 20 Jan 2001

0001  E/R Panama, w/ 2 Destroyers in Tandem Tow, Proceeding Well

0600  Position - 17°-07.3' N × 155°-17.6' W
      course - 153°              speed - 4.4
      wind - SE'ly @ 10-15    Seas - 4-6
      vis - clear              bar - (scrap)

1220  Pos. 16° 45'.59 N - 155° 04.32 W, course 125°, spd 3.5 kts
      Wind E @ 25-30, Barr. 1022 MB, vis clear, seas 6-8'
      MTG 4785 To W/P 157

1800  Position - 16°-30.3' N × 154°-50.2' W
      course - 154°              speed - 3.9
      wind - E'ly @ 15-20     seas - 4-6
      vis - clear

2400  Pos. 16° 08'.00 N - 154° 38'.25 W, course 151°, spd 4.1 kts
      Seas 4-6', Wind E @ 15-20, vis clear MTG 4770

SUNDAY 21 Jan 2001

0001  E/R Panama w/2 Destroyers in Tandem Tow, Proceeding Well

0600  Position - 15°-45.8' N × 154°-26.7' W
      course - 154°              speed - 4.2
      wind - SE'ly @ 10-15    seas - 4-6
      vis - clear

1200  POSIT. 15° 24' N - 154° 16' W    SPD. = 4.2   BAR. 1024 →
      SEAS 6-8-10   Wind SSE 20-25 kts      CLEAR

1800  Position - 15°-02.6' N × 154°-04.6' W
      course - 154°              speed - 4.0
      wind - SE'ly @ 15-20     seas - 6-8

66

Monday 22 Jan 2001

0001  L/R Panama As Before

0600  Position — 14°-19' N x 153°-40.1' W
      course — 154°              speed — 4.0
      wind — ESE'ly @ 15-20     seas — 6-8'
      vis — clean

1200  POS. 14.04'N - 153°26'W   SPD. 2.7   COURSE 120°T
      WIND  ENE 30-42   SEAS > 20' sporadic E & CROSS
      STORMY & RAIN  HEAVY at TIMES

1800  Position — 13°-55.2' N x 153°-12.7' W
      course — 130°             speed — 2.6
      wind — E'ly @ 25-30       seas — 12-15'
      vis — clear

2400  POSITION 13°49' N   152°58' W      SPD = 2.7 KTS
      WIND  ENE 25-40   SEAS SHITTY   BAR. 10.18.2 mB →
      TEMP 79°F   10% OVERCAST  OCCASIONAL RAIN

          TUESDAY  23  JAN  2001
0001  ENROUTE  PEARL HARBOR - PANAMA

0600  Position — 13°-43.7' N x 152°-41.8' W
      course — 112°             speed — 2.4
      wind — ENE'ly @ 20-25     seas — 8-12
      vis — clear

1200  Pos. 13°33'26" N - 152°39.80 W - Spd 3.3 Kts, Wind 20-25 SE
      Seas 6-8', Vis Clear, Bar 10.17.4, RM.76 x 157  4551

1800  Position — 13°-13.2' N x 152°-39.9' W
      course — 168°             speed — 3.3
      wind — E'ly @ 15-20       seas — 6-8
      vis — clear

67

Wednesday Jan 24, 2001

0001  E/R Pearl Harbor To Panama

0600  Position - 12° - 35.2' N × 152° - 33.1' W
      course - 178°              speed - 3.1
      wind - E'ly @ 15-25        seas - 6-8'
      vis - clear

1200  Pos. 12° 19.26 N - 152° 26.79 W, SPD 2.8 Kts, Wind E@ 25-30
      Seas 6-8' w/occ 20, Vis Clear, Barr. 1014.7 mB, MTG To #157 4470

1800  Position - 12° - 01.3' N × 152° - 21.2' W
      course - 155°             speed - 2.9
      wind - E'ly @ 25-30       seas - 8-12
      vis - clear

2400  Pos. 11° 43.16 N - 152° 16.02 W - Speed 3.4 Kts, Course 164°
      Wind 25-30 E, Seas 6-8 w/occ 14, Barr. 1015.7 mB
      Vis Clear, MTG To # 157 4443

THURSDAY Jan 25, 2001

0001  E/R Pearl Harbor To Panama

0600  Position - 11° - 25.1' N × 152° - 12.2' W
      course - 168°            speed - 2.9
      wind - E'ly @ 20+        seas - 7-9
      vis - clear

1200  Pos. 11° 12.33 N - 152° 06.71 W - Spd 2.8 Kts, Seas 4-6 w/occ 14
      Course 145°, Wind E@ 20-25, Vis Clear MTG To 157 4411

1800  Position - 10° - 54.5' N × 151° - 58.6' W
      course -                 speed - 3.0
      wind - E'ly @ 20-25      seas - 7-9
      vis - clear

68

FRIDAY Jan 26, 2001

0001  E/R Pearl Harbor To Panama

0600  Position - 10°-18.2'N × 151°-36.4'W
      course - 156°              speed - 3.6
      wind - E'ly @ 15-20        seas - 6-8'
      vis - Clear

1200  Pos. 10°03'51 N — 151°21.18 W, Spd 4.2 Kts, course 133°
      Wind E @ 15-20, Seas 3-6, Vis Clear, MTG #159 4213

1800  Position - 09°-45.3'N × 151°-01.7'W
      course - 126°              speed - 4.1
      wind - E'ly @ 15-20        seas - 6-8
      vis - Clear

2400  Pos 09°28'38.N — 150°43.06 W - speed 5.1 Kts, Wind E @ 15-20
      Seas 3-5', Vis Clear, Ber. 1019.5, MTG To #159 4178

SATURDAY Jan 27, 2001

0001  E/R Pearl Harbor To Panama As Before

0600  Position - 09°-10.1'N × 150°-19.5'W
      course - 132°              speed - 5.0
      wind - E'ly @ 20           seas - 5-7
      vis - Clear

1100/  TIME CHANGE    1100 = 1200    Z = 9 GMT
  1200  POSITION 28°52'N - 149°59'W    SPD = 5.2   MTG. 413.7
      WIND ENE 28K   SEAS 8'-12' E   BAR. 1013.0 ↓

1800  (ZD-9) Position - 08°-39.4'N × 149°-32.1'W
      course - 118°              speed - 4.4
      wind - E.NE'ly @ 25-30     seas - 6-8
      vis - reduced in squalls

69

SUNDAY Jan 28, 2001

0001   E/R Pearl Harbor To Panama as Before

0600   Position - 08°-17.8'N × 148-58.9'W
       course - 123°              speed - 3.9
       wind - E'ly @ 20+          seas - 14-6
       vis - clear

:800   Position - 08°-15.7'N × 148°-12.9'W
       course - 088°             speed - 3.0
       wind - ESE'ly @ 20        seas - 7-9'
       vis - clear

2400.  Pos. 08°16.17 N - 147°54.44 W  Spd 3.4 Kts, Wind NNE @ 25=30
       Seas 6-8', Vis Clear w/ overcast, MT76 To #157 4617
       Average Speed Last 24 Hrs 3.2 Kts, Course 093°

MONDAY Jan 29, 2001

0001   E/R Pearl Harbor To Panama as Before

0600   Position - 08°-15.2'N × 147°-34'W
       course - 086°             speed - 3.2
       wind - SE'ly @ 20+        seas - 6-8
       vis - reduced in numerous squalls

1200   POS. 08°17'N -147°10'W   Spd = 4.5   Course 086°T
       Wind ENE 20 Kt.   Seas 8-10 w/ Swell   Bar 29.71 →

1900   Position - 08°-08.5'N × 146°-36.3'W
       course - 086°            speed - 5.2
       wind - E'ly @ 10-15      seas - 5-7
       vis - clear

2400   Pos 08°15.61 N - 146°08.70 W - Speed 5.9 Kts, Seas 4-6'
       Wind E @ 15-20, Vis Clear, Bar 1018.0, MT76 To #157 3912

70

Tuesday Jan 30, 2001

0001  F/R Pearl Harbor To Panama As Before

0600  Position - 08°-07.6'N × 145°-32.5'W
      course - 105°                    speed - 5.7
      wind - E'ly @ 15-20              seas - 5-7'
      vis - clear

1200  Pos. 08° 05. M - 144° 54 W - Spd 5.4 Kts, Seas 8-10
      Wind E @ 15-20, Vis Cloudy w/ Rain

1230  Broken Strand on STBD Tow Wire, Reev ship - Cut 3'
      off and Took wire in 4½ Wraps

1300  Underway again to Panama, Proceeding Cautiously. MTG 3866
      course 077°, speed 4.7 Kts.

1800  Position - 08°-04'N × 144°-29.5'W
      course - 090°                    speed - 4.9
      wind - E'ly @ 20+                seas - 7-9
      vis - clear

2400  Pos. 08°01.25 M - 144°03.04 W - Spd 4.1 Kts. Seas 14-20'
      wind E @ 25-30, Vis, clear w/occ Rain, Course 086°
      MTG To #157 3784, Spd last 24 HRS 5.1 Kts

Wednesday Jan 31, 2001

0001  F/R Pearl Harbor To Panama As Before

0600  Position - 08'-03.9'N × 143°-38.2'W
      course - 086°                    speed - 3.7
      wind - E'ly @ 20+                seas - 6-8'
      vis - clear

1200  POSIT. 08 04'N 143°15'            SPD = 4.1  COURSE 086°T
            W = NE 25-30 KT.             SEAS 6-8 + SWELL = 15'

1800  Position - 08°-03.6'N × 142°-51.7'W

THURSDAY FEB 1st 2001

0001  ENROUTE PEARL HARBOR ~ PANAMA CANAL
TANDEM TOW DDG STODDART & DDG CORCORAN

1  Pos. 08° 04 N - 142° 28 W, MTG 3696, Spd 3.9 Kts
Seas 8-10, Wind ENE @ 25-30, Vis Clear w/local
Thunderstorms.

0600  Position - 08° - 06.7' N × 142° - 04.2' W
course - 086°          speed - 3.9
wind - ENE'ly @ 20+     seas - 7-9'
vis - clear

1200  Pos. 08.06. N - 141.41 W - Speed 3.6 Kts, course 092°
Wind ENE @ 25-30, Seas 10-12, Vis overcast w/lar Rain
MTG 3648

1800  Position - 08° - 06.3' N × 141° - 16.4' W
course - 086°          speed - 3.2
wind - var in local squalls  seas - 8-12
vis - red. in local squalls

2400  Pos. 08° 06' N - 140° 51. W - Speed 4.1 Kts, Seas 8-12'
Wind E @ 25-30, Rain Squalls, Vis Reduced, course 077°
MTG To #157 3599, Speed last 24 Hrs 4.0 Kts

FRIDAY Feb 2, 2001

0001  E/R Pearl Harbor To Panama ts Estero

0600  Position - 08° - 02.5' N × 140° - 26.4' W
course - 083°          speed - 3.9
wind - E'ly @ 15-20     seas - 6-8
vis - clear

0640  Advised by Mate Torres that tow looked

NO APPARENT ... ... TO ... ... ...
BENT LIFELINES & DENT @ MAIN DECK

72

FRIDAY FEB 2ND, 01 CONTINUED
1400  SALVAGE CREW ABOARD FOR SURVEY JIM
PAUL
OPENED EXTERIOR & SOME INTERIOR HATCHE
1800  Position - 08°-03.8'N x 140°-23.0'W
  sty @ DDG STODDARD
  Wind - E'ly @ 25-35          Seas - 12-14'

2400  Pos 08° 01.54 N - 140° 21.09 W, Standing By DDG Stoddard
  Wind E @ 25-30, Seas 12-14'

SATURDAY Feb 3, 2001
0001  Standing By DDG Stoddard, circling @ 1.5 Kts, Seas 12-14'
  Wind E @ 25-30, Stoddard Bow up, Stern down, Main
  Deck AFT awash, waves breaking over 2nd deck, near
  Rear Gun Turret.
0600  Pos. 07° 58'.08 N - 140° 33.09 W - Stoddard, .9 mi south
  Floundering in Night Seas, continues Taking on Water
1000  Pos. 07° 58'.09 N - 140° 31.5 W, Stoddard .5 mi N.
  Stern continues awash, Bow up, 25° list to Starboard
1200  Pos 07° 57'.09 N - 140° 32.6 W, Stoddard 1.0 mi E
  Ship continues list to STBD 30°, Clear aft, waves
  Breaking over 3rd deck aft.
1230  Pos. 07° 56,869' N - 140° 33.095 W - Alongside Stoddard
  Begins sharp roll to STBD. Begins going down fast at
  Stern, Bow coming straight up.
1240  Stoddard ships below surface @ Pos 07° 56.869 N -
  140° 33.095 W.
1300  Underway to Remora w/ Remora Destroyer. course 086
  Speed 6.2 Kts., Seas 14-20', Wind E @ 20-30, occ Rain

1800  Position - 07°-53.2'N x 140°-03.1'W
  course - 104°                Speed - 5.6
  Wind - ENE'ly @ 15-20        Seas - 6-8
  Vis - clear

