47

United States District Court
Southern District of Texas
ENTERED
SEP 2 1 2001
Michael N. Milby, Clerk of Court
By Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| INTERNATIONAL SHIPBREAKING LIMITED, L.L.C. | § § | |
| Plaintiff, | § § | |
| V. | § § | C.A. NO. B-01-048 (ADMIRALTY) |
| SMITH L.C. & SMITH MARITIME *In Personam*, and the TUG ELSBETH II, her engines, tackle, and gear, etc, *In Rem* | § § § § | |
| Defendants. | § | |

**ORDER**

BE IT REMEMBERED, that on the 21st day of September, 2001 the Court considered the Defendant Smith Maritime's Motion for Summary Judgment [Dkt. No. 01-CV-48]. Based on the pleadings, Motion, Amended Motion, Response, Reply to the Response, and the Response to the Reply to the Response, the Court **GRANTED IN PART AND DENIED IN PART** the Defendant's Motion for Summary Judgment.

1. **Summary and Procedural History**

These actions arise out of a series of events culminating in the sinking and loss from towage by Defendants of a naval destroyer, the USS STODDERT ("STODDERT"). On

1

March 22, 2001, the hirer, International Shipbreaking, Limited, L.L.C. ("ISL") filed suit against Defendants "Smith L.C.," Smith Maritime, ("Smith") and the Tug ELSBETH II ("tug"). The complaint alleges a) negligence in the towing of the destroyer and b) breach of the warranty of workmanlike service implied under the contract between Smith and ISL ("Contract"). Smith timely filed an Answer in which it counterclaimed for breach of the contract due to a) ISL's failure to pay the final installment under the contract for the towage of the two ships, and b) the unseaworthiness of the tow.

ISL effected the arrest of the tug and demanded security for its *in rem* claims against it. Smith obtained and filed a bond for $1,000,000 for the release of the tug and filed a Claim of Owner for the Tug. Smith demanded and was granted, after a hearing before this Court, countersecurity from ISL in the amount of $400,000. <u>See</u> Motion Hearing. ISL posted countersecurity in the above amount. The funds were deposited with the registry of the Court on July 9, 2001. <u>See</u> Docket Entry No. 32. On July 23, 2001, Smith filed a Motion for Summary Judgment[1] on ISL's claims of negligence and breach of the warranty of workmanlike service, as well as Smith's counterclaims for breach of the contract.

2.  **Standard for Ruling on a Summary Judgment Motion**

Summary judgment is appropriate when, viewing the evidence and all justifiable inferences in the light most favorable to the nonmoving party, the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled

---

[1] The Court notes that the Motion for Summary Judgment is advanced by Defendant Smith Maritime only, and not by Defendant Smith L.C., *In Personam*, or Defendant the Tug ELSBETH II, her engines, tackle and gear, etc, *In Rem*. These Defendants have, to date, filed no answers. Smith's Motion was superseded by an Amended Motion for Summary Judgment filed August 17, 2001.

2

to judgment as a matter of law." Fed. R.Civ. P. 56 (c). See Hunt v. Cromartie, 526 U.S. 541 (1999). The party making a summary judgment motion has the initial burden of informing the court of the basis for the motion and identifying those portions of the pleadings and discovery documents which demonstrate the absence of a genuine issue of material fact. See Celotex v. Catrett, 477 U.S. 317 (1986); Colson v. Grohman, 174 F.3d 498, 506 (5th Cir. 1999). If the moving party meets this burden, the nonmovant must then designate specific facts showing there is a genuine issue for trial to survive summary judgment. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986); Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994).

3.  **Summary of Facts in the Summary Judgment Record**

In November, 2000, Plaintiff International Shipbreaking, Limited, L.L.C, (ISL) was awarded a contract by the United States Navy to perform services relating to two decommissioned Navy destroyers, the COCHRANE and the STODDERT. The contract between ISL and the United States Navy ( "Navy Contract") provided that ISL was to tow and dismantle the STODDERT and the COCHRANE, dispose of hazardous materials, sell scrap material, and for partnering. ISL was also to procure and maintain insurance on the vessels. ISL entered into a contract with Smith for the towage of the destroyers from Hawaii to the ISL facility in Brownsville. Smith in turn dispatched its tug to Pearl Harbor for this purpose. The tug left Pearl Harbor with the STODDERT and the COCHRANE in tow on January 17, 2001. All crew members rode on the tug, and none on either of the destroyers.