2400  Pos. 07° 46.4 N - 139° 30.0 W - Seas 5 Wide ...

SUNDAY FEB, 4, 2001
0001 | E/R Pearl Harbor To Panama w/one Destroyer in Tow

0600 | Position - 07°- 42.6' N x 138.' - 59.4' W
course - 100°      Speed - 5.4
wind = E'ly @ 15-25      Seas - 7-9'
vis - clear

1200 | Pos. 07°40.8' N - 138° 29.2 W    S: 5.1 kt Course 100°T
SEAS 8-14' WIND E'LY 30 Kt.    M.TG. 3486

1800 | Position - 07°- 37.9' N x 137° - 59.4' W
course - 0.95°      Speed - 5.0
wind = E'ly @ 15-20      Seas - 5-7'
vis - clear

2400 | Pos. 07° 38' N - 137° 26. W - sped 5.9 Kts, course 086°, Seas 4-6'
Wind E E @ 20-25, vis Clear oc/showers M.TG 3379 To 157

Monday Feb 5, 2001
0001 | E/R Pearl Harbor To Panama as Before

0600 | Position - 07°- 36.9' N x 136° - 52.3' W
course - 085°      Speed - 5.6
wind = E'ly @ 20+      Seas - 4-6'
vis - clear, except in isolated
squalls

1200 | Pos. 07° 40' N - 136° 18' W - spd 5.6 Kts, Seas 6-8', course 086°
vis Overcast w/Thundershowers, Wind E @ 20-25, M.TG 3330

1800 | Position - 07°- 42.7' N x 135° - 44.1' W
course - 0.87°      Speed - 5.8
wind = E'ly @ 15+      Seas - 4-6
vis - clear

2400 | Pos. 07° 44.3' N - 135° 09.5 W - speed 5.7 Kts, course 08°

74

Tuesday Feb 6, 2001

0001   F/R Rosch Harbor To Panama as Before

0330   Pos 07°46 N - 134° 49' W - Crossed Time Bone To Pacific Time

0600   Position - 07° - 47.8' N × 134° - 39.2' W
       course - 095                    speed - 5.5
       wind - E'ly @ 10-15             Seas - 3-5
       vis - clear

1200   POSITION 07° 47.5' N   134° 02.5 W       SPD = 6.5
       COURSE 095°   WIND 25 Kts E.   SEAS 6'8'

1800   Position - 07° - 47.5' N × 133° - 23.2' W
       course - 081°                  speed - 6.4
       wind - E'ly @ 15-25            Seas - 5-7
       vis - clear

2400   Pos. 07° 50.7 N - 132° 43.4 W - Course 090, speed 6.6 Kts
       Wind E @ 15-30, vis clear, MTG 2117

Wednesday Feb 7, 2001

0001   F/R Rosch Harbor To Panama as Before.

0600   Position - 07° - 48.6' N × 132° - 01.7' W
       course - 094°                  speed - 6.6
       wind - E'ly @ 15-20            Seas - 5-7'
       vis - clear

1200   Pos. 07° 50.7 N - 131° 24.2 W - Speed 6.3 Kts, Wind E @ 20-25
       Seas 5-7 w/ occ 12', vis clear, MTG 3038

1800   Position - 07° - 48.9' N × 130° - 47.8' W
       course - 085°                  speed - 6.2
       wind - E'ly 15-25              Seas - 5-7
       vis - clear

2400   Pos. 07° 48.6 N - 130° 16.0 W - speed 5.2 Kts, Course 094°
       Wind E @ 20-25, Seas 4-6', vis clear, MTG 2001

THURSDAY Feb 8, 2001

0001 F/R Pearl Harbor To Panama As Before

0600 Position - 07°-46.9' N x 129°-43.8' W
Course - 089°          Speed - 5.1
Wind - E'ly @ 15-25    Seas - 5-7'
Vis - Clear

1200 POSITION   07° 46.8' N - 129° 13.2' W   Spd = 5.1
820 RAN PORT & CENTER ENG.   Wind E. 20-25 Seas 8-10
WEATHER CLEAR & LOCAL SQUALLS   BAR, 1009 →

1800 Position - 07°-45.9' N x 128°-42.2' W
Course - 088°          Speed - 5.5
Wind - E'ly @ 20+      Seas - 8-10
Vis - Clear

2400 Pos. 07° 46.2' N - 128° 10.4' W - Speed 5.2 Hrs, Course 091°
Wind E @ 20+, Vis Clear, Seas 4-6, MTG 2846
Average Speed Last 24 Hrs. 5.2 Kts

FRIDAY FEB 9, 2001

0001 F/R Pearl Harbor To Panama As Before

0600 Position - 07°-46.6' N x 127°-38.3' W
Course - 090°          Speed - 5.3
Wind - E'ly @ 15-20    Seas - 5-7
Vis - reduced in passing squalls

1200 POSITION 07° 47' N - 127° 09' W   Spd. 5.0
COURSE 091°  M.T.G. 2786   8-12' SEAS WIND NE 25 Kts

1800 Position - 07°-45.5' N x 126°-41.1' W
Course - 087°          Speed - 4.8
Wind - E'ly @ 15-20    Seas - 6-8
Vis - Clear

76

SATURDAY FEB 10, 2001

0001 E/R Pearl Harbor To Panama As Before

0600 Position - 07°-39.9'N x 125°-47.7'W
     course - 088°           speed - 4.5
     wind - E'ly @ 15-20     Seas - 8-10'
     vis - clear

1200 POSITION 07°38'N - 125°23'W
     SPD. 4.3  COURSE 100°T  WIND E 25 SEAS 10-14

1800 Position - 07°-35.4'N x 125°-09.9'W
     course - 089°           speed - 4.1
     wind - E'ly @ 10-15     Seas - 7-9'
     vis - clean

2400 Pos. 07° 35.4 N - 124° 32.7 W, speed 4.8 Kts
     Seas 4-6', Wind E @ 20-25, course 096°, MTG 2631
     average speed last 24 hrs - 4.2 Kts., vis Clear w/showers

SUNDAY FEB 11, 2001

0001 E/R Pearl Harbor To Panama As Before

0600 Position - 07°-33.5'N x 124°-04.2'W
     course - 089°           Speed - 4.6
     wind - E'ly @ 10-15     Seas - 5-7'
     vis - clear except m Scattered
          squalls
1200 07° 32° N - 123°37 W.    SEAS 12'-15'

1800 Position - 07°-30.1'N x 123°-11.6'W
     course - 088°           speed - 4.5
     wind - E'ly @ 20-25     seas - 10-12
     vis - clear

2400 Pos. 07° 28.7 N - 122° 44.3 W - speed 4.6 Kts
     Course 088°  Seas 10-12', Wind E @ 25-30

77

Monday Feb 12, 2001

0001    E/R Recel Harbor To Panama As Before

0600    Position - 07° - 28.6' N × 122° - 14.9' W
        Course - 090°           Speed - 4.5
        Wind - E'ly @ 20-25     Seas - 10-12
        Vis - clear

1200    Pos. 07° 29.4' N - 121° 46.6' W - Speed 4.8 Kts, Course 082°
        Seas 10-12', Wind E @ 20-25, Vis clear

1800    Position - 07° - 34.6' N × 121° - 18.8' W
        Course - 073°           Speed - 4.5
        Wind - ENE'ly @ 20      Seas - 10-12'
        Vis - clean

2400    Pos. 07° 42.7' N - 120° 51.2 W - Course 074° - Wind ENE @ 20-25
        Seas 10-12', Vis clear, MTG 2411, Avg of 24 HRS 4.7 K

TUESDAY FEB 13, 2001

0001    E/R Recel Harbor To Panama As Before

0600    Position - 07° - 49.4' N × 120° - 20.7' W
        Course - 082°           Speed - 5.0
        Wind - E'ly @ 20+       Seas - 8-12
        Vis - clean

1000/1100  TIME CHANGE  8Z to 7Z   120° W Long

1200    Posit. 07° 52.6 N - 119° 56.5' W  Spd - 5.5
        ___ FUEL ___ 31,300 gal ___ ___ 261 24 hrs
        2358 MTG TO CANAL ENTRANCE
        SEAS 8'-12' WIND 25-30 NE Course 085°

1800    Position - 07° - 54.3' N × 119° - 25.7' W

Case 1:01-cv-00048   Document 43   Filed in TXSD on 08/17/2001   Page 275 of 338

78

Wednesday Feb 14, 2001

0001  E/R Pearl Harbor To Panama As Before

0600  Position - 07° - 59.4' N × 118° - 28.1' W
      Course - 084°              Speed - 4.8
      Wind - E'ly @ 25-30        Seas - 12-15
      Vis - Clear

1200  Pos 08° 02.4 N - 118° 00.0 W - Course 082°
      Speed 4.5 Kts, Seas 10-14, Wind E @ 20-25, Vis Clear
      MTG 2240, FRESHENED NII° on Wire

1800  Position - 08° - 07.8' N × 117° - 29.7' W
      Course - 079°              Speed - 4.7
      Wind - E'ly @ 20-25        Seas - 10-12'
      Vis - Clear

2400  Pos 08° 11.7 N - 116° 59.7 W., Course 089°, Spd 5.6 Kts
      Wind E @ 20-25, Seas 10-12, MTG 2189, Vis Clear
      Average Speed Last 24 HRs - 4.8 Kts

                    THURSDAY FEB 15, 2001

0001  E/R Pearl Harbor To Panama As Before

0600  Position - 08° - 12.1' N × 116° - 28.4' W
      Course - 093°              Speed - 5.0
      Wind - E'ly @ 20+          Seas - 8-12

1200  Pos 08° 12.5 N - 116° 01.7 W - Speed 4.3 Kts, Course 089°
      Wind E @ 25-30, Seas 10-12', MTG 2123

1800  Position - 08° - 10.9' N × 115° - 35.7' W
      Course - 090°              Speed - 4.4
      Wind - E'ly @ 25-30        Seas - 10-12'
      Vis - Clear

FRIDAY FEB 16, 2001

0001   Er Pearl Harbor To Panama as before

0600   Position—08°-08.1'N×114°-47.6'W
       course — 093°          speed — 3.5
       wind—E'ly @ 20-25      Seas— 8-12'
       vis—clear

0900   STOPPED, RUN DOWN SEAS FOR FUEL
       SOUNDINGS  21,500 OB.  SEAS 6-8
       ASSESSED possibility of Fueling from
       POCOKAN (NO GO)
       Set Course 110 TRUE  STARTED CENTER
       ENGINE = 3 × 840  EST FUEL Consumption
       @ 2500/DAY.

1200   POS 08°.00.7 N — 114° 29.2 W — Speed 4.9 Kts, course 108°
       Wind ENE @ 20-25, Seas 6-10, YMTG 2058

1800   Position — 07°-51.8'N×114°-06.7'W
       course — 110°          speed— 3.9
       wind—ENE'ly @ 20+     Seas— 7-9'
       vis— clear
2400   POS 07°46.4 N — 113° 42.1 W — Course 105°, Spd. 4.1 Kts
       Wind ENE @ 20+ , Seas 6-8', YMTG 2038
       Average Speed last 24 HRS  4.0

       SATURDAY FEB 17, 2001

0001   Er Pearl Harbor To Panama as before

0600   Position — 07°-40.1'N×113°-18.1'W
       course — 108°          speed — 4.4
       wind—NE'ly @ 20-25     Seas— 8-10
       vis—clear except in passing squalls
1200   POS 07°30.9 N —112°52.7 W — Speed 4.9 Kts, Seas 6-8'

SUNDAY FEB 17, 2001

0001 E/R Back Harbor To Panama As Above

0600 Position — 07°-28.1'N x 111°-25.7'W
course — 085°          speed — 5.1
wind — E'ly @ 15-25          seas — 6-8'
vis — clear

0700 Commence Takeing Fuel FROM Chevron
Ray Doug. Charles aboard to transfer
SPLIT HOSES CHANGED NUMEROUS TIMES
1000 ACTUALLY STARTED PUMPING FUEL
1400 SECURED Pumping TOOK APPROX 13000 gal
1400 DISCOVERED HOLES IN PORT SIDE
APPARENTLY FROM BUMP with STODDARD
ONE HOLE 6"x6" 8' OFF WATER Directly BELOW
AFT EDGE OF 5"x38" GUN HOUSE
ONE HOLE 18"x18" At BOOT TOP & HULL PAINT
3' ABOVE WATER Line DISCOVERED SUBSTANTIAL
DOWN FLOODING IN CPOES QUARTERS &
SURROUNDING AREA. BUILT SOFT PATCH
FOR LOWER 18"x18" HOLE AND PREPARE FOR
INSTALLATION, weather allowing.
1420 U/w 2 ENG 800 RPM 4.4 Kts 8'-10' SEAS
WIND 20-25 KTS NE
POSITION 07°28' -111.26 DRIFTED 270°
7 MILES in 7 HOURS.