At 6:40 a.m. on February 2, 2001, crew member Paul Torres alerted the crew that the STODDERT looked heavy with a starboard list. By 9:00 a.m., about one-third of the STODDERT's main deck aft was reported to be awash and the bow was rising out of the water. At about 10:00 a.m. the tow wire was cut.

For the next several hours, the tug stood by until sea conditions abated enough for a salvage party to board. At about 2:00 p.m., crew members Paul Torres and Jim Morrison boarded the STODDERT. Captain Latham Smith, in a telephone conversation, ordered the tug's captain to order all hatches opened to allow the STODDERT to sink. Morrison and Torres opened all exterior and some interior hatches. The STODDERT dropped below the water's surface at 12:40 p.m. the following day, February 3. The COCHRANE was delivered to ISL in Brownsville.

4. **ISL's Negligence Claim: Application of *Robins Dry Dock***

As a general principal in maritime law, where a claimant sustains no physical damage to property of its own, no recovery is available for economic losses where a maritime tort is unintentional. See Robins Dry Dock & Repair Co. v. Flint, 275 U.S. 303 (1927). In Robins, a dry dock company contracted with the owners of a steamship to dock and perform repairs on a ship once every six months, during which time anyone wishing to hire the ship would not have access to it. When the dry dock company delayed repairs to the ship, a time charterer[2] asserted a claim of negligence, maintaining that the dry dock company's delay kept the charterer from operating the ship for a period of two weeks. The Court held that the time charterer did not have a significant property interest in the ship which would allow it to state a claim for negligence, since "the contract [between the dry dock company and] the owners imposed no immediate obligation upon the [the dry dock company] to third persons . . . and whether [the dry dock company] performed [the repairs] promptly or with negligent delay was the business of the owners and of nobody else." Robins, 275 U.S. at 308.

---

[2]  A charter for the specified period, rather than for a specific task or voyage; a charter under which the shipowner continues to manage and control the vessel, but the charterer designates the ports of call and the cargo carried. Each party bears the expenses related to its functions and for any damage it causes. – Also termed *catch-time charter*. Black's Law Dictionary, at 229 (7th ed. 1999).

4

The Fifth Circuit has further expanded on the principle that a claimant may not recover absent physical damage to some property in which it has a proprietary interest. Most recently, in <u>Reserve Mooring Inc. v. American Commerical Barge Line L.L.C.</u>, 251 F.3d 1069 (5th Cir. 2001), a mooring operator was precluded from recovering from a barge owner which sank its barge near the mooring facility, causing no damage to the facility but blocking other vessels from mooring there, which in turn caused economic damage to the mooring facility. Similarly, in <u>State of La. ex rel. Guste v. M/V Testbank</u>, 752 F.2d 1019 (5th Cir. 1985) held that plaintiffs who suffered economic damage as a result of a chemical spill caused by the collision of a bulk carrier and a container ship could not recover since they sustained no physical damage to their property.

ISL maintains in its Response to Defendants' (sic) Motion for Summary Judgment (<u>see</u> fn. 1, <u>supra</u>) that the rule of <u>Robins Dry Dock</u> does not apply to this case for three reasons: 1) ISL has alleged an intentional tort or fraud;[3] 2) ISL has a proprietary interest in the STODDERT; and 3) that <u>Robins</u> applies only where no contractual relationship exists between the parties. The Court disagrees.

### a.   ISL's Complaint Does Not Allege Intentional Tort or Fraud

The complaint states that "[t]he Plaintiff's claim is for negligence and breach of the warranty of workmanlike service implied by law in a towing contract with Smith L.C. & Smith Maritime . . . . During the voyage, the USS STODDERT was lost and/or intentionally scuttled in the Pacific Ocean due to the negligence and breach of warranty of workmanlike service provided by the Defendants, her tug and crew. Further and in the alternative, defendants were negligent and breached the warranty of workmanlike service in

---

[3]   The Court notes that Fed. R. Civ. P. 9(b) requires that fraud be pleaded with particularity. Although ISL's Response to Defendants' (sic) Motion for Summary Judgment (<u>see</u> fn. 1, <u>supra</u>) states that "fraud and an intentional tort by the Defendants have been alleged [in the Original Complaint]," the Complaint does not meet the heightened pleading requirement. ISL has submitted an Opposed Motion for Leave to Amend ISL's Original Complaint in order to allege a claim of fraud. This motion is treated in a separate order.