1800 Position — 07°-27.6'N x 111°-16.2'W
course — 095°          speed — 4.4
wind — E'ly @ 80+          seas — 8-10'
vis — clear

2400 Position 07°25.0 N — 110° 48.6 W, Speed 4.8 Kts
course 094°, Wind E @ 20-25, Seas 8-10
MTG 1940

(28'11')

MONDAY FEB 18, 2001

0001  F/R Pearl Harbor To Panama As Before

0600  Position - 07° - 21.9' N x 110° - 17.2' W
      course - 095°              speed - 5.0
      wind - E'ly @ 20+          seas - 6-8'
      vis - Clear

1200  Pos. 07° 20.5' N - 109° 49.2' W - speed 4.6 kts, course 095°
      Wind E @ 20+, Seas 10-12, MTG 1879

1800  Position - 07° - 18.6' N x 109° - 20.2' W
      course - 094°              speed - 4.8
      wind - E'ly @ 20-25        seas - 8-10'
      vis - Clear

2400  Pos. 07° 15.9' N - 108° 50.8' W, speed 4.8 kts,
      course 095°, seas 8-10, Wind E @ 25-30
      MTG 1823, Average spd last 24 Hrs 4.8 kts

TUESDAY FEB 19, 2001

0001  F/R Pearl Harbor To Panama As Before

0600  Position - 07° - 13.6' N x 108° - 23.1' W
      course - 094°              speed - 4.6
      wind - E @ 25-30           seas - 10-12'
      vis - clear

1200  Pos. 07° 10.9' N - 107° 53.9' W, speed 4.4 kts, Seas 14-16'
      Wind E @ 20-25, Course 097°, MTG 1868

1800  Position - 07° - 09.1' N x 107° - 27.9' W
      course - 095°              speed - 4.7
      wind - E'ly @ 15-20        seas - 8-10'
      vis - clear

2400  Pos. 07° 06.3' N - 107° 01.1' W, speed 4.8 kts,
      Seas 4-6', Wind E @ 20-25, vis, Clear

82

WEDNESDAY FEB 21, 2001

0001  E/R Pearl Harbor To Panama As Before

0600  Position – 07° - 05.5' N × 106° - 34.9' W
      course - 094°          speed - 4.2
      wind - E'ly @ 20+      seas - 7-10'
      vis - clean

1200  Pos. 07°01.9 N – 106° 10.4 W, speed 4.2 Kts, course 092°
      Wind E @ 20+, Seas 6-8', Vis Clean

1800  Position – 07° - 02.1' N × 105° - 43.4' W
      course - 088°          speed - 4.5
      wind - E'ly @ 20+      seas - 6-8'
      vis - Clean

2400  Pos. 07° 03.2 N – 105° 15.9 W – speed 5.1 Kts
      Seas 6-8, Wind E @ 15-20, Vis Clear, MTG 1608
      average spd last 24 Hrs  4.4 Kts

THURSDAY FEB 22, 2001

0001  E/R Pearl Harbor To Panama As Before

0600  Position – 07° - 04.5' N × 104° - 46.6' W
      course - 088°          speed - 4.7
      wind - E'ly @ 10-15    seas - 4-6'
      vis - clear

1100/1200  TIME CHANGE  Z 7 = Z 6 (Central Std)
           POSITION 07° 05' N – 104° 23'  Spd 4.7  Avg Spd 4.5 ON
           FRESHEN NIP ON  FOUL WORE

1800  Position – 07° - 05.7' N × 103° - 58.8' W
      course - 088°          speed - 4.5
      wind - E'ly @ 15-20    seas - 5-7'
      vis - clear

2400  Pos. 07° 07.6 N – 103° 30.2 W – speed 4 Kts

83

**FRIDAY FEB 23, 2001**

0001  E/R Reovt Harbor To Panama As Before

0600  Position — 07° - 08.8' N × 103° - 06.4' W
      course - 089°          speed - 4.5
      wind - E'ly @ 20       seas - 5-7'
      vis - clear

1200  Pos. 07° 09.2 N — 102° 37.7 W, speed 5.3 Kts
      Seas 3-5', Wind E @ 15-20, course 077°
      Vis Clear

1450  changed course To 080, Pos. 07° 08.6 N — 102° 23.8 W
      Heading For Fuel Rendevous at Gulf Of Nicopa

1800  Position — 07° - 11.8' N × 102° - 08.6' W
      course - 080°          speed - 4.7
      wind - E'ly @ 115-20   seas - 5-7'
      vis - clear

2000  COURSE CHANGE  090° T

2400  Pos. 07° 11.0 N — 101° 42.0 W — Speed 4.7 Kts
      Course 102°, Seas 5-7, Wind E @ 20-25
      MTB 1395, Average spd last 24 HRS  4.5 Kts
      TV

**SATURDAY FEB 24, 2001**

0001  E/R Reovt Harbor To Panama As Before, Fuel O/B  20,233 Gals

0600  Position — 07° - 07.4' N × 101° - 13.5' W
      course - 070°          speed - 4.6
      wind - E'ly @ 15-20    seas - 4-6'
      vis - clear

1200  Pos. 07° 08.5 N — 101° 42.1 W — speed 5.0 Kts, Seas 4-6'
      Wind E @ 15-20, Vis Clear

1800  Position — 07° - 10.4' N × 100° - 14.9' W
      course - 090°          speed - 4.8
      wind - E'ly @ 15-20    seas - 5-7'

84

SUNDAY FEB, 25, 2001

0001  F/B Pearl Harbor To Panama As Before , Fuel O/B 17,500 Gals

0600  Position = 07°-11.9'N x 099°-14.8'W
      course = 090°              speed - 4.7
      Wind - E'ly @ 10-15        seas - 2-4'
      vis - clear

1200  Pos. 07°13.2 N - 098° 47.9 W - speed 4.7 Kts
      Seas 2-4', Wind E @ 10-15, Vis clear, MTG 1222

1800  Position = 07°-14.1'N x 098°-21.7'W
      course = 086°              speed - 3.9
      wind - E'ly @ 10-15        seas - 2-4'
      vis - clear

2400  Pos. 07°15.6 N - 097° 59.5 - W, Speed 3.5 Kts
      Seas 3-5', Wind E @ 15+, course 086°, MTG 1124
      average speed last 24 Hrs 4.3 Kts

MONDAY FEB 26, 2001

0001  F/B Pearl Harbor To Panama As Before - Fuel O/B 15,353 GALS

0600  Position - 07°-13.6'N x 097°-38.4'W
      course = 091°              speed - 3.3
      wind - E'ly @ 5-10         seas - 2-4'
      vis - clear

1200  Pos. 07°14.5 N - 097° 17.9 W - speed 4.1 Kts, Seas 1-3'
      Wind 15+ E, course 095°, Vis - clear

1800  Position - 07°-14.3'N x 096°-53.2'W
      course = 095°              speed - 3.7
      wind - E'ly @ 5-10         seas - 2-4'
      vis - clear

2400  Pos. 07°15.2 N - 096° 28.6 W - speed 4.7 Kts
      Course 089° Seas 2-4' Wind E @

85

### TUESDAY FEB 27, 2001

0001   E/R Pearl Harbor To Panama As Before - Fuel O/B - 13,364 Gal

0600   Position - 07°-17.2'N × 096°-01.7'W
       Course - 089°          speed -
       Wind - ENE'ly @ 10     Seas - 2-4'
       Vis - clear

1200   POSITION 07°17'N  095°32'W  C = 087°T

1800   Position - 07°-17.2'N × 095°-12.2'W
       course = 094°          speed - 4.5
       wind = ENE'ly @ 20+    seas - 6-8'
       Vis - Clear

2400   Pos 07°12.6 N - 094°43.5 W - speed 4.9 Kts
       Course 091°, Seas 6-8', Wind ENE @ 15-20
       Vis, Clear, M.T.G 979, Average spd last 24 Hrs - 4.4 Kts

### WEDNESDAY FEB 28, 2001

0001   E/R Pearl Harbor To Panama As Before, Fuel O/B 11,375 Gals

0600   Position - 07°-17.9'N × 094°-10.7'W
       course = 092°          speed - 5.4
       wind = E'ly @ 10-15    seas - 3-4'
       Vis = clear

1800   Position - 07°-20.1'N × 092°-54.3'W
       course = 084°          speed - 7.3
       wind = E'ly @ 5-10     seas - 1-2'
       Vis = clear

2400   Pos 07°24.1 N - 092°15.8 W - speed 6.3 Kts, Vis clear
       Wind E @ 10-15, Seas 2-3', Course 093°, MTG 833
       Average speed last 24 Hrs - 6.0 Kts,

### THURSDAY MAR 1, 2001

0001   E/R Pearl Harbor To Panama As Before

86

THURSDAY MAR 1, 2001 — Cont'd

2400   Pos. 07°52.6 N — 089°32.8 W — speed 6.9 Kts, Seas 2-4'
Wind EME @ 10, Course 071,

FRIDAY Mar. 2, 2001

0001   E/R Rendt Harbor To Pandama As Before

0600   Position — 08°—04.1'N × 088°—57.5'W
course — 077°     speed — 6.8
wind — weak/van.     seas — slight
vis — clean

1100/1200   TIME CHANGE TO EASTERN STD TIME
POSITION 08°13'N — 088°25'W SPD 6.5 C=075

1800   Position — 08°—23.1'N × 087°—47.6'W
course — 076°     speed — 6.7
wind — weak/van.     seas — calm
vis — clean

2400   Pos. 08°33.5 N — 087°13.6 W — speed 6.0 Kts
Seas Calm, Wind vor 5 Kts, Vis clear

SATURDAY

0001   E/R Rendt Harbor To Panama As Before

0600   Position — 08°—41.5'N × 086°—38.1'W
course — 075°     speed — 5.9
wind — weak/van.     seas — calm
vis — clean

1200   POSIT. 08°53'N — 086°02'W SPD. 7.0 C= 067 T
26 miles from Rhendevous with 'GLORIA' & LATHAM

1400   ALONG-SIDE GLORIA

1630

87

Sunday
04 March 2001

0001 | enrante to Panama, Panama

0500 | Position – 08°–26.9' N × 084°–45.9' W
Course – 114°          Speed – 5.3
wind – weak/var.          Seas – calm
vis – clear

_(faint, illegible line)_

7? | 0.82?   084.3?   Speed ...

1800 | Position – 08°00.1' N × 083°–52.4' W
Course – 115°          Speed – 4.8
wind – weak/var.          Seas – calm
vis – clear

2430 | Position – 07°47.8 N   083°23.6 W
Course – 103°    Speed 4.3
Wind – Weak Var.   – Seas Calm.

Monday
05 March 2001

0001 | ✓w. as above

0600 | Position – 07°–39.6' N × 083°–05.1' W
Course – 116°          Speed – 3.9
wind – weak/var.          Seas – calm
vis – clear

0800 | 0736.6 × 8258.4   Speed 3.6 contrary currents

88

Monday
05 March 2001

1800    Position - 07°-21.5'N × 082°-21.1'W
        course - 116°              speed - 3.8
        wind - weak/var.          seas - 2-3'
        vis - clear

Tuesday
06 March 2001

0600    Position - 07°-06.3'N × 081°-32.6'W
        course - 09.8°            speed - 4.5
        wind - E'ly @ 10-15       seas - 2-4'
        vis - clear

1800    Position - 07°-08.3'N × 080°-42.8'W
        course = 088°             speed - 4.4
        wind - weak/var.          seas - slight
        vis = clear

23:00   0710 × 80 23   wind NE 8Kts, seas slight
        Clear moonlight  +/- 4Kt

Wednesday
07 March 2001

0600    Position - 07°-20.2'N × 080°-00.6'W
        course - 056°            speed - 3.4
        wind - NE'ly @ 5-10      seas - slight
        vis - clear

1800    Position - 07°-58.5'N × 079°-45.4'W
        course - 018°

THURSDAY
08 March 2001

0400   08°-40.1'N° 079°-30.9'W , S - 4.3

0630   Entering anchorage area. Contact Flamingo
Station ch 12. Instructed to proceed to
position 1.3 mi from Sea Buoy + take pilot
0930  thirteen tow. Reverse 12 piece chain
await pilot, wind N 8kts, flat.
0935  Pilot board A/c 3 inspectors
for paper pre transit inspection  10:30
Passed inspection, Capt kick bell life + raft
crew for ship berthing etc.
         Tonnage displacement in question on
worship.
11:00  steaming slowly to North to unmete cargo
14:00  all secure √
14:15  A/c at Ramos  quiet graft agent
      by Topro vessel 380 deg of sul.
      Inspections + work all day.

Friday
0900   awaiting pilots to bring surveyors as
ordered on safety inspection
10:00 Pilots rescheduled on own to go, commence
details of ship prep break off cables,
change chain, heli up, etc,
18:00  Pilot arrives, U Way 2000 finishing
ships ..... ...... with pilot (silly)
     deck on adjusters. Slipping work.

      6:30  Pilot aboard, U/way very
dat - Mon. Various tasks of preparing ship for passage

90

14th

Wed | Pilots sched for 0930

1000 | Boat o/t to suggest pilots 1230

1420 | Pilot on board 1420 anchor up w/way 1609

~~1730~~ | Enter first locks, 1620 Cleared locks

1745 | Clear breakwater, 1800 line out 1500 ft

22:08  09 46 X 79 57   5.3 Kts turning 720 on 3

word NNE 10-12 Kts, old swell to 9 ft, NNE

Clear night, tow out 1450 ft, riding nicely.