5

abandoning an endangered tow (USS STODDERT) without using all reasonable efforts to salvage her." See Complaint at 1-2. Federal Rule of Civil Procedure 8(e)(1) states that "[e]ach averment of a pleading shall be simple, concise and direct." A widely regarded authority comments: "This portion of [Fed. R. Civ. P.] 8 indicates the objective of the rule is to avoid technicalities and to require that the pleading discharge the function of giving the opposing party fair notice of the nature and basis or grounds of the claim and a general indication of the type of litigation involved. . . ." 5 Wright & Miller, Federal Practice and Procedure § 1215 at 137-38 (2d ed. 1990). "Notice pleading means, first of all, that plaintiff must give fair notice of what his claim is. The pleading must *apprise the defendant of the precise nature of the claim*, and the allegations of the complaint must be sufficiently clear and detailed to at least set forth the essentials." Higganbotham v. Mobil Oil Corp., 302 F. Supp. 857, 861 (E.D. La. 1969); rev'd on other grounds, 436 F.2d 8 (5th Cir. 1970) (citations omitted) (emphasis added). Considering the above, the Court cannot read this portion of the Complaint as apprising Smith of any tort claim other than negligence.

    b.    **ISL Had No Ownership Interest in the STODDERT**

A proprietary interest is "[t]he interest held by a property owner together with all appurtenant rights, such a stockholder's right to vote the shares." See Black's Law Dictionary at 816 (7th ed. 1999). The STODDERT was at all times the property of the United States Navy, and was not at any time the property of ISL. Moreover, ISL's Co-Chief Operating Officer, Robert Berry, testified that he was aware that ISL never owned the STODDERT. See Transcript of Hearing of May 14, 2001 at 24. ISL's contract with the Navy was for certain services: towing, dismantling, and selling scrap. The Navy's contract with ISL directed the actions ISL was to take regarding the sale of the scrap, including reporting the results in a Cost Data Report. See Navy Contract Section C1-5. There is no evidence in the Summary Judgment record that ISL assumed any express ownership interest in the STODDERT under its services contract with the Navy.

6

The question then becomes whether some other type of non-ownership proprietary interest applies. ISL likens its interest to that of the bareboat charterer[4] in Bosnor S.A. de C.V. v. Tug L.A. Barrios, 796 F.2d 776 (5th Cir. 1986). In that case, Reyna, a freight forwarder, contracted with Delmar for a bareboat sub-charter of a barge[5] and a time sub-charter of a tug. When cargo was lost off the barge, the court held Reyna to have a sufficient proprietary interest in the barge to state a cause of action for Reyna's economic loss against Walton, the stevedoring company which loaded the cargo onto the barge, even though Reyna did not own the barge or cargo. The Court, noting the Robins court's suggestion that a bareboat charterer has a proprietary interest in the vessel chartered,[6] created a narrow exception to the normal rule: "[a] bareboat charterer stands in the shoes of the owner of the vessel for the duration of the charter and is responsible for managing and maintaining the ship; the shipowner merely retains a right of reversion. Additionally, if the vessel is damaged, the charterer is ordinarily responsible to the shipowner for the damage." Id. at 783 citing Gilmore & Black, The Law of Admiralty §§ 4-20–4-24 (2d ed. 1975).

ISL argues essentially that its contractual relationship with the Navy is analogous to that of the bareboat charterer. ISL asserts that it has a direct relationship to the STODDERT, because ISL is not a "stranger" to the contract like the claimants in Reserve

---

[4] Black's Law Dictionary defines a bareboat charter as: A charter under which the shipowner provides the ship, and the charterer provides the personnel, insurance, and other materials necessary to operate it. --Also termed *demise charter*. Id., at 228 (7th.ed. 1999).

[5] Delmar bareboat chartered the barge from its owners, Cheramie Bo-Truc #7, Inc., and time chartered the tug from its owners, Slatco. Delmar then subchartered both to Reyna.

[6] The Bosnor Court acknowledged an exception suggested by Robins for bareboat or demise charterers: "The district court allowed recovery on the ground that the respondents had a 'property right' in the vessel, *although it is not argued that there was a demise.*" Bosnor, at 783 citing Robins, at 309 (emphasis added). The Bosnor court read this language as an indication of the Robins court's belief that a demise charter would have a stronger case for asserting a property right.

7

and Testbank. See Response to Defendants' (sic) Motion for Summary Judgment at 10 (see fn. 1, supra). The question becomes whether the relationship between ISL and the STODDERT is more analogous to that of the bareboat charterer or that of the time charterer to their respective vessels. The Court finds that ISL's relationship with the STODDERT is closer to that of the time charterer.

The bareboat charterer fits into the narrow category of non-owners with a proprietary interest because it assumes the role of temporary owner of the vessel, and is as ultimately responsible for the vessel for the duration of the voyage, just as the actual owner would be. In contrast, the time charterer at no time manages the vessel, controlling only the destination and designating what type of cargo, if any, will be carried. The ship's owner is responsible for all other matters relating to the time charter voyage.