THURSDAY 15.3.2001

0400 | 09° 55'.2 N 079° 58'.3 W    SPEED 5 KTS

COURSE 356    WIND NNE 10 KTS    Seas 6/8 ft.

Tow out 1450 FT.


0600 | 10° 25'.5 N  080° 01'.2" W  Spd 5.1 KTS

Wind NE 8-10 KTS    Seas 6 FT.    RPM 730 -

0800 | 10° 34'.9 N 080° 02'.8 W  Spd 4.9 KTS   Wind NNE 12-14 KTS

Seas 6'-8' FT.


0900 | 10° 40 X 80° 04"    Wind ENE 13 Kts    5.1 KTS

Swell 5-8 ft.   av. 5.4 Kt    1415 M T.Go


1600 | 11° 14'.7 N  080° 11'.2 W  Spd 5.0   RPM 725

Wind NNE 10 KTS   Seas 6-8 FT.

1800 | 11° 24'.3 N  080° 14'.3 W  Spd 5.1   Wind NNE 15 KTS

1900 | 11° 29' N  080° 15'.7 W  Spd 5.1.

Wind NNE 17 KTS    Course 349   Seas 6-8 FT.


Friday 16, 2001

0500 | 12° 15'.1 N  080° 33'.3 W  Spd 4.3 KTS

Wind NE 12 -  Seas 4-6 FT.   RPM 725 - 725 - 650

0700 | 12° 22'.7 N  080° 36'.1 W  Spd 4.0  Wind NE 10

Seas 6-8 FT.

91

SATURDAY
17 March 2001

0020   13° 51.1 N   081° 11.2 W   SPEED 6.0 KTS   RPM 702
Winds 6/8 KTS E   SEAS 4/6 FT.

0400   14° 09.9 N   081° 25.9 W   Spd. 6.1 + Course 321°
0500   14° 15. N   081° 29.1 W   Spd 6.4   New course 336°
0600   14° 21. N   081° 31.4 W   Spd 6.3
0700   14° 27.1 N   081° 33.5 W   Spd .63   RPM 720
Wind E 7-10 KTS   Course 336°   Seas 4'

0800   14 33 × 81 34.8   Speed 6.0/6   wd ESE 12-15
1140 MT Go   - Seas to 5 ft.

1200   14 53 × 81 44   Wind E 15-18,   seas to 6 ft
Gunboat at close quarters to look at warship.
Cleaning Port eng after cooler.  S, 2 left

1600   15° 12.9 N   081° 51.9 W   Spd. 5.1   Wind East 04 TS
Seas 4 FT.

1700   15° 17.6 N   081° 53.3 W   spd 5.2
715   three mains on line   710 RPM  Spd. 5.6 KTS
1800   15° 23.4 N   081° 54.5 W   Spd. 5.9
1930   15° 31.3 N   081° 57.9 W   Spd 5.7   Wind East 8 10 KTS

2130   soft winds S'ly  15° 41 × 82 03   S; 7 KTS
C Course to 330

SUNDAY
18 March 2001

____   15° 53.8 N   82° 10.5 W   SPEED 5.4 KTS   Course 332°
wind ESE 5    Seas 4'
____   16° ___ N   82° 26.7 W   Spd 5.4 KTS
____   ____   ____ W   Spd. 5.5   Seas 4'   Course 332°
0500   16° 4.8 N   082° 27.9 W   Spd. 5.4

Case 1:01-cv-00048   Document 43   Filed in TXSD on 08/17/2001   Page 289 of 338

92

MONDAY
19 March 2001

0200   17° 48.9 N   083° 42.7 W   Speed 5.5 KTS
Course 316°   Wind 6/8 KTS SE Scr 2/4

0400   17° 57.4 N   083° 52.6 W   Spd 6.0 KTS
Course 310°   Wind SE 6/10 KTS   Seas 2/4

0500   18° 01.2 N   083° 56.2 W   Spd 5.9   Wind E 10 KTS
Seas 2-4 FT   0600 pick ε III on RTN s/ Key West

0700   18° 10.3 N   084° 03.7 W   Spd 6.0 KTS, Broken Gradual

0830   Stop, Tom, just Pete + Phil ___ ___ deck
to fix lights, get wipers, ___ ___ ___
wind SE 10/14

0900   18° 19 x 84° 11   6+ kts   880 m ___

1200   18 33 x 84 24   Wind SE 10
1600   18° 49.2 N   084° 35.5 W   Spd 5.9 wind WW 2 KTS
1800   18° 55.8 N   084° 38.7 W   Spd 4.9
1900   18° 59.4 N   084° 42.1 W   ___ ___ ___ NW ___
2400   19° 20.5 N   85° 02.6 W   ___ ___ Crse 304
Wind NW 3/6 KT   ___

TUE ___
20 Mar ___

0200   19° 30.2 N   85° 07.3 W   ___
___ ___ ___ NW 5 KT ___
0400   19° 39.6 N   85° 14.8 W   Speed 6.0 KTS Crse 225 ___ 3/7
0500   19° 44.9 N   085° 17.7 W   Spd 5.7   Wind NW 2 ___
Sea 2 4'   RPM's 720
0600   19° 50.2 N   085° 19 ___ W   ___ ___ ___
Wind NNW 16 KT
0700   19° 55.2 N   085° 22 W   ___
730   19 58 x 85 23   Wind picking up from NW
15 KTs, seas starting up   750 m ___

21 March 2001

21° 21.6 N 86 10.2 W Sp 5.9 kt
Wind NNW Seas S/

0400 21° 30.7 N 086° 15.9 Spd 6.5 Wind NNW 20-25
0500 21° 37.3 N 086° 18.7 W Spd 6.3
0600 21° 43 N 086° 21.0 W 6.3 Wind NNW 15
21° 47.8 N 086° 25.5 W Spd 5.9 Wind NNW 15
Seas 7-10 ft RPMs 730
21° 52.9 N 086° 28.3 W Spd 5.4

1900 21 58 N 86° 31 5.4 kt 630 MT Go B'ville Buoy
Wind NW 15-22, seas 4-7 ft, softer spacing after
N'ly currents, N'ly winds and steep seas. Clear.
A.OK

230 22° 10.6 N 86° 46.6 W Spd 5.4 kt Wind NW 20/23 kts
Seas 6/8 ft
1615 22° 21.3 N 087° 01.9 W Spd 5.0 kts
1700 22° 22.6 N 087° 05.6 W Spd 5.0
1800 22° 24.2 N 087° 10.7 W Spd 5.0 Wind NNW 10-13 kts
1900 22° 25.9 N 087° 15.7 W Spd
2000 22° 27.7 N 087° 20.8 W 4.8 kt Wind NW
2100 22 35.7 N 087° 41.5 W Spd 5.3 kts Wind NW 6-10 kts

Thursday
22 March 2001

5100 22° 37.6 N 087° 46.2 W Spd 5.1 kts Wind NE 5/
0200 22° 39.9 N 087° 51.7 W Spd 5.3 kts Wind NE 4-7 kts course 294
0400 22° 44.6 N 088° 02.6 W Spd 5.6 kts Wind NE 4/8 kts Seas 29.0
0500 22° 46.5 N 088° 08.1 W Spd 5.6 Wind NE 10 kts
0600 22° 49.3 N 088° 13.4 W Spd 5.6
0700 22° 52.1 N 088° 18.7 W Spd 5.7 RPM's 7550 Wind NNE 5-10 kts
Seas 2-4 ft
0800 22° 54.4 N 088° 24.5 W Spd 5.9 kts Wind N 2-5 kts
23° 06.3 N 088° 03 W 5.2 kts

94

FRIDAY
23 Mar

| | | |
|---|---|---|
| 0100 | 23° 25.9 N   089° 50.6 W   Spd 5.1 kts | |
| 0200 | 23° 28.0 N   089° 55.7 W   Spd 5 kts | |
| 0400 | 23° 31.8 N   090° 16.6 W   Spd 5.2 kts   Course | |
| 0500 | 23° 33.6 N   090° 16.6 W   Spd 5 kts | |
| 0600 | 23° 35.8 N   090° 17.1 W   Spd 5 kts | |
| 0700 | 23° 37.9 N   090° 22 W   Sailed   Spd 5.6 | |

Seas   Course   155°

| | |
|---|---|
| 0800 | 23° 40.1 N   090° 26.9 W   Spd 5.3 |
| 1700 | 24° 01.6 N   091° 18.2 W   Spd 5.3, ESE 5 KTS, Course 287° |
| 1910 | 24° 05.7 N   091° 30.2 W   Spd 5.5 |
| 22.00 | 24° 11 N 91° 47   Clear, cool    ship  rig lift |

getting dim. Cleared tow Winch, repaired
linkage, cleared  rig in   310 M T G

| | |
|---|---|
| 2400 | 24° 15.3 N   091° 58.7 W ESE   Spd 5.8 kts   S/h |

Course 293.

Saturday
24 Mar

| | |
|---|---|
| 0100 | 24° 19.8 N   092° 10.8 W   Spd 5.9 kts |
| 0330 | 24° 23.4 N   092° 1 W |

Seas

| | |
|---|---|
| 0500 | 24° 26.5 N   092° 2.2 W   Spd 6.1 kts |
| 0600 | 24° 29.8 N   092° 35.1 W   Spd 5.7 kts   Wind S 10-12 kts |
| 0700 | 24° 32.3 N   092° 40.7 W   Spd 5.5 KTS   Wind S 13 kts |

Seas 4 FT   Brng 780   Fwn

| | |
|---|---|
| 0800 | 24° 34.1 N   092° 46.4 W   Spd 5.4 |
| 1700 | 24° 52.4 N   093° 29.8 W   Spd 5.5   Wind S   5 kts |

Seas 1.25 FT   Course 283°

| | |
|---|---|
| 1900 | 24° 56.5 N   093° 41.5 W   Spd 5.6 |
| 2400 | 25° 6 N 94 11   169 M T G   5.7 kts |

Wind E'ly  8 kts, seas 2 ft, Clear.

Sunday

Sunday
25 March 200?

25° 34.3 N 095° 38.8 W   Spd 5.5 kts   Wind NE 7/10 kts.
25° 37.9 No 095° 50.1 W   Spd 5.3 kts   Wind NE 6/10 kts.
25° 41.5 N 096° 00.7 W   Spd 5.1
25° 45.3 N 096° 11.6 W   Spd 5.2   Wind E 12-16 kts
25° 52.0 N 096° 21.2 W   Spd 5.3

25° 55.0 N

25° _____
25° 59.8 N 096° 53.9 W
26° 01.8 N 097° 00.1 W

Thursday 29 March 200?

1020 (CST) Spoke to U.S. Minesweep Garcia this morning. Per
moving boat to "Int Ship Broken" to get him to Int ____
_____ The motion _____
as long as it was O.K'd with "Int Ship Broken"
at 10:00 this morning this had spoke to _____
with Bear _____ U.S. Marshals 956-548-2519 Register

1                IN THE UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF TEXAS

2                    BROWNSVILLE DIVISION

3    ——————————————————————————————  )

    INTERNATIONAL SHIPBREAKING,      )

4    LIMITED, L.L.C.               )

                                  )

5                            )  CIVIL ACTION NO.

    VS.                       )  B-01-48

6                            )

    L.C. SMITH, ET AL          )

7    ——————————————————————————————  )

8

9

10                         MOTION HEARING

           BEFORE THE HONORABLE HILDA G. TAGLE

11                     MAY 14, 2001

12   APPEARANCES:

13   For the Plaintiff:        MR. JIM HUNTER

                            MR. EWING SIKES

14                       Attorneys at Law

                            Brownsville, Texas

15

    For the Defendant:        MR. JEFFREY BALE

16                       MR. JUSTIN RENSHAW

                            Attorneys at Law

17                       Houston, Texas

18   Transcribed by:           BRECK C. RECORD

                            Official Court Reporter

19                       600 E. Harrison, Box 16

                            Brownsville, Texas  78520

20                       (956)548-2510

21

22

23

24                     **EXHIBIT**

25                       E

```
 1                        I-N-D-E-X
                                              Page No.
 2      Court Reporter's Certificate  . . . . . . . .   46

 3    ROBERT L. BERRY

 4      Direct Examination By Mr. Hunter: . . . . . . .    8
        Cross-Examination By Mr. Bale:  . . . . . . . .   18
 5      Redirect Examination By Mr. Hunter: . . . . . .   28
        Cross-Examination By Mr. Bale:  . . . . . . . .   39
 6

 7                   PLAINTIFF'S EXHIBITS

 8      Exhibit No.                      OFFRD    ADMTD

 9      Plaintiff's Exhibit 2             31        31
        Plaintiff's Exhibit 1             32        32
10

11                ADDITIONAL EXHIBIT INDEX

12      Exhibit No.                             Page No.

13      Plaintiff's Exhibit 1 . . . . . . . . . . . .   11
        Plaintiff's Exhibit 1 . . . . . . . . . . . .   33
14      Plaintiff's Exhibit 1 . . . . . . . . . . . .   38
        Plaintiff's Exhibit 1 . . . . . . . . . . . .   39
15      Plaintiff's Exhibit 2 . . . . . . . . . . . .   31

16

17

18

19

20

21

22

23

24

25
```

1          THE COURT:  All right.  At this time The Court will call

2    Cause No. 01-CV-48, International Shipbreaking versus Smith, et

3    al.