Under its contract with the Navy, ISL was to provide the personnel (see Navy Contract at 3), insurance (see Navy contract at 15), and other materials. However, the terms of the Navy contract provided that the government would indemnify ISL "against liabilities (including expenses incidental thereto) to third persons which . . . would have been covered by . . . Collision Liability and Protection and Indemnity Liabilities Insurance,[7] and which are not compensated by insurance or otherwise, provided such liabilities are represented by final judgment or by settlements approved in writing by the Department." (See Navy Contract at 15). Because the Navy assumed financial responsibility for these liabilities, ISL cannot be said to have assumed the role of temporary owner of the STODDERT for the duration of the voyage, and therefore had insufficient proprietary

---

[7] "Traditionally, hull marine insurance policies covered collision liability and damage to the ship and machinery on board, but not liability for damage to its cargo. This deficit in marine insurance was filled by the creation of mutual protection and indemnity clubs [or policies], which insured liability for personal injury and cargo loss aboard the vessels." Traveler's Indemnity Co. v. Calvert Fire Ins. Co., 798 F.2d 826 (5th Cir. 1986).

interest in it to state a claim for economic loss. Therefore, on the issue of negligence in the loss of the STODDART, summary judgment is **GRANTED** in favor of the Defendant.[8]

5. <u>**ISL's Breach of Warranty of Workmanlike Service Claim**</u>

As a matter of general maritime contract law, a warranty of workmanlike service is implied in maritime contracts. <u>Stevens v. East-West Towing Co., Inc.</u>, 649 F.2d 1104 (5th Cir. 1981); <u>Cargill Inc. v. C.& P. Towing Co., Inc.</u>, 1991 AMC 101 (E.D.Va. 1990).

The contract between Smith and ISL states:

> (B) The following shall be for the sole account of the Hirer [ISL] without any recourse to the Tug Owner [Smith], his servants or agents, whether or not the same is due to breach of contract, negligence or any fault on the part of the Tugowner, his servants or agents:
> (i) loss or damage of whatsoever nature, howsoever caused to or sustained by the tow
>
> <u>See</u> Contract <u>Id.</u> Part II 18(2)(b).

ISL asserts that Smith is liable for the loss of the STODDERT because Smith breached a warranty of workmanlike service which is implied despite this explicit contract provision. The Court will here decide whether the above-cited contract clause is valid.[9]

---

[8] On these grounds, we also dispose of ISL's claim that the contract with Smith was enough to give it a proprietary interest in the STODDERT. <u>See</u> Plaintiff's Response to Defendants' (sic) Motion for Final Summary Judgment at 9 (<u>see</u> fn.1, <u>supra</u>). ISL argues that, like Reyna, it was a party to a contract and therefore has a proprietary interest in the lost item. The Court disagrees. ISL's contract with Smith does not in any way create an interest which would allow ISL to claim that the STODDERT was somehow effectively its property. ISL's contract with the Navy was a service contract regarding property it did not own and was not ultimately responsible for. If any contract were to create such an interest, it would be the contract between ISL and the Navy, which, as discussed above, did not do so.

[9] ISL, in its Response to Smith's Reply to ISL's Response to Smith's Motion for Final Summary Judgment, cites <u>Bisso v. Inland Waterways Corp.</u>, 349 U.S. 85 (1955) as standing for the proposition that "exculpatory provisions in towing contracts are invalid as a matter of the general Maritime law." <u>See</u> ISL Response at 7. However, it is important to note that <u>Bisso</u> deals with a provision purporting to insulate the defendant from

The Court finds the Fifth Circuit's decision in <u>Employers Ins. Of Wausau v. Suwannee River Spa Lines, Inc.</u>, 866 F.2d 752 (5th Cir. 1989) persuasive. In <u>Suwannee</u>, the owner of a vessel brought a products liability claim against the builder and construction supervisor of the vessel for economic losses sustained when the vessel sank. Because no warranties are implied in contracts for services (as they would be under the U.C.C.), the court considered whether a warranty is implied in a commercial services contract. The court held that a clause in the construction contract limiting the owner's recovery to the cost of repair or replacement of guarantee deficiencies was valid even though the vessel sank, making repair or replacement of such deficiencies impossible. The court reasoned that the risk of damage was understood by the (sophisticated) commercial parties who had allocated the risk to the owner; therefore no tort-like implied extracontractual warranties were necessary. The court stated:

> In a commercial context . . . parties are generally capable of allocating the risk of defective performance of a contract for services in the same way that they can allocate the risk of a defect in the product itself. While the commercial purchaser of services will not have the benefit of implied warranties imposed by the U.C.C., it may bargain– as mentioned above– for an express warranty of workmanlike performance or for an express warranty defined in terms of the quality of the finished product. The contract price would then turn in part on whether the provider of services is willing to guarantee that its performance of the contract will be satisfactory.
> <u>Employers Ins. of Wausau v. Suwannee River Spa Lines, Inc.</u>, 866 F.2d 752, 764-65 (5th Cir. 1989) (some citations omitted).