4       Counsel, if you will announce your name for the record and

5    whom you represent?

6          MR. HUNTER:  Jim Hunter and Eddie Sikes for the

7    Plaintiff, International Ship Breaking, Limited.

8          MR. BALE:  Jeff Bale and Justin Renshaw for the

9    Defendant, Smith Maritime.

10         THE COURT:  All right.  There's a motion to -- regarding

11   the counter-claim and the bond or the security, so, who wishes

12   to address The Court first?  Mr. Hunter, do you wish to do so?

13         MR. HUNTER:  Your Honor, I believe it's the Plaintiff's

14   burden under Supplemental Admiralty Rule E7.  The Court can

15   order counter-security unless for cause shown, so, I believe it

16   is my burden today.

17      Your Honor, we have some evidence we can put on at a later

18   date or today, if you'd like.  I didn't know what The Court had

19   in mind this afternoon.  But let me just kind of brief you on my

20   argument and you can decide whether you would like to take

21   testimony or not.

22      Your Honor, under Supplemental Admiralty Rule E7,

23   counter-security is discretionary.  The Court essentially has

24   three options.  The first is to order the counter-security,

25   second is to deny it, and the third is to order security and

Captured and Transcribed by Computer - Eclipse

4

1    abate the proceedings or even dismiss the case if the Defendant

2    does not put up the counter-security.

3         The circuit courts have developed three factors that should

4    guide The Court's discretion.  The first is whether or not the

5    counter-security places to parties on equal footing.  The second

6    is whether or not the Plaintiff seeks to release from arrest his

7    own property -- I'm sorry -- yeah, whether the Plaintiff seeks

8    to release arrest of his own property by putting up the

9    counter-security.  The courts can look at the financial

10   condition of the Plaintiff and its ability to put up this bond.

11   Our argument essentially, Your Honor, is that No. 1, the loss of

12   the guided missile destroyer Stoddert has had a devastating

13   financial impact on my client.  It's viability as a business is

14   at stake.  It would have extreme difficulty, if not

15   impossibility, trying to find any surety who would put up a bond

16   for them based on their financial condition, and the fact that

17   most of their assets are encumbered quite significantly.

18        The second factor which I think is dispositive in this case

19   is that the Plaintiff, by putting up counter-security would not

20   be trying to have this property released, because no property

21   has been seized from my client.  And under the applicable case

22   law and Professor Moore in Moore's Federal Practice has stated

23   the uniform concern in admiralty that where there's no property

24   to be seized and the Plaintiff -- the Defendant in this case is

25   trying to demand counter-security, then the courts should be

1   reluctant to grant counter-security in this situation.  As

2   Professor Moore put it, "Ordering counter-security where there's

3   no property under seizure is contrary to our judicial system."

4       I'm prepared to put on testimony of my client's financial

5   condition and the fact that it cannot put up a bond, the fact

6   that there is no property under seizure from my client if The

7   Court wishes to take that up.

8           THE COURT:  All right.

9           MR. HUNTER:  I don't know if defense counsel --

10          THE COURT:  Let me ask Mr. Bale whether he wishes to

11  address The Court at this time.

12          MR. BALE:  Yes, Your Honor.  Judge, we believe that the

13  issue about whether there's property to be released or not is

14  irrelevant under controlling Fifth Circuit jurisprudence.  In

15  the Titan, Judge Pelitz laid out the factors that the court is

16  to look at.

17      Security is essentially automatic, even when there is no

18  maritime claim asserted by the Defendant.  And the Titan is very

19  clear on that.  The Titan also indicates that simply because a

20  plaintiff may be having financial difficulties, that does not

21  automatically excuse the posting of the bond.

22      In this case, we believe that the evidence, should The Court

23  wish to hear evidence at this time, would show that

24  International Ship Breaking received money from the United

25  States Navy.  They were advanced funds for the towage, which is

6

1   owed to my client for the work which it did.  My client is owed

2   in excess of $300,000, which is still unpaid which is due and

3   owing, and my client is in a serious financial situation itself.

4       As far as its inability to secure a bond, we would be able

5   to offer evidence, not today, but we have talked to

6   International Surety in New Orleans, the same company which

7   stands by the bond which issued the bond that we have posted in

8   this case, and even an uncollateralized bond could be secured

9   for 8 percent -- excuse me, $8,000 -- two percent of the amount

10  that is demanded which in this case would be, as I said, $8,000.

11      We believe that security is further warranted in this case

12  because International Shipbreaking did not own the Stoddert.  It

13  is seeking economic loss only in this case and we believe that

14  International Shipbreaking's claims are precluded under the

15  teachings of Robbins Dry Dock and the Test Bank and other cases.

16  We think at the end of the day, this case will be disposed

17  summarily in my client's favor on International Shipbreaking's

18  claims, and my client will be left still having money owed to

19  it.  And part of the money which is owed to it has been advanced

20  by the Navy, according to conversations that my client had with

21  International Shipbreaking.  We believe that under the facts of

22  this case, security is certainly warranted.  This is not a poor

23  local company as they try to portray themselves in their papers

24  before The Court.  This is a company of national, if not

25  international, renown in this industry.  They have broken 14

Captured and Transcribed by Computer - Eclipse

1    ships per information posted on their web site since they were

2    founded in 1995.  The contract at issue in this case was for

3    $2 million.  Part of that obviously will not be realized because

4    of the loss of the Stoddert.

5         We think, again, Judge, security is clearly warranted under

6    the facts of this case.

7         THE COURT:  Mr. Hunter, if you wish to put on evidence

8    in the points brought out by opposing counsel on not only -- I

9    mean what you would like for me to hear about the viability and

10   the encumbrance of the assets but also regarding the amounts

11   paid by the Navy in anticipation of this fulfillment of this

12   contract, you can do so at this time.  But you have to be --

13   I'll allow leading just so that I can get the evidence before

14   The Court and thereafter I can make any decision.

15        MR. HUNTER:  I'll be brief, Your Honor.  One thing that

16   we would point out is that we don't believe that the Fifth

17   Circuit's decision in Titan controls this, that the guidance

18   does.  And in Titan the distinguishing factor was whether or not

19   the plaintiffs would be adequately protected in the event -- or

20   I'm sorry, the defendants would be adequately protected in the

21   event of a judgment and that's not the case here.  And I would

22   make that distinction.

23        Your Honor, we would call Mr. Bob Berry to the stand.

24        THE COURT:  Are there any other witnesses that are

25   expected to be called?

Captured and Transcribed by Computer - Eclipse

1          MR. HUNTER:  Your Honor, we may call Mr. Barry Chambers,

2     if necessary.  But I anticipate that Mr. Berry can put on the

3     evidence that we need.

4          THE COURT:  Would you have both witnesses come forward

5     so that they may be sworn?

6          Please stand before the clerk and raise your right hand.

7          (Witnesses sworn.)

8          THE COURT:  All right.  And please tell me what your

9     name is beginning with you, sir.  Your name?

10         THE WITNESS:  My name is Robert L. Berry, B-E-R-R-Y.

11         THE WITNESS:  My name is Barry, B-A-R-R-Y, Chambers,

12     C-H-A-M-B-E-R-S.

13         THE COURT:  Have a seat.  Who will you be calling?

14         MR. HUNTER:  Mr. Berry.

15         THE COURT:  Mr. Chambers, have a seat; Mr. Barry, have a

16     seat in the witness chair.  Thank you.

17

18                         ROBERT L. BERRY,

19     the witness, having been first duly cautioned and sworn to tell

20     the truth, the whole truth and nothing but the truth, testified

21     as follows:

22                        DIRECT EXAMINATION

23     BY MR. HUNTER:

24     Q    Would you state your name, sir?

25     A    My name is Robert L. Berry.

1    Q    Could you tell your court what your relationship is to

2    International Shipbreaking, the plaintiff in this case?

3    A    I am the co-chief operating officer for International

4    Shipbreaking.

5         MR. HUNTER:   I'll refer to ISL as -- International

6    Shipbreaking as ISL for the sake of brevity, Your Honor.

7    BY MR. HUNTER:

8    Q    Are you familiar with the finances of ISL and its operations

9    at the Port of Brownsville?

10   A    I am familiar.

11   Q    What is ISL's business?

12   A    ISL is in the business of dismantling ships.

13   Q    Okay.  How many customers do you have?

14   A    Two customers basically.

15   Q    And who are they?

16   A    The Navy and the Maritime Administration.

17   Q    Okay.  Also known as Marad?

18   A    Marad.

19   Q    Okay.  How many vessels do you scrap a year?

20   A    It varies, but from -- anywhere from two to six a year.

21   Q    Okay.  And you have to go out for contract for each -- bid

22   for each vessel; is that correct?

23   A    Yes, we bid for each vessel and each contract.

24   Q    Okay.  Could you explain your relationship between the Navy,

25   Marad and ISL?

1   A    Well, ISL has contracts for various ships.  Sometimes we can

2   have two ships on one contract like the Cochran and the

3   Stoddert, but each ship is a separate contract.  We do that

4   contract and then that's for a set amount of money in the case

5   of the Cochran and the Stoddert and then that's the end of that

6   relationship at that point until the next bid.

7   Q    Okay.  How do you set your contracts -- contract prices for

8   these particular ships?

9   A    We look at the ship, estimate the amount of work and

10  supplies, et cetera, to be used on that ship and overhead, that

11  sort of thing, and a certain amount of profit, and then base our

12  bid on those numbers.

13  Q    Okay.  Are you familiar with the contract between ISL and

14  the Navy for the towing and dismantling of the Stoddert which is

15  at issue in this case and the Cochran?

16  A    Yes, I am.

17  Q    Okay.  Do you also have --

18         MR. HUNTER:  Your Honor, I believe that The Court has my

19  original exhibits.

20         THE COURT:  I'm not sure.  I've got --

21         MR. HUNTER:  Here they are.

22  BY MR. HUNTER:

23  Q    Who gets the profits from the sale of the scrap on these

24  naval vessels?

25  A    The Navy.

Captured and Transcribed by Computer - Eclipse

1   Q   Okay.  And how do you make your profit, Mr. Berry?

2   A   We are under -- the Navy pays us to dismantle the ships a

3   set price.  When we -- as we finish dismantling the ship they

4   pay us.

5   Q   Okay.  Are you familiar with the contract for the price of

6   the tow of the Stoddert with Smith Maritime?

7   A   Yes, I am.

8   Q   And I'll refer to that as the Tow Con; is that okay?

9   A   That's okay.

10  Q   All right.

11          MR. HUNTER:  May I approach the witness, Your Honor?

12          THE COURT:  Yes.

13  BY MR. HUNTER:

14  Q   Mr. Berry, I've handed you what's been marked Exhibit 1.

15  Can you identify that document?

16  A   This is the tow contract or Tow Con with Smith Maritime.

17  Q   Does that appear to be a true and correct copy of the Tow

18  Con between Smith and ISL?

19  A   If I may have just a moment to look at it.  Yes, it appears

20  to be so.

21  Q   Okay.  Did you personally negotiate this Tow Con with Smith?

22  A   Yes, I did.

23  Q   Who were you dealing with at Smith when you negotiated this

24  contract?

25  A   I dealt with both Latham and Rea Smith.

1    Q    And do you recognize Mr. Smith here sitting at counsel

2    table?

3    A    I do.

4    Q    Okay.  What was the contract price for the towing of the

5    Cochran and the Stoddert as between the Navy and ISL?

6    A    About $1.4 million.  I don't remember the exact number.

7    Q    Okay.  And approximately how much was the amount of the

8    contract to tow between ISL and Smith?

9    A    $648,000.

10   Q    Okay.  I ran some quick numbers this morning and I come up

11   with a difference between the two of about $800,000.  Sir, is

12   that how much profit ISL made on this?

13   A    No, not at all.  We also have costs in Pearl Harbor, the

14   port we would pick it up from; cost for the canal, crossing the

15   Panama Canal; and cost in the Port of Brownsville.  As well as

16   we would be responsible for some increases in fuel prices as

17   allowed for in the contract.

18   Q    Okay.

19   A    And possible other interests.

20   Q    All right.

21   A    And also, you have overhead that must be allocated to that.

22   Q    Okay.  Let's talk about overhead just for a minute because

23   that seems to be a point of contention.  Is it standard industry

24   practice in the marine business, and particularly dismantling,

25   to capitalize your overhead in your contract prices?

Captured and Transcribed by Computer - Eclipse

1    A    Yes, it is.

2    Q    And why is that?

3    A    You have a set number of contracts per year.  And like, for

4    instance, we have two contracts right now this year.  One was

5    this contract with the Navy and the other was a Maritime

6    Administration contract.  Those are discrete amounts of work and

7    we have to allocate our overhead to each contract based on the

8    percent of our income.

9    Q    Okay.  What was the profit margin for ISL on this particular

10   job?  And I'm talking about the Cochran and the Stoddert.

11   A    I would say about 15 percent.

12   Q    Okay.  It wasn't $800,000?

13   A    No.

14   Q    Okay.  Has the Navy paid you in full under your contract

15   with the Navy?

16   A    They have not.

17   Q    Okay.  Is ISL in the hole, so to speak, because of the loss

18   of the Stoddert?

19   A    We are in the hole, yes, we are.

20   Q    Okay.  There's an allegation in Mr. Smith's affidavit that

21   you told him that the Navy advanced funds for the tow portion of

22   this contract.  Is that true?

23   A    No, it is not true.  What I told him was that the contract

24   would be -- the Navy was going to pay as quickly as possible to

25   get the money to us as fast as they could.

1    Q    Okay. In fact, you can't pay anybody until you're paid by

2    the Navy; isn't that correct?

3    A    That is correct.

4    Q    Okay. And, in fact, there may be some testimony later that

5    there were some delays -- short delays -- in payment under the

6    Tow Con to Smith and what was the reason for that?

7    A    Was the Navy had some delays in paying not only this

8    contract, but the previous contract.

9    Q    Okay. Could you generally describe for The Court what sort

10    of financial impact the loss of the Stoddert has had on ISL's

11    business?

12    A    The biggest loss is the loss of the ship itself and not

13    having that work to do. The Navy will not pay us one penny of

14    the dismantling contract.

15    Q    Okay.

16    A    And also apparently is not going to pay us -- we don't know

17    how much -- but a large piece of the towing contract.

18    Q    Okay.

19    A    And it is the loss of that work that also entails a loss of

20    overhead will have to be -- come out of that contract and be

21    allocated to the other contracts --

22    Q    Okay.

23    A    -- including Marad and this -- and the tow of the Cochran.

24    Q    And those contracts are already fixed?

25    A    They're fixed.

Captured and Transcribed by Computer - Eclipse

1   Q   So you're likely going to take a significant loss on those

2   contracts?

3   A   A very significant loss.

4   Q   Mr. Berry, as you're aware, the issue today that we're here

5   on is whether ISL should put up or must put up counter-security

6   of $400,000 as requested by Smith.  Can ISL post that security?

7   A   No.

8   Q   Okay.  You heard counsel's argument here that might only

9   cost 4 or $8,000.  Did you hear that?

10  A   Yes, I did.

11  Q   Do you know what a surety company or an insurance company

12  looks to when they put up a bond like that for an individual

13  entity?

14  A   They look at the financial position of the company.

15  Q   Okay.  And in general, does your company have the financial

16  wherewithal, collateral that a surety or an insurance company

17  would look to in taking a risk such as a bond like this?

18  A   We do not.

19  Q   Okay.  Let me ask you this:  In addition to the debt you now

20  have, does ISL have any other bonds currently out there?

21  A   ISL has one bond with the Navy on this contract.  I believe

22  it's $150,000.

23  Q   Okay.

24  A   And another bond with the Maritime Administration for the

25  amount of that contract which is almost $1.6 million.

Captured and Transcribed by Computer - Eclipse

1   Q   Okay.  So you're bonded almost up to -- close to $2 million,

2   correct?

3   A   That's correct.

4   Q   Do you know what those bonds -- what collateral was used to

5   put up those bonds?

6   A   I'm not entirely sure.  I believe some of the -- I'm not

7   entirely sure what the collateral was.  I know it is not -- I'm

8   not sure how we were able to come up with those bonds to tell

9   you the truth.

10   Q   Let's approach it this way:  I assume you do have a limited

11   amount of equipment and assets at your shipyard in Brownsville?

12   A   Yes, we do.

13   Q   Okay.  Do those assets and equipment -- do you know what the

14   value of those assets and equipment are?

15   A   Between 1 and $2 million.

16   Q   Do you know if that equipment serves as collateral for those

17   bonds?

18   A   No, it serves as collateral for a loan that's outstanding.

19   Q   Okay.  And how much is the loan for?

20   A   The loan is over $2 million.

21   Q   Okay.  So you're -- as we sit here today, your assets are

22   less than your debt; is that correct?

23   A   Yes, that's correct.

24   Q   Okay.  This may seem like a simple question, but did Smith

25   arrest or seize any of your assets at the Port of Brownsville?

1   A   No.

2   Q   Okay.  Would it be fair to say that if he did seize your

3   assets and there were -- this court or another court had to

4   foreclose on any of your assets, Smith would have to stand in

5   line with the other creditors at the bottom of the line?

6   A   Yes, that's true.

7   Q   Okay.  Is it fair to say that Smith will probably get

8   nothing if your assets were seized and sold at a foreclosure

9   sale of some sort of?

10   A   I don't see that there would be any possibility of anything

11   being left.

12   Q   As you may have heard my argument, The Court has discretion

13   in this matter and can order ISL to put up security and also has

14   discretion that if ISL does not put up that security, The Court

15   can abate this case or even dismiss this case.  She can dismiss

16   this case, excuse me.  What would happen if The Court dismissed

17   this case or abated it and ISL was deprived of the ability to

18   try to recoup its losses as a result of the Stoddert?

19   A   Based on our position today, we would not be in business.

20   Q   Okay.  When you negotiated the tow contract with Mr. Smith

21   and Smith Maritime, did you look to make sure that they had P&I

22   coverage, insurance coverage?

23   A   Yes, we did.

24   Q   And if all else failed and there was no P&I insurance, did

25   you rely on the credit of the L. Smith II, the tug, to be able

Case 1:01-cv-00048   Document 43   Filed in TXSD on 08/17/2001   Page 310 of 338

1    to satisfy the claim from ISL in the event of some casualty?

2    A    Ask it again.

3    Q    Sure.  If there was no P&I coverage and there was casualty,

4    looking back, when you negotiated with Mr. Smith, did you rely

5    upon the credit or the value of the L. Smith II, the tug at

6    stake here, in being able to satisfy judgment in event of a

7    casualty?

8    A    Yes, that would be true.

9         MR. HUNTER:  Your Honor, this portion of the testimony

10   regarding whether or not ISL can post security or not is pretty

11   much at an end.  I don't know what The Court's going to do and I

12   don't know if Mr. Bale wants to respond.  If The Court's going

13   to grant the request for counter-security, we want to put on

14   evidence why of the level of security.  We hope that The Court

15   doesn't do that, but I'd like to break it up that way and save

16   you some unnecessary time.

17        THE COURT:  All right.  I'll ask Mr. Bale if he has any

18   cross.

19        MR. BALE:  A few minutes, Judge.

20                         CROSS-EXAMINATION

21   BY MR. BALE:

22   Q    Mr.Berry, you told The Court on direct examination, sir,

23   that ISL breaks up two to six ships a year?

24   A    Breaks up what?

25   Q    Two to six ships per year?

Captured and Transcribed by Computer - Eclipse

1    A    Well, we have done in the past.  We've got two ships this

2    year and we've have the capability of doing six.

3    Q    Okay.  Do you have contracts for six?

4    A    No, we have contracts for two.

5    Q    Okay.  What is your arrangement with the Navy as far as

6    getting business from them?

7    A    We bid on the contracts with the Navy.

8    Q    And have you posted -- excuse me.

9    A    Go ahead.

10   Q    I thought you were done.

11   A    That's fine.

12   Q    Have you posted an article on your web site, sir, that

13   boasts of the fact, at least as of 1998, that ISL has received a

14   hundred percent of the contracts it has bid on with any

15   governmental agency?

16   A    I didn't see that in our web site.  I'm not saying it is not

17   there.  I didn't see it.

18   Q    Have you ever issued a press release that said that?

19   A    I have never not.

20   Q    Has the company?

21   A    I don't know that the company has or not.  I haven't seen

22   it.

23   Q    Based on your experience, what has the ratio been of success

24   and failure with bidding on Navy contracts?

25   A    That's not a real straightforward answer.  We have lost

1   bids.  We lost a ship last year to -- well, one of the Navy

2   ships and we -- we were not able -- in fact, we had to shut down

3   and lay off everybody all through the winter because of that.

4   Q   Well, when you bid on this contract in 1999, didn't you

5   boast to the Navy that you were the largest and best

6   shipbreaking facility on the Gulf Coast?

7   A   That's true.

8   Q   And at the time you bid on this contract, you had 101

9   employees which was in your bid proposal?

10  A   That is correct.

11  Q   And you indicated that you were actually going to have to

12  hire more folks if you got the job for the Stoddert and the

13  Cochran?

14  A   That is correct.

15  Q   And so before you ever entered into this contract which has

16  caused all this financial hardship, you had a substantial staff

17  of people out there working for ISL?

18  A   That is correct.

19  Q   And in your papers, in your bid proposal to the Navy, you

20  said that you had an extensive insurance program, a benefits

21  program, and you paid a bonus to the people who worked for you?

22  A   That is correct.

23  Q   Now, sir, of the $800,000, I wasn't real clear on this, you

24  indicated that there was a 15 percent profit margin on this job?

25  A   It's 15 percent on the overall contract, the overall bid of

Case 1:01-cv-00048   Document 43   Filed in TXSD on 08/17/2001   Page 313 of 338

1    two ships and towing contract.

2    Q   Okay.  Now, what was the rate or what was the percentage

3    that you earned on the Cochran?

4    A   We -- I don't understand.

5    Q   How much do you expect to make on the Cochran?

6    A   We're not -- I'm not sure how the loss of the Stoddert's

7    going to affect it yet.

8    Q   Well, let's talk about that for a second because I think you

9    indicated in your testimony that the loss of the Stoddert was

10   the biggest problem that you had encountered or it was the

11   biggest part of the loss that you had suffered.  Do you recall

12   that?

13   A   Yes.

14   Q   Okay.  Now, you're not going to have to incur any expenses

15   such as the overhead or you actually saved money on the towage

16   because there was less fuel used, right?

17   A   That's not true.

18   Q   Is it your testimony that you used the same amount of fuel

19   to get the Cochran here as would have been required to get both

20   the Stoddert and the Cochran here?

21   A   I didn't see any reduction for fuel in the bills that we

22   were -- that we saw from Smith Maritime.

23   Q   Are you --

24   A   And your other part of your statement was that the overhead

25   is less.  The overhead is not less.  We had the same overhead,

Case 1:01-cv-00048  Document 43  Filed in TXSD on 08/17/2001  Page 314 of 338

1    whether the Stoddert is there or not.

2    Q    And so as I understand it, the problem is that now you have

3    to attribute all of your overhead factor that is there anyway

4    that you carried with your business day in and day out and you

5    have to now allocate all of that to one ship as opposed to

6    another?

7    A    Actually to the two ships, the two contracts that we have,

8    which are the only two we have this year.

9    Q    Okay.  So you've got another contract with the Navy coming

10   up?

11   A    No, not with the Navy.  The Marad contract I'm speaking of.

12   Q    I'm sorry.  I'm sorry.  So you have another contract and you

13   have to allocate overhead to that?

14   A    If we get that contract.  There's no guarantee of that.

15   Q    Okay.  Have you put out any other bids on any other ships to

16   break this year?

17   A    We had put out a bid to the Maritime Administration on other

18   ships --

19   Q    Okay.

20   A    -- multiple ships.

21   Q    Okay.  Now let me just ask you this:  As far as the fuel

22   bill for getting the vessels here, are you unaware of the fact

23   that Smith Maritime did not bill you for the bunkers it had

24   stored on the Stoddert when it went to the bottom?

25   A    I don't believe I saw that, no.

Captured and Transcribed by Computer - Eclipse

Case 1:01-cv-00048   Document 43   Filed in TXSD on 08/17/2001   Page 315 of 338

1    Q    Okay.  That would be news to you, but you couldn't dispute

2    it?

3    A    I can't dispute it, no.

4    Q    And you would expect some cost savings in fuel towing one

5    ship as opposed to two?

6    A    I would think there would be some cost savings in fuel.

7    There should be, yes.

8    Q    Okay.

9    A    I haven't seen those cost savings, but I would think there

10    should be.

11    Q    Have you been paid any money for breaking the Cochran, yet?

12    A    No.

13    Q    The Navy hasn't paid you a dime?

14    A    Not for breaking the Cochran.

15    Q    Have they paid you anything as part of the contract that you

16    bid on back in 1999, whether for fuel, whether for towage,

17    whether for any other incidental work that was required of ISL

18    under its contract with the United States Navy?

19    A    You're talking about the original contract, which -- that we

20    won a -- the Bagley, the first ship.

21    Q    No, sir, I'm talking about the Stoddert and the Cochran?

22    A    We've been paid part of the towage contract.

23    Q    And Smith Maritime hasn't been paid all of what it incurred

24    in its towage expenses, has it?

25    A    I'm -- you mean have they been paid -- I don't understand

1    the question.

2    Q    Their bill was $648,000?

3    A    That's correct.

4    Q    You paid some of that?

5    A    We did pay some of that.

6    Q    You understand that there's currently in excess of $300,000

7    in dispute?

8    A    In dispute, yes.

9    Q    Okay.  Have you paid any of that?

10   A    No.

11   Q    Okay.  Do you acknowledge that you owe any of that?

12   A    Oh, I don't, frankly.

13   Q    You don't feel you owe any of it?

14   A    I think it is in dispute.  I think we need to look at it,

15   but I don't -- maybe -- well, I should say there's a possibility

16   that we should pay at least part of that, yes.

17   Q    Okay.  Well, let's just talk very briefly about this.  Now,

18   first of all, you did not own the Stoddert, did you?

19   A    We did not own it.

20   Q    Didn't have any sort of ownership, or possessory interest in

21   that?

22   A    It was in our care and custody and possession.

23   Q    But it belonged to the United States government?

24   A    Belonged to the United States government.

25   Q    And what this case is about is your lost expectancy, your

1    expected lost profits, and that's why you sued the L. Smith,

2    isn't it?

3    A    I don't believe we're asking for lost profits.

4    Q    Okay.  You are suing for economic losses?

5    A    Losses that we will take on the loss of the ship.

6    Q    Okay.  There was no physical damage to any property that is

7    owned by ISL as part of the sinking of the Stoddert, right?

8    A    No.

9    Q    You agree with me on that?

10   A    I agree with you.  I don't believe -- there wasn't any

11   physical damage to ISL -- owned by ISL.

12   Q    Okay.  Now as far as the sinking of this vessel, this vessel

13   had been sitting in Pearl Harbor for 10 years or so?

14   A    That's as reported in the documentation.

15   Q    And prior to that, it had been pretty much mothballed in

16   Japan?

17   A    I don't know the history on that.

18   Q    Okay.  In any event, it was an old ship that had been laid

19   up for a very long time?

20   A    Some 10 years, according to the documents.

21   Q    And your company was the hirer in the Tow Con and as part of

22   the obligations of the hirer, you were obligated to provide a

23   seaworthy vessel?

24        MR. HUNTER:  Your Honor, I'm going to object to this

25   line of questioning.  Mr. Bale is getting into the merits of

1    what this whole case is about.  We're here today talk about

2    counter-security.

3         THE COURT:  What's the purpose of this line of

4    questioning, Mr. Bale?

5         MR. BALE:  Judge, just basically to establish that these

6    people agreed with the sinking.  There was communication back

7    and forth and I think it goes to the issue of losses and what

8    they've sustained in losses.

9         THE COURT:  Objection is sustained.

10        MR. BALE:  I'll move on.

11   BY MR. BALE:

12   Q   Now, I'm not sure that I got an answer.  I didn't write it

13   down.  Can you tell The Court how much money you have been paid

14   as a result of the job for the towage of the Stoddert and the

15   Cochran?

16   A   I haven't looked in the last week, but I believe we've been

17   paid something like $950,000.

18   Q   $950,000?

19   A   I'm not really sure of that number exactly.

20   Q   Okay.  And have you been paid any other money for any other

21   vessel work or breaking or that ISL has done this year from any

22   other source?

23   A   Maritime Administration has paid us.

24   Q   How much have you been paid by the Maritime Association --

25   excuse me, the Maritime Association this year?

Captured and Transcribed by Computer - Eclipse

A Maritime Administration you mean?
Q Thank you.
A Something over $900,000.
Q Okay. So this is May 14th and you've made about a million eight this year?
A The gross income is about a million eight.
Q Yes, sir, I understand. Now, can you tell us how many sureties you have checked with in reaching your conclusion that you could not post a bond?
A The sureties that -- you mean the -- oh, the people the surety companies that put up bonds?
Q Yes, sir.
A I personally haven't talked to any, but our managing directors have talked to a number of them.
Q In connection with Smith Maritime's demand for counter-security?
A I misunderstood your question. I thought you meant this year for sureties.
Q I'm sorry. And I almost withdrew the question because it was incomplete; so, let me re-ask that. I don't mean to confuse you. Have you done any checking with any sureties about what it would take to have a bond issued in connection with the demand for counter-security that has been made by Smith Maritime in this case?
A I personally have not.

ClibPDF - www.fastio.com

1    Q    Okay.  Are you aware of anyone with your company who has

2    done that?

3    A    I believe our -- one of our managing directors has.

4    Q    Okay.  And do you know that for a certainty or do you just

5    believe that based on office talk?

6    A    Just talk, just communications that we've had.  Not a

7    surety.

8    Q    Okay.

9         MR. BALE:  Judge, I think that's all I have for now.

10         THE COURT:  Mr. Hunter, anything further?

11                      REDIRECT EXAMINATION

12    BY MR. HUNTER:

13    Q    Mr.Berry, you're operating at a loss currently, aren't you?

14    A    At the moment, yes.

15    Q    Okay.  And all of your assets are encumbered at ISL; isn't

16    that correct?

17    A    Yes.

18    Q    Okay.  And those assets that are encumbered with loans also

19    serve as collateral for performance bonds in the amount of

20    $1.5 million to the Navy; isn't that correct?

21    A    That is correct.

22    Q    And the value of your assets are less than the amount of the

23    bonds that you currently have in place; isn't that correct?

24    A    That is correct, as well.

25    Q    And you haven't been paid by the Navy for this -- you

1    haven't been paid for the tow portion of this contract by the

2    Navy?

3    A    Not the entire portion, no.

4    Q    And is there any chance of them paying anytime soon?

5    A    No.

6    Q    Is the Navy watching to see what happens in this case?

7    A    I believe they are.

8    Q    Okay.

9         MR. HUNTER:  Your Honor, that would conclude our portion

10   of the testimony on the issue of whether counter-security should

11   be posted.

12        THE COURT:  Mr. Hunter, do me the favor of having the

13   witness explain what he means when he says -- or in response to

14   your question about the towing portion of the contract versus

15   what other portion of the contract.

16        MR. HUNTER:  Okay.

17        THE COURT:  In other words, what is that $950,000 in

18   payment for?

19        MR. HUNTER:  Yes, Your Honor.

20        THE COURT:  Payment I guess.

21   BY MR. HUNTER:

22   Q    Mr.Berry, maybe we haven't been -- didn't explore this

23   enough.  Could you tell The Court how many portions of this

24   contract for the Cochran and the Stoddert there are?

25   A    Just to be clear, there's a master contract which is for

Captured and Transcribed by Computer - Eclipse

1  five years.  That contract basically gives us the right.  And it

2  gives four people the right in the United States to bid -- to

3  bid on other portions called clins, which is a ship -- each ship

4  and the tow that goes along with the ship.  And on this

5  particular part of the contract, there were three what they call

6  clins.  The Cochran is one clin, the Stoddert is another clin

7  and the tow of the two is a third clin.  But collectively, the

8  three make this particular part of the master contract.

9       THE COURT:  Repeat the last thing you said.

10      THE WITNESS:  Collectively the three make up this part

11  of the master contract, this portion of the master contract.

12      THE COURT:  Okay.  So tell me, that $950,000 that you

13  got paid, what was that for?

14      THE WITNESS:  On our billing for the tow, for portions

15  of the tow.  We billed for the tow very similar to what that tug

16  company bills us.  We bill when the -- like when the tug gets

17  underway, we bill the Navy.  When the tug gets to Panama -- gets

18  to the Pearl we bill the Navy.  And when the tug and the tow

19  leave Pearl we bill the Navy again for portions of the tow.

20      THE COURT:  So is any portion that's been paid to you

21  for the tow of the Stoddert?

22      THE WITNESS:  Well, since it was a tandem tow, they were

23  towing them at the same time, they must have -- they had to have

24  paid at least a portion of that tow.  And, of course, we have

25  paid Smith at least a portion of that tow as well because he

1    billed us and our billing to the Navy followed his billing.

2            THE COURT:  All right.  Anything else on that issue?

3            MR. HUNTER:  Not on this issue, Your Honor.

4            THE COURT:  All right.  I'm going to grant the request

5    for the counter-security to be posted.

6        Now, let's go to the next.

7            MR. HUNTER:  Next issue is the level of security, Your

8    Honor.

9            THE COURT:  Okay.

10           MR. HUNTER:  May I approach, Your Honor?

11           THE COURT:  Yes.

12   BY MR. HUNTER:

13   Q   Mr.Berry, I've handed you what's been marked as Plaintiff's

14   Exhibit 2.  Can you identify that document?

15   A   It's a copy of the Smith maritime invoice to ISL for

16   demurrage and also a copy of the invoice from Transmarine

17   Navigation Corporation apparently to Smith Maritime.

18   Q   Does that invoice and its attachments appear to be a true

19   and correct copy of the invoice with backup documentation that

20   was submitted to you by Smith?

21   A   It appears to be, yes.

22   Q   Okay.

23           MR. HUNTER:  Your Honor, we move to admit Exhibit No. 2.

24           MR. BALE:  No objection.

25           THE COURT:  Admitted.

1          MR. HUNTER:  As a housekeeping matter, Your Honor, I'd

2     also move to admit Exhibit 1, a copy of the Tow Con.

3          MR. BALE:  Judge, I don't have any objections to any of

4     their exhibits.

5          THE COURT:  Admitted.

6     BY MR. HUNTER:

7     Q    Mr.Berry, let me direct your attention to Page 1 of

8     Exhibit No. 2 and I want to try to go through these as briefly

9     as possible which Smith is attempting to charge you for and upon

10    which it basis its counter-demand for security.

11         The first item is the demurrage for transit of the Panama

12    Canal on the way to Hawaii.  It appears to me, Mr.Berry, that

13    Smith is trying to invoice for demurrage for the transit of L.

14    Smith II, the tug, through the Panama Canal.  Is that what you

15    interpret the invoice to be?

16    A    I interpret that to be just that.

17    Q    Okay.  Was there any agreement between ISL and Smith to the

18    contrary?

19    A    Yes.  I had been told that they would not charge demurrage

20    on the trip down lite boat; in other words, with just the tug.

21    Q    And they're charging, it appears to be, the $4500, the

22    agreed-upon rate for demurrage; is that right?

23    A    It looks like that.

24    Q    So you and Mr. Smith agreed to the contrary; is that

25    correct?

1    A    That's correct.

2    Q    And, in fact, the Tow Con, Exhibit No. 1 specifically

3    provides and addresses free days.  Could you tell The Court what

4    a free day is?

5    A    Free day is the day that the tug arrives at wherever it is

6    supposed to be doing work or wherever it is supposed to be at a

7    certain time and then for reasons not under control of the tug,

8    he's not able to either do the job or he has to wait.  And that

9    results in paying demurrage.

10   Q    Based on your agreements and the free days provision in the

11   Tow Con that's Exhibit No. 1, should you be invoiced for this

12   demurrage of transit of the Panama Canal on way to Hawaii?

13   A    No, we should not.  And we discussed it and even put it on

14   the -- and we always discuss free days.  Whenever you're going

15   to a job, you agree on the free days up front.  And the Panama

16   Canal, we even put on the contract that the free days are for

17   the return because that's when we would need them.

18   Q    Okay.  So, in other words, to simplify this, the sum of

19   $11,812.50 ought to be deducted from this invoice; is that

20   correct?

21   A    It should be.

22   Q    Let's move on to the next item.  Demurrage for standby time

23   while the Stoddert was sinking.  And that's -- Smith's invoicing

24   you from one to eight hours at the rate of $8,000 per day.  Do

25   you believe ISL should pay for that?

Captured and Transcribed by Computer - Eclipse

1   A   No, I do not.

2   Q   Why is that?

3   A   I don't believe ISL caused the sinking or had control of the

4   cause of the sinking.

5   Q   So, should the sum of $10,666.64 ought to be deducted from

6   the invoice?

7   A   Yes.

8   Q   Let's move on to Page 2.  First item also being invoiced is

9   demurrage for transit of the Panama Canal en route to

10   Brownsville, Texas.  Sir, how many free days does the Tow Con

11   allow for?

12   A   Tow Con allows for four days free time.

13   Q   Okay.

14       THE COURT:  I'm sorry, four days three times?

15       THE WITNESS:  Four days free time.

16       THE COURT:  Okay.

17   BY MR. HUNTER:

18   Q   In other words, demurrage shouldn't be charged for those

19   four days.

20   A   Excuse me, I'm reading Pearl Harbor.  It is five days in the

21   Panama Canal.

22   Q   So at least five days shouldn't be billed for; is that

23   correct?

24   A   That's on the return.

25   Q   Okay.

Captured and Transcribed by Computer - Eclipse

1   A   Yes, five days.

2   Q   And the vessel was actually held up at the Panama Canal for

3   what reason?

4   A   Part of the reason was the tow wasn't ready -- I mean, the

5   tug itself wasn't ready to go through the canal.

6   Q   Is that ISL's fault?

7   A   That's not ISL's fault.

8   Q   Was there another reason the tug was held up in Panama?

9   A   The other reason was the -- part of the reason was the

10   inspection by the tug and tow by the Navy.

11   Q   All right.  And is that ISL's fault?

12   A   No, it is not.

13   Q   So, should demurrage for that transit be charged and should

14   the sum of $29,062.50 ought to be deducted from the invoice?

15   A   No, it should not.

16   Q   Should be deducted?

17   A   Should not be deducted -- should be deducted from the

18   invoice.  It should not be paid by us.

19   Q   Should not have been billed?

20   A   Should not have been due.

21   Q   Okay.  Next item demurrage on arrival in Brownsville, Texas.

22   Busy until released.  Five hours at the rate of $8,000 to date.

23   Do you know what that's for?

24   A   Frankly, no.  I'm not sure how that was calculated; so, I

25   don't even know whether to say it is good or not.

Captured and Transcribed by Computer - Eclipse

1  Q   Okay.  The last item is the cost breakdown of equipment lost

2  and there's a sum on that for $23,780.  Do you know where that

3  equipment lost comes from?  Who's equipment was lost?

4  A   Based on the list of equipment here, it is equipment that

5  was on the ship -- put on the ship by the tug.  With the

6  exception of the wire rope for $13,000, I don't know, but I

7  believe that to be the part of their towing wire.

8  Q   Let's try to clarify this.  Who's equipment was placed on

9  what ship?

10  A   Smith Maritime's equipment was placed on the ship when they

11  put their towing gear or the bridal they hooked on to and this

12  other -- and some of this equipment was equipment to handle fuel

13  from the ship to the tug.

14  Q   Okay.

15  A   The rest of it was for the tow.

16  Q   All right.  So they're billing you for their equipment that

17  was lost as a result of the loss of the Stoddert; is that

18  correct?

19  A   That's correct.

20  Q   Should you have to pay for that?

21  A   I don't believe so.

22  Q   All right.  So $23,780 ought to be deducted from the

23  invoice, shouldn't it?

24  A   It should be deducted.

25  Q   Okay.  I've totalled these up, Mr.Berry.  The total invoice

Captured and Transcribed by Computer - Eclipse

1   prices $300,566.42.  Roughly these charges that shouldn't be

2   here total $76,988.24.  Bringing the balance of $223,578.18 that

3   could legitimately be asserted by Smith; is that correct?

4   A   Your numbers.  I wasn't writing it down.  Your numbers

5   didn't sound right.

6   Q   Did you have different numbers?

7   A   Can you give the numbers again?

8   Q   Sure.  I'll just tell you, I went and totalled up the items

9   in dispute that we just talked about.

10  A   Okay.  I was looking at his invoice here and there's another

11  item that we don't have -- you don't have here, the demurrage

12  for standby in Honolulu.  Look at Page 2.

13  Q   Okay.

14  A   And you don't have that invoice in this -- don't have the

15  invoice itself here, but it does list that invoice as part of

16  the $300,000.

17  Q   Let's talk about that.  At the very bottom of the page on

18  Page 2 of Exhibit 2 says invoice ISB111 dated January 23rd for

19  demurrage while on standby at Honolulu $65,578.12.

20  A   That is wrong as well.

21  Q   Why is that wrong?

22  A   Because -- and I don't have the invoice here or -- but I

23  know that there was not that much demurrage.  In Honolulu, smith

24  chose to stay there himself for a large portion of that time and

25  I don't -- I don't know what the -- you know, what should be.

Captured and Transcribed by Computer - Eclipse

1    Q    In fact, some of the crewmen of the tug L. Smith II brought

2    their wives to vacation in Hawaii during the standby time,

3    didn't they?

4    A    I wasn't there, but I heard that.

5    Q    Okay.  So you dispute -- the amount of $65,578.12 ought not

6    to be billed because of the free days included in the contract;

7    is that correct?

8    A    That is correct.

9    Q    Okay.

10         MR. HUNTER:  Your Honor, that's all we have on this

11    issue.  I'll give you a new total here in just a minute.  I'll

12    let Mr. Bale.

13         THE COURT:  All right.

14         MR. BALE:  May I have just a moment, Judge?

15         THE COURT:  Yes.  Also, when you're referring to the

16    free days and referring to the contract, what I have as

17    Exhibit 1 is a very bad Xerox copy and I'm not sure when you

18    refer to those days in this contract what I'm looking for.

19         THE WITNESS:  May I show you, Your Honor?

20         THE COURT:  Yes.

21         THE WITNESS:  May I approach?

22         THE COURT:  Well, stand right there.

23         THE WITNESS:  Right here.  It is in this section right

24    here, ma'am.  Those are the free days.  It is a little hard to

25    read.

1        THE COURT:  Yeah, it is.

2        THE WITNESS:  Panama Canal, five days on the return and

3   at Pearl Harbor four days.  Those are free days.

4        THE COURT:  Okay.

5        MR. BALE:  May I proceed, Your Honor?

6        THE COURT:  Yes.

7                        CROSS-EXAMINATION

8   BY MR. BALE:

9   Q   Mr. Berry, if you would, take a look at the Tow Con contract

10  which is Plaintiff's Exhibit 1 which is I believe there at the

11  stand with you?

12  A   Say again.  I didn't hear you.

13  Q   I think your lawyer left Exhibit 1, the Tow Con contract.

14  A   I have a copy of it.

15  Q   Thank you.  There's no question in this case, but that the

16  agreed rate for demurrage was $4500 a day, right?

17  A   No question.

18  Q   And that's stated right on the face of the contract in the

19  third block down on the right-hand side of the page, right?

20  A   That's right there, yes.

21  Q   Now, one of the things you're complaining about in this case

22  is that Mr. Smith supposedly agreed with you not to bill you for

23  demurrage time going through the canal on the way to Hawaii to

24  pick up the Stoddert and the Cochran, right?

25  A   That's correct.

1    Q    If you look at the third line down on the left-hand side of

2    the page where it talks about free days, it says, "Panama Canal,

3    five days- return," right?

4    A    That's correct.

5    Q    Do you have any writing, any agreement that was signed by

6    anybody that indicates that Smith Maritime or that expressly

7    states that Smith Maritime said that it would not charge you for

8    demurrage transiting the canal on its way to Hawaii?

9    A    I do not.

10   Q    And you did receive an invoice for that time after this

11   agreement was supposedly entered into, right?

12   A    No.

13   Q    Now, let me just address two items very quickly as far as

14   the time for standby for the sinking and the equipment loss

15   which was the towing wire on the way back.  You do understand in

16   this case that there is a very real dispute between Smith

17   Maritime and ISL regarding who was at fault for the sinking of

18   the Stoddert?

19   A    Yes.

20   Q    You understand that it is Smith Maritime's position that ISL

21   had an obligation according to Tow Con to provide a seaworthy

22   vessel and Smith Maritime contends that the vessel was not

23   seaworthy for the transit that was made?

24   A    Yes.

25   Q    Okay.

1    MR. BALE:  That's all I have, Judge.

2    THE COURT:  Mr. Hunter, anything else?

3    MR. HUNTER:  No further questions.

4    THE COURT:  Sir, you may step down.

5    MR. HUNTER:  We close, Your Honor.

6    THE COURT:  Rest?  Okay.  Mr. Bale, any witnesses you

7  intend to call?

8    MR. BALE:  Judge, we don't have any testimony to put on

9  at this point.

10   THE COURT:  All right then.  Argument, Mr. Hunter?

11   MR. HUNTER:  Your Honor's already ordered

12  counter-security, so, I won't address that issue, but what we do

13  believe the invoice and legitimate invoicing of the defendant

14  demonstrates that there's at least $76,988.24 in costs that

15  cannot be recoverable under the Tow Con for free days and also

16  under loss of the Smith's own equipment.

17     Additionally, there's another $65,578.12 while the vessel

18  was in Honolulu waiting to depart because the tug crew chose not

19  to go when the vessel was ready.  And in fact had brought wives

20  to vacation there for two weeks while the vessel was -- while

21  the Stoddert was ready to go.

22   THE COURT:  Mr. Hunter, I don't have any evidence of

23  that.

24   MR. HUNTER:  Yeah.  I believe the -- I believe at least

25  one of the -- I believe Mr.Berry testified to that.

1      In any event, we know they were in at least Pearl Harbor for

2  two weeks.  And so deducting that amount, as well, we believe

3  the legitimate amount of the counter-claim is $168,000.06 and

4  that a reasonable amount of counter-security should be somewhere

5  in the neighborhood of 175 to $180,000 to account for costs,

6  which, Your Honor, I am still not certain we'll be able to post,

7  but at least I would make that contention, Your Honor.  With

8  that, we'll rest.

9          THE COURT:  Mr. Bale?

10          MR. BALE:  Judge, we have an outstanding invoice for in

11  excess of $300,000.  That invoice does not constitute all of the

12  damages that Smith Maritime is seeking in this case.  The

13  arguments that they pose as far as the amount of security

14  actually goes to the merits of the case and the damages phase of

15  the case as to what is truly owed, not what should be posted in

16  the way of security.  We're talking about trying to put the

17  parties on equal footing at this point in time so we can move

18  forward with this case to get to the merits.  And if they have

19  viable defenses, to show that it was our fault and that we

20  shouldn't have broke that tow wire and we shouldn't have waited

21  around while the vessel sank.  Those are arguments that can be

22  advanced at that time and The Court can take that into

23  consideration in assessing or denying our request for damages.

24  I think that with the amount of just the invoice that is

25  outstanding, taking into account that we have substantially more

Captured and Transcribed by Computer - Eclipse

1  that -- not substantially more, but by a factor some more --

2  that we intend to take at trial, we have asked The Court to

3  order security in the amount of $400,000, which will take into

4  account the time delay, the value of the money, prejudgment

5  interest and things of that nature.  And I think that under the

6  facts and the testimony of the witnesses with the amount of

7  money that they have received so far on just two jobs this year

8  with the low premium that would be required on a bond, $400,000

9  would be fair, reasonable and just and in the best interest of

10  all concerned.

11          THE COURT:  Mr. Bale, for example, on your Page 2 of the

12  Smith Maritime invoice in which the amount of $23,780 for

13  equipment lost, wouldn't that be one of those losses that if you

14  were, in fact, to prove that they're responsible for it because

15  the vessel was not seaworthy as opposed to something that was

16  part of the contract, you know, any terms regarding the towing,

17  whether it's demurrage or any of the things that would have been

18  incurred as part of executing or performing the contract?

19          MR. BALE:  Yes, Judge, they hired us.  And if the vessel

20  was unseaworthy when they warranted that it would be seaworthy,

21  we are entitled to recover that, both under the terms of the

22  contract and I think as a matter of course.

23          THE COURT:  Okay.  But, again, isn't that something that

24  would be up to you to prove if you're putting on your evidence

25  of damages, you know, the equipment -- the cost of the equipment

Captured and Transcribed by Computer - Eclipse

1   that was lost when this vessel went down?

2          MR. BALE:  Yes, Judge, we certainly will bear the burden

3   of proof on that, but I think they would have to respond in

4   damages for that if we're able to prove the vessel was

5   unseaworthy.

6          THE COURT:  Well, anything else on a figure?

7          MR. BALE:  No, Your Honor.

8          THE COURT:  Okay.  Well, to be honest with you, I guess

9   what -- you know, you've got testimony about the free days

10  versus the period of time that was -- you know, that the tug had

11  to be on standby.  I mean there not being anything other than

12  what I have heard today, I'm going to assume that this is the

13  appropriate figure except for, like I said, the equipment.  I

14  mean, that's something that you have to prove up.  I don't think

15  that that's necessarily part of the agreement.  You say under

16  the terms of the contract, can you point to me where in the

17  contract it provides for that.

18         MR. BALE:  Yes, Judge, if I may have just a minute.

19         THE COURT:  And then still again it's something that

20  they would be required to -- or you would be required to prove

21  up.  I can't read the contract very well.  It is very poor

22  quality.

23         MR. BALE:  Judge, if I may, it is actually in Part II of

24  the contract, it is on the fifth page in the right-hand column

25  at Line 332, Subparagraph B.  It says, "The following shall be

Captured and Transcribed by Computer - Eclipse

1  for the sole account of the hirer," which would be ISL, "without

2  any recourse of the tug owner, its servants, agents, whether or

3  not the same is due to breach of contract, negligence, or any

4  fault on the part of the tower, his servants, or agent's loss or

5  damage of whatsoever nature howsoever caused or sustained by the

6  tow."  And we believe that the ship's gear and appurtenances are

7  part of the tow.

8         THE COURT:  Okay then.  That's the level of surety I'm

9  going to require, the amount of the invoice of $300,566.42.

10        MR. BALE:  Thank you, Judge.

11        MR. HUNTER:  Thank you, Your Honor.  May we be excused,

12  please?

13        THE COURT:  All right then.  Is there anything else,

14  Counsel?

15        MR. HUNTER:  No, Your Honor.

16        MR. BALE:  May we be excused?

17        THE COURT:  Yes.

18        MR. BALE:  Thank you.

19     (Hearing concluded.)

20

21

22

23

24

25

Captured and Transcribed by Computer - Eclipse

46

1    UNITED STATES DISTRICT COURT       *

2

     SOUTHERN DISTRICT OF TEXAS         *

3

4         I, BRECK C. RECORD, Official Court Reporter, United States

5    District Court, Southern District of Texas, do hereby certify

6    that the foregoing is a correct transcript from the record of

7    proceedings in the above-entitled matter.

8         I certify that the transcript fees and format comply with

9    those prescribed by the Court and Judicial Conference of the

10   United States.

11

12   6/27/01                    Breck Record

13                              BRECK C. RECORD,
                                Official Court Reporter
                                United States District Court
14                              Southern District of Texas

15

16

17

18

19

20

21

22

23

24

25

Captured and Transcribed by Computer - Eclipse