In reaching this conclusion, the <u>Suwannee</u> court discussed <u>PPG Industries Inc., v. Sunstrand Corp</u>, 681 F. Supp. 287 (W.D. Penn. 1988), a non-maritime case involving a dispute over an engineering agreement. The <u>PPG</u> court reasoned that "the special non-

---

*negligence*. Because ISL does not state a cognizable claim of negligence, the fact that such a contractual provision would be unenforceable in a cause of action for *negligence* is irrelevant where ISL is suing for breach of a warranty implied in the *contract*. It is possible that the express provision has validly insulated Smith from the implied warranty of workmanlike service as a matter of maritime *contract* law. This is the question the Court examines in the section above.

10

contractual duties of professionals such as doctors, lawyers, and architects enforced by tort law were created in part to make up for the lack of sophistication and bargaining power of those seeking these professional services." Id. at 290. The Suwannee court also examined the Supreme Court's East River case, which noted that in a commercial context, disparities in the bargaining power of the parties which would justify the imposition of such extracontractual duties rarely exist. See East River S.S. Corp. v. Transamerica Delaval, Inc., 476 U.S. 858, 872-73 (1986). The Suwannee court concluded that this is equally true "where the parties to a contract for services are sophisticated commercial entities, 'adept at negotiating complex agreements and allocating risks between them.'" See Suwannee, 866 F.2d at 765, quoting PPG, 681 F. Supp. at 290.

Similarly, in the contract between Smith and ISL, where both parties are clearly commercial entities, no implied warranty of workmanlike service will control the contract where express provisions explicitly provide for the allocation of risk. Therefore, finding as the Court does that the warranty of workmanlike service implied in maritime contracts does not control a contract between commercial entities which expressly provides that the risk be otherwise allocated, Summary Judgment for the Defendant on ISL's breach of warranty claim is **GRANTED**.

6. **Smith's Breach of Contract Claim**

Smith prays for summary judgment on its counterclaim for the unpaid installment of the contract.[10] As Smith correctly points, out, the contract between Smith and ISL provides for payment for the two destroyers "lost or not lost". See Contract Part II Clause 2(c). Because the Court finds that the implied warranty of workmanlike service is superseded by the express contract provision, Smith's prayer for summary judgment is **GRANTED**. See Wausau, 866 F.2d at 764-65 (5th Cir. 1989).

---

[10] A hearing to for the purpose of determining damages will be set at a later date, as the amount appears from the record to be in dispute. See Transcript of Hearing of May 14, 2001, Testimony of Robert Berry at 36-37.

11

Smith's counterclaim states that ISL also breached the Contract by providing an unseaworthy tow.[11] ISL has created an issue of fact through the affidavit of its Co-Chief Financial Officer CEO Robert Berry, who stated that contrary to the affidavit of Latham Smith, he never ordered the scuttling of the STODDERT.[12] ISL has therefore created an issue of material fact with regard to whether the tow was seaworthy which Smith has not rebutted, as is its burden.  See Celotex, 477 U.S. at 323.  The Court finds that because material issues of fact remain regarding whether the COCHRANE was unseaworthy summary judgment on that issue is inappropriate and is therefore **DENIED**.

DONE at Brownsville, Texas, this 21st day of September 2001.

Hilda G. Tagle

United States District Judge

---

[11] The Court notes that although the seaworthiness of a tow is also generally implied in maritime contracts, see King Fisher v. NP Sunbonnet, 724 F.2d 1181 (5th Cir. 1984), the parties here took the time to insert an express contract provision requiring that the tow be seaworthy.  See Contract at Part II (12).

[12] Fed. R. Civ. P. 56(e) states, "Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein."  Paul Torres' affidavit does not affirmatively set forth that he is competent to testify to the proper procedure of a tug and tow operation.  Moreover, he does not purport to have personal knowledge of the events leading up to the alleged collision between the two tows.  Therefore, Torres' affidavit will not be considered by the Court